```
 1                 UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2
     UNITED STATES OF AMERICA,      )  Criminal Action
 3                                  )  No. 1:22-cr-00028-APM
                        Plaintiff,  )
 4                                  )  Jury Voir Dire - Day 3
     vs.                            )  (afternoon session)
 5                                  )
     SANDRA R. PARKER, et al.       )  Washington, D.C.
 6                                  )  February 7, 2023
                        Defendants. )  Time:  1:40 p.m.
 7   _____

 8           Transcript of Jury Voir Dire - Day 3
                        Held Before
 9            The Honorable Amit P. Mehta
               United States District Judge
10   _____

11              A P P E A R A N C E S

12   For the Government:     Kathryn L. Rakoczy
                             Troy A. Edwards, Jr.
13                           UNITED STATES ATTORNEY'S OFFICE
                             FOR THE DISTRICT OF COLUMBIA
14                           601 D Street, Northwest
                             Washington, D.C. 20579
15
     For the Defendant Sandra Ruth Parker:
16                           John L. Machado
                             LAW OFFICE OF JOHN MACHADO
17                           503 D Street, Northwest, Suite 310
                             Washington, D.C. 20001
18
     For the Defendant Bennie Alvin Parker:
19   (via Zoom)              Stephen F. Brennwald
                             BRENNWALD & ROBERTSON, LLP
20                           922 Pennsylvania Avenue, Southeast
                             Washington, D.C. 20003
21
     For the Defendant Laura Steele:
22                           Peter A. Cooper
                             PETER A. COOPER
23                           400 5th Street, Northwest, Suite 350
                             Washington, D.C. 20001
24

25
```

```
1            A P P E A R A N C E S, continued

2     For the Defendant Connie Meggs:
                              Stanley E. Woodward, Jr.
3                             BRAND WOODWARD LAW
                              1808 Park Road, Northwest
4                             Washington, D.C. 20010

5                             Juli Zsuzsa Haller
                              LAW OFFICES OF JULIA HALLER
6                             601 Pennsylvania Avenue, Northwest
                              Washington, D.C. 20036

7
      For the Defendant William Isaacs:
8                             Eugene J. Rossi
                              CARLTON FIELDS, P.A.
9                             1025 Thomas Jefferson Street, Northwest
                              Washington, D.C. 20007

10
                              Charles Greene
11                            LAW OFFICE OF CHARLES M. GREENE, P.A.
                              55 East Pine Street
12                            Orlando, Florida 32801

13    For the Defendant Michael L. Greene:
                              Britt Redden
14                            REDDEN LAW, PLLC
                              3300 Oak Lawn Avenue, Suite 700
15                            Dallas, Texas 75219

16    _____

      Stenographic Official Court Reporter:
17                            Nancy J. Meyer
                              Registered Diplomate Reporter
18                            Certified Realtime Reporter
                              333 Constitution Avenue, Northwest
19                            Washington, D.C. 20001
                              202-354-3118
20
      Proceedings recorded by mechanical stenography; transcript
21    produced by computer-aided transcription.

22

23

24

25
```

1                    P R O C E E D I N G S

2           (REPORTER'S NOTE:  The a.m. portion of the trial was

3     reported by William P. Zaremba, who prepared said transcript.)

4           (Proceedings held outside of the jury venire.)

5           MR. GREENE:  Judge, a motion, before we begin.  For

6     the record, I want to note that the jury selection has taken

7     place during a particularly prejudicial time when there's

8     scaffolding on the courtroom, which the jury can see from the

9     cafeteria.  There's armed guards.  There's a sense of almost

10    danger.  It's akin to almost --

11          THE COURT:  Scaffolding on the courthouse, or you

12    mean on the Capitol?

13          MR. GREENE:  The Capitol.  I'm sorry.  You can see

14    the Capitol from the window at the courthouse where the jury is

15    sitting.  So both the timing of the trial and the location are

16    particularly prejudicial.

17          So for the record, Judge, we renew our motion to

18    continue, renew our motion to change venue.  We also object to

19    the jury venire as being insufficient given the widespread

20    prejudice that is explicit in their jury questionnaires to be

21    insufficient to find a fair juror -- jury.

22          THE COURT:  Okay.  And the objections are noted for

23    the record.

24          MR. ROSSI:  Thank you, Your Honor.

25          THE COURT:  And I guess I should make clear for the

679

1    record that the reason there is scaffolding at the Capitol

2    is -- there's been scaffolding at the Capitol for some time

3    because of construction being done on the west side of the

4    Capitol.

5         Insofar as the fact that there are fencings --

6    fencing -- there's fencing right now on the Capitol Grounds is

7    because tonight is the State of the Union address, which

8    presumably means it will go down tomorrow.  It has not been up,

9    I believe, before yesterday or the day before.

10        So those facts alone are not a problem.  And, frankly,

11   the jury selection process is proceeding as one would hope it

12   would we have eliminated a number of people because of bias

13   concerns, and those who remain, I'm confident, can be fair and

14   impartial.

15        MR. ROSSI:  Thank you, Your Honor.

16        THE COURT:  So over the break I asked of the

17   government whether they would agree to excuse Juror 1680, who

18   was on line 113.  This is a person who, based on her

19   questionnaire, works for the State Department; does a fair

20   amount of domestic counterterrorism work as is obvious from her

21   questionnaire; a great deal of familiarity with the events of

22   January 6th; has worked on January 6th-related work.  So the

23   government's agreed to not oppose striking her for cause.

24        So 1680, which is on line 113, is stricken for cause.

25        MR. MACHADO:  Your Honor.

1           THE COURT:  Yep.

2           MR. MACHADO:  How many jurors does the Court have

3    qualified?  We're trying to compare some numbers --

4           THE COURT:  I have 29 qualified.

5           MR. MACHADO:  Okay.

6           THE COURT:  And we only have 9, unfortunately, who

7    are here this afternoon, even though we called in 15.  So at

8    least as of now, the following jurors are not present:  the

9    juror on line 96 at -- who was 2355; juror on line 100, who is

10   1381; the juror on line 101, who is 2238; juror on line 103,

11   who is 2564; juror on line 106, who is 1298; and juror on

12   line 107, who is 10439 [sic].

13          So we will go through who's available and who's present,

14   and we will try to get these folks in tomorrow.

15          Ready when you are.

16          (Proceedings held in the presence of the jury

17   venire.)

18          THE COURT:  All right.  Good afternoon.  Please be

19   seated, everyone.

20          All right.  Ladies and gentlemen, good afternoon.  My

21   name is Judge Amit Mehta, and welcome to the U.S. District

22   Court for the District of Columbia.  Thank you all for being

23   here.

24          You are here as potential jurors in the case of United

25   States v. Sandra Ruth Parker, Bennie Alvin Parker, Laura

1    Steele, Connie Meggs, William Isaacs, and Michael Greene.

2         Before we get started, I want to extend to you my

3    gratitude for making yourselves available for jury service

4    today.  As you know, in our system of justice, juries and

5    jurors play a critical role.  Indeed, it's a fundamental

6    feature of our democracy to have ordinary citizens serve as

7    decision-makers in our courts of law.  So you are -- so you are

8    performing an important duty today.  So let me thank you in

9    advance for your service.

10        So before we proceed, I'm going ask all of you to please

11   stand once more and raise your right hands because we need to

12   have you sworn in.

13             (Oath administered.)

14             THE JURY VENIRE:  (Collective affirmation.)

15             THE COURTROOM DEPUTY:  Thank you.

16             THE COURT:  All right.  Please be seated, everybody.

17        So for those of you who have gone through jury selection

18   before, today will be both different and familiar.  It will be

19   different in the sense that usually when jurors are being

20   considered for service, we will start the process by asking a

21   series of questions to assist us in determining whether a juror

22   can be fair and impartial.  In this case, however, we will not

23   start out the process with questions because you came in a few

24   weeks ago and completed a juror questionnaire that the parties

25   proposed and I approved.  So that part of the process is now

 1      complete.

 2           What will feel familiar and why you are here today is to

 3      ask each of you additional questions based upon your responses

 4      to the juror questionnaire.  The way that will work is as

 5      follows:  There are just shy of ten of you here this afternoon.

 6      I have -- after I complete these initials remarks and

 7      instructions, the courtroom deputy will escort all of you to a

 8      different courtroom.  We will then call each of you back in

 9      individually into this courtroom one at a time for additional

10      questions from me and from the parties.

11           Now, the questions we may -- we will be asking you may

12      touch on matters that are personal to you.  Rest assured, it is

13      not my intention or desire, nor is it the intention or desire

14      of the lawyers, to invade your privacy or embarrass you.  Our

15      only wish is to select the fairest, most impartial jury

16      possible so that the parties can be assured that jurors

17      selected will not be biased or prejudge the case and will

18      return a verdict based only on the law and the evidence.

19           What'll also feel familiar about this jury selection

20      process is that you will spend a little bit of time waiting

21      this afternoon.  I promise for those of who you are -- will

22      have to wait, we'll try to keep your wait time to a minimum,

23      but some wait time is unavoidable.

24           While you're waiting during the jury selection process,

25      please feel free, if you wish, to talk quietly amongst

 1    yourselves or to read a book, magazine, or whatever you have

 2    brought with you.  The courtroom is Wi-Fi enabled so you should

 3    feel free to use your phones or other mobile devices to read

 4    online or surf the internet.  I would ask, however, that you

 5    place all of your devices on silent mode.

 6         Now, this is very important.  While you may use your

 7    mobile devices, you should not at any point during the jury

 8    selection process -- and this will be true afterwards, if you

 9    are selected -- communicate with anyone about this case or do

10    any online research about the case or the parties.  That means

11    do not email, text, tweet, or Snapchat a friend or family

12    member or your followers about the case.  No posting on

13    Facebook or Instagram that you are a potential juror in the

14    case.

15         Do not get online and start doing research about the

16    case or the parties.

17         We also asked you as part of the questionnaire to avoid

18    media coverage about the case, and that includes social media.

19    That instruction continues to apply and is perhaps even more

20    important now that the jury selection process has started.  You

21    should avoid any newspaper, television, or radio news;

22    podcasts; and, importantly, any social media about the case or

23    the events of January the 6th.

24         That means avoiding not only news stories in *The*

25    *Washington Post* or on the TV news, but also journalists or

1    others who are tweeting about this case or posting about it on

2    other social media sites.

3         So if you follow journalists or others who cover or

4    comment on the events of January 6th, I'm going to instruct you

5    to avoid reading their tweets or any other social media

6    postings until you are fully dismissed from jury service in

7    this case.

8         I'll also ask you to turn off any push notifications

9    that you receive on your mobile devices from any news

10   organization.

11        The reason for these restrictions is simple.  If you are

12   selected as a juror, you will be sworn to decide this case

13   based only on the evidence that is presented at trial, and the

14   law as to which you will receive instructions.  You will be

15   strictly forbidden to consider anything you might have read or

16   heard about the case from news sources or from social media or

17   from other people.

18        If at any point during the jury selection process you

19   happen to come across news or commentary regarding this case,

20   please immediately avert your eyes or ears, and please alert

21   the courtroom deputy so he can advise me.  A juror who violates

22   these restrictions jeopardizes the jury selection process and

23   possibly the trial itself, which could require the entire

24   process to start over.

25        Also, during this jury selection process, if anyone

1    attempts to communicate with you about this case, please notify

2    the courtroom deputy or a court security officer immediately.

3    The lawyers here are under strict instructions not to speak

4    with any jurors during the jury selection process.  So if you

5    happen to see them in the courthouse and they walk the other

6    direction, they are not being rude.  They are simply following

7    my instructions.

8         I also have issued an order to members of the media and

9    the public not to approach any of you about this case during

10   jury selection.  Still, despite these instructions, if you are

11   approached about this case by anyone, please notify the

12   courtroom deputy or a court security officer.

13        One other feature of the jury selection process today

14   will be different.  In most criminal cases, we complete the

15   jury selection process in one day.  That usually means that,

16   unless you are immediately excused, we ask you to remain in the

17   courthouse until near the end of the day when we select a final

18   jury.  In this case, however, we will not complete the jury

19   selection process today.  So after we have finished asking you

20   additional questions, you will be done for the day.  You will

21   be given instructions about further jury service in this case

22   after your individual questioning is completed.  Do not leave

23   the courthouse until you have received additional instructions

24   by a member of the court staff.

25        If you are excused from further service today, we will

```
1    let you know soon after your questioning is concluded.  If you
2    are excused, you will be relieved of the restrictions I
3    discussed earlier.  If you are not excused from service,
4    however, and we ask you to return, it is critically important
5    that you follow my earlier instructions; that is, do not
6    communicate with anyone about the case or do not read or listen
7    to anything about the case, and do no independent research
8    about the case, and do not watch or read about any other
9    proceedings that might be taking place about the case or
10   January 6th.
11        Following these instructions is critical to ensuring a
12   process that will result in a fair and impartial jury to hear
13   this case.
14        Finally, as you can see, everyone in the courtroom is
15   wearing a mask, except for me while I am speaking.  Although
16   masking is required in -- excuse me -- not required in the
17   public spaces in this courthouse, I will require masking during
18   the trial.  The only exception to that rule will be for lawyers
19   who are speaking and witnesses who are testifying.  You may
20   be asking yourself, well, why do we need to mask?  Well, there
21   are two reasons.  First is none of you are here today
22   voluntarily.  You are required to be here.  So unlike going to
23   a grocery store or a restaurant or a concert, you don't have
24   the choice to avoid this location or a person who might choose
25   not to wear a mask.
```

1          The second reason for masking is to avoid a COVID

2     outbreak that might disrupt this trial.  As you know, the trial

3     is scheduled to last for more than a month, possibly six weeks

4     or more.

5          If one or more people inside the courtroom, including

6     jurors, tests positive for COVID, that could delay the trial

7     proceedings; that is something I would rather avoid.  Masking

8     will, hopefully, prevent any COVID-related trial delays.

9          All right.  Before you are taken to the other courtroom,

10    you-all will recall that with your jury questionnaire -- or

11    juror questionnaire there was a list of names that we attached

12    to it for you to identify, if you recognized any of the names

13    or knew any of the people on that list.  Those were people who

14    may testify at trial or whose names may be mentioned at trial.

15    The parties have some additional names.  So I'll ask for them

16    to identify those names.  And if any of you recognize these new

17    names, please do tell us when we call you in for individual

18    questioning.

19         Ms. Rakoczy.

20         MS. RAKOCZY:  Thank you, Your Honor.

21         Good afternoon, ladies and gentlemen.  The government

22    has five additional names to read to you.  You may hear from

23    the following witnesses during the government's case in chief:

24    From the United States Capitol Police, Captain

25    Jessica Baboulis, B-a-b-o-u-l-i-s; and Sergeant

1    David VanBenschoten, V-a-n-B-e-n-s-c-h-o-t-e-n.

2          From the Federal Bureau of Investigation, retired

3    Special Agent Norman Kuylen, K-u-y-l-e-n; Special Agent

4    Richard Maier; and Special Agent Matthew Oliver.

5          Thank you.

6          THE COURT:  Ms. Haller.

7          MS. HALLER:  Thank you, Your Honor.

8          And on behalf of Defendant Meggs and some of the other

9    defendants, we will -- we may also call an agent by the name of

10   Jennifer Moore and an FBI agent by the name of Kathryn --

11   excuse me -- Kathryn Cain.  And then we may also call a woman

12   named Patricia Gee, G-e-e.  She's from Florida.

13         Thank you.

14         MR. ROSSI:  Good afternoon, Your Honor.

15         THE COURT:  Mr. Rossi.

16         MR. ROSSI:  Good afternoon, Jurors.  Thank you for

17   your patience.

18         I'm Gene Rossi, and my co-counsel is Chuck Greene.  And

19   we represent William Isaacs, who is sitting right there.

20         We have a few more witnesses.  Jeff Morelock; Agent

21   Katie Hill; Alondra Propes, P-r-o-p-e-s; Luis Hallon; Ms. Traci

22   Isaacs; Ms. Lesley Gray; Greg McWhirter; Elizabeth Beth

23   Santoro; Dr. Laurie Sperry; Agent Bryon Cody; and Task Force

24   Officer Paul Ura.

25         Thank you so much.

```
 1              THE COURT:  All right.  Thank you, Mr. Rossi.

 2          All right.  So with that, ladies and gentlemen,

 3    Mr. Douyon will escort you to the other courtroom, and we will

 4    then call you in for some additional questioning.  We look

 5    forward to speaking with you.  Thank you very much.

 6              (Proceedings held outside the presence of the jury

 7    venire.)

 8              (REPORTER'S NOTE:  Juror 1353 enters.)

 9              THE COURTROOM DEPUTY:  Your Honor, this is Juror

10    No. 1353.

11              THE PROSPECTIVE JUROR:  Can I get my reading glasses

12    out so I can read?

13              THE COURT:  Yes, of course.

14              THE PROSPECTIVE JUROR:  Thank you.

15              THE COURT:  Hi.  How are you?

16              THE PROSPECTIVE JUROR:  I'm good.

17          How are you?

18              THE COURT:  Good.  Thank you for being with us this

19    afternoon.

20          You are Juror 1353?

21              THE PROSPECTIVE JUROR:  Yes.

22              THE COURT:  Feel free to remove your mask if you are

23    comfortable doing so.

24          Your juror questionnaire is in front of you; so I'll ask

25    you to pick that up and turn first to page 12.
```

1        We asked you in Question 53 whether you've read, seen,

2 or heard anything about the Oath Keepers organization or any

3 judicial proceedings involving the organization or any of its

4 members.  You answered that question yes.  What can you tell us

5 about what you have seen, read, or heard about the Oath

6 Keepers?

7        THE PROSPECTIVE JUROR:  I believe that the

8 Oath Keepers are a far right-wing organization that generally

9 supported President Trump, did not agree with the outcome of

10 the election, was involved in January 6th.  In some cases,

11 might endorse the use of violence to support their cause.

12        THE COURT:  Okay.  So let's start with a word that

13 you used to describe them.  That was right wing.  What do you

14 mean by that?

15        THE PROSPECTIVE JUROR:  Politically conservative.

16        THE COURT:  Okay.  Do you mean anything else other

17 than politically conservative by that term?

18        THE PROSPECTIVE JUROR:  I mean, I might say

19 they're -- are in some cases extremists.

20        THE COURT:  Okay.  And extremists in what sense?

21        THE PROSPECTIVE JUROR:  Well, I guess if you're

22 willing to use violence to support your cause, that's extreme.

23 I think to a certain extent some Oath Keepers have been

24 identified with -- with a racist ideology.

25        THE COURT:  Okay.  So let me ask you the following:

1    You also said that they -- you have some understanding of their

2    involvement on January 6th.  Do you have any more specific

3    understanding of what they may have done or members of the

4    group may have done on January 6th?

5           THE PROSPECTIVE JUROR:  I don't know if it's sort of

6    reliably specific.  I feel like I have heard about,

7    potentially, some Oath Keepers using social media to encourage

8    their followers to come to the Capitol on January 6th and to --

9    and to protest, but I think that's the extent of it.

10          THE COURT:  Do you have any understanding of whether

11   the Oath Keepers -- any member of the Oath Keepers engaged in

12   violent behavior?  Do you have any sort of underlying belief as

13   to whether there was any violent behavior by the Oath Keepers

14   on January 6th?

15          THE PROSPECTIVE JUROR:  I know that Oath Keepers have

16   been associated with violent activity on the 6th.  I don't know

17   personally if that has been shown to be accurate.

18          THE COURT:  Okay.  And so you've read some things

19   and -- and learned some things about the organization, which

20   may or may not be true.  The organization is not on trial.

21   These individual defendants are.  Do you think you would be

22   able to set aside things that you have just told us and

23   evaluate the evidence fairly and impartially as to each of

24   these defendants?

25          THE PROSPECTIVE JUROR:  I do.

```
 1              THE COURT:  Any doubt in your mind about that?

 2              THE PROSPECTIVE JUROR:  No.  My -- my job is to

 3    assess evidence and to make sure that the facts support my

 4    findings.  So I -- I think I can be impartial in that sense.

 5              THE COURT:  Okay.  What kind of work do you do,

 6    ma'am?

 7              THE PROSPECTIVE JUROR:  I work for the Government

 8    Accountability Office.

 9              THE COURT:  Okay.  You also answered yes to

10    Question 55; that you had read, seen, or heard some things

11    about Stewart Rhodes, Kelly Meggs, Jessica Watkins, and some

12    others listed there.  Can you tell us which of those people you

13    have read, seen, or heard anything about, and what that's --

14              THE PROSPECTIVE JUROR:  The -- the only individual

15    from that list that I had heard anything about was

16    Stewart Rhodes, who, I believe, is closely associated with the

17    Oath Keepers; and has a social media presence; and has some

18    relationship to January 6th, but I'm not sure what the specific

19    relationship is.

20              THE COURT:  Okay.  And do you have any sense of what

21    his connection is to the organization?

22              THE PROSPECTIVE JUROR:  I think -- it's possible that

23    he started the organization, but I'm not sure.

24              THE COURT:  Not sure.  Okay.  So you have -- you've

25    heard the name, but perhaps not real specifics about either
```

```
 1    potential conduct on January 6th or association with the -- the

 2    organization?

 3              THE PROSPECTIVE JUROR:  That's correct.  It's like

 4    I've heard of it at some point, but I don't remember.

 5              THE COURT:  Fair enough.  Fair enough.

 6         While we are on the page, page 12, I'll ask you to just

 7    move up the page there to Question 50 and 51; and we were

 8    trying to get a sense of how closely you followed the

 9    January 6th committee hearings.  Can you tell us how closely

10    you followed those hearings.

11              THE PROSPECTIVE JUROR:  I watched the one in its

12    entirety that had the woman -- whose name I'm forgetting --

13    with the white blazer.  She had worked in the Trump White House

14    and -- her name is just escaping me.  So I watched that one in

15    its entirety.  And, aside from that, I would say that, you

16    know, if I watched the evening news or read in the paper, I

17    would sort of read summary descriptions of the hearings, but

18    that's the only one that I sort of watched from beginning to

19    end.

20              THE COURT:  Okay.  And based on your exposure to

21    those hearings, do you have any recollection of any discussions

22    about Oath Keepers during those hearings?

23              THE PROSPECTIVE JUROR:  Sure.  I mean, I think there

24    was a question about whether the Oath Keeper helped incite some

25    of the violence.
```

1          THE COURT:  Okay.  And what do you recall the -- the

2    discussion to be, and what was said about that issue?

3          THE PROSPECTIVE JUROR:  Just that there was certainly

4    social media involvement; that there are -- if I recall

5    correctly, were some allegations, at least, that members of the

6    Oath Keepers might have been in communication with some of

7    President Trump's colleagues or friends; and that there might

8    have been some coordination to actually proceed with the events

9    of January 6th.

10         THE COURT:  Gotcha.

11         So the same question I asked you earlier in terms of

12   things that you've read, seen, or heard, again, with the

13   January 6th committee hearings.  Would you be able to set that

14   aside what you heard in connection with those hearings and,

15   again, focus only on the evidence in the case and apply it to

16   these defendants individually?

17         THE PROSPECTIVE JUROR:  Yes.

18         THE COURT:  Okay.  Could you please turn, then, to

19   Question 7.

20         THE PROSPECTIVE JUROR:  Question 7?

21         THE COURT:  I'm sorry.  Page 7.

22         THE PROSPECTIVE JUROR:  Yeah.

23         THE COURT:  Starting with Question 15.  We asked you

24   whether you have a close friend or family member who's ever

25   been employed at the U.S. Capitol Building.

1          THE PROSPECTIVE JUROR:  Yes.  And I had a -- I had a

2     clarifying question on that.  Did that mean the actual Capitol

3     Building or the Capitol complex to include, like, House and

4     Senate office buildings?

5          THE COURT:  We'd include that in the definition.

6     Right.  The Capitol complex, yes.

7          THE PROSPECTIVE JUROR:  Okay.  Yes.  So I worked for

8     the Senate Health, Education, Labor and Pensions public health

9     subcommittee back in 2001, 2002.  My brother worked for

10    Senator Durbin.  And I guess that's the answer, yes.

11         THE COURT:  And does he presently work for Senator

12    Durbin?

13         THE PROSPECTIVE JUROR:  No.

14         THE COURT:  And how long ago were you employed -- I

15    think you may have said it.  But can you repeat how long ago it

16    was you were an employee on the Hill.

17         THE PROSPECTIVE JUROR:  Up until 2002.

18         THE COURT:  Up until 2002.

19    Okay.  And do you still have colleagues --

20         THE PROSPECTIVE JUROR:  I'm sorry, 2001, actually.

21    Sorry.

22         THE COURT:  Do you have friends and colleagues from

23    that period who are still working there?

24         THE PROSPECTIVE JUROR:  No.  I think they have all

25    moved on to other jobs.

1           THE COURT:  And have you since January 6th discussed

2    with anyone -- or have you had any conversation with anyone who

3    was actually present at the Capitol on January 6th?

4           THE PROSPECTIVE JUROR:  A woman who works for me; her

5    husband is a Capitol Police officer who was there the day of

6    January 6th.

7           THE COURT:  Okay.  And what has she shared with you

8    about his experiences and what happened to him on that day?

9           THE PROSPECTIVE JUROR:  That he was physically

10   injured in the violence, and that it has taken a mental health

11   toll on him and also her family.

12          THE COURT:  Okay.  And how do you think that

13   relationship would affect your ability as a juror to be fair

14   and impartial?

15          THE PROSPECTIVE JUROR:  I don't think it would.

16          THE COURT:  So let me spin out a hypothetical in that

17   do you think because of your relationship with this -- this

18   employee who is married to a Capitol Police officer, do you

19   think it will be harder for you to acquit the defendants in

20   this case because of that relationship?

21          THE PROSPECTIVE JUROR:  No.

22          THE COURT:  Do you think it would be difficult for

23   you to maintain your professional and personal relationship

24   with this other person if you were to vote to acquit because

25   her husband is a Capitol Police officer?

1          THE PROSPECTIVE JUROR:  No.

2          THE COURT:  Have you yourself spoken with him about

3    his experiences on that day?

4          THE PROSPECTIVE JUROR:  No, I've never met him.

5          THE COURT:  Okay.  Question 16, we asked you about a

6    close friend or family member to have ever been employed by the

7    federal government.  You've told us you are.  Anybody else?

8    You also mentioned your brother.  I take it -- I think I did

9    ask, but your brother, is he -- he's no longer working for

10   Senator Durbin; correct?

11         THE PROSPECTIVE JUROR:  He's a doctor now.  Yeah.

12         THE COURT:  He's a doctor now.  Okay.  So this was

13   some time ago?

14         THE PROSPECTIVE JUROR:  Yes.  Quite a while ago.

15         THE COURT:  Gotcha.

16         THE PROSPECTIVE JUROR:  So my father, who is now

17   retired, worked for the federal government for many years.  I

18   mean, many of my close friends are employed by the federal

19   government.

20         THE COURT:  Okay.  Anybody in a law enforcement

21   capacity?

22         THE PROSPECTIVE JUROR:  No.

23         THE COURT:  Question 18, we asked you about close

24   friends or family members who worked for the armed forces.

25         THE PROSPECTIVE JUROR:  My father served in the Army.

1    One of my closest friends was in the Marine Corps.

2                THE COURT:  Okay.  Question 20, we asked you about

3    your attendance at rallies, protests in the last five years.

4    You told us you attended a protest denouncing President Trump's

5    treatment of minors at the southwest border.  Let me ask you

6    if -- you may have intuited that the defendants in this case

7    may have political views that are different than yours and, in

8    fact, support the former -- and may have supported the former

9    President.  How, if at all, do you think that fact would affect

10   your ability to be fair and impartial?

11               THE PROSPECTIVE JUROR:  I don't think that it would.

12               THE COURT:  Do you think you would hold it against

13   any of these defendants if they held political views different

14   than yours?

15               THE PROSPECTIVE JUROR:  No.

16               THE COURT:  Do you have particular opinions or views

17   or preconceptions about people that are supporters of the

18   former President?

19               THE PROSPECTIVE JUROR:  I mean, I don't agree with

20   their ideology.

21               THE COURT:  Okay.  But beyond that?

22               THE PROSPECTIVE JUROR:  I mean, I think I would

23   question the judgment of somebody who supports President Trump

24   and believes what he says.

25               THE COURT:  Okay.  And so if the evidence were to be

1   that a defendant, one or more, questioned the outcome of the

2   election, how do you think that would affect your view of that

3   particular defendant, if at all?

4           THE PROSPECTIVE JUROR:  If they said they don't

5   believe the outcome of the election?  Do you mind rephrasing

6   the question?  I want to make sure --

7           THE COURT:  Sure.  Say you were to learn that one or

8   more of the defendants believed that -- consistent with what

9   President Trump was saying, that the election was stolen; that

10  the outcome of the election was not legitimate.  How, if at

11  all, would that affect your view of that defendant?

12          THE PROSPECTIVE JUROR:  I might not think that they

13  are the most intelligent.

14          MR. ROSSI:  I didn't hear the answer.

15          THE PROSPECTIVE JUROR:  I might not think that they

16  are the most intelligent people.

17          THE COURT:  Okay.  And how would that impact your

18  responsibilities and abilities as a juror?

19          THE PROSPECTIVE JUROR:  I don't think it would impact

20  it if I'm supposed to judge the evidence.

21          THE COURT:  Okay.  All right.  Question 22 asked

22  about having been on Capitol Grounds or inside the

23  Capitol Building.  You've told us about your prior employment.

24          Question 43.  If you would please turn to page 11.  We

25  asked you in Question 43 whether you recognize any of the names

1     of people who were -- that were on the list.  You identified

2     Alex Jones, Roger Stone, Enrique Tarrio.  Those names could be

3     mentioned in trial, but certainly not -- I wouldn't expect

4     testimony from any of those people.  Is there something about

5     the mere fact that they may be mentioned at trial or a

6     defendant might have a relationship with any of these people

7     that would cause you to have difficulty being fair and

8     impartial?

9              THE PROSPECTIVE JUROR:  No.

10             THE COURT:  45, 46, 47, we asked you about the -- the

11    amount of news you've consumed about the events of the 6th.

12    Can you generally share with us how much news you've been

13    exposed to and how much news you have read, seen, or heard.

14             THE PROSPECTIVE JUROR:  I mean, I try to follow the

15    news every day.  You know, I listen to radio news in the

16    morning.  Sometimes I watch TV news in the evening.  To the

17    extent that it was covering the January 6th committee hearings,

18    I -- and the events of January 6th, it would cover that.

19    But -- I wouldn't say that I have specifically sought out

20    coverage of January 6th as an area of focus.

21             THE COURT:  Okay.

22             THE PROSPECTIVE JUROR:  I was watching TV on the day

23    of January 6th.

24             THE COURT:  Right.  So what we would ask you as a

25    juror to do is to try and set aside all of what you may have

1     read or seen or heard from the media, and, again, focus only on

2     the evidence at issue in this case.  Is that something you

3     think you could do?

4                    THE PROSPECTIVE JUROR:  Yes.

5                    THE COURT:  All right.  If I could please ask you to

6     turn to page 12, Question 59.  Question 59 asked about friends,

7     relatives who are in the legal profession.

8                    THE PROSPECTIVE JUROR:  Yes.  My sister-in-law works

9     at GW law school.  My brother once worked as a temp in a law

10    office.  I worked very briefly in a law office -- office in a

11    sort of consulting practice part of the law firm.

12                   THE COURT:  Okay.  So starting with your

13    sister-in-law.  Do you know what subject area she teaches in?

14                   THE PROSPECTIVE JUROR:  She does not teach.  She runs

15    public affairs media for the law school.

16                   THE COURT:  And then yourself or your brother, a

17    little -- the work you've done in law firms, any of those firms

18    do criminal work?

19                   THE PROSPECTIVE JUROR:  I don't remember what law

20    firm my brother worked in, and I believe that the law firm I

21    worked in no longer exists.

22                   THE COURT:  Okay.

23                   THE PROSPECTIVE JUROR:  And I was doing, like, health

24    law.

25                   THE COURT:  Gotcha.

1      Question 60 asked about family members, close friends

2  who are in law enforcement.

3      THE PROSPECTIVE JUROR:  So I used to work for the

4  Special Inspector General For Afghanistan Reconstruction, which

5  has a law enforcement component to it.  I think that's why I

6  answered yes to that question.

7      THE COURT:  Gotcha.

8      Anyone other than yourself?

9      THE PROSPECTIVE JUROR:  No.

10      THE COURT:  Okay.  Question 63 and 64, we asked you

11  about experience with crime and violence, close friends or

12  family members or yourself has ever been a victim of a crime.

13  And then in 64 we asked about a witness of a crime.

14      THE PROSPECTIVE JUROR:  Yes.  And this is a minor

15  crime, but I was once sitting at a bus stop and some youths

16  came up and started bashing in the side of the bus stop and

17  broke the glass down.

18      THE COURT:  Okay.

19      THE PROSPECTIVE JUROR:  So it was sort of vandalism.

20      THE COURT:  Were you hurt?

21      THE PROSPECTIVE JUROR:  I was not, no.

22      THE COURT:  Did you interact with the Metropolitan

23  Police Department as a result of that?

24      THE PROSPECTIVE JUROR:  I was quite young.  I believe

25  I went home and told my parents, and they called the police.

1     And then the police came and interviewed me.

2               THE COURT:  Okay.  Anything about that experience

3     that would cause you to think you couldn't be fair and

4     impartial in this case?

5               THE PROSPECTIVE JUROR:  No.

6               THE COURT:  All right.  Any follow-up from the

7     government?

8               MS. RAKOCZY:  No, Your Honor.  Thank you.

9               THE COURT:  Any follow-up from the defense?

10              MS. HALLER:  Yes, Your Honor.

11         Hi.  I'm Juli Haller.  I represent Connie Meggs in this

12    case.  I just want to follow up on a few things that you

13    touched base with the judge on.

14              In your response to number -- Question No. 14 on page 6,

15    you explained in your response that you're an SES director to

16    the GAO.  Can you tell us -- can you explain SES; what that

17    means to those who might not be familiar with that.

18              THE PROSPECTIVE JUROR:  Sure.  It's a member of the

19    senior executive service.  So it's just a level in the federal

20    government when you go past the general schedule, you've gone

21    above the GS-15, and you're entered into the senior executive

22    service.

23              MS. HALLER:  And is your position as an SES

24    permanent, or are you subject to political oversight?

25              THE PROSPECTIVE JUROR:  It's permanent.  And GAO is a

1      nonpartisan agency.

2              MS. HALLER:  No, I understand.  But sometimes SES

3      positions will be changed depending on the administration.

4              THE PROSPECTIVE JUROR:  Oh, so none of them at GAO

5      can be changed.

6              MS. HALLER:  Okay.

7              THE PROSPECTIVE JUROR:  Yeah.

8              MS. HALLER:  And when you say that you assess

9      national security issues, have you come across anything to do

10     with domestic -- alleged domestic national security issues,

11     such as potentially the Oath Keepers, if they have been

12     investigated in your line of work in any way?

13             THE PROSPECTIVE JUROR:  No.  The only thing that I

14     can think of is I did a review a few years ago looking at how

15     active duty troops are being used on the southwest border.

16     That was mostly about sort of the costs associated with -- with

17     their deployment.  And there was activity from a right-wing

18     group -- well, called the Proud Boys, and it was just mentioned

19     as part of the review, but it was not something that we were

20     assessing.  It was more situational awareness for when we were

21     conducting our site visits.

22             MS. HALLER:  Okay.  So that it's fair to say that you

23     have not reviewed the Oath Keepers as part of your work in the

24     government?

25             THE PROSPECTIVE JUROR:  No, I mostly do military

```
 1          housing work.

 2                    MS. HALLER:  Okay.  And when you answered No. 21, you

 3          mentioned that you attended a protest against Trump's treatment

 4          of -- I think that says minorities, but I couldn't make out --

 5                    THE COURT:  Minors.

 6                    MS. HALLER:  Minors.

 7                    THE PROSPECTIVE JUROR:  Yeah.

 8                    MS. HALLER:  Okay.  Can you tell us a little bit

 9          about what that means.

10                    THE PROSPECTIVE JUROR:  So at a certain point in the

11          Trump administration, they made a policy decision to separate

12          children from their parents at the southwest border, which

13          meant that, you know, children were alone in holding

14          facilities.  And I personally found that to be just sort of

15          incomprehensibly bad, and I felt that it warranted protesting.

16                    MS. HALLER:  Is it fair to say, then, that in that

17          same line -- I think earlier you said that supporters of

18          Trump -- or maybe you were speaking about the Oath Keepers --

19          have a racist ideology or follow a racist ideology?  Would that

20          be consistent with the protest that there's this belief that

21          Trump or his supporters are trying to hurt people or have --

22          let me rephrase that.

23                The Earlier, I believe, you said racist ideology.

24                    THE PROSPECTIVE JUROR:  Yeah.

25                    MS. HALLER:  Who does that apply to?
```

```
 1              THE PROSPECTIVE JUROR:  I believe that I said that at
 2    least some Oath Keepers have been associated with a racist
 3    ideology, and I don't know a whole lot more than that, except
 4    for that that's my impression based on what I have heard in the
 5    news media.
 6              MS. HALLER:  Okay.  So you're saying that that is
 7    your impression?
 8              THE PROSPECTIVE JUROR:  Yes.
 9              MS. HALLER:  Okay.  But do you understand that when
10    they have the constitutional right to a fair and impartial
11    jury, it is not their burden to prove that they're not racists?
12              THE PROSPECTIVE JUROR:  Yes.  Yeah, I understand
13    that.
14              MS. HALLER:  Okay.  And --
15          That's all I have.  Thank you.
16              THE PROSPECTIVE JUROR:  Yeah.  Thank you.
17              THE COURT:  Mr. Rossi.
18              MR. MACHADO:  Oh.  Just very quickly.  With regard to
19    the employee who works with you whose husband was in the
20    U.S. Capitol Police, have you met him in person?
21              THE PROSPECTIVE JUROR:  No.
22              MR. MACHADO:  Okay.  Thank you.
23              THE COURT:  Mr. Rossi.  Mr. Rossi, do you have any
24    questions?
25              MR. ROSSI:  Yeah, I'm just -- I apologize,
```

1    Your Honor.

2         Thanks for coming.  I just have a few follow-ups to what

3    Mr. Machado and Ms. Haller asked.

4         You mentioned or made a comment that you questioned the

5    intelligence -- I'm sorry.  You questioned the judgment of

6    Donald Trump's supporters, and I think you said -- you

7    mentioned their intelligence.  Could you go a little further on

8    that.  Are you just talking about Trump supporters, generally,

9    or Oath Keepers or who?

10        THE PROSPECTIVE JUROR:  I guess I was speaking

11   generally about Trump supporters.  I mean, I think that there

12   is ample evidence that he has been untruthful in many instances

13   over many years, and so if a person despite all of that

14   evidence still believes what he says, that does make me

15   question their judgment and intelligence.

16        MR. ROSSI:  You're familiar with what the "Stop the

17   Steal" rally was about?

18        THE PROSPECTIVE JUROR:  Yes.

19        MR. ROSSI:  Generally?

20        THE PROSPECTIVE JUROR:  I believe it -- it was a -- a

21   protest suggesting that he had actually won the election.

22        MR. ROSSI:  That the election was fraudulent?

23        THE PROSPECTIVE JUROR:  Right.  I believe that was

24   part of -- part of it, yeah.

25        MR. ROSSI:  In your current job, do you touch on

```
 1    national security issues?

 2              THE PROSPECTIVE JUROR:  So I am a director in

 3    the defense capabilities and management team at GAO, which

 4    does national security work broadly.  My portfolio is focused

 5    on quality-of-life issues for service members; so things

 6    like military housing and access to -- to food and things like

 7    that.

 8              MR. ROSSI:  And in your SES position -- and

 9    congratulations.

10              THE PROSPECTIVE JUROR:  Thank you.

11              MR. ROSSI:  It's a big deal.

12         In your SES position, do you touch on any matters

13    relating to January 6th or U.S. Capitol security?

14              THE PROSPECTIVE JUROR:  No.

15              THE COURT:  How about domestic groups, including

16    Oath Keepers and the Proud Boys?

17              THE PROSPECTIVE JUROR:  The only instance was the one

18    I mentioned before where the presence of the Proud Boys at the

19    border came up when I was visiting there with -- with one of my

20    audit teams.

21              MR. ROSSI:  Could you explain that a little more,

22    please.

23              THE PROSPECTIVE JUROR:  Sure.  So I visited the

24    Rio Grande Valley with my audit team, gosh, back in probably

25    2018 or so.  And while we were there, we were visiting sites
```

1    along -- along the border.  And so we got a briefing before we

2    visited the specific sites, sort of like a -- like situational

3    awareness briefings so we would know sort of what the safety

4    procedures were.  And that was when I learned that the

5    Proud Boys were there, and that there were pockets of

6    Proud Boys who liked to -- to incite violence.  And so they

7    just wanted us to be aware of that in case we had to get back

8    in the truck.

9           MR. ROSSI:  Ma'am, on Question 54 on page 12, could

10   you go to that, please.

11          Question 54, page 12, please.

12          THE PROSPECTIVE JUROR:  Uh-huh.

13          MR. ROSSI:  And tell me when you're done.

14          THE PROSPECTIVE JUROR:  Yep.

15          MR. ROSSI:  Okay.  You answered no as to whether you

16   have read, seen, or heard anything about the Oath Keepers and

17   would affect your ability to be fair and impartial.  I want to

18   follow up on that.

19          THE PROSPECTIVE JUROR:  Sure.

20          MR. ROSSI:  You worked on Capitol Hill in 2001?

21          THE PROSPECTIVE JUROR:  Yes.

22          MR. ROSSI:  For a House subcommittee.

23          THE PROSPECTIVE JUROR:  For a Senate subcommittee.

24          MR. ROSSI:  A Senate subcommittee.

25          And what was the subcommittee?  I'm just curious.

```
 1              THE PROSPECTIVE JUROR:  It was the public health
 2   subcommittee of the Senate Health Education, Labor and Pensions
 3   committee.
 4              MR. ROSSI:  And were you a staff member for a
 5   specific senator?
 6              THE PROSPECTIVE JUROR:  I was a -- a fellow.  So I
 7   had what was called -- then called a Jacob Javits Fellowship,
 8   and I was working in Senator Kennedy's office.
 9              MR. ROSSI:  Ted Kennedy?
10              THE PROSPECTIVE JUROR:  Correct.
11              MR. ROSSI:  Not the John Kennedy from Louisiana?
12              THE PROSPECTIVE JUROR:  No.  Very different.
13              MR. ROSSI:  A little bit different.  A little bit
14   different.
15              THE PROSPECTIVE JUROR:  Yeah.
16              THE COURT:  Mr. Rossi.
17              MR. ROSSI:  I have one more question, Your Honor.
18   I'm sorry.
19              THE COURT:  That's okay.
20              MR. ROSSI:  And your husband worked for Senator
21   Durbin; correct?
22              THE PROSPECTIVE JUROR:  My brother.
23              MR. ROSSI:  I'm sorry.  Your brother.
24              THE PROSPECTIVE JUROR:  Yeah.
25              MR. ROSSI:  My last question.  You're going to see
```

1    videos of actions by the Oath Keepers and others inside the

2    Capitol that may be very disturbing, and as someone who worked

3    in the Senate, who had a brother who worked in the Senate,

4    would you agree that that could make you awkward and question

5    your ability to be fair and impartial?

6              THE PROSPECTIVE JUROR:  No.  I would not agree with

7    that.  Again, because my -- my job is to collect facts and

8    evidence and data and analyze them impartially and in a

9    nonpartisan manner.

10             MR. ROSSI:  Thank you.

11             THE PROSPECTIVE JUROR:  Uh-huh.

12             THE COURT:  All right.  Thank you for your time this

13   afternoon.

14        Mr. Douyon will show you out of the courtroom and

15   provide additional instructions.

16             (REPORTER'S NOTE:  Juror 1353 left.)

17             MS. HALLER:  Your Honor, to start with, my biggest

18   concern for -- the reason I would object -- or that we may

19   object is that -- the racist ideology.  I -- I am concerned

20   that is something someone cannot set aside if they believe it

21   and would be extremely prejudicial.  And I -- I do believe that

22   she appears to be an intelligent woman, but if you truly

23   believe someone would hurt children, even, or minorities or be

24   racist -- you know, because of the protests she attended, that

25   she talked about, that I think that is an uphill battle for

1    these defendants.  I think it makes it difficult -- I think it

2    puts the burden on them to prove that they're not racist, and

3    that they're -- you know, that the messages that they supported

4    from the former President wouldn't be to -- to hurt people.

5    And -- and so I at this point would object.

6                 MR. WOODWARD:  If the Court would indulge me.

7                 THE COURT:  Don't you represent the same client?

8                 MR. WOODWARD:  Yes, that's why I asked for the

9    Court's indulgence.

10               I would just add to the record that although the Court

11   will no doubt observe that Juror 1353 very calmly and

12   passionately affirmed her ability to set aside all of her

13   understandings concerning the Oath Keepers and the events of

14   January 6th, nonetheless, these defendants, and Mrs. Meggs, in

15   particular, would be prejudiced insofar as we would be having

16   to educate that juror as to what role, if any, was played by

17   the Oath Keepers or these defendants on January 6th.  And the

18   burden imposed by her preconceived beliefs, irrespective of her

19   ability to set all of that aside, would prejudice Mrs. Meggs

20   and the defendants.  And for that reason, I join Ms. Haller in

21   objecting to her.

22               THE COURT:  Anything to add?

23               MR. ROSSI:  I'm sorry, Your Honor.

24               THE COURT:  I mean actually add, as opposed to

25   reiterate.

1          MR. ROSSI:  No, I'll add.  They were eloquent.

2          I just want to add, Your Honor, her answer to Question

3   54 is inconsistent with just common sense.  Her brother worked

4   on the Hill.  She worked on the Hill.  She has questions about

5   the judgment and intelligence of Trump supporters.  She

6   mentions she's -- that some of them are racists.  I just think

7   her answers are inconsistent with her beliefs, and I just can't

8   see how she can compartmentalize those views.  We move for

9   cause.

10          MR. MACHADO:  Your Honor, just a slight attachment on

11  that with regard to the intelligence comments.  I think someone

12  who has that opinion and is based entirely on political opinion

13  is not giving the -- the juror a -- or I'm sorry -- the

14  defendant a fair shake, and I think that would be reason for

15  cause.

16          THE COURT:  Does the government wish to be heard?

17          MS. RAKOCZY:  Yes, Your Honor.  Thank you.

18          More than many people who come in here and talk to us,

19  this juror spoke with dispassionate detachment that from the

20  government's perspective was not concerning but was consistent

21  with the way she described her job where she has to regularly

22  objectively assess things without -- without prejudice or prior

23  experience coming into the system.

24          She, we thought, explained very forthrightly things that

25  she had heard and preconceptions that she had, but also spoke,

1    from our perspective, convincingly on her ability to put that

2    aside and her understanding of a role as a juror to judge the

3    evidence based solely on what she hears in this courtroom.  We

4    think, frankly, you know, if she has concerns that folks who

5    thought the election were stolen, I think what she said that

6    about shows, if anything, an openness to consider ways in which

7    folks like that could have been manipulated.  And maybe she's

8    very open to certain defenses that some of the defendants may

9    put forward about their intentions that day and why they

10   ultimately went to the Capitol Grounds and/or into the

11   building.

12          She also spoke very plainly about the ability to judge

13   the evidence based solely on what she hears in this courtroom.

14          THE COURT:  Okay.  It's a close call.  I think I'm

15   going to err on the side of striking her for cause.  The truth

16   is there are convictions in this case.  I don't want any of

17   these defendants thinking there's a juror who prejudges their

18   intelligence in a negative way.

19          So I'm going to strike her for cause.

20          MR. ROSSI:  Thank you, Your Honor.

21          (REPORTER'S NOTE:  Juror 1926 enters.)

22          THE COURTROOM DEPUTY:  Your Honor, this is Juror

23   1926.

24          THE COURT:  Hi.  How are you?

25          THE PROSPECTIVE JUROR:  I'm all right.  How are you?

1              THE COURT:  Good.

2         Thank you for being with us this afternoon.

3         You are Juror 1926?

4              THE PROSPECTIVE JUROR:  Correct.

5              THE COURT:  All right.  Feel free to remove your mask

6    if you're comfortable doing so.

7         Your juror questionnaire is in front of you.  I'm going

8    to ask you, first, please, to turn to page 6 of the

9    questionnaire.  So in Question 12 you told us that you worked

10   for the FBI during the time in question.  You said you don't

11   think it would affect your ability, but want to make sure the

12   Court is aware for consideration.

13        So can you first start by telling us where within the

14   FBI you worked.

15             THE PROSPECTIVE JUROR:  So I worked -- so physically

16   I worked at headquarters in Washington, D.C.  And I did work in

17   the counterterrorism division at the time.

18        What else would you like to know?

19             THE COURT:  When you say "headquarters," I just want

20   to be clear.  You mean the main FBI headquarters and not the

21   Washington Field Office?

22             THE PROSPECTIVE JUROR:  Correct.  Yes.  The Hoover

23   building, yeah.

24             THE COURT:  Right.  And can you tell us what -- what

25   your role and responsibilities were.

```
 1              THE PROSPECTIVE JUROR:  Yes.  Well, for the most
 2    part.
 3              THE COURT:  Just the parts you can share with us.
 4              THE PROSPECTIVE JUROR:  Yes.  So let me think back to
 5    this.  This was -- so I was an acting unit chief in our
 6    strategy and policy unit.  It's basically -- it was on the
 7    administrative side.  So while it was part of the operational
 8    division, we didn't do operational work with the exception of
 9    the -- the event in question, given the -- I would say the size
10    of the digital tips that were submitted, they did need
11    additional people to assist with reviewing those, of which I
12    was one of them, so.
13              THE COURT:  Okay.  So part of your responsibilities
14    included reviewing tips that would come in on the FBI tip line;
15    is that correct?
16              THE PROSPECTIVE JUROR:  Not normally, but given --
17              THE COURT:  Right.  But just --
18              THE PROSPECTIVE JUROR:  But for this, I did have
19    to -- there's special, like, digital evidence that was
20    submitted, yes.
21              THE COURT:  Okay.
22              THE PROSPECTIVE JUROR:  We did review some of those.
23              THE COURT:  And as part of your work at that time --
24    well, let me back up.  Other than what you've just described,
25    is -- did you participate in any other active investigation of
```

1 the events of January the 6th?

2    THE PROSPECTIVE JUROR:  No.

3    THE COURT:  Did you have reason to interact with

4 people who were investigating the events of the 6th?

5    THE PROSPECTIVE JUROR:  Only in the sense of, like,

6 if mass emails went out and I may have been copied on, like,

7 this is, you know, the next stage of, like, oh, we're

8 reviewing, you know, maybe, like, X thousand tips or whatever

9 the number was.  And the only thing I will say, I think there

10 was, like, a name that was mentioned, Jennifer Moore.  I -- a

11 lot of these names I don't -- they weren't people I knew

12 personally, but, like, if I was -- whether they were like, you

13 know, like, cc'd on an email or something, that maybe, like,

14 their name sounded familiar, but otherwise no.  Like, my role

15 is never part -- directly part of any investigation.

16    THE COURT:  All right.  Did you have reason to

17 work with people who were investigating counterterrorism

18 matters?

19    THE PROSPECTIVE JUROR:  So -- so technically

20 investigations are handled out of the field office, and their

21 program managed by people at headquarters.  I worked with

22 people at headquarters who program managed those who

23 investigated things --

24    THE COURT:  Okay.

25    THE PROSPECTIVE JUROR:  -- if that makes sense.

1          THE COURT:  So does that mean that you would have had

2     direct interaction with field agents?

3          THE PROSPECTIVE JUROR:  So, again, I wouldn't say

4     anything more than maybe, like, cc'd on an email that was more

5     of an administrative matter.

6          THE COURT:  Okay.

7          THE PROSPECTIVE JUROR:  Yeah.

8          THE COURT:  So let me just ask the -- what is the

9     obvious question, which is:  Could you be fair and impartial?

10    You were a former employee of the FBI.  You were there at the

11    time on January the 6th.  There will be lots of -- or some

12    number of FBI agents that testify.  Do you think you could

13    evaluate their testimony in the same way that you would be

14    asked to evaluate the testimony of anyone else?

15         THE PROSPECTIVE JUROR:  Uh-huh.  I do.

16         THE COURT:  And you don't think that you would, for

17    example, kind of have an implicit reason or implicit --

18    implicitly trust the testimony of an agent more than someone

19    who's not in law enforcement?

20         THE PROSPECTIVE JUROR:  I would not trust one more

21    versus the other.

22         THE COURT:  Okay.  And if you thought that there was

23    evidence discrediting the agent's testimony or giving -- or

24    reason to question the agent's testimony, is that something you

25    think you would consider fairly and objectively?

1          THE PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Okay.  And can you tell us in terms of

3     the tips, can you give us a sense of quantity of tips that you

4     reviewed.

5          THE PROSPECTIVE JUROR:  I don't know the number.

6          THE COURT:  How about -- ballpark, are we talking

7     about hundreds, thousands?

8          THE PROSPECTIVE JUROR:  Not thousands, no.  I don't

9     even know that I would say hundreds, really.  I don't know.

10    Maybe less than 200.

11         THE COURT:  Do you have any recollection of any tip

12    coming in regarding the Oath Keepers or somebody associated

13    with that group?

14         THE PROSPECTIVE JUROR:  Anything specific to that

15    group, no.  To be honest, it all kind of blurred together.

16    It's been several years ago.

17         THE COURT:  Right.  And do you have -- do you require

18    knowledge -- or did you acquire knowledge about how the FBI

19    processed those tips that were coming in?  How they were

20    reviewed?  How they were processed?  How they were inventoried

21    and the like?

22         THE PROSPECTIVE JUROR:  Yes, to an extent, in the

23    sense of, you know, I knew we had an intake system; we had to

24    organize people to review them; and what we looked for; and,

25    you know, feedback that we were supposed to give as part of the

1    review process.

2              THE COURT:  Gotcha.  Okay.

3         Any objections from the government?

4              MS. RAKOCZY:  No, Your Honor.

5              THE COURT:  All right.  Anything else from the

6    defense?

7              MR. MACHADO:  No, Your Honor.

8              THE COURT:  All right.  Thank you very much for your

9    time, and you're -- enjoy the rest of your afternoon.

10             MR. ROSSI:  I'm sorry, Your Honor.

11             THE COURT:  That's okay.

12        Thank you.

13             THE PROSPECTIVE JUROR:  Okay.

14             (REPORTER'S NOTE:  Juror 1926 left.)

15             (REPORTER'S NOTE:  Juror 1063 enters.)

16             THE COURTROOM DEPUTY:  Your Honor, this is Juror No.

17    1063.

18             THE COURT:  Hi, ma'am.  How are you?

19             THE PROSPECTIVE JUROR:  Hello.

20             THE COURT:  How are you today?

21             THE PROSPECTIVE JUROR:  Fine.

22             THE COURT:  You're Juror 1063; is that right?

23             THE PROSPECTIVE JUROR:  Yes.

24             THE COURT:  Okay.  Feel free to remove your face mask

25    if you would like.

```
 1              The juror questionnaire that you completed is in front
 2     of you.  Let me ask you, please, first, to turn to page 12 and
 3     Question 53.  So we had asked you whether you've read, seen, or
 4     heard anything about the Oath Keepers organization or any
 5     judicial proceedings involving the organization.  Can you tell
 6     us -- well, you've answered that question no.  Is it the case
 7     that you've not read, seen, or heard anything about an
 8     organization known as the Oath Keepers?
 9              THE PROSPECTIVE JUROR:  Say that again.  I'm trying
10     to get the understanding.
11              THE COURT:  It's okay.  Is it the case or is -- is it
12     still the case that you have not read, seen, or heard anything
13     about an organization known as the Oath Keepers?
14              THE PROSPECTIVE JUROR:  No, I've never heard
15     anything.
16              THE COURT:  Never heard of them ever?
17              THE PROSPECTIVE JUROR:  No.
18              THE COURT:  So first time you heard of the name of
19     the organization was when you got this juror questionnaire; is
20     that correct?
21              THE PROSPECTIVE JUROR:  Correct.
22              THE COURT:  Let me ask you -- and you'll forgive me
23     for intruding, but if you turn to page 6 of your questionnaire,
24     you indicated in Question 13 that you are unable to work due
25     to disability.  Could you share with us what the disability
```

1    is that makes it difficult for you or prevents you from

2    working.

3             THE PROSPECTIVE JUROR:  I have a learning disability,

4    and I have some health issues.

5             THE COURT:  Okay.  And can you help us understand a

6    little bit more in detail how that -- what the learning

7    disability is and can you tell us a little bit more about that.

8             THE PROSPECTIVE JUROR:  Well, I was in special ed in

9    school.

10            THE COURT:  Okay.  Let me ask you this:  Did you have

11   any difficulty understanding any of the questions that were in

12   our questionnaire?

13            THE PROSPECTIVE JUROR:  No.

14            THE COURT:  You were able to understand all of them?

15            THE PROSPECTIVE JUROR:  Yes.

16            THE COURT:  And do you have any -- let me ask you

17   this -- and I hope you don't take this the wrong way.  If you

18   were selected as a juror, do you have any concerns or

19   reservations about your ability to sit and pay attention and

20   follow all of the testimony and evidence that's presented at

21   trial?

22            THE PROSPECTIVE JUROR:  No.

23            THE COURT:  So you're confident you could do that?

24            THE PROSPECTIVE JUROR:  Yes.

25            THE COURT:  All right.  If you would please turn to

1     page 11.  Page 11, Questions 45, 46, 47, we tried to get a

2     sense from you how much news media you've been exposed to about

3     the events of January 6th.  Can you tell us how much news media

4     you have followed or been exposed to about the events of

5     January 6th.

6                THE PROSPECTIVE JUROR:  I don't really watch the news

7     too much, but when I do see it, I did see that event.

8                THE COURT:  Okay.  You did.  Can you describe for us

9     what you mean by that.

10               THE PROSPECTIVE JUROR:  What did I see?

11               THE COURT:  Yes.

12               THE PROSPECTIVE JUROR:  By glancing?  I just seen,

13    like, the title and what happened.

14               THE COURT:  Okay.  And what do you think -- when you

15    say "the title," what do you mean?

16               THE PROSPECTIVE JUROR:  I mean when they said -- can

17    I say that?

18               THE COURT:  Yeah, of course.

19               THE PROSPECTIVE JUROR:  When they say it's about the

20    break-in.

21               THE COURT:  About the break-in?

22               THE PROSPECTIVE JUROR:  Yes.

23               THE COURT:  Where?  The U.S. Capitol or somewhere

24    else?

25               THE PROSPECTIVE JUROR:  Yes, the U.S. Capitol.

724

1        THE COURT:  Okay.  And so when did you see that news?

2        THE PROSPECTIVE JUROR:  I don't know exactly when I

3    seen it.  I just seen it when I, like, turn on the TV.  I don't

4    watch TV much.

5        THE COURT:  Okay.  And have you read any news

6    coverage?

7        THE PROSPECTIVE JUROR:  No.

8        THE COURT:  No.  So other than what you've just

9    described for us, any other news coverage or news exposure to

10   the events of January 6th?

11       THE PROSPECTIVE JUROR:  No.  Just on the news.

12       THE COURT:  Okay.  Any follow-up questions from the

13   government?

14       MS. RAKOCZY:  Yes, Your Honor.  Just briefly.

15       Good morning [sic], ma'am.  If you could turn to the

16   very end of your questionnaire at Questions 76 and 77.  Do you

17   see where those are at?

18       THE PROSPECTIVE JUROR:  Yes.

19       MS. RAKOCZY:  The questions are a little confusing,

20   but I just want to make sure we understand your answer.  One of

21   the questions asks:  If you got on the jury and some of the

22   other folks disagreed with you, would you be able to respect

23   what they were saying but still, you know, not let them run

24   over you and your opinions, but would be able to respect what

25   they were saying and have a conversation?

```
 1              THE PROSPECTIVE JUROR:  Yes.

 2              MS. RAKOCZY:  Would you be able to do that?

 3              THE PROSPECTIVE JUROR:  Yes.

 4              MS. RAKOCZY:  Okay.  And then if somebody else on the

 5    jury suggested that you and the other jurors shouldn't listen

 6    to the evidence here or they shouldn't listen to the judge,

 7    would you go along with that or would you say, no, we should

 8    listen to the evidence, and no, we need to follow the judge?

 9              THE PROSPECTIVE JUROR:  No, you just listen to the

10    evidence.

11              MS. RAKOCZY:  Okay.

12         Thank you, Your Honor.  No further questions.

13              THE COURT:  Any follow-up from the defense?

14              MS. HALLER:  No questions, Your Honor.

15              MR. MACHADO:  Ma'am, my apologies for asking this

16    question.  I noticed that you moved in a little slowly when you

17    came to the -- to the seat.  Do you have any physical issues

18    that might cause any problems as far as you being able to sit

19    here, you know, five days a week, for the most part, from 9:30

20    to 5:00?

21              THE PROSPECTIVE JUROR:  As far as being mobile?

22              MS. RAKOCZY:  As far as being -- sitting in the jury.

23              THE PROSPECTIVE JUROR:  I'm fine sitting in the jury.

24              MR. MACHADO:  All right.  Thank you.

25         No other questions.
```

```
 1              MR. ROSSI:  Nothing, Your Honor.

 2              THE COURT:  All right.  Ma'am, thank you very much.

 3         Mr. Douyon will provide you with additional

 4    instructions.

 5              All right.  Thank you very much.

 6              THE PROSPECTIVE JUROR:  Thank you.

 7              (REPORTER'S NOTE:  Juror 1063 left.)

 8              MR. MACHADO:  Your Honor, I think I'm going to move

 9    for cause on this one.  I'm concerned about the -- some of the

10    answers that were provided that the government -- I'm grateful

11    they pointed it out, but also just the learning disability.  I

12    really didn't get into it too much.  I felt the Court decided

13    it was -- got the information it needed, but I just would ask

14    to strike for cause.

15              THE COURT:  Anyone else want to be heard?

16              MR. ROSSI:  Your Honor, I just think when you read

17    the aiding and abetting instructions; conspiracy; Pinkerton, if

18    it's added, anything like that; I just don't know if she'll

19    have the ability to understand.

20              I want to thank Ms. Rakoczy.  Those answers troubled me.

21              MS. RAKOCZY:  Your Honor, the government understands

22    the concerns that have been raised.  I think, though, that she

23    appeared to answer all of the Court's questions with a full

24    understanding of what was going on and what the Court was

25    asking, and so I think we're not comfortable suggesting she be
```

1    struck just because she expressed that she has a learning

2    disability.

3              THE COURT:  Okay.  I have concerns.  I didn't catch

4    the answers to the last two questions, and, frankly, I'm not

5    worried about the way in which she answered them.  My concern,

6    rather, is her ability to -- to understand more complex legal

7    questions that she's going to be asked to tackle, and follow

8    complex legal instructions.  I will note, although perhaps it's

9    more indicative than disqualifying, is that, you know, she has

10   indicated she's lived in Washington her whole life and she has

11   misspelled her neighborhood, Logan Circle, which gives me some

12   pause about her capacity, notwithstanding the fact that I think

13   she actually was -- was quite responsive to everyone's

14   questions.

15        So I will strike her for cause.

16              (REPORTER'S NOTE:  Juror 0707 enters.)

17              THE COURTROOM DEPUTY:  Your Honor, this is

18   Juror No. 0707.

19              THE COURT:  Hi, sir.  How are you?

20              THE PROSPECTIVE JUROR:  Doing well.

21        How are you?

22              THE COURT:  Thank you for joining us.

23        You are Juror 0707?

24              THE PROSPECTIVE JUROR:  Yes.

25              THE COURT:  Feel free to remove your mask if you are

1    comfortable doing so.

2          Your juror questionnaire is there in front of you, and

3    I'm going to ask you to, please, first, turn to page 12.  So

4    I'll direct you to Question 53, and we asked you:  Have you

5    read, seen, or heard anything about an organization called the

6    Oath Keepers?  And your answer was no.  Is it accurate -- still

7    accurate that you have not read, seen, or heard about an

8    organization known as the Oath Keepers?

9          THE PROSPECTIVE JUROR:  Yes.

10          THE COURT:  So the first time you heard of the

11    organization -- of an organization known as the Oath Keepers

12    was when you received this juror questionnaire?

13          THE PROSPECTIVE JUROR:  I may have heard the name,

14    but I don't know anything about it.

15          THE COURT:  You have no concept of what the

16    organization's mission is, what it stands for, ideology?

17          THE PROSPECTIVE JUROR:  No, sir.

18          THE COURT:  Any idea or understanding of what its

19    role may have been on January 6th?

20          THE PROSPECTIVE JUROR:  No, sir.

21          THE COURT:  All right.  You've told us you work for a

22    media organization.  You work for Vox.  Can you just describe

23    for us what you do and to the extent you are in sort of the

24    news portion of that organization.

25          THE PROSPECTIVE JUROR:  Of course.  So I'm a data

1    analyst.  So, essentially, when you or anyone reads a news

2    article, you get there by searching something or some intended

3    action.  You spend a specific amount of time with that content.

4    You might share it with someone else.  I'm the person who gets

5    all that data.  I translate it for editors and newsrooms to

6    make actions on it based on kind of identifying -- right?  If

7    something is a success, maybe they write more about it.  If

8    something doesn't do well, maybe they stop covering that

9    content.

10            THE COURT:  So as part of your work, have you

11   provided data analysis with respect to stories about

12   January 6th?

13            THE PROSPECTIVE JUROR:  No, sir.

14            THE COURT:  Not at all?

15            THE PROSPECTIVE JUROR:  No.  Not to my knowledge.

16            THE COURT:  Okay.  If you would please turn to

17   page 7.

18            THE PROSPECTIVE JUROR:  Okay.

19            THE COURT:  We asked you in Question 16 whether you

20   have a close friend or family member who's ever been employed

21   by the federal government.  Can you tell us about that.

22            THE PROSPECTIVE JUROR:  Yes.  So I think I said no to

23   this, but I do know now that -- a friend from undergrad, still

24   my friend, who's a foreign service officer in Australia.  Kind

25   of dumb.  I didn't realize that was a federal government job at

1     the time, but I do now.

2              THE COURT:  That's okay.  It sounds like a nice

3     posting.

4              THE PROSPECTIVE JUROR:  It is.

5              THE COURT:  So Question 18 asks about a close friend

6     or family members who are in the armed forces.

7              THE PROSPECTIVE JUROR:  Oh, yes.  My grandfather --

8     both of my grandfathers were in the armed forces.

9              THE COURT:  Okay.  Question 22 asks whether you've

10    ever been on Capitol Grounds or inside the Capitol Building.

11             THE PROSPECTIVE JUROR:  Yes.  In eighth grade I took

12    a tour of the Capitol.

13             THE COURT:  Okay.  If you would please turn to

14    page 11.  And Questions 45, 46, 47, we tried to get a sense of

15    how much news coverage you have been exposed to about the

16    events of January 6th.  Can you share with us generally how

17    much news you've consumed about the events of that day.

18             THE PROSPECTIVE JUROR:  Yes.  So I did see live

19    coverage on the day of January 6th, and then shortly

20    thereafter, of course, saw some footage of folks entering the

21    Capitol.  And then I -- the last video that I watched

22    purposefully was the video of Ashli Babbitt, and after that I

23    stopped watching content.

24             THE COURT:  Okay.  And can you just give us a sense

25    when your watching of those videos would have occurred.

1              THE PROSPECTIVE JUROR:  Oh, very close to -- to

2    January 6th.

3              THE COURT:  Close in time?

4              THE PROSPECTIVE JUROR:  Yeah.

5              THE COURT:  And so is it fair to say since that date,

6    you have been less -- or that you have not regularly read or

7    watched news about the events of that day?

8              THE PROSPECTIVE JUROR:  Yes.  I think the only thing

9    that I've seen semi-recently was -- was that footage of Josh --

10   Senator Josh Hawley running in the Capitol.

11             THE COURT:  All right.  Other than that, that's the

12   most recent news that you can recall having read or seen about

13   the events of that day?

14             THE PROSPECTIVE JUROR:  Yeah.

15             THE COURT:  Okay.  And so if you were selected as a

16   juror, we would ask you to set aside anything that you may have

17   seen from that day.  And would you be able to do that?

18             THE PROSPECTIVE JUROR:  I'd like to think so, yeah.

19             THE COURT:  Okay.  You just mentioned the shooting

20   of Ashli Babbitt.  Let me ask you:  Having watched that video,

21   do you think you would have difficulty watching video of

22   the events of that day if they were presented in this

23   courtroom?

24             THE PROSPECTIVE JUROR:  So long as nobody is dying, I

25   think I would be okay.

1          THE COURT:  Okay.  I don't expect there to be any

2     video of -- depicting that -- that kind of event.

3          Okay.  Anything from the government?

4          MS. RAKOCZY:  No, Your Honor.

5          THE COURT:  Anything from the defense?

6          MS. HALLER:  Thank you.  No, Your Honor.

7          MR. MACHADO:  Just briefly, and I just -- just don't

8     want to make an incorrect assumption.  I assume the reason you

9     stopped watching the videos after Ashli Babbitt was because of

10    the -- what it portrayed or what was in the video.  Would that

11    be a correct statement?

12         THE PROSPECTIVE JUROR:  Yes.  Yeah.

13         MR. MACHADO:  Okay.  Thank you.

14         THE COURT:  All right.  Sir, thank you very much for

15    your time.

16         Mr. Douyon will show you out of the courtroom and

17    provide you with additional instructions.

18         THE PROSPECTIVE JUROR:  Okay.  Thank you.

19         (REPORTER'S NOTE:  Juror 0707 left.)

20         THE COURT:  I should know this, Ms. Rakoczy, but can

21    you tell me again the name of the person that you had testify

22    from the Architect of the Capitol building.

23         MS. RAKOCZY:  Yes, Your Honor.  His name is Jason

24    McIntyre.

25         THE COURT:  Okay.

```
 1                 (REPORTER'S NOTE:  Juror 2764 enters.)

 2                 THE COURT:  Hi, ma'am.  Come on in.  Come on up and

 3     have a seat.

 4                 THE COURTROOM DEPUTY:  This is Juror No. 2764.

 5                 THE COURT:  So how are you?

 6                 THE PROSPECTIVE JUROR:  Good.

 7                 THE COURT:  You are Juror 1298; is that correct?

 8                 THE PROSPECTIVE JUROR:  No.

 9                 THE COURT:  Oh, I'm sorry.  You're not 1298?

10                 THE COURTROOM DEPUTY:  2764.

11                 THE COURT:  I'm sorry.  Okay.  Sorry.  My mistake.

12     Bear with me for a second.

13            Sorry about that.

14            Okay.  So you are Juror 2764; is that correct?

15                 THE PROSPECTIVE JUROR:  Yes.

16                 THE COURT:  All right.  Feel free to remove your mask

17     if you're comfortable doing so.

18            And your juror questionnaire is there in front of you.

19     I'm going to ask you, if you would, please, turn to page 14 --

20     or, actually, I should say, page 13, Question 70.  It's 13 and

21     then carries over to page 14.  In that question we told you

22     about a legal principle that defendants are presumed innocent

23     and cannot be found guilty unless the jury unanimously and

24     based solely on the evidence finds the government has proven

25     its guilt beyond a reasonable doubt.  The burden of proof of
```

1   guilt rests with the government.  That burden never shifts, and

2   they have no obligation; that is, defendants have no obligation

3   to offer evidence or to prove their innocence.  We asked can

4   you think of any reason that would interfere with your ability

5   to follow and apply these principles of law, and you said yes.

6   Can you tell us why you answered yes.

7           THE PROSPECTIVE JUROR:  Yeah, I think this one I

8   might have misread.  I think that one should be no.  Just was

9   thinking more about concerned biases of -- just my preferences.

10          THE COURT:  Your preferences.  Okay.  We'll talk

11  about that in a moment.

12          But just to be clear, could you follow legal

13  instructions in which would you have to presume a defendant to

14  be innocent?

15          THE PROSPECTIVE JUROR:  Yes.

16          THE COURT:  And do you understand that it would be

17  the government's burden to prove guilt beyond a reasonable

18  doubt?

19          THE PROSPECTIVE JUROR:  Yep.

20          THE COURT:  And do you have any trouble following

21  that instruction?

22          THE PROSPECTIVE JUROR:  No.

23          THE COURT:  And do you understand that the defense

24  has no burden to bring forth any evidence at all?  Do you

25  understand that?

```
 1              THE PROSPECTIVE JUROR:  Yes.

 2              THE COURT:  All right.  Question 74, we asked you

 3    whether the nature of the charges in this case would affect

 4    your ability to fairly evaluate the evidence or determine the

 5    defendant's guilt beyond a reasonable doubt.  You answered yes.

 6    Can you share with us the reason for answering yes.

 7              THE PROSPECTIVE JUROR:  Yeah.  I have a friend that

 8    was at the Capitol that day, close friend, so I just have some

 9    biases around the day itself.

10              THE COURT:  Okay.  Can you tell us about that.

11              THE PROSPECTIVE JUROR:  Yeah.  I actually was in an

12    apartment watching some of the rioters park their cars and walk

13    over, and I just can't think of any positive outcome that could

14    have come from that day with any planning.

15              THE COURT:  Do you think you -- let me ask you this:

16    Do you think you could serve and -- serve as a fair and honest

17    juror given what you observed on that day and what you have

18    experienced or what your friend may have experienced on that

19    day?

20              THE PROSPECTIVE JUROR:  I -- I guess it would be

21    based on the evidence.

22              THE COURT:  Okay.  I'm not asking you to guess.

23    I'm asking --

24              THE PROSPECTIVE JUROR:  Yeah.

25              THE COURT:  There are no correct answers here.  We
```

```
 1    just want your honest opinion -- or honest assessment of
 2    whether you think you could be fair and impartial.
 3              THE PROSPECTIVE JUROR:  Yeah.  I might have trouble
 4    with that, so no.
 5              THE COURT:  Okay.  Fair enough.
 6         Any objections, Counsel?
 7              MS. RAKOCZY:  No, Your Honor.
 8              MR. MACHADO:  No, Your Honor.
 9              MS. HALLER:  No, Your Honor.
10              THE COURT:  All right.  Thank you very much for your
11    time.
12         Mr. Douyon will give you some additional instructions.
13              (REPORTER'S NOTE:  Juror 2764 left.)
14              (REPORTER'S NOTE:  Juror 2411 enters.)
15              THE COURTROOM DEPUTY:  Your Honor, this is
16    Juror No. 2411.
17              THE COURT:  Hi, sir.  How are you?
18              THE PROSPECTIVE JUROR:  Good.
19              THE COURT:  Thank you for being here.
20         Feel free to remove your mask if you are comfortable.
21              THE PROSPECTIVE JUROR:  Sure.
22              THE COURT:  You're Juror 2411; is that correct?
23              THE PROSPECTIVE JUROR:  Yes.
24              THE COURT:  All right.  Your juror questionnaire is
25    in front of you.
```

1        I'll ask you, first, to please turn to page 5 and

2   Question 1.  So Question 1 was -- we tried to get a sense of

3   what kind of hardship it would present for you if you were to

4   serve.  You've told us that you have several work and personal

5   trips scheduled during the month of February.  Can you tell us

6   a little bit more about what you have scheduled as travel.

7        THE PROSPECTIVE JUROR:  Yeah.  And I have my

8   itineraries here as well.  Tomorrow I -- I'm booked on a trip

9   to California, a work trip, for three days, coming back on

10  Friday evening.

11        And next week I have a doctor's appointment, but that's

12  here locally.

13        And then on the week of the 20th of February, my wife

14  and I are scheduled to go to Mexico for a week.

15        THE COURT:  Okay.  And the Mexico vacation, is that

16  something you've already booked and has been paid for?

17        THE PROSPECTIVE JUROR:  Yes.  Months ago.

18        THE COURT:  Okay.  All right.

19        All right.  Any objections, Counsel?

20        MS. RAKOCZY:  No, Your Honor.

21        MR. MACHADO:  No, Your Honor.

22        THE COURT:  All right, sir.  Thank you very much for

23  coming in.  We appreciate your time.

24        THE PROSPECTIVE JUROR:  Thank you.

25        (REPORTER'S NOTE:  Juror 2411 left.)

```
 1                (REPORTER'S NOTE:  Juror 1308 enters.)

 2                THE COURT:  Come on up and have a seat, sir.

 3                THE COURTROOM DEPUTY:  Your Honor, this is

 4     Juror No. 1308.

 5                THE COURT:  All right.  Welcome.  Thank you for being

 6     with us this afternoon.

 7           You are Juror 1308?

 8                THE PROSPECTIVE JUROR:  Yes, sir.

 9                THE COURT:  Feel free to remove your mask if you're

10     comfortable doing so.

11           Your juror questionnaire is in front of you.  I'll ask

12     you to pick it up, please, and turn to page 12, and turn your

13     attention, please, to Question 53.

14           In Question 53, we asked whether you had read, seen, or

15     heard anything about the Oath Keepers organization or any

16     judicial proceedings involving the organization.  And you

17     answered that question yes.  Can you tell us what you have

18     read, seen, or heard.

19                THE PROSPECTIVE JUROR:  I don't remember much.  Just

20     certainly have -- that term Oath Keepers has been in the news.

21                THE COURT:  Okay.  Beyond -- well, let me ask:  Do

22     you have any specifics -- more specifics of -- in the context

23     in which you've seen that name in the news?

24                THE PROSPECTIVE JUROR:  In connection with

25     January 6th, but I -- nothing specific.
```

1          THE COURT:  Okay.  Just to make sure, do you have any

2     understanding based upon what you've seen, read, or heard about

3     what role Oath Keepers or its members may have played on

4     January 6th?

5          THE PROSPECTIVE JUROR:  No.

6          THE COURT:  Any understanding about what the

7     organization's mission is or its purpose?

8          THE PROSPECTIVE JUROR:  No.

9          THE COURT:  Question 50, just above there, we asked

10    you about how much of the January 6th committee hearings you

11    had attended, viewed, or listened to.  Can you give us a sense

12    of how much of those hearings you followed and how you followed

13    them.

14         THE PROSPECTIVE JUROR:  I followed them casually on

15    TV.  I didn't attend any of them.  I telework one or two days a

16    week, and we leave the television on for the dog and casually

17    walked through and --

18         THE COURT:  Have you had any conversations with the

19    dog about the hearings?

20         (Laughter.)

21         THE PROSPECTIVE JUROR:  I have.

22         THE COURT:  Even given your limited exposure, do you

23    have any recollection of the Oath Keepers organization being

24    discussed during those hearings?

25         THE PROSPECTIVE JUROR:  No.

740

1        THE COURT:  All right.  If I could ask you to please

2    turn to page 7.  Question 20, we asked you about rallies,

3    protests, and the like that you have attended, or members of

4    your family have attended.  You've identified a couple.

5        Let me ask you the following:  One is that you've

6    identified the Parkland rally.  Is that a gun control rally?

7        THE PROSPECTIVE JUROR:  It was organized by --

8    included some of the students from the Parkland High School,

9    yes.

10       THE COURT:  Okay.  And so in Question 19, we asked

11   you, "Do you have such strong feelings about firearms or the

12   laws concerning firearms that would make it difficult for you

13   to be . . . fair and impartial . . ."  And you answered no.  So

14   is it the case, notwithstanding having attended a rally that

15   was about gun control, that you could sit fairly and

16   impartially as a juror in this case?

17       THE PROSPECTIVE JUROR:  Yes, that's true.

18       THE COURT:  So let me just give you a sense of what

19   the evidence is likely to be.  There's likely to be evidence of

20   gun possession in this case.  You also may see weapons brought

21   into the courtroom.  However, none of the defendants are

22   charged with unlawfully possessing a firearm.  With that

23   information, do you think that would affect your ability at all

24   to be fair and impartial?

25       THE PROSPECTIVE JUROR:  I do not.

1          THE COURT:  Okay.  Question 22 -- well, before we get

2     to 22, let me ask you a different question.  If you were to

3     come to learn that the defendants in this case had political

4     views that are different than yours, how would it affect your

5     ability to serve fairly and impartially as a juror?

6          THE PROSPECTIVE JUROR:  I do not believe that it

7     would affect my ability.

8          THE COURT:  Okay.  Question 22 asked whether you've

9     been on the Capitol Grounds or inside the Capitol Building.

10    And you answered yes.  Can you tell us about that.

11         THE PROSPECTIVE JUROR:  I live and work in the

12    District.  I for many years worked about eight blocks from the

13    Capitol.  The only specific time I remember visiting was during

14    a shutdown of the government because of spending limits or

15    whatever it was.  The District of Columbia's government is also

16    tied into the -- the federal shutdown, and I was there for a

17    local press conference.

18         THE COURT:  Okay.  On page 8, you have told us in

19    Question 29 that you have had prior jury service in a criminal

20    jury some years ago.  Whatever you may recall from that

21    experience, would you be able to set that aside and follow the

22    instructions of law that I would give you?

23         THE PROSPECTIVE JUROR:  I would.

24         THE COURT:  Questions -- if you turn to page 11,

25    please.  Questions 45, 46, and 47, we were trying to get at a

1    sense -- we're trying to get a sense of how much news you have

2    been exposed to about the events of January 6th.  Can you give

3    us just an overall sense of how closely you followed news about

4    the events of that day.

5         THE PROSPECTIVE JUROR:  Certainly I've seen some

6    videos.  I was alerted to it the day of and sort of watched

7    some -- some of it unfold.  I used to get a daily subscription

8    to *The Washington Post*.  I now only get the Sunday paper.  So

9    some.  Not closely.

10        THE COURT:  Okay.  And in your -- well, let me ask

11   you this:  Would it be fair to describe your consumption of

12   news about the events of that day as if you happen to come

13   across it, you may or may not read it?

14        THE PROSPECTIVE JUROR:  Yes.

15        THE COURT:  Okay.  So if you were selected as a

16   juror, what we would ask you to do is to set aside any news

17   coverage that you read about the events of that day and focus

18   only on the evidence in the case and make your determinations

19   about the evidence -- excuse me -- make your determinations

20   based only on the evidence in this case.  Is that something you

21   could do?

22        THE PROSPECTIVE JUROR:  Yes.

23        THE COURT:  If I could please ask you to turn to

24   page 13.  Beginning with Question 63, we asked:  Have you or a

25   close family, friend or -- close -- you, close friend or family

1    member ever been the victim of a crime.  And you answered

2    Question 63 yes.  Can you tell us about that, please.

3              THE PROSPECTIVE JUROR:  My 33-year-old son was

4    recently a victim of indecent exposure and -- and testified in

5    that case.

6              THE COURT:  Okay.  Was that here in the District or

7    elsewhere?

8              THE PROSPECTIVE JUROR:  Elsewhere.

9              THE COURT:  All right.  And so is that the same

10   reason -- what you've just described, that's why you have

11   answered 64 and 65 yes as well?

12             THE PROSPECTIVE JUROR:  Yes.

13             THE COURT:  Okay.  All right.  Any follow-up from the

14   government?

15             MS. RAKOCZY:  No, Your Honor.  Thank you.

16             THE COURT:  Anything from the defense?

17             MS. HALLER:  Yes, Your Honor.  Just very briefly.

18        Sir, I just want to say thank you for your service.  I

19   see that you're chief of crisis services, and God bless you

20   because that's a very major position.

21        I just have one question.  You worked for the D.C.

22   government; correct?

23             THE PROSPECTIVE JUROR:  Correct.

24             MS. HALLER:  And in your position, do you report

25   or -- are you -- are you political or are you -- are you in a

1    long-term permanent position?

2           THE PROSPECTIVE JUROR:  I'm in a career position.

3    Management supervisory services at will, but it's not a

4    political appointment.

5           MS. HALLER:  Okay.  Would there be any -- if you were

6    to find the defendants to be acquitted, hypothetically, would

7    that impact your position in any way?

8           THE PROSPECTIVE JUROR:  No.

9           MS. HALLER:  As -- would you have any concerns --

10   just because -- I don't know if you're aware, but the Attorney

11   General in D.C. sued these defendants.  So I just -- I know

12   it's not the same area, but because you-all report under the

13   mayor, I just want to make sure there's no --

14          THE PROSPECTIVE JUROR:  (Witness shakes head.)

15          MS. HALLER:  Okay.  Thank you.  And thank you for

16   your service.

17          MR. ROSSI:  I echo Ms. Haller's comment.  Thank you

18   for your service.

19          You may or may not -- if you're picked as juror, you may

20   or may not hear testimony from an expert on ASD or you may hear

21   testimony about ASD, specifically Asperger's.  If you disagree

22   with the conclusions of that expert or -- or the other

23   evidence, would that affect your ability to be fair and

24   impartial?

25          THE PROSPECTIVE JUROR:  No.

1          MR. ROSSI:  Thank you, Your Honor.

2          THE COURT:  All right, sir.  Thank you very much for

3     your time.

4      And Mr. Douyon will show you out of the courtroom and

5     provide you additional instructions.

6          (REPORTER'S NOTE:  Juror 1308 left.)

7          THE COURT:  All right.  Ms. Haller, I'm just going to

8     ask you to not inject into questioning the fact of a civil suit

9     against certain defendants.  I don't think it's terribly

10    helpful or appropriate.  If somebody were at the attorney

11    general's office, it might be different question, but somebody

12    who's in a completely different branch of the District

13    government, I don't think it's terribly useful and plants a

14    seed that need not be planted.

15         MS. HALLER:  Your Honor, his position is different,

16    but the last witness or juror that spoke agreed that it would

17    be a problem for her as she was a political appointee, and --

18    and she made that clear in her responses.  I'm not trying to

19    offend them.  I am simply concerned that if they find

20    themselves in a position would it be hard to acquit because of

21    their job, and -- and --

22         THE COURT:  That -- that's fine.  You can ask about

23    the job.  I'm -- my comment is specific to the lawsuit.

24         MS. HALLER:  The lawsuit makes us party opponents.

25    These same defendants.  We're not talking about different

1    defendants.  Meggs is --

2              THE COURT:  Ms. Haller, I've asked you not to do it.

3    I don't understand why we're having this debate.  The juror is

4    not a party opponent.  You can ask about whether it would

5    affect their work, but the fact is you are injecting

6    information about a lawsuit against your clients that they have

7    no prior knowledge of.  In the same way, we've asked you not to

8    discuss prior indictments or convictions of other defendants.

9         Mr. Rossi.

10             MR. ROSSI:  Your Honor, the last question I had --

11   only question I had, really, was he's a psychologist.  And I'm

12   just concerned if he gets on the jury, he may play Monday

13   morning quarterback and go outside his juror's domain.

14             We move for cause.

15             THE COURT:  All right.  That's overruled.  I don't

16   think there's anything about his answering of questions that

17   would suggest that he would paint outside the lines.  We have

18   plenty of people here with some subject matter relationship to

19   potential testimony, including lawyers, and so I don't think

20   the fact of his being a psychiatrist, I believe -- psychologist

21   would disqualify him.

22             MS. RAKOCZY:  Your Honor, we would ask that until the

23   Court rules on the evidence about Mr. Isaacs, that Mr. Rossi

24   refrain from saying that that's the type of evidence that would

25   come in.  I think that jurors who have medical background could

1    be questioned about whether they could set their medical

2    experience aside a little bit more generally.

3             THE COURT:  I think that's probably a fair request,

4    Mr. Rossi, in the sense that I'd ask you to just simply avoid

5    identifying the specific condition as opposed to -- you can ask

6    generally about -- you know, you can say that there may be

7    testimony about mental health matters, et cetera.

8             MR. ROSSI:  Okay.  Fair enough.

9             THE COURT:  Thank you.

10            (REPORTER'S NOTE:  Juror 1188 enters.)

11            THE COURTROOM DEPUTY:  Your Honor, this is

12   Juror 1188.

13            THE COURT:  Hello, ma'am.  How are you?

14            THE PROSPECTIVE JUROR:  I'm good.  And yourself?

15            THE COURT:  Good.  Thank you for being with us.

16       You're Juror 1188?

17            THE PROSPECTIVE JUROR:  Yes.

18            THE COURT:  Feel free to remove your mask if you're

19   comfortable doing so.

20       I'll ask you, please -- your juror questionnaire is in

21   front of you.  I'm going to ask you first to please turn to

22   page 12 and direct your attention to Question 53.

23            THE PROSPECTIVE JUROR:  Can I put my glasses on?

24            THE COURT:  I'm sorry?

25            THE PROSPECTIVE JUROR:  Glasses.

1          THE COURT:  Oh, understood.

2      All right.  So in Question 53, we asked whether you had

3  read, seen, or heard anything about an organization known as

4  the Oath Keepers.  Can you tell us what you have read, seen, or

5  heard.

6          THE PROSPECTIVE JUROR:  That should have been a no.

7          THE COURT:  That's a no.

8          THE PROSPECTIVE JUROR:  That's a no.

9          THE COURT:  Okay.  So just to follow up then.  Is it

10  accurate to say that you had never heard of the organization

11  known as the Oath Keepers until --

12          THE PROSPECTIVE JUROR:  I've heard of them.  I just

13  know based on what I saw in the news, just they're a group of

14  men that believe in -- I guess I want to say some sort of

15  racial act, but something in that sort of term.

16          THE COURT:  Okay.  So let me ask you:  Are you

17  certain that that's the group that you think you are discussing

18  or talking about?

19          THE PROSPECTIVE JUROR:  No.  No.

20          THE COURT:  No.  So you have just told us that there

21  may be some connection in your mind, but you don't have any

22  certainty of that; is that right?

23          THE PROSPECTIVE JUROR:  Correct.

24          THE COURT:  Okay.  And insofar as what you've learned

25  or what you've read or seen, is there anything else about the

1    organization that you think --

2                 THE PROSPECTIVE JUROR:  Absolutely not.

3                 THE COURT:  Any sense of what that -- what role that

4    organization or its members may have played on January 6th?

5                 THE PROSPECTIVE JUROR:  No.

6                 THE COURT:  All right.  If I could please ask you to

7    turn to page 7, Question 22.  We simply just asked whether

8    you've been inside the Capitol Grounds -- or on the

9    Capitol Grounds or inside the Capitol Building.  And you

10   answered that question yes.  Can you tell us when you've been

11   inside the building or on the grounds.

12                THE PROSPECTIVE JUROR:  Oh, yeah.  I got -- I was

13   misunderstood because it says have I ever -- it says have I

14   been there, yes, but then the question at the top in bold made

15   a comment about -- where did it go?  Something about --

16   January 6th.  And I just wanted to make sure that they knew --

17   or you knew that I've been to the Capitol before, but not on

18   that day.

19                THE COURT:  Right.  Okay.

20                THE PROSPECTIVE JUROR:  Okay.

21                THE COURT:  Yeah, we appreciate that.

22        So to the extent you've been there, can you tell us

23   when, and then for what reason.

24                THE PROSPECTIVE JUROR:  Well, I work close to the

25   area, so that's where I walk.

1          THE COURT:  I see.  So you just walk past the

2     grounds?

3          THE PROSPECTIVE JUROR:  Right.

4          THE COURT:  Gotcha.

5          If I could please ask you to turn to page 11.  Questions

6     45, 46, and 47.  We tried to get a sense of how much news

7     you've consumed about the events of January 6th.  Can you just

8     give us a sense generally of how closely you have followed the

9     news about the events of that day.

10          THE PROSPECTIVE JUROR:  Not much.  The only time I

11     watch news in the evening -- well, in the morning, it's really

12     to hear the news so I can get dressed.  It's background noise,

13     and I just go for the weather.  But I try to watch David Muir

14     and Lester Holt in the evenings; the 6:30, David Muir; and the

15     7:00, Lester Holt.  And that's, like, 30 minutes each.

16          THE COURT:  Okay.  And in the context of those news

17     broadcasts that you've watched, do you recall there being

18     stories about January 6th?

19          THE PROSPECTIVE JUROR:  Yes.  In that short period of

20     time, all the sensationalized about showing a lot of pictures

21     of them storming it.  Really any major content, I didn't get

22     any of that too much.

23          THE COURT:  Okay.  So if you were selected as a

24     juror, we would ask you to set aside what you've seen or what

25     you've heard about the events of that day and evaluate the

1    evidence as it relates to these defendants based on the

2    evidence alone.  Could you do that?

3              THE PROSPECTIVE JUROR:  I could.

4              THE COURT:  Okay.  Any follow-up from the government?

5              MS. RAKOCZY:  No.  Thank you.

6              THE COURT:  Anything from the defense?

7              MS. HALLER:  No, Your Honor.

8              MR. MACHADO:  Yes.

9         Ma'am, with regard to walking around the Capitol, would

10   you -- did you walk around the Capitol area around the time of

11   January 6th?

12             THE PROSPECTIVE JUROR:  No.

13             MR. MACHADO:  That's something more recent or in the

14   past or --

15             THE PROSPECTIVE JUROR:  In the past.

16             MR. MACHADO:  All right.  Thank you very much.

17             THE PROSPECTIVE JUROR:  Yep.

18             THE COURT:  All right, ma'am.  Thank you very much

19   for your time.

20             THE PROSPECTIVE JUROR:  Okay.  Thank you.

21             THE COURT:  Mr. Douyon will show you out and provide

22   you with additional instructions.

23             (REPORTER'S NOTE:  Juror 1188 left.)

24             MR. MACHADO:  Your Honor, while we have a second, I

25   think the government and -- at least I have 32 qualified.

```
 1              THE COURT:  (Nods head.)

 2              MR. MACHADO:  Great.  Thank you.

 3              MS. HALLER:  32?

 4              MR. MACHADO:  32.

 5              (REPORTER'S NOTE:  Juror 0788 enters.)

 6              THE COURTROOM DEPUTY:  Your Honor, this is

 7    Juror No. 0788.

 8              THE COURT:  Hi, sir.  How are you?

 9              THE PROSPECTIVE JUROR:  Fine.

10              THE COURT:  Thank you for being here with us this

11    afternoon, and thank you for your patience.

12         You are Juror 0788?

13              THE PROSPECTIVE JUROR:  Yes.

14              THE COURT:  Okay.  Feel free to remove your mask if

15    you're comfortable doing so.  I'm going to ask you to speak

16    into the microphone and keep your voice up so everyone can hear

17    you.

18         So first question -- your juror questionnaire is there

19    in front of you.  I'll ask you to pick that up, please, and

20    turn to page 5.

21         You've told us that you live -- or that your

22    neighborhood is Capitol Hill.  On January 6th, did you live on

23    the Hill?

24              THE PROSPECTIVE JUROR:  I did.

25              THE COURT:  And when you -- were you home that day?
```

```
1              THE PROSPECTIVE JUROR:  I was.

2              THE COURT:  And did you observe any events or people

3    who may have participated in the events of that day?

4              THE PROSPECTIVE JUROR:  On TV.  I don't think I left

5    the apartment that day.

6              THE COURT:  Okay.  So in terms of your personal

7    observations, even around your neighborhood, you didn't see

8    anything; is that correct?

9              THE PROSPECTIVE JUROR:  The Capitol was shut down at

10   my street.  So my street was closed.

11             THE COURT:  Okay.  So -- but did you see people

12   marching by, or did you hear any sounds or -- or anything with

13   respect to that?

14             THE PROSPECTIVE JUROR:  I learned all of it just from

15   news media.

16             THE COURT:  Okay.  Gotcha.

17        Let me ask you this:  Based upon where you were located

18   and what you were seeing on the news, did you -- were you

19   fearful of your own safety?

20             THE PROSPECTIVE JUROR:  On January 6th?  No.

21             THE COURT:  All right.  And how about for the safety

22   of your neighbors or -- or others that lived in the area?

23             THE PROSPECTIVE JUROR:  Not on that day, no.

24             THE COURT:  Okay.  All right.  So if I could please

25   ask you to turn to page 12.  And I'll direct you to
```

1    Question 53.  Question 53, we asked you whether you've read,

2    seen, or heard anything about the Oath Keepers organization or

3    any judicial proceedings involving the organization or its

4    members.  You answered that yes.  Can you tell us what you have

5    read, seen, or heard.

6              THE PROSPECTIVE JUROR:  I watch the news every night,

7    and it's just been regularly on the news.

8              THE COURT:  Okay.

9              THE PROSPECTIVE JUROR:  That's about the extent of

10   it.

11             THE COURT:  Okay.  So based on your viewing of the

12   news, can you tell us what you have retained or what you

13   believe you understand about the organization?

14             THE PROSPECTIVE JUROR:  I'm aware that they were

15   there on January 6th at the march.  I'm aware that several

16   members have been arrested.  I believe several have been

17   convicted already.  I think that's probably the extent of what

18   I know.

19             THE COURT:  Okay.  And when -- starting at the first

20   response, you said that the organization, its members were

21   involved.  Do you have a firmer sense of the way in which they

22   were involved or may have been involved in the events of the

23   6th?

24             THE PROSPECTIVE JUROR:  I remember news footage of --

25   of them marching on the Mall.

1              THE COURT:  Marching on the Mall?

2              THE PROSPECTIVE JUROR:  That's what I recall, yeah.

3              THE COURT:  Okay.  Any other footage or information

4  specific to the organization or its members?

5              THE PROSPECTIVE JUROR:  I mean, I feel like I've seen

6  them on the Mall at other occasions.  So I don't know if that

7  was before or after January 6th.

8              THE COURT:  Okay.

9              THE PROSPECTIVE JUROR:  But at that time I would have

10  been running on the Mall almost every day.  So there have been

11  times where I've seen people wearing that paraphernalia.

12              THE COURT:  Let me ask you:  Did you either -- there

13  were a couple of election-related rallies in Washington, D.C.,

14  in November of 2020 and then again -- these are post-election

15  rallies.  November 2020 and then again in December of 2020.  Do

16  you recall running by or seeing any of those rallies?

17              THE PROSPECTIVE JUROR:  Most likely I did.  Like I

18  said, I -- I live at Sixth and East Capitol, and my running

19  route is to the Capitol, down to the Mall, to the Washington

20  Monument, and back.

21              THE COURT:  Okay.

22              THE PROSPECTIVE JUROR:  And so I regularly see

23  whoever it is on the Mall protesting or organizing or whatever

24  the case may be.  And on at least one, if not more occasions, I

25  recall seeing Oath Keepers in some of those crowds.

```
 1              THE COURT:  Okay.  And why do you say -- why do
 2     you think you were able to identify these people as
 3     Oath Keepers?
 4              THE PROSPECTIVE JUROR:  I think they have, like,
 5     black and yellow clothing or insignia or something.  I'm not --
 6     I'm just connecting that from the news.  I could be completely
 7     wrong, but that was my impression.
 8              THE COURT:  Okay.  And anything -- could you just
 9     describe the clothing that you believe Oath Keepers were
10     wearing in the rallies or demonstrations that you have run by.
11              THE PROSPECTIVE JUROR:  I mean, it would have been --
12     I don't know.  How would I describe it?  Kind of like
13     biker-type clothing, black.  I feel like there was yellow
14     insignia.  Also, a lot of, like, "Don't Tread on Me" stuff.  I
15     don't know if that's associated with the Oath Keepers or not.
16     But, yeah, that type of clothing.
17              THE COURT:  Okay.  Let me ask you this:  Do you have
18     a sense of what the organization's mission, purpose is; what it
19     stands for?
20              THE PROSPECTIVE JUROR:  I don't think I could
21     accurately represent that to anyone, no.
22              THE COURT:  Okay.  What's your sense, even if it may
23     be inaccurate?
24              THE PROSPECTIVE JUROR:  From media, I would think
25     that they are an organization that was not happy with the
```

1    election.  They may have been characterized as, like, a white

2    supremacist organization.  That would be my kind of high-level

3    perspective.

4         THE COURT:  And when you say the words "white

5    supremacist," do you have -- is there a certain connection in

6    your mind between the organization known as the Oath Keepers

7    and that characterization, or are you just recalling something

8    that may or may not be accurate?

9         THE PROSPECTIVE JUROR:  I don't know if it's accurate

10   or not.  I have not done any research on the Oath Keepers.  I

11   feel like that's how the media has portrayed them.

12        THE COURT:  Okay.  So let me ask you this:  If that

13   is what you've heard in terms of potential media portrayal,

14   how do you think it would affect your ability if you were

15   selected to serve and be fair and impartial to these

16   defendants who are all either members of or affiliated with the

17   group?

18        THE PROSPECTIVE JUROR:  I mean, I hope I could

19   presume innocence of any person who is standing trial.  So to

20   the best of my ability, I would do that.

21        THE COURT:  Do you have some concerns about your

22   ability to do that given what you just described to us and what

23   you've learned in the media?

24        THE PROSPECTIVE JUROR:  Unclear in my mind.

25        THE COURT:  Unclear?

 1          THE PROSPECTIVE JUROR:  (Nods head.)

 2          THE COURT:  So you have -- let me ask you this:  Do

 3   you have reservations in your mind about your ability to remain

 4   fair and impartial given what you've heard and what your

 5   suppositions are about members of the group?

 6          THE PROSPECTIVE JUROR:  I -- I've certainly had those

 7   questions in my mind since January 13th [sic].  I wasn't

 8   involved in any way, but certainly lived close to the actions,

 9   so.

10          THE COURT:  Okay.  And to the extent you had

11   questions in your mind, how have you resolved them, if you

12   have?

13          THE PROSPECTIVE JUROR:  I've resolved to come here

14   and tell the truth.

15          THE COURT:  All right.  Okay.  Any objections from

16   the government?

17          MS. RAKOCZY:  Can I just ask one question, follow-up

18   question?

19          THE COURT:  Sure.

20          MS. RAKOCZY:  Sir, thank you for coming today, and

21   thank you for being up-front about what you know and what

22   you've heard in advance.

23       If the judge instructs you that you need to consider

24   just the evidence you've heard here and put aside what you have

25   heard elsewhere, do you think you could follow that instruction

1    or do you think what you've heard would be too hard to

2    completely set aside?

3              THE PROSPECTIVE JUROR:  I think I can.

4              THE COURT:  Okay.

5              MS. RAKOCZY:  Thank you.

6              THE COURT:  Any objections from defense?

7              MR. MACHADO:  Yes.

8         With regard to your -- your exercising, jogging around,

9    were you doing that around January 6th as well?

10             THE PROSPECTIVE JUROR:  Yes.  I don't record my jogs.

11   But if you had asked me did I jog the day before, the two days

12   before, I would have said yes.  I don't -- I don't recall

13   jogging on January 6th.  I was working that day.  But most

14   likely the day before or the day before that.

15             MR. MACHADO:  Okay.  And that's fine.  I don't need

16   that specific date.

17        But do you recall around that time viewing the security

18   measures and other things that were set up at the Capitol?  Do

19   you have any recollection about how things were around that

20   time?

21             THE PROSPECTIVE JUROR:  So I certainly -- certainly

22   recollect the -- the security measures after that day --

23             MR. MACHADO:  Okay.

24             THE PROSPECTIVE JUROR:  -- and how they were very

25   different and how they significantly impacted our community.

1    And so I could certainly say how free it was to walk on

2    the Capitol the day before just because, you know, I would

3    have just enjoyed a run like I would normally around the

4    Capitol.

5             MR. MACHADO:  So you definitely remember things

6    being more secure and tight before January 6th and -- or after

7    January 6th?

8             THE PROSPECTIVE JUROR:  Certainly after, yeah.  Yeah.

9             MR. MACHADO:  Okay.

10            THE PROSPECTIVE JUROR:  I mean, obviously, the

11   security around the Capitol changes regularly.  So today it's

12   secure again.  And so I notice those things when I run because

13   my normal path is, like, beeline for the Capitol, right down

14   East Capitol Street, and run as close to the Capitol -- along

15   the Capitol and then down on the Mall.  You know, that means I

16   don't have to cross as many streets if I stick close to the

17   Capitol.

18            So whenever there's an event, that pushes you all the

19   way out to Independence and Constitution.  And then, of course,

20   after January 6th, even that was cut off.  So if you lived on

21   the Hill, there was no way for a pedestrian to get down to the

22   Mall for an extended period of time.

23            MR. MACHADO:  Thank you.  I appreciate it.

24            THE COURT:  All right, sir.  Thank you very much for

25   your time.

```
 1              Mr. Douyon will show you out of the courtroom --
 2              MR. ROSSI:  Your Honor --
 3              THE COURT:  -- and provide you additional
 4    instructions.
 5              (REPORTER'S NOTE:  Juror 0788 left.)
 6              MR. ROSSI:  I apologize.  I missed the cue,
 7    Your Honor.
 8              THE COURT:  I'm going to strike 0788 for cause.  I
 9    didn't get a very high degree of confidence from his responses
10    to questions about bias and ability to set it aside; that he
11    would be able to do so.
12              MR. ROSSI:  Thank you, Your Honor.
13              THE COURT:  Okay.  So that is the last of our jurors
14    for the day.  We'll pick up tomorrow, again, at 9:30.  I have
15    32 qualified.  Maybe we get to the magic number tomorrow.
16    Let's hope.
17         So, obviously, no openings tomorrow.  I think
18    realistically what we're looking at is, hopefully, having
19    enough qualified by tomorrow and then making strikes on
20    Thursday morning and then going into openings shortly after
21    that and, ideally, finishing them all in one day.
22         So do you-all have a sense at this point how long your
23    openings will be?
24              MS. RAKOCZY:  Between 45 minutes and an hour for the
25    government, Your Honor.
```

```
 1              THE COURT:  Okay.  Mr. Machado?

 2              MR. MACHADO:  Probably 15 minutes, Your Honor.

 3    Although I do want to have a discussion about Mr. Brennwald and

 4    what's going to be on there, just to -- whether he's going to

 5    be joining us and what's going to be happening.

 6              THE COURT:  Well, I would hope he would be here with

 7    us by then.

 8              Mr. Brennwald, do you have any updates on your

 9    condition?

10              MR. BRENNWALD:  Yes, Your Honor.  I'll be coming in

11    tomorrow with a mask.

12              THE COURT:  Mr. Brennwald, we can't hear you.

13              MR. BRENNWALD:  Can you hear that now?

14              THE COURT:  So you said you'll be here tomorrow with

15    a mask on; is that correct?

16              MR. BRENNWALD:  Yes, Your Honor.

17              And as to my opening -- opening statement, I'm guessing

18    20 to 25 minutes.  I tend to be a little bit detailed, but I'll

19    try not to overdo it.

20              THE COURT:  All right.  For those of you who weren't

21    able to hear, Mr. Brennwald said his opening would be about 20

22    to 25 minutes.

23              I can't remember who is next on the indictment.  But

24    just -- Mr. Cooper.

25              MR. COOPER:  Probably 10 to 15.
```

```
 1              THE COURT:  Okay.  And then Ms. Meggs -- for
 2    Ms. Meggs.
 3              MS. HALLER:  About 45 minutes, Your Honor.
 4              THE COURT:  Okay.  And then Mr. Rossi.
 5              MR. ROSSI:  Forty.
 6              THE COURT:  All right.
 7              MR. ROSSI:  Your Honor, you don't have to smile.
 8              THE COURT:  And then Ms. Redden.
 9              MS. REDDEN:  I'll be reserving, Your Honor.
10              MR. COOPER:  Can I change my answer?
11              THE COURT:  Only if the answer is revised to go down
12    in time.
13         All right.  So I think even with some of our longer
14    openings, I think we should be able to -- if -- if we are -- if
15    we have the number of qualified tomorrow, we select the jury
16    first thing Thursday morning, we should be able to get through
17    openings on Thursday and begin with government evidence Friday.
18    So I think, realistically, your first witness should be
19    available Friday morning.
20              MS. RAKOCZY:  Thank you, Your Honor.
21              THE COURT:  Okay.  All right.
22              MS. RAKOCZY:  Your Honor, it may be that we have some
23    extra time Thursday afternoon to address this, but we did want
24    to ask to set aside just a little bit of time with the Court --
25    probably no more than half an hour or 45 minutes -- to address
```

1    a few questions of relevance and inadmissibility for the

2    exhibits that the government is discussing stipulations with

3    the defense, and I think they'd like to address the question of

4    admissibility and relevance before agreeing to the stipulations

5    to authenticity.

6              THE COURT:  Okay.  Well --

7              MR. WOODWARD:  I don't know why she looks at me,

8    Your Honor.

9              MS. RAKOCZY:  Because you were so helpful in

10   conveying the position of the defense in our discussions.

11             THE COURT:  In that case, let's take 15 minutes.  And

12   Mr. Woodward can tell us what he's objecting to then.

13             Thanks.  We'll see you-all in 15 minutes.

14             (Recess taken.)

15             THE COURT:  Okay.  So do we have everybody back?

16             All right.  I think we have everybody back.  So who

17   would like to tee up the evidentiary issues?  Ms. Rakoczy?

18             MS. RAKOCZY:  I'm going to defer to Mr. Edwards on

19   this, Your Honor.

20             THE COURT:  Ah, Mr. Edwards.

21             MR. EDWARDS:  Yes, Your Honor.  Thank you,

22   Your Honor.

23             I think, respectfully, it might make more sense for

24   defense to come up.  The only reason I state that is because

25   I'm not actually sure which pieces of evidence -- specifically

1    of the evidence that we're discussing stipulations for -- they

2    have objections to for relevance as opposed to authenticity.  I

3    think both of those exist at differing levels for various parts

4    and pieces of evidence.

5         I will say -- I don't want to speak for defense

6    counsel -- I think the pieces of evidence involve the

7    following:  The Zello chat that Jessica Watkins was on and

8    other individuals; the GoToMeeting, I believe, is another; and

9    then a couple videos that were from, I think, the day of

10   January 6th.

11        And I think that there are different arguments as to

12   authenticity and relevance, but I -- I'm not sure I could

13   articulate them just because it's been raised at kind of a

14   surface level to us.

15            THE COURT:  Okay.  Why don't we start with the

16   authenticity questions.

17            MS. HALLER:  Your Honor, just on the GoToMeeting,

18   which is the only one I will speak to -- is it -- it's a

19   recording, from what we understand, from when Mr. Rasheed

20   testified, that he made off one phone to the other phone.  And

21   it's very unclear.  You cannot understand who's saying what on

22   that video.  The -- the transcripts we have received from the

23   government for it were changed at least four or five times

24   before the final one was submitted in Rhodes 1.  And so on

25   authenticity, yes, we have an objection, and we would ask the

1    government to recall Rasheed.  That's the only one right now

2    that I'm raising.

3         But the other point that I would raise on the statements

4    the government intends to introduce -- which is not a

5    stipulation question -- we can go through -- but at some point

6    we'd like to discuss the statements they're intending to -- to

7    admit.  They've parsoned [sic] out by group chats -- and I

8    understand what the Court has already ruled.  But there's also,

9    number one, the election-night texts, which the Court has not

10   yet ruled on; and prior to that, the September text messages

11   from Kelly Meggs that relate to a training he went to in

12   September, but the text messages are also from September.  So

13   we would object to those as outside the conspiracy.  So we

14   would also address statements at some point.

15        But as to stipulations, we have given our consent and

16   agreed to stipulate on some of the videos, such as Stephen

17   Horn, such as Derrick Evans.  I don't have the list in front of

18   me.  But the only one I'm specifically raising an objection to

19   on authenticity that we don't want to stipulate on is the

20   GoToMeeting.

21             THE COURT:  Okay.

22             MS. HALLER:  On authenticity, Meggs -- Connie Meggs

23   does not object on authenticity, but I believe another

24   defendant may have an objection.

25             THE COURT:  I'm confused.  I thought you were

 1    objecting on authenticity grounds to the GoToMeeting recording.

 2              MS. HALLER:  Yes, Your Honor.  The Zello call --

 3              THE COURT:  Oh, the Zello call.

 4              MS. HALLER:  -- Connie Meggs is not objecting to on

 5    the grounds of authenticity.

 6              THE COURT:  Okay.

 7              MS. HALLER:  But somebody else may speak to that.

 8              THE COURT:  Okay.

 9              MS. HALLER:  So I will have someone else address it.

10              MR. WOODWARD:  Just -- as we were -- as defense

11    counsel dutifully gathered over the weekend to talk through the

12    stipulations that the government had proposed, limiting it to

13    about the first week or so of testimony, we were informed that

14    in the second trial, some -- potentially many of the videos

15    that are in question here the Court allowed in through the

16    testimony of officers or other individuals who were able to

17    authenticate the video based on what they had seen and heard

18    that day.

19         And so they did not create the video in question, but

20    after watching it, they were able to, presumably, testify that,

21    yes, that is a fair and accurate depiction of the scene as I

22    witnessed it or -- and that I think -- I also understand that

23    the Court allowed officers to review or to testify, rather,

24    that they had reviewed CCTV footage of an area; and that

25    following their review of CCTV footage of that area, they were

1    then able to look at other video, not CCTV footage, but video

2    created by individuals who were present and to authenticate it

3    by saying that following my review of CCTV footage of a

4    particular area -- presumably the steps of the Capitol and

5    then the Rotunda.  Following my review of the CCTV footage of

6    this area, I have now reviewed this video footage obtained by

7    the government from some third-party source, and the video is

8    a fair and accurate depiction of what I saw in the CCTV

9    footage.

10          And so that discussion with the government led us to

11   where we are today, which is, well, if the Court is inclined to

12   permit authenticity through that means, we need not reach an

13   agreement on whether the government has to subpoena, for

14   example, members of the press who created video or worse --

15   maybe not worse is the right word.  But as complicated

16   witnesses who are potentially going to invoke the Fifth, as the

17   Court recalls those discussions.

18          So while I appreciate my colleague Mr. Edwards directing

19   the spotlight over to this side of the aisle, it is -- very

20   much still remains a collaborative effort.  And so I would

21   appreciate the government's indication of the stipulations --

22   for the stipulations they've propounded which they believe they

23   can bring in -- assuming the Court is going to, again, allow

24   the government to do this, which of the video they believe they

25   can bring in through this -- I'm going to bury the lede here,

1    but the hybrid approach to authenticity that was fashioned in

2    -- in the Rhodes 2 trial.

3            Is the Court following?  Yeah.

4            And so we have here about two dozen videos, although

5    maybe only half a dozen individuals.  And my question for the

6    government would be:  Of those, which does it believe it can

7    admit through the testimony of someone other than the content

8    creator?

9            THE COURT:  So I don't recall -- well, let me back

10   up.

11           As to the first mode of authentication, if a person who

12   is present on that day can say that the video fairly and

13   accurately depicts what they observed on that day, the creator

14   of the content doesn't need to be there to authenticate the

15   video.

16           MR. WOODWARD:  On behalf of Mrs. Meggs, we agree.

17           THE COURT:  I don't recall the other way in which

18   you've suggested I did allow authenticity at the second trial.

19           Maybe, Mr. Edwards, you can --

20           MR. EDWARDS:  No.  And I apologize if there was a

21   miscommunication to Mr. Woodward and the government.  So what I

22   intended to articulate was there were two times this came up in

23   the prior two trials.  One was the --

24           THE COURT REPORTER:  Say that again.

25           MR. EDWARDS:  *Declare Your Independence* podcast.  And

1    I will slow down.  I've been excited to jump up here today.

2        So the *Declare Your Independence* podcast was an example

3    of the evidence that we authenticated with an agent who was

4    able to talk about the metadata and the method of downloading

5    from the internet.

6        THE COURT:  The *Declare Your Independence* is --

7        MR. EDWARDS:  The January 6th and 7th podcast that

8    Mr. Vallejo and Mr. Kandaris were on.

9        THE COURT:  Right.

10       MR. EDWARDS:  So that was an example that I offered

11   to the defense as an example of not needing -- the government

12   not needing a witness to come in and authenticate; that the

13   Court was open, if the agents were able to check certain boxes,

14   to authenticate certain evidence.  And that, in fact, happened

15   for the podcasts.

16       THE COURT:  All right.  I think my recollection was

17   that the agent was able to get on the stand and say we -- we,

18   the FBI -- maybe that agent in particular -- went to perhaps

19   his website, or wherever he would have gone, and identified the

20   audio that was on that web page or in that -- where did they

21   find it?

22       MR. EDWARDS:  The Phoenix -- Phoenix Freedom [sic]

23   website, which posts the *Declare Your Independence* podcast.

24       THE COURT:  So he went to the website, identified the

25   audio, downloaded the audio, listened to the audio; this is a

1    fair and accurate -- this is fair and accurate -- this is what

2    was downloaded.  The audio was downloaded.

3          And then I think on -- we also ensured that the agent

4    was able to identify the voices of Mr. Kandaris, Mr. Vallejo,

5    and the host.  So it would be the combination of all that

6    testimony that I thought established authenticity of that

7    exhibit.

8                MR. EDWARDS:  Right.

9          Then the second example that I gave to defense was one

10   in which I could have been clearer.  It was one that was raised

11   in either the first or second trial, Ms. SoRelle's Facebook

12   live videos.  At some point there was a bit of a debate between

13   the parties as to whether someone would stipulate.

14         And my -- if -- if I recall it correctly, there was a

15   conversation with the Court, or at least open thought as to,

16   well, if the government can authenticate using CCTV that had

17   been stipulated to by the defense and can see this party moving

18   in the exact same way and together at the same time and in the

19   same location.  But we didn't end up actually doing that

20   because we reached a stipulation.  So there was not actually a

21   ruling from the Court.

22               THE COURT:  Right.

23               MR. EDWARDS:  It was just a conversation with the

24   Court and parties as --

25               THE COURT:  Okay.  Because I didn't recall, sort of,

1      the two-step stipulation that Mr. Woodward had suggested.

2                MR. EDWARDS:  Right.  Right.  And so I raised that.

3                THE COURT:  Authentication.  Not stipulation.  Sorry.

4                MR. EDWARDS:  Correct.

5           So I raised that as an example of a conversation we

6      previously had, as the parties and with the Court.  We didn't

7      end up going that direction because the parties reached a

8      stipulation on those videos.

9           But I was highlighting for the defense that some of

10     these videos, the stipulation would not be stipulating away a

11     witness's testimony.  So I understand Mr. Woodward's question

12     to be, give us the -- give us your position as to the status of

13     witnesses the government would call if we didn't stip.  What

14     you might be stipulating away is certain questions to an agent

15     who has reviewed CCTV to authenticate these videos, to be able

16     to say there are these videos that the parties all agree are

17     authentic with time stamps and are what they purport to be.

18          So to answer his first question:  What videos does the

19     government think we would attempt to do that with if they

20     didn't stipulate?  We believe we can do that with nearly all of

21     them.  These are videos that are outside that are depicted in

22     CCTV or some inside.  And it will show various people's

23     activity.

24               THE COURT:  Okay.  I'm not quite sure I follow then

25     where the conflict is.

```
1            MR. EDWARDS:  I think it's that the defense doesn't
2     agree that that's an appropriate method of authenticity.
3            THE COURT:  What is not an appropriate method?
4            MR. EDWARDS:  Using the CCTV and using an agent as
5     opposed to somebody who recorded the video.
6            THE COURT:  Well, again, if what you mean by the CCTV
7     is -- you don't need the creator of the content to come in to
8     authenticate it.  All you need is somebody to say, whether it's
9     a photograph or some other visual depiction, like a video, that
10    this fairly and accurately represents the circumstances at this
11    place and at this time.  That's all you need.  You don't
12    need -- as you all know, you don't need the person who actually
13    filmed the video to come in.
14           So with the CCTV, I'm not quite sure I understand what
15    the problem is if an agent is prepared to come in and -- well,
16    sorry.  Not an agent.  Someone who was there is prepared to
17    come in and say this was a fair and accurate depiction.  I
18    suppose the alternative is to bring in, you know, some
19    custodian of records from the Capitol --
20           MR. WOODWARD:  We've stipulated --
21           THE COURT:  -- but I don't know that you're asking
22    for that.
23           MR. WOODWARD:  I'm sorry to talk over you, Your
24    Honor.
25           We've stipulated for CCTV.
```

1           THE COURT:  Okay.

2           MR. WOODWARD:  So that isn't an issue.  It is the

3     content created by third parties --

4           THE COURT:  Right.

5           MR. WOODWARD:  -- for which -- which is different

6     from CCTV.

7           THE COURT:  Uh-huh.

8           MR. WOODWARD:  So the question is:  How does the

9     government intend to authenticate?  What is the status of a

10    witness who would come in and say, whether the creator or

11    otherwise, that is what I saw that day?

12          THE COURT:  Correct.  Right.  So if -- for example, I

13    think that happened with the Capitol Hill -- Capitol Police

14    officers who were manning the east doors, I believe.

15          MR. EDWARDS:  Yes, Your Honor.

16          THE COURT:  They were able to authenticate video in

17    that way.  I don't remember anybody else.

18          MR. EDWARDS:  There are -- in the past two trials,

19    there have been certain videos, cooperators have looked at and

20    said, yes, that's me or, yes, that's someone else I saw.

21         So through some combination of civilian and law

22    enforcement witnesses and so -- set that aside.  If we're all

23    in agreement that that's an appropriate way to authenticate,

24    the government agrees.  And there are some videos the

25    government will authenticate through that manner if there is

1    not a stipulation.

2              THE COURT:  Okay.

3              MR. EDWARDS:  The second manner in which we would

4    authenticate certain videos is this -- and I'll use

5    Your Honor's terminology -- this two-step process; right?  That

6    there is CCTV that shows the exact same parties based on the

7    clothing and their actions and where they are located on the

8    Capitol Grounds or inside the Capitol and their movements, both

9    parties are agreeing that that CCTV is authentic, it is what it

10   purports to be, it is the correct time stamp.

11             And if the video is a first-person account and shows the

12   exact same group of people moving and doing the exact same

13   things, it's the government's position that is not problematic

14   for an agent to say, I have reviewed CCTV, which we all agree

15   is authentic, and is what it purports to be.  It shows this

16   exact same movement.  And so, therefore, that video is

17   authentic.

18             If the defense wants to raise an issue as to, well, it

19   could have been doctored in certain ways, I mean, we're now on

20   the third trial.  I understand these are new defendants, but

21   that issue has not come up on any of these videos.  And so I

22   think that that is -- if the defense wants to raise that issue,

23   they can.  I don't hear that to be the case.  I hear this to

24   just be a general "that's not an appropriate way to authentic."

25   And I think the government's position is it is given the status

1          of the CCTV.

2                  MR. WOODWARD:  My colleague is correct.  We're not

3          going to argue to the Court there's doctored video.  I don't

4          have proof of a doctored video to proffer to the Court.  But

5          the rules of evidence do exist for a reason, and this would be

6          a novel way of introducing video in what is a novel case.  And

7          so the defense is not prepared to stipulate or otherwise agree

8          that -- that it is an appropriate way to admit video taken by

9          third parties in this case.

10                 We respect the government and its efforts to do this.

11         We respect the province of the Court and its ultimate

12         determination of whether this is appropriate in this matter.

13         You know, we -- we have treaded new ground in video recently;

14         for example, in the introduction of -- of CCTV video where

15         nobody is present; right?

16                 The D.C. Court of Appeals had to address the question

17         of, well, how do you authenticate that?  Well, you

18         authenticate, as the Court did, for the Ernest Hancock video.

19         The government obtained it.  We know it was recorded in a

20         reliable manner.  This is not that, but it is -- and it is

21         different, and so --

22                 THE COURT:  Let me just -- let me just share my

23         off-the-cuff thoughts.  I mean, I -- I suppose I'd have to see

24         specifically what you're talking about.  That said, it seems a

25         little awkward to me, leaving aside the propriety of it, to

1   have an agent look at CCTV from a particular angle and then say

2   that a different video from a different angle that arguably

3   captures different people, sounds, et cetera, is authentic

4   based upon the authenticity of the CCTV.

5        That seems strange to me that somebody could do that,

6   because, essentially, you're not asking them to authenticate

7   something.  You're actually asking them to make a comparison,

8   to, essentially, match up the video.  And I suppose that's

9   something a layperson could do, but I'm not so sure about that

10  either.

11       MR. EDWARDS:  Yes, Your Honor.

12       I'd have to go back -- and I should have been prepared

13  this morning -- to -- this afternoon to -- I -- I may have

14  misspoken.  With the Kellye SoRelle videos, the Facebook live

15  videos, I believe the government -- this is how we introduced

16  them during the first trial.  And my colleague reminded me that

17  we might not have ended up reaching the stipulation, and I see

18  the Court's reaction.  Maybe -- I may be misremembering here.

19  So I'd like to dig back into that just to see if that's how we

20  did it.  I recall we did the analysis and homework to make sure

21  that it was all compared.  It's just my memory is -- is a

22  little fuzzy on whether that's actually how we introduced it to

23  the jury.

24       So that -- that said, I would disagree a little bit with

25  Mr. Woodward's statement that this is novel.  This is something

1    the government has done in, you know, Superior Court cases to

2    introduce body-worn camera that shows actions and activities

3    that are going on around in a scene to be able to show this is

4    what happened.  There was an agreement among the parties about

5    body-worn camera, and then somebody's cell phone video might

6    show a similar action.

7         I do understand the difference there; that body-worn

8    camera may capture audio, and so the audio is the same, and

9    that may add an element of authenticity.  But I'm not so sure

10   the Court's concern about this just being a comparison is

11   problematic to the question of whether it's authentic.  I'm

12   not -- I think it's the government's position that it doesn't

13   have to be a witness who perceived it live to say it's

14   authentic.  Comparison is possibly an appropriate way to

15   authenticate.

16        THE COURT:  I mean, authenticity is simply a

17   foundation of evidence that establishes that the evidence

18   purports to be what it is.  And, again, I guess I'd have to

19   think about this some more.  But, again, it seems odd to me

20   that a depiction of what is purported to be the same scene but

21   captures different angles, different sounds, perhaps, that by

22   watching Video A one could authenticate Video B.  Now, maybe

23   they're doing that over in the Superior Court.  I don't know if

24   there's a Court of Appeals decision.  I would welcome some

25   guidance on that.

1      MR. EDWARDS:  It's possible I was doing it

2   incorrectly.

3      THE COURT:  What's that?

4      MR. EDWARDS:  It's possible I was just doing it

5   incorrectly.

6      THE COURT:  Maybe.  Maybe not.  I don't know.  I have

7   not encountered this.  So I guess what I'll say is this:

8   You-all continue to have a discussion.  If we are in a position

9   where it's either/or -- in other words, either it's this

10   two-step process you're talking about or it's not -- or the

11   only other alternative is to identify the creator and have the

12   creator come in, which poses some difficulties, let me know and

13   I'll make a ruling.

14      MR. EDWARDS:  Yes, Your Honor.

15      The one -- the last thing I'll note is it's not simply

16   that an agent is taking the stand and comparing two videos.

17   It's a legal question, I believe, for the Court to determine

18   whether or not it has become -- the government has met its

19   burden that it's authentic.

20      THE COURT:  Right.

21      MR. EDWARDS:  And so if that's the case, then I think

22   it's -- it's actually two steps that the government is taking

23   for the Court, if not for the jury.

24      One is the agent, which is just a vessel through which

25   to talk about the CCTV comparison.  But what makes the

1    secondary video authentic is the second step, which is the

2    stipulation across the parties that that CCTV is what it

3    purports to be.  I know that's not addressing the Court's

4    concern about an added layer, which is a different angle or

5    audio, but I thought I would just clarify that it's because

6    it's a legal question, I do think it's appropriate for the

7    Court to consider that second step, which is that the parties

8    have agreed that the CCTV is authentic.

9         THE COURT:  No, I understand that.  I'm not -- I'm

10   not discounting that.  I understand that fully, and I

11   understand, frankly, that's the predicate for the second step,

12   which is that nobody is disputing that a particular CCTV

13   depiction is what it purports to be and fairly and accurately

14   does so.

15        So the question is is there some basis to then say, all

16   right, well, here's this other video of a slightly different

17   angle, different sounds, et cetera, and you can infer the

18   authenticity based upon the CCTV video.  I don't know.  I'd

19   have to think about it.

20        MR. EDWARDS:  Right.

21        My colleague helpfully reminds me that -- for the Court

22   to consider Rule 901(b)(3), which permits authentication by

23   comparison with other admitted evidence, which is -- seems

24   directly on point.

25        THE COURT:  Okay.

1          MR. EDWARDS:  So, Your Honor, if we -- what might be

2     helpful is if the parties can get together and identify which

3     specific videos this is going to be a problem for.  And I

4     understand Mr. Woodward and I have a conversation or two to

5     figure out who's to get that ball rolling.  We can do that.  In

6     the meantime, if we find anything on point, we can provide it

7     to the Court.

8          THE COURT:  Okay.

9          MR. EDWARDS:  I don't believe this will be an issue

10    in opening, and so this is something that we can continue to

11    work on.

12          I know Mr. Rossi wants to address the Zello chat.  So

13    I'll defer to the Court, but I'm happy to address the

14    GoToMeeting and statements and then -- or just let Mr. Rossi

15    come up and address Zello.  I'm happy to do it either way.

16          THE COURT:  Hang on one second.

17          What 901(b)(3) says is that -- it's a little of examples

18    of evidence that satisfies the authenticity requirement, and

19    it's -- 903(b)(3) [sic] is titled Comparison by an Expert

20    Witness or the Trier of Fact.  And then this simply says, "A

21    comparison with an authenticated specimen by an expert witness

22    or the trier of fact."  I'm not quite sure what that trier of

23    fact portion means, but.

24          MR. EDWARDS:  If we could --

25          MR. WOODWARD:  (Inaudible.)

1          THE COURT REPORTER:  I can't hear you.

2          THE COURT:  Was that a bench trial?

3          MR. WOODWARD:  Handwriting experts.

4          THE COURT:  No, I get the expert part.  I'm just

5     trying to understand what the trier of fact part is.

6          MR. WOODWARD:  It's -- the comment explains that the

7     rule addresses comparisons of handwriting samples, and so --

8     not applicable to -- to video or at least would be novelly

9     applicable to video.

10         MR. EDWARDS:  One thing --

11         THE COURT:  Let's put a pin on it because I want

12    to -- we also -- we need to get out of here by 5 o'clock.

13         MR. EDWARDS:  Your Honor, just a case cite for

14    Your Honor on this issue:  *U.S. v. Hoyt*, H-o-y-t.  This is

15    946 F.2d 127, D.C. Circuit (1991), which deals with

16    authenticating a photograph by comparing it to other

17    admitted -- previously admitted evidence.

18         THE COURT:  Okay.

19         MR. EDWARDS:  And, you know, I understand I'm

20    speculating here, but it's possible that for the trier of fact

21    to make this determination, it's -- it's possible that the

22    government could present the CCTV in question by showing the

23    CCTV and the video, to be able to have the agent highlight for

24    the jury the two.  But I understand that question is not for

25    the jury to decide as to whether or not that's authentic.

1          THE COURT:  That's why I'm not quite clear on what

2     the trier of fact is referring to here.  I mean, if what the

3     rule is suggesting is that somehow the trier of fact can

4     establish authenticity, that seems odd to me.

5          In other words, just kind of put it in and let the trier

6     of fact -- let the jury determine whether -- but in any event,

7     we'll put a pin on it, and we'll both -- let's all think about

8     it some more.  I'll take a look at the case and see what we

9     come up with.

10          MR. EDWARDS:  Okay.

11          THE COURT:  Insofar as the GoToMeeting chat and the

12     authenticity of that -- excuse me, the recording, look, if the

13     defendants aren't prepared to stipulate, I don't know what else

14     the government is prepared to do other than call Mr. Rasheed in

15     to testify.

16          MR. EDWARDS:  One option -- other options include, in

17     the government's perspective at least, using the -- if the

18     Court recalls, there's an FBI business record when the tip was

19     provided, which would, combined with two other facts -- one is

20     the GoToMeeting summary records, which talks about the various

21     GoToMeetings that particular Oath Keepers were involved in

22     during the timeline of the charged conspiracy.  There was

23     only one GoToMeeting that this person who submitted the tip was

24     a part of, which would then establish the date, the

25     November 9th date.

1            THE COURT:  The problem is it doesn't establish the

2     contents, and I think that's the real issue.

3            MR. EDWARDS:  Correct.  And the second step is to

4     highlight the time stamp -- the running time in the video.  If

5     the Court recalls, there's actually video of the -- you know,

6     the witness who would come in and highlight that there was an

7     actual recording of the phone.  And you can see the time stamp

8     and the running time to show when in the call.  So you can --

9     you know, it's a little bit of, you know, work, but if you're

10    able -- you're able to actually take that recording combined

11    with the GoToMeeting summary records and show not only the date

12    but the time of the call and then the FBI business record.

13           THE COURT:  Here's a question.  Can you authentic

14    based upon prior testimony in a prior proceeding?  I don't know

15    the answer to that.  I mean, it's been authenticated in two

16    previous trials.  Maybe it was stipulated to in the second, but

17    it was certainly authenticated in the first by him.

18           Now, in fairness, none of these particular defendants

19    were present to cross-examine him, and so maybe that's the

20    hang-up with using prior testimony for that purpose.  But if

21    authentication is a judicial determination that I'm permitted

22    to make, it's not clear to me why if a defendant is not

23    otherwise demanding to cross-examine about the authenticity

24    of it, why I couldn't rely on his prior testimony to do so.

25    I haven't ever considered this, but this is another

1    possibility.

2              MR. EDWARDS:  Right.  I -- I speculate as to the

3    defense position on that issue.

4              THE COURT:  Well, I'm just raising it because, again,

5    this is --

6              MR. EDWARDS:  Right.

7              THE COURT:  -- this is an issue of admissibility.

8    And we can rely on all sorts of things for purposes of making

9    an admissibility determination, including, oftentimes, hearsay.

10   Sometimes hearsay.  So -- well, to put it differently, the

11   rules against hearsay don't restrict the Court's ability to

12   rely on hearsay to establish the merits for an evidentiary

13   foundation.

14             MR. EDWARDS:  Right.  Rule 104 is what came to mind

15   for the government.  I, candidly, don't know the answer to the

16   Court's open question of the confrontation issue.

17             THE COURT:  Okay.

18             MR. EDWARDS:  We can look into that.

19             THE COURT:  Yeah, I'm not --

20             MS. HALLER:  May I ask the Court a question on that?

21        Are you first finding he's not available?  I mean, is it

22   under the unavailable witness rule that Your Honor is --

23             THE COURT:  I'm not sure it's, again, under any rule.

24   It would simply be that the Court can rely on his prior

25   testimony.  Again, I don't know if that's accurate or not.  I

1    don't know if I can do that or not.  But I'm just putting that

2    out there as another possibility.

3         I mean, I have heard his testimony, I heard him

4    cross-examined about it, and I don't hear any defendant

5    seeking to cross-examine him about the particulars of the way

6    in which the recording happened or the contents of the

7    recording.

8              MS. HALLER:  Well, it's certainly prejudicial to

9    these defendants to --

10             THE COURT:  Ms. Haller, you're missing the point.

11   I'm simply asking the question, and I'm not sure if it's

12   prejudicial to these defendants, except for the fact that it's

13   otherwise admissible.  And I'm just trying to figure out if I

14   can rely on prior testimony -- that's one -- that was subject

15   to cross-examination, albeit not by these defendants, to make

16   that determination.

17             MS. HALLER:  Understood, Your Honor.

18             THE COURT:  I'll have to look at it.

19             MS. HALLER:  Okay.  Thank you, Your Honor.

20             THE COURT:  All right.  What else?

21             MR. WOODWARD:  The only video on behalf of Mrs. Meggs

22   that is to be played by the government in opening that we

23   have -- that's given us some pause, you'll recall in the second

24   trial, Mr. Fleet testified about his experience on January 6th,

25   including his being in the -- on the House Floor, as well as he

1  observed video of a hallway within the Speaker's suite that is

2  just off the House Floor, describing the individuals -- or

3  identifying the individuals that were going into a conference

4  room and the titles.  And the government plans to show that

5  video in its opening, and then they plan to bring that video in

6  and, again, have Mr. Fleet testify about that.

7      I'm not going to belabor the point, Your Honor.  I've

8  read the transcript concerning the -- defense counsel's

9  objection to the video in that trial.  This is a different

10 trial.  The counts are different.  You know, I appreciate that

11 the government's argument is going to be that Mrs. Meggs, among

12 others, was outside the Speaker's suite when these individuals

13 are depicted going into the conference room.

14      THE COURT:  So is your objection to the relevance of

15 it or something else?

16      MR. WOODWARD:  I think our objection would be both to

17 relevance, and to the extent that the Court found -- finds that

18 there's -- remains probative value for these defendants, that

19 it is -- its prejudice outweighs that probative value.  And --

20 and, generally, we can take up Mr. Fleet's testimony after

21 openings, of course.

22      But there are two distinct buckets of testimony that

23 are, I think, unquestionably prejudicial.  The question is

24 is the -- prejudice outweigh the probative value, the video of

25 people going into a conference room, of which none of the

1    defendants had any knowledge the -- the hallway in question was

2    closed off.  There's no allegation, nor any video for that

3    matter, of any of the defendants, let alone any Oath Keeper,

4    going into that hallway during the -- during the riot.

5         And there's also no testimony that any of those

6    individuals had any feelings at all.  It was, rather, the

7    government that argued in summation that those people would do

8    it -- I'm paraphrasing, but that they were hiding or that they

9    were barricading themselves and they were arguing that based on

10   inferences from the video.

11        So in -- in summary, the use of that video is

12   prejudicial to these defendants.  I flag this.  If the Court is

13   inclined to simply stick with its prior ruling, we won't spend

14   a lot of time overnight briefing it, but that is one concern we

15   have in advance of openings.

16             THE COURT:  Okay.

17             MR. EDWARDS:  I don't know if the Court has any

18   questions for the government on it or I can just provide

19   argument, but if the Court doesn't need it --

20             THE COURT:  I'll think about it overnight.

21        I mean, look, the -- you know, I don't hear you to say,

22   Mr. Woodward, there's not relevance to it.  There surely is.  I

23   mean, these defendants stand accused of seeking to interfere

24   with a congressional proceeding and conspiring to do so.  And

25   the fact that staff members or people who were involved in that

1    proceeding are forced to relocate as a result of not only their

2    conduct, but the conduct of others, seems to me, plainly, to

3    make it relevant.

4        In terms of the prejudice outweighing the probative

5    value of it, the reality is, of course it's prejudicial.  But

6    the fact that it's prejudicial doesn't make it inadmissible.  I

7    mean, you know, it's not the kind of thing that is so

8    inflammatory that it would arouse -- I mean, you know, cause

9    the jury to unfairly consider the evidence against the

10   defendants.  But I'll think about it overnight.

11       MR. WOODWARD:  And to reiterate, Your Honor, the

12   video itself is one thing.  It's the government's then argument

13   of what the video depicts that we think tips the scale -- tips

14   the scales.

15       THE COURT:  Well, that's a different issue.  I mean,

16   if -- if -- if it's a question of what they said in closing and

17   what inferences they drew, we could always have that

18   conversation before closing.  And whether they can say what

19   they said -- I don't remember specifically what was said in

20   that closing.  But if that's the objection, then we can always

21   revisit how the government and -- what they can argue in

22   advance of closing.

23       MR. WOODWARD:  Or how they describe it in opening.

24       THE COURT:  Fair enough.  Fair enough.  I mean, I

25   could say, look, this is -- you know, to the extent it's being

1     admitted, has to be described very literally.  This is --

2     members of Congresswoman Pelosi's staff going from one room to

3     another right around this time, and leave it at that, and we

4     can then figure out whether anything more is appropriate in

5     closing.

6             MR. WOODWARD:  Thank you, Your Honor.

7             MR. EDWARDS:  Just so we understand the limitations.

8     I'm sorry.  I was talking to my counsel who is providing the

9     opening.  Can you give the limitations.

10            THE COURT:  Well, I think, look, what Mr. Woodward is

11    saying, his concern is what inferences the government is

12    drawing and what inferences it will -- it's permitted to make

13    to the jury.

14            MR. EDWARDS:  Right.

15            THE COURT:  Now, in an opening -- you know,

16    obviously, both opening and closing, jury's told this is in

17    evidence.  Closings you have a little bit more flexibility

18    because you can make reasonable inferences or argue reasonable

19    inferences from the evidence that's presented.  You get a

20    little bit of that in opening too, but arguably a little bit

21    more restricted.

22            And so if we have a concern about how to interpret the

23    video, you know, you could describe it just literally.  These

24    are members of -- you know, you will hear and see testimony or

25    here's our video evidence of members of Congresswoman Pelosi's

1    staff during - at this time when these defendants were outside

2    the -- the congresswoman's -- the Speaker's chambers, moving

3    from one room to the other.

4              MR. EDWARDS:  If -- or fled to that room.  The reason

5    I flag it is to say there are -- there are words that involve

6    emotion, like cowering and hiding.  There's a gray area that

7    you can say these people ran to another room or --

8              THE COURT:  Well, I mean, you could say ran.

9              MR. EDWARDS:  The video will show that.

10             THE COURT:  Yeah.  Right.  Or they -- I mean, we can

11   play with this a little bit --

12             MR. EDWARDS:  Sure.

13             THE COURT:  -- tomorrow, but.

14             MR. EDWARDS:  I just want to be clear.  Just to make

15   sure we don't step out -- just to avoid objections during

16   opening.

17             THE COURT:  Okay.

18             MR. EDWARDS:  And to poke Mr. Woodward.

19        So the last question, Your Honor, that's open before

20   Mr. Rossi comes up are Ms. Haller provided an objection to

21   statements in September that revolve around, I think, the --

22   Mr. and Mrs. Meggs's training in September.  I don't know if

23   the Court has any questions.

24        The government's position is this has come in now twice,

25   including against Mr. Meggs.  Ms. Meggs is at the training in

1    September.  So the government's position is that these

2    statements revolving around that training and the videos of

3    those trainings are admissible for the same reasons.

4         THE COURT:  And you're proposing to admit them

5    against all defendants or just Ms. Meggs?

6         MR. EDWARDS:  If I recall correctly, some of those

7    statements -- or the videos in Trial 2 were limited against the

8    people who were at that training, including Mr. Hackett.

9         THE COURT:  Right.

10        MR. EDWARDS:  I think to be in line with the

11   Court's ruling before, I don't think the government would be

12   pushing to -- we don't have a different argument than we made

13   last time.  We thought that they should come in against

14   everyone.  The Court's ruling was that the videos, at least,

15   should come in against the people that were involved in the

16   training.

17        (REPORTER'S NOTE:  A sotto voce conference was held

18   between Mr. Edwards and Ms. Rakoczy.)

19        MR. EDWARDS:  And I want to separate two things, and

20   Ms. Rakoczy is right.  So there's a statement on January 5th

21   that Mr. Meggs sends that is like a -- I think the Court

22   referred to this as a hype video at one point -- about the --

23   that's different.

24        THE COURT:  Right.  That's different.

25        MR. EDWARDS:  Right.  So I just wanted to make sure

1     those are two separate.

2          I'm talking right now about just those videos that are

3     about -- all of the September training and the statements.

4          THE COURT:  All right.

5          MR. WOODWARD:  I'll read the transcript overnight of

6     what the limitation on the admissibility was in the second

7     trial.  I have not read that.

8          THE COURT:  Okay.  All right.

9          MR. EDWARDS:  And then I think the --

10         MS. HALLER:  And just for clarification on the

11    statements that the government is addressing, I'm talking about

12    text messages sent in September that were not admitted at the

13    Rhodes trial, at least Rhodes 1.  I'm not talking about the --

14    the -- the training that's referenced in later messages.

15         This is your statements -- Excel spreadsheet on which

16    you have messages dated September 20th of 2020 that we're

17    objecting to because these are outside the period of

18    conspiracy.  And what we're objecting to, that follow, are also

19    the 11/3 text messages, which are a spreadsheet --

20         THE COURT:  So let me -- let me make the following

21    observation.  It's not terribly helpful for me to observe a

22    conversation between the two of you.  So why don't you-all have

23    that conversation, and then let me know what I need to resolve,

24    if anything.

25         MR. EDWARDS:  Yes, Your Honor.

1          MS. HALLER:  Yes, Your Honor.

2          THE COURT:  All right.  Mr. Rossi, you have something

3     you want to raise.

4          MR. ROSSI:  Your Honor, I'll -- believe it or not,

5     Your Honor -- please don't smile -- I'll be brief.

6          The Zello chat --

7          THE COURT:  By the way, I'm going to fine every

8     lawyer who stands up and says "briefly."

9          MR. ROSSI:  The Zello chat -- all we ask, Your Honor,

10    is that the person who took the Zello chat recording - I think

11    it's a reporter -- we just want that person to lay the

12    foundation under 901.  That's it.  There's no 902 exception.

13    So we want the opportunity to cross-examine.

14         I did want to address Your Honor's question about having

15    transcripts from another proceeding that don't involve

16    Mr. Isaacs and using that as a 901 foundation.  There's a

17    Fourth Circuit case -- I know it's not binding here.  Back in

18    the day we used to argue 1101(d) applies to supervised release

19    hearings.  Fourth Circuit issued an opinion -- I'll provide it

20    to the Court -- where they put a limitation on how far 1101(d),

21    104 can go even in a supervised release hearing because hearsay

22    is acceptable, but there are limits.  So we would oppose the

23    use of other transcripts.

24         Thank you.

25         THE COURT:  Yeah.  I mean, that's fair.  Look, all

1    I'm saying to everybody here is I threw it out there.  I don't

2    know whether it's appropriate or not.  If you-all want to take

3    a look, give me some thoughts, and I'll consider it.

4            MR. ROSSI:  And that was brief, Your Honor.

5            THE COURT:  And if we have to bring the reporter in,

6    we'll bring the reporter in.

7            MR. ROSSI:  I thought I was clear that everybody's

8    objecting to rule -- Rule 403 for Zello.  We're not waiving our

9    right to rule under 403.  We made that motion.

10       Thank you.

11           THE COURT:  Well, I mean, I don't -- in any event, I

12   mean, I think it's -- well, I don't remember that there was a

13   motion made under 403.  There was certainly a motion.

14           MR. ROSSI:  Your Honor --

15           THE COURT:  If there was, I'm not recalling it, but.

16           MR. ROSSI:  In our omnibus.

17           THE COURT:  So, I mean, look, this is -- these are

18   Ms. Watkins's words describing her conduct and her actions as a

19   co-conspirator on January 6th.  You know, it -- there's --

20   there can't be any greater -- more probative value than that.

21   I mean, she's describing -- providing play by play or exactly

22   what she's doing, who's with her, to some extent what the

23   intentions are, and I've ruled in terms of the hearsay issues

24   as to why those statements are admissible.

25           MR. ROSSI:  Thank you, Judge.

1          THE COURT:  Okay.  Anything else?

2          MR. EDWARDS:  Not from the government, Your Honor.

3          THE COURT:  Okay.  So we'll reconvene tomorrow at

4    9:30.  Hopefully, we will make more progress tomorrow than we

5    did today.

6          Thanks, everybody.  See you in the morning.

7               (Proceedings were concluded at 4:45 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        <u>CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER</u>

2

3            I, Nancy J. Meyer, Registered Diplomate Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9                        Dated this 7th day of February, 2023.

10

11                   /s/ Nancy J. Meyer
                     Nancy J. Meyer
12                   Official Court Reporter
                     Registered Diplomate Reporter
13                   Certified Realtime Reporter
                     333 Constitution Avenue Northwest
14                   Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

**0**

**0707** [4] - 727:16,
727:18, 727:23,
732:19
**0788** [5] - 752:5,
752:7, 752:12,
761:5, 761:8

**1**

**1** [4] - 737:2, 765:24,
793:13
**10** [1] - 762:25
**100** [1] - 680:9
**101** [1] - 680:10
**103** [1] - 680:10
**104** [2] - 785:14,
794:21
**10439** [1] - 680:12
**106** [1] - 680:11
**1063** [4] - 720:15,
720:17, 720:22,
726:7
**107** [1] - 680:12
**11** [6] - 699:24, 723:1,
730:14, 741:24,
750:5
**11/3** [1] - 793:19
**1101(d** [2] - 794:18,
794:20
**113** [2] - 679:18,
679:24
**1188** [4] - 747:10,
747:12, 747:16,
751:23
**12** [11] - 689:25, 693:6,
701:6, 709:9,
709:11, 715:9,
721:2, 728:3,
738:12, 747:22,
753:25
**127** [1] - 782:15
**1298** [3] - 680:11,
733:7, 733:9
**13** [4] - 721:24,
733:20, 742:24
**1308** [4] - 738:1,
738:4, 738:7, 745:6
**1353** [5] - 689:8,
689:10, 689:20,
711:16, 712:11
**1381** [1] - 680:10
**13th** [1] - 758:7
**14** [3] - 703:14,
733:19, 733:21
**15** [6] - 680:7, 694:23,
762:2, 762:25,
764:11, 764:13
**16** [2] - 697:5, 729:19

**2**

**1680** [2] - 679:17,
679:24
**18** [2] - 697:23, 730:5
**19** [1] - 740:10
**1926** [4] - 714:21,
714:23, 715:3,
720:14
**1991** [1] - 782:15

**2**

**2** [2] - 769:2, 792:7
**20** [4] - 698:2, 740:2,
762:18, 762:21
**200** [1] - 719:10
**2001** [3] - 695:9,
695:20, 709:20
**2002** [3] - 695:9,
695:17, 695:18
**2018** [1] - 708:25
**2020** [4] - 755:14,
755:15, 793:16
**20th** [2] - 737:13,
793:16
**21** [1] - 705:2
**22** [6] - 699:21, 730:9,
741:1, 741:2, 741:8,
749:7
**2238** [1] - 680:10
**2355** [1] - 680:9
**2411** [4] - 736:14,
736:16, 736:22,
737:25
**25** [2] - 762:18, 762:22
**2564** [1] - 680:11
**2764** [5] - 733:1,
733:4, 733:10,
733:14, 736:13
**29** [2] - 680:4, 741:19

**3**

**30** [1] - 750:15
**32** [4] - 751:25, 752:3,
752:4, 761:15
**33-year-old** [1] - 743:3

**4**

**403** [3] - 795:8, 795:9,
795:13
**43** [2] - 699:24, 699:25
**45** [8] - 700:10, 723:1,
730:14, 741:25,
750:6, 761:24,
763:3, 763:25
**46** [5] - 700:10, 723:1,
730:14, 741:25,
750:6
**47** [5] - 700:10, 723:1,
730:14, 741:25,

**5**

750:6
**4:45** [1] - 796:7

**5**

**5** [3] - 737:1, 752:20,
782:12
**50** [2] - 693:7, 739:9
**51** [1] - 693:7
**53** [9] - 690:1, 721:3,
728:4, 738:13,
738:14, 747:22,
748:2, 754:1
**54** [3] - 709:9, 709:11,
713:3
**55** [1] - 692:10
**59** [2] - 701:6
**5:00** [1] - 725:20
**5th** [1] - 792:20

**6**

**6** [3] - 703:14, 715:8,
721:23
**60** [1] - 702:1
**63** [3] - 702:10,
742:24, 743:2
**64** [3] - 702:10,
702:13, 743:11
**65** [1] - 743:11
**6:30** [1] - 750:14
**6th** [61] - 679:22,
683:23, 684:4,
686:10, 690:10,
691:2, 691:4, 691:8,
691:14, 691:16,
692:18, 693:1,
693:9, 694:9,
694:13, 696:1,
696:3, 696:6,
700:11, 700:17,
700:18, 700:20,
700:23, 708:13,
712:14, 712:17,
717:1, 717:4,
718:11, 723:3,
723:5, 724:10,
728:19, 729:12,
730:16, 730:19,
731:2, 738:25,
739:4, 739:10,
742:2, 749:4,
749:16, 750:7,
750:18, 751:11,
752:22, 753:20,
754:15, 754:23,
755:7, 759:9,
759:13, 760:6,
760:7, 760:20,
765:10, 770:7,
786:24, 795:19

**6th-related** [1] -
679:22

**7**

**7** [6] - 694:19, 694:20,
694:21, 729:17,
740:2, 749:7
**70** [1] - 733:20
**74** [1] - 735:2
**76** [1] - 724:16
**77** [1] - 724:16
**7:00** [1] - 750:15
**7th** [1] - 770:7

**8**

**8** [1] - 741:18

**9**

**9** [1] - 680:6
**901** [2] - 794:12,
794:16
**901(b)(3** [2] - 780:22,
781:17
**902** [1] - 794:12
**903(b)(3** [1] - 781:19
**946** [1] - 782:15
**96** [1] - 680:9
**9:30** [3] - 725:19,
761:14, 796:4
**9th** [1] - 783:25

**A**

**a.m** [1] - 678:2
**abetting** [1] - 726:17
**abilities** [1] - 699:18
**ability** [24] - 696:13,
698:10, 709:17,
711:5, 712:12,
712:19, 714:1,
714:12, 715:11,
722:19, 726:19,
727:6, 734:4, 735:4,
740:23, 741:5,
741:7, 744:23,
757:14, 757:20,
757:22, 758:3,
761:10, 785:11
**able** [27] - 691:22,
694:13, 722:14,
724:22, 724:24,
725:2, 725:18,
731:17, 741:21,
756:2, 761:11,
762:21, 763:14,
763:16, 767:16,
767:20, 768:1,
770:4, 770:13,

**750:6**
**4:45** [1] - 796:7

770:17, 771:4,
772:15, 774:16,
778:3, 782:23,
784:10
**absolutely** [1] - 749:2
**acceptable** [1] -
794:22
**access** [1] - 708:6
**account** [1] - 775:11
**Accountability** [1] -
692:8
**accurate** [12] - 691:17,
728:6, 728:7,
748:10, 757:8,
757:9, 767:21,
768:8, 771:1,
773:17, 785:25
**accurately** [4] -
756:21, 769:13,
773:10, 780:13
**accused** [1] - 788:23
**acquire** [1] - 719:18
**acquit** [3] - 696:19,
696:24, 745:20
**acquitted** [1] - 744:6
**act** [1] - 748:15
**acting** [1] - 716:5
**action** [2] - 729:3,
778:6
**actions** [6] - 711:1,
729:6, 758:8, 775:7,
778:2, 795:18
**active** [2] - 704:15,
716:25
**activities** [1] - 778:2
**activity** [3] - 691:16,
704:17, 772:23
**actual** [2] - 695:2,
784:7
**add** [6] - 712:10,
712:22, 712:24,
713:1, 713:2, 778:9
**added** [2] - 726:18,
780:4
**additional** [15] -
682:3, 682:9,
685:20, 685:23,
687:15, 687:22,
689:4, 711:15,
716:11, 726:3,
732:17, 736:12,
745:5, 751:22, 761:3
**address** [11] - 679:7,
763:23, 763:25,
764:3, 766:14,
767:9, 776:16,
781:12, 781:13,
781:15, 794:14
**addresses** [1] - 782:7
**addressing** [2] -

780:3, 793:11
**administered** [1] -
681:13
**administration** [2] -
704:3, 705:11
**administrative** [2] -
716:7, 718:5
**admissibility** [4] -
764:4, 785:7, 785:9,
793:6
**admissible** [3] -
786:13, 792:3,
795:24
**admit** [4] - 766:7,
769:7, 776:8, 792:4
**admitted** [5] - 780:23,
782:17, 790:1,
793:12
**advance** [4] - 681:9,
758:22, 788:15,
789:22
**advise** [1] - 684:21
**affairs** [1] - 701:15
**affect** [13] - 696:13,
698:9, 699:2,
699:11, 709:17,
715:11, 735:3,
740:23, 741:4,
741:7, 744:23,
746:5, 757:14
**affiliated** [1] - 757:16
**affirmation** [1] -
681:14
**affirmed** [1] - 712:12
**Afghanistan** [1] -
702:4
**afternoon** [16] - 680:7,
680:18, 680:20,
682:5, 682:21,
687:21, 688:14,
688:16, 689:19,
711:13, 715:2,
720:9, 738:6,
752:11, 763:23,
777:13
**afterwards** [1] - 683:8
**agency** [1] - 704:1
**Agent** [5] - 688:3,
688:4, 688:20,
688:23
**agent** [16] - 688:9,
688:10, 718:18,
770:3, 770:17,
770:18, 771:3,
772:14, 773:4,
773:15, 773:16,
775:14, 777:1,
779:16, 779:24,
782:23
**agent's** [2] - 718:23,

718:24
**agents** [3] - 718:2,
718:12, 770:13
**ago** [9] - 681:24,
695:14, 695:15,
697:13, 697:14,
704:14, 719:16,
737:17, 741:20
**agree** [10] - 679:17,
690:9, 698:19,
711:4, 711:6,
769:16, 772:16,
773:2, 775:14, 776:7
**agreed** [4] - 679:23,
745:16, 766:16,
780:8
**agreeing** [2] - 764:4,
775:9
**agreement** [3] -
768:13, 774:23,
778:4
**agrees** [1] - 774:24
**aiding** [1] - 726:17
**aisle** [1] - 768:19
**akin** [1] - 678:10
**albeit** [1] - 786:15
**alert** [1] - 684:20
**alerted** [1] - 742:6
**Alex** [1] - 700:2
**allegation** [1] - 788:2
**allegations** [1] - 694:5
**alleged** [1] - 704:10
**allow** [2] - 768:23,
769:18
**allowed** [2] - 767:15,
767:23
**almost** [3] - 678:9,
678:10, 755:10
**Alondra** [1] - 688:21
**alone** [4] - 679:10,
705:13, 751:2, 788:3
**alternative** [2] -
773:18, 779:11
**Alvin** [1] - 680:25
**Amit** [1] - 680:21
**amount** [3] - 679:20,
700:11, 729:3
**ample** [1] - 707:12
**analysis** [2] - 729:11,
777:20
**analyst** [1] - 729:1
**analyze** [1] - 711:8
**angle** [4] - 777:1,
777:2, 780:4, 780:17
**angles** [1] - 778:21
**answer** [11] - 695:10,
699:14, 713:2,
724:20, 726:23,
728:6, 763:10,
763:11, 772:18,

784:15, 785:15
**answered** [16] - 690:4,
692:9, 702:6, 705:2,
709:15, 721:6,
727:5, 734:6, 735:5,
738:17, 740:13,
741:10, 743:1,
743:11, 749:10,
754:4
**answering** [2] - 735:6,
746:16
**answers** [5] - 713:7,
726:10, 726:20,
727:4, 735:25
**apartment** [2] -
735:12, 753:5
**apologies** [1] - 725:15
**apologize** [3] -
706:25, 761:6,
769:20
**Appeals** [2] - 776:16,
778:24
**appeared** [2] - 726:23
**applicable** [2] - 782:8,
782:9
**applies** [1] - 794:18
**apply** [4] - 683:19,
694:15, 705:25,
734:5
**appointee** [1] - 745:17
**appointment** [2] -
737:11, 744:4
**appreciate** [6] -
737:23, 749:21,
760:23, 768:18,
768:21, 787:10
**approach** [2] - 685:9,
769:1
**approached** [1] -
685:11
**appropriate** [11] -
745:10, 773:2,
773:3, 774:23,
775:24, 776:8,
776:12, 778:14,
780:6, 790:4, 795:2
**approved** [1] - 681:25
**Architect** [1] - 732:22
**area** [11] - 700:20,
701:13, 744:12,
749:25, 751:10,
753:22, 767:24,
767:25, 768:4,
768:6, 791:6
**arguably** [2] - 777:2,
790:20
**argue** [4] - 776:3,
789:21, 790:18,
794:18
**argued** [1] - 788:7

**arguing** [1] - 788:9
**argument** [4] - 787:11,
788:19, 789:12,
792:12
**arguments** [1] -
765:11
**armed** [4] - 678:9,
697:24, 730:6, 730:8
**Army** [1] - 697:25
**arouse** [1] - 789:8
**arrested** [1] - 754:16
**article** [1] - 729:2
**articulate** [2] - 765:13,
769:22
**ASD** [2] - 744:20,
744:21
**Ashli** [3] - 730:22,
731:20, 732:9
**aside** [19] - 691:22,
693:15, 694:14,
700:25, 711:20,
712:12, 712:19,
714:2, 731:16,
741:21, 742:16,
747:2, 750:24,
758:24, 759:2,
761:10, 763:24,
774:22, 776:25
**Asperger's** [1] -
744:21
**assess** [3] - 692:3,
704:8, 713:22
**assessing** [1] - 704:20
**assessment** [1] -
736:1
**assist** [2] - 681:21,
716:11
**associated** [6] -
691:16, 692:16,
704:16, 706:2,
719:12, 756:15
**association** [1] -
693:1
**assume** [1] - 732:8
**assuming** [1] - 768:23
**assumption** [1] -
732:8
**assured** [2] - 682:12,
682:16
**attached** [1] - 687:11
**attachment** [1] -
713:10
**attempt** [1] - 772:19
**attempts** [1] - 685:1
**attend** [1] - 739:15
**attendance** [1] - 698:3
**attended** [7] - 698:4,
705:3, 711:24,
739:11, 740:3,
740:4, 740:14

**attention** [3] - 722:19,
738:13, 747:22
**Attorney** [1] - 744:10
**attorney** [1] - 745:10
**audio** [8] - 770:20,
770:25, 771:2,
778:8, 780:5
**audit** [2] - 708:20,
708:24
**Australia** [1] - 729:24
**authentic** [13] -
772:17, 775:9,
775:15, 775:17,
775:24, 777:3,
778:11, 778:14,
779:19, 780:1,
780:8, 782:25,
784:13
**authenticate** [18] -
767:17, 768:2,
769:14, 770:12,
770:14, 771:16,
772:15, 773:8,
774:9, 774:16,
774:23, 774:25,
775:4, 776:17,
776:18, 777:6,
778:15, 778:22
**authenticated** [4] -
770:3, 781:21,
784:15, 784:17
**authenticating** [1] -
782:16
**authentication** [4] -
769:11, 772:3,
780:22, 784:21
**authenticity** [23] -
764:5, 765:2,
765:12, 765:16,
765:25, 766:19,
766:22, 766:23,
767:1, 767:5,
768:12, 769:1,
769:18, 771:6,
773:2, 777:4, 778:9,
778:16, 780:18,
781:18, 783:4,
783:12, 784:23
**available** [4] - 680:13,
681:3, 763:19,
785:21
**avert** [1] - 684:20
**avoid** [8] - 683:17,
683:21, 684:5,
686:24, 687:1,
687:7, 747:4, 791:15
**avoiding** [1] - 683:24
**aware** [5] - 709:7,
715:12, 744:10,
754:14, 754:15

**awareness** [2] - 704:20, 709:3
**awkward** [2] - 711:4, 776:25

# B

**Babbitt** [3] - 730:22, 731:20, 732:9
**Baboulis** [1] - 687:25
**BABOULIS** [1] - 687:25
**background** [2] - 746:25, 750:12
**bad** [1] - 705:15
**ball** [1] - 781:5
**ballpark** [1] - 719:6
**barricading** [1] - 788:9
**base** [1] - 703:13
**based** [24] - 679:18, 682:3, 682:18, 684:13, 693:20, 706:4, 713:12, 714:3, 714:13, 729:6, 733:24, 735:21, 739:2, 742:20, 748:13, 751:1, 753:17, 754:11, 767:17, 775:6, 777:4, 780:18, 784:14, 788:9
**bashing** [1] - 702:16
**basis** [1] - 780:15
**battle** [1] - 711:25
**bear** [1] - 733:12
**become** [1] - 779:18
**beeline** [1] - 760:13
**begin** [2] - 678:5, 763:17
**beginning** [2] - 693:18, 742:24
**behalf** [3] - 688:8, 769:16, 786:21
**behavior** [2] - 691:12, 691:13
**belabor** [1] - 787:7
**belief** [2] - 691:12, 705:20
**beliefs** [2] - 712:18, 713:7
**believes** [2] - 698:24, 707:14
**bench** [1] - 782:2
**Bennie** [1] - 680:25
**best** [1] - 757:20
**Beth** [1] - 688:22
**between** [5] - 757:6, 761:24, 771:12,

792:18, 793:22
**beyond** [5] - 698:21, 733:25, 734:17, 735:5, 738:21
**bias** [2] - 679:12, 761:10
**biased** [1] - 682:17
**biases** [2] - 734:9, 735:9
**big** [1] - 708:11
**biggest** [1] - 711:17
**biker** [1] - 756:13
**biker-type** [1] - 756:13
**binding** [1] - 794:17
**bit** [17] - 682:20, 705:8, 710:13, 722:6, 722:7, 737:6, 747:2, 762:18, 763:24, 771:12, 777:24, 784:9, 790:17, 790:20, 791:11
**black** [2] - 756:5, 756:13
**blazer** [1] - 693:13
**bless** [1] - 743:19
**blocks** [1] - 741:12
**blurred** [1] - 719:15
**body** [3] - 778:2, 778:5, 778:7
**body-worn** [3] - 778:2, 778:5, 778:7
**bold** [1] - 749:14
**book** [1] - 683:1
**booked** [2] - 737:8, 737:16
**border** [5] - 698:5, 704:15, 705:12, 708:19, 709:1
**boxes** [1] - 770:13
**Boys** [5] - 704:18, 708:16, 708:18, 709:5, 709:6
**branch** [1] - 745:12
**break** [3] - 679:16, 723:20, 723:21
**break-in** [2] - 723:20, 723:21
**Brennwald** [4] - 762:3, 762:8, 762:12, 762:21
**BRENNWALD** [3] - 762:10, 762:13, 762:16
**brief** [2] - 794:5, 795:4
**briefing** [2] - 709:1, 788:14
**briefings** [1] - 709:3
**briefly** [5] - 701:10, 724:14, 732:7,

743:17, 794:8
**bring** [7] - 734:24, 768:23, 768:25, 773:18, 787:5, 795:5, 795:6
**broadcasts** [1] - 750:17
**broadly** [1] - 708:4
**broke** [1] - 702:17
**brother** [10] - 695:9, 697:8, 697:9, 701:9, 701:16, 701:20, 710:22, 710:23, 711:3, 713:3
**brought** [2] - 683:2, 740:20
**Bryon** [1] - 688:23
**buckets** [1] - 787:22
**building** [4] - 714:11, 715:23, 732:22, 749:11
**Building** [6] - 694:25, 695:3, 699:23, 730:10, 741:9, 749:9
**buildings** [1] - 695:4
**burden** [8] - 706:11, 712:2, 712:18, 733:25, 734:1, 734:17, 734:24, 779:19
**Bureau** [1] - 688:2
**bury** [1] - 768:25
**bus** [2] - 702:15, 702:16
**business** [2] - 783:18, 784:12

# C

**cafeteria** [1] - 678:9
**Cain** [1] - 688:11
**California** [1] - 737:9
**calmly** [1] - 712:11
**camera** [3] - 778:2, 778:5, 778:8
**candidly** [1] - 785:15
**cannot** [3] - 711:20, 733:23, 765:21
**capabilities** [1] - 708:3
**capacity** [2] - 697:21, 727:12
**Capitol** [61] - 678:12, 678:13, 678:14, 679:1, 679:2, 679:4, 679:6, 687:24, 691:8, 694:25, 695:2, 695:3, 695:6, 696:3, 696:5, 696:18, 696:25,

699:22, 699:23, 706:20, 708:13, 709:20, 711:2, 714:10, 723:23, 723:25, 730:10, 730:12, 730:21, 731:10, 732:22, 735:8, 741:9, 741:13, 749:8, 749:9, 749:17, 751:9, 751:10, 752:22, 753:9, 755:18, 755:19, 759:18, 760:2, 760:4, 760:11, 760:13, 760:14, 760:15, 760:17, 768:4, 773:19, 774:13, 775:8
**Captain** [1] - 687:24
**capture** [1] - 778:8
**captures** [2] - 777:3, 778:21
**career** [1] - 744:2
**carries** [1] - 733:21
**cars** [1] - 735:12
**case** [54] - 680:24, 681:22, 682:17, 683:9, 683:10, 683:12, 683:14, 683:16, 683:18, 683:22, 684:1, 684:7, 684:12, 684:16, 684:19, 685:1, 685:9, 685:11, 685:18, 685:21, 686:6, 686:7, 686:8, 686:9, 686:13, 687:23, 694:15, 696:20, 698:6, 701:2, 703:4, 703:12, 709:7, 714:16, 721:6, 721:11, 721:12, 735:3, 740:14, 740:16, 740:20, 741:3, 742:18, 742:20, 743:5, 755:24, 764:11, 775:23, 776:6, 776:9, 779:21, 782:13, 783:8, 794:17
**cases** [4] - 685:14, 690:10, 690:19, 778:1
**casually** [2] - 739:14, 739:16
**catch** [1] - 727:3
**cc'd** [2] - 717:13,

718:4
**CCTV** [28] - 767:24, 767:25, 768:1, 768:3, 768:5, 768:8, 771:16, 772:15, 772:22, 773:4, 773:6, 773:14, 773:25, 774:6, 775:6, 775:9, 775:14, 776:1, 776:14, 777:1, 777:4, 779:25, 780:2, 780:8, 780:12, 780:18, 782:22, 782:23
**cell** [1] - 718:5
**certain** [12] - 690:23, 705:10, 714:8, 745:9, 748:17, 757:5, 770:13, 770:14, 772:14, 774:19, 775:4, 775:19
**certainly** [13] - 694:3, 700:3, 738:20, 742:5, 758:6, 758:8, 759:21, 760:1, 760:8, 784:17, 786:8, 795:13
**certainty** [1] - 748:22
**cetera** [3] - 747:7, 777:3, 780:17
**chambers** [1] - 791:2
**change** [2] - 678:18, 763:10
**changed** [3] - 704:3, 704:5, 765:23
**changes** [1] - 760:11
**characterization** [1] - 757:7
**characterized** [1] - 757:1
**charged** [2] - 740:22, 783:22
**charges** [1] - 735:3
**chat** [6] - 765:7, 781:12, 783:11, 794:6, 794:9, 794:10
**chats** [1] - 766:7
**check** [1] - 770:13
**chief** [3] - 687:23, 716:5, 743:19
**children** [3] - 705:12, 705:13, 711:23
**choice** [1] - 686:24
**choose** [1] - 686:24
**Chuck** [1] - 688:18
**Circle** [1] - 727:11
**Circuit** [3] - 782:15, 794:17, 794:19

**circumstances** [1] - 773:10

**cite** [1] - 782:13

**citizens** [1] - 681:6

**civil** [1] - 745:8

**civilian** [1] - 774:21

**clarification** [1] - 793:10

**clarify** [1] - 780:5

**clarifying** [1] - 695:2

**clear** [8] - 678:25, 715:20, 734:12, 745:18, 783:1, 784:22, 791:14, 795:7

**clearer** [1] - 771:10

**client** [1] - 712:7

**clients** [1] - 746:6

**close** [19] - 694:24, 697:6, 697:18, 697:23, 702:1, 702:11, 714:14, 729:20, 730:5, 731:1, 731:3, 735:8, 742:25, 749:24, 758:8, 760:14, 760:16

**closed** [2] - 753:10, 788:2

**closely** [6] - 692:16, 693:8, 693:9, 742:3, 742:9, 750:8

**closest** [1] - 698:1

**closing** [6] - 789:16, 789:18, 789:20, 789:22, 790:5, 790:16

**closings** [1] - 790:17

**clothing** [5] - 756:5, 756:9, 756:13, 756:16, 775:7

**co** [2] - 688:18, 795:19

**co-conspirator** [1] - 795:19

**co-counsel** [1] - 688:18

**Cody** [1] - 688:23

**collaborative** [1] - 768:20

**colleague** [4] - 768:18, 776:2, 777:16, 780:21

**colleagues** [3] - 694:7, 695:19, 695:22

**collect** [1] - 711:7

**Collective** [1] - 681:14

**Columbia** [1] - 680:22

**Columbia's** [1] - 741:15

**combination** [2] - 771:5, 774:21

**combined** [2] - 783:19, 784:10

**comfortable** [9] - 689:23, 715:6, 726:25, 728:1, 733:17, 736:20, 738:10, 747:19, 752:15

**coming** [6] - 707:2, 713:23, 719:12, 719:19, 737:9, 737:23, 758:20, 762:10

**comment** [6] - 684:4, 707:4, 744:17, 745:23, 749:15, 782:6

**commentary** [1] - 684:19

**comments** [1] - 713:11

**committee** [5] - 693:9, 694:13, 700:17, 710:3, 739:10

**common** [1] - 713:3

**communicate** [3] - 683:9, 685:1, 686:6

**communication** [1] - 694:6

**community** [1] - 759:25

**compare** [1] - 680:3

**compared** [1] - 777:21

**comparing** [2] - 779:16, 782:16

**comparison** [6] - 777:7, 778:10, 778:14, 779:25, 780:23, 781:21

**Comparison** [1] - 781:19

**comparisons** [1] - 782:7

**compartmentalize** [1] - 713:8

**complete** [4] - 682:1, 682:6, 685:14, 685:18

**completed** [3] - 681:24, 685:22, 721:1

**completely** [3] - 745:12, 756:6, 759:2

**complex** [4] - 695:3, 695:6, 727:6, 727:8

**complicated** [1] - 768:15

**component** [1] - 702:5

**concept** [1] - 728:15

**concern** [7] - 711:18, 727:5, 778:10, 780:4, 788:14, 790:11, 790:22

**concerned** [5] - 711:19, 726:9, 734:9, 745:19, 746:12

**concerning** [4] - 712:13, 713:20, 740:12, 787:8

**concerns** [7] - 679:13, 714:4, 722:18, 726:22, 727:3, 744:9, 757:21

**concert** [1] - 686:23

**concluded** [2] - 686:1, 796:7

**conclusions** [1] - 744:22

**condition** [2] - 747:5, 762:9

**conduct** [4] - 693:1, 789:2, 795:18

**conducting** [1] - 704:21

**conference** [5] - 741:17, 787:3, 787:13, 787:25, 792:17

**confidence** [1] - 761:9

**confident** [2] - 679:13, 722:23

**conflict** [1] - 772:25

**confrontation** [1] - 785:16

**confused** [1] - 766:25

**confusing** [1] - 724:19

**congratulations** [1] - 708:9

**congressional** [1] - 788:24

**Congresswoman** [2] - 790:2, 790:25

**congresswoman's** [1] - 791:2

**connecting** [1] - 756:6

**connection** [5] - 692:21, 694:14, 738:24, 748:21, 757:5

**Connie** [1] - 681:1, 703:11, 766:22, 767:4

**consent** [1] - 766:15

**conservative** [2] - 690:15, 690:17

**consider** [8] - 684:15, 714:6, 718:25,

758:23, 780:7, 780:22, 789:9, 795:3

**consideration** [1] - 715:12

**considered** [2] - 681:20, 784:25

**consistent** [3] - 699:8, 705:20, 713:20

**conspiracy** [4] - 726:17, 766:13, 783:22, 793:18

**conspirator** [1] - 795:19

**conspiring** [1] - 788:24

**Constitution** [1] - 760:19

**constitutional** [1] - 706:10

**construction** [1] - 679:3

**consulting** [1] - 701:11

**consumed** [3] - 700:11, 730:17, 750:7

**consumption** [1] - 742:11

**content** [8] - 729:3, 729:9, 730:23, 750:21, 769:7, 769:14, 773:7, 774:3

**contents** [2] - 784:2, 786:6

**context** [2] - 738:22, 750:16

**continue** [3] - 678:18, 779:8, 781:10

**continues** [1] - 683:19

**control** [2] - 740:6, 740:15

**conversation** [9] - 696:2, 724:25, 771:15, 771:23, 772:5, 781:4, 789:18, 793:22, 793:23

**conversations** [1] - 739:18

**conveying** [1] - 764:10

**convicted** [1] - 754:17

**convictions** [2] - 714:16, 746:8

**convincingly** [1] - 714:1

**Cooper** [1] - 762:24

**COOPER** [2] - 762:25, 763:10

**cooperators** [1] -

774:19

**coordination** [1] - 694:8

**copied** [1] - 717:6

**Corps** [1] - 698:1

**correct** [24] - 693:3, 697:10, 710:10, 710:21, 715:4, 715:22, 716:15, 721:20, 721:21, 732:11, 733:7, 733:14, 735:25, 736:22, 743:22, 743:23, 748:23, 753:8, 762:15, 772:4, 774:12, 775:10, 776:2, 784:3

**correctly** [3] - 694:5, 771:14, 792:6

**costs** [1] - 704:16

**Counsel** [2] - 736:6, 737:19

**counsel** [4] - 688:18, 765:6, 767:11, 790:8

**counsel's** [1] - 787:8

**counterterrorism** [3] - 679:20, 715:17, 717:17

**counts** [1] - 787:10

**couple** [3] - 740:4, 755:13, 765:9

**course** [7] - 689:13, 723:18, 728:25, 730:20, 760:19, 787:21, 789:5

**COURT** [372] - 678:11, 678:22, 678:25, 679:16, 680:1, 680:4, 680:6, 680:18, 681:16, 688:6, 688:15, 689:1, 689:13, 689:15, 689:18, 689:22, 690:12, 690:16, 690:20, 690:25, 691:10, 691:18, 692:1, 692:5, 692:9, 692:20, 692:24, 693:5, 693:20, 694:1, 694:10, 694:18, 694:21, 694:23, 695:5, 695:11, 695:14, 695:18, 695:22, 696:1, 696:7, 696:12, 696:16, 696:22, 697:2, 697:5, 697:12, 697:15, 697:20,

697:23, 698:2,
698:12, 698:16,
698:21, 698:25,
699:7, 699:17,
699:21, 700:10,
700:21, 700:24,
701:5, 701:12,
701:16, 701:22,
701:25, 702:7,
702:10, 702:18,
702:20, 702:22,
703:2, 703:6, 703:9,
705:5, 706:17,
706:23, 708:15,
710:16, 710:19,
711:12, 712:7,
712:22, 712:24,
713:16, 714:14,
714:24, 715:1,
715:5, 715:19,
715:24, 716:3,
716:13, 716:17,
716:21, 716:23,
717:3, 717:16,
717:24, 718:1,
718:6, 718:8,
718:16, 718:22,
719:2, 719:6,
719:11, 719:17,
720:2, 720:5, 720:8,
720:11, 720:18,
720:20, 720:22,
720:24, 721:11,
721:16, 721:18,
721:22, 722:5,
722:10, 722:14,
722:16, 722:23,
722:25, 723:8,
723:11, 723:14,
723:18, 723:21,
723:23, 724:1,
724:5, 724:8,
724:12, 725:13,
726:2, 726:15,
727:3, 727:19,
727:22, 727:25,
728:10, 728:15,
728:18, 728:21,
729:10, 729:14,
729:16, 729:19,
730:2, 730:5, 730:9,
730:13, 730:24,
731:3, 731:5,
731:11, 731:15,
731:19, 732:1,
732:5, 732:14,
732:20, 732:25,
733:2, 733:5, 733:7,
733:9, 733:11,
733:16, 734:10,
734:16, 734:20,

734:23, 735:2,
735:10, 735:15,
735:22, 735:25,
736:5, 736:10,
736:17, 736:19,
736:22, 736:24,
737:15, 737:18,
737:22, 738:2,
738:5, 738:9,
738:21, 739:1,
739:6, 739:9,
739:18, 739:22,
740:1, 740:10,
740:18, 741:1,
741:8, 741:18,
741:24, 742:10,
742:15, 742:23,
743:6, 743:9,
743:13, 743:16,
745:2, 745:7,
745:22, 746:2,
746:15, 747:3,
747:9, 747:13,
747:15, 747:18,
747:24, 748:1,
748:7, 748:9,
748:16, 748:20,
748:24, 749:3,
749:6, 749:19,
749:21, 750:1,
750:4, 750:16,
750:23, 751:4,
751:6, 751:18,
751:21, 752:1,
752:8, 752:10,
752:14, 752:25,
753:2, 753:6,
753:11, 753:16,
753:21, 753:24,
754:8, 754:11,
754:19, 755:1,
755:3, 755:8,
755:12, 755:21,
756:1, 756:8,
756:17, 756:22,
757:4, 757:12,
757:21, 757:25,
758:2, 758:10,
758:15, 758:19,
759:4, 759:6,
760:24, 761:3,
761:8, 761:13,
762:1, 762:6,
762:12, 762:14,
762:20, 763:1,
763:4, 763:6, 763:8,
763:11, 763:21,
764:6, 764:11,
764:15, 764:20,
765:15, 766:21,
766:25, 767:3,

767:6, 767:8, 769:9,
769:17, 769:24,
770:6, 770:9,
770:16, 770:24,
771:22, 771:25,
772:3, 772:24,
773:3, 773:6,
773:21, 774:1,
774:4, 774:7,
774:12, 774:16,
775:2, 776:22,
778:16, 779:3,
779:6, 779:20,
780:9, 780:25,
781:8, 781:16,
782:1, 782:2, 782:4,
782:11, 782:18,
783:1, 783:11,
784:1, 784:13,
785:4, 785:7,
785:17, 785:19,
785:23, 786:10,
786:18, 786:20,
787:14, 788:16,
788:20, 789:15,
789:24, 790:10,
790:15, 791:8,
791:10, 791:13,
791:17, 792:4,
792:9, 792:24,
793:4, 793:8,
793:20, 794:2,
794:7, 794:25,
795:5, 795:11,
795:15, 795:17,
796:1, 796:3
**court** [3] - 685:2,
685:12, 685:24
**Court** [47] - 680:2,
680:22, 712:6,
712:10, 715:12,
726:12, 726:24,
746:23, 763:24,
766:8, 766:9,
767:15, 767:23,
768:11, 768:17,
768:23, 769:3,
770:13, 771:15,
771:21, 771:24,
772:6, 776:3, 776:4,
776:11, 776:16,
776:18, 778:1,
778:23, 778:24,
779:17, 779:23,
780:7, 780:21,
781:7, 781:13,
783:18, 784:5,
785:20, 785:24,
787:17, 788:12,
788:17, 788:19,
791:23, 792:21,

794:20
**Court's** [9] - 712:9,
726:23, 777:18,
778:10, 780:3,
785:11, 785:16,
792:11, 792:14
**courthouse** [6] -
678:11, 678:14,
685:5, 685:17,
685:23, 686:17
**COURTROOM** [11] -
681:15, 689:9,
714:22, 720:16,
727:17, 733:4,
733:10, 736:15,
738:3, 747:11, 752:6
**courtroom** [20] -
678:8, 682:7, 682:8,
682:9, 683:2,
684:21, 685:2,
685:12, 686:14,
687:5, 687:9, 689:3,
711:14, 714:3,
714:13, 731:23,
732:16, 740:21,
745:4, 761:1
**courts** [1] - 681:7
**cover** [2] - 684:3,
700:18
**coverage** [7] - 683:18,
700:20, 724:6,
724:9, 730:15,
730:19, 742:17
**covering** [2] - 700:17,
729:8
**COVID** [3] - 687:1,
687:6, 687:8
**COVID-related** [1] -
687:8
**cowering** [1] - 791:6
**create** [1] - 767:19
**created** [3] - 768:2,
768:14, 774:3
**creator** [6] - 769:8,
769:13, 773:7,
774:10, 779:11,
779:12
**crime** [5] - 702:11,
702:12, 702:13,
702:15, 743:1
**criminal** [3] - 685:14,
701:18, 741:19
**crisis** [1] - 743:19
**critical** [2] - 681:5,
686:11
**critically** [1] - 686:4
**cross** [7] - 760:16,
784:19, 784:23,
786:4, 786:5,
786:15, 794:13

**cross-examination** [1]
- 786:15
**cross-examine** [4] -
784:19, 784:23,
786:5, 794:13
**cross-examined** [1] -
786:4
**crowds** [1] - 755:25
**cue** [1] - 761:6
**cuff** [1] - 776:23
**curious** [1] - 709:25
**current** [1] - 707:25
**custodian** [1] - 773:19
**cut** [1] - 760:20

## D

**D.C** [6] - 715:16,
743:21, 744:11,
755:13, 776:16,
782:15
**daily** [1] - 742:7
**danger** [1] - 678:10
**data** [4] - 711:8,
728:25, 729:5,
729:11
**date** [5] - 731:5,
759:16, 783:24,
783:25, 784:11
**dated** [1] - 793:16
**David** [3] - 688:1,
750:13, 750:14
**days** [4] - 725:19,
737:9, 739:15,
759:11
**deal** [2] - 679:21,
708:11
**deals** [1] - 782:15
**debate** [2] - 746:3,
771:12
**December** [1] - 755:15
**decide** [2] - 684:12,
782:25
**decided** [1] - 726:12
**decision** [3] - 681:7,
705:11, 778:24
**decision-makers** [1] -
681:7
**Declare** [4] - 769:25,
770:2, 770:6, 770:23
**defendant** [9] - 699:1,
699:3, 699:11,
700:6, 713:14,
734:13, 766:24,
784:22, 786:4
**Defendant** [1] - 688:8
**defendant's** [1] -
735:5
**defendants** [40] -
688:9, 691:21,

691:24, 694:16,
696:19, 698:6,
698:13, 699:8,
712:1, 712:14,
712:17, 712:20,
714:8, 714:17,
733:22, 734:2,
740:21, 741:3,
744:6, 744:11,
745:9, 745:25,
746:1, 746:8, 751:1,
757:16, 775:20,
783:13, 784:18,
786:9, 786:12,
786:15, 787:18,
788:1, 788:3,
788:12, 788:23,
789:10, 791:1, 792:5
**defense** [24] - 703:9,
708:3, 720:6,
725:13, 732:5,
734:23, 743:16,
751:6, 759:6, 764:3,
764:10, 764:24,
765:5, 767:10,
770:11, 771:9,
771:17, 772:9,
773:1, 775:18,
775:22, 776:7,
785:3, 787:8
**defenses** [1] - 714:8
**defer** [2] - 764:18,
781:13
**definitely** [1] - 760:5
**definition** [1] - 695:5
**degree** [1] - 761:9
**delay** [1] - 687:6
**delays** [1] - 687:8
**demanding** [1] -
784:23
**democracy** [1] - 681:6
**demonstrations** [1] -
756:10
**denouncing** [1] -
698:4
**Department** [2] -
679:19, 702:23
**depicted** [2] - 772:21,
787:13
**depicting** [1] - 732:2
**depiction** [6] - 767:21,
768:8, 773:9,
773:17, 778:20,
780:13
**depicts** [2] - 769:13,
789:13
**deployment** [1] -
704:17
**DEPUTY** [11] - 681:15,
689:9, 714:22,

720:16, 727:17,
733:4, 733:10,
736:15, 738:3,
747:11, 752:6
**deputy** [4] - 682:7,
684:21, 685:2,
685:12
**Derrick** [1] - 766:17
**describe** [8] - 690:13,
723:8, 728:22,
742:11, 756:9,
756:12, 789:23,
790:23
**described** [6] -
713:21, 716:24,
724:9, 743:10,
757:22, 790:1
**describing** [2] - 787:2,
795:18, 795:21
**descriptions** [1] -
693:17
**desire** [2] - 682:13
**despite** [2] - 685:10,
707:13
**detachment** [1] -
713:19
**detail** [1] - 722:6
**detailed** [1] - 762:18
**determination** [5] -
776:12, 782:21,
784:21, 785:9,
786:16
**determinations** [2] -
742:18, 742:19
**determine** [3] - 735:4,
779:17, 783:6
**determining** [1] -
681:21
**devices** [4] - 683:3,
683:5, 683:7, 684:9
**difference** [1] - 778:7
**different** [33] - 681:18,
681:19, 682:8,
685:14, 698:7,
698:13, 710:12,
710:13, 710:14,
741:2, 741:4,
745:11, 745:12,
745:15, 745:25,
759:25, 765:11,
774:5, 776:21,
777:2, 777:3,
778:21, 780:4,
780:16, 780:17,
787:9, 787:10,
789:15, 792:12,
792:23, 792:24
**differently** [1] - 785:10
**differing** [1] - 765:3
**difficult** [4] - 696:22,

712:1, 722:1, 740:12
**difficulties** [1] -
779:12
**difficulty** [3] - 700:7,
722:11, 731:21
**dig** [1] - 777:19
**digital** [2] - 716:10,
716:19
**direct** [4] - 718:2,
728:4, 747:22,
753:25
**directing** [1] - 768:18
**direction** [2] - 685:6,
772:7
**directly** [2] - 717:15,
780:24
**director** [2] - 703:15,
708:2
**disability** [6] - 721:25,
722:3, 722:7,
726:11, 727:2
**disagree** [2] - 744:21,
777:24
**disagreed** [1] - 724:22
**discounting** [1] -
780:10
**discrediting** [1] -
718:23
**discuss** [2] - 746:8,
766:6
**discussed** [3] - 686:3,
696:1, 739:24
**discussing** [3] -
748:17, 764:2, 765:1
**discussion** [4] -
694:2, 762:3,
768:10, 779:8
**discussions** [3] -
693:21, 764:10,
768:17
**dismissed** [1] - 684:6
**dispassionate** [1] -
713:19
**disputing** [1] - 780:12
**disqualify** [1] - 746:21
**disqualifying** [1] -
727:9
**disrupt** [1] - 687:2
**distinct** [1] - 787:22
**District** [6] - 680:21,
680:22, 741:12,
741:15, 743:6,
745:12
**disturbing** [1] - 711:2
**division** [2] - 715:17,
716:8
**doctor** [2] - 697:11,
697:12
**doctor's** [1] - 737:11
**doctored** [3] - 775:19,

776:3, 776:4
**dog** [2] - 739:16,
739:19
**domain** [1] - 746:13
**domestic** [4] - 679:20,
704:10, 708:15
**Donald** [1] - 707:6
**done** [8] - 679:3,
685:20, 691:3,
691:4, 701:17,
709:13, 757:10,
778:1
**doors** [1] - 774:14
**doubt** [5] - 692:1,
712:11, 733:25,
734:18, 735:5
**Douyon** [3] - 689:3,
711:14, 726:3,
732:16, 736:12,
745:4, 751:21, 761:1
**down** [9] - 679:8,
702:17, 753:9,
755:19, 760:13,
760:15, 760:21,
763:11, 770:1
**downloaded** [3] -
770:25, 771:2
**downloading** [1] -
770:4
**dozen** [2] - 769:4,
769:5
**Dr** [1] - 688:23
**drawing** [1] - 790:12
**dressed** [1] - 750:12
**drew** [1] - 789:17
**due** [1] - 721:24
**dumb** [1] - 729:25
**Durbin** [4] - 695:10,
695:12, 697:10,
710:21
**during** [20] - 678:7,
682:24, 683:7,
684:18, 684:25,
685:4, 685:9,
686:17, 687:23,
693:22, 715:10,
737:5, 739:24,
741:13, 777:16,
783:22, 788:4,
791:1, 791:15
**dutifully** [1] - 767:11
**duty** [2] - 681:8,
704:15
**dying** [1] - 731:24

---

**E**

**ears** [1] - 684:20
**east** [1] - 774:14
**East** [2] - 755:18,

760:14
**echo** [1] - 744:17
**ed** [1] - 722:8
**editors** [1] - 729:5
**educate** [1] - 712:16
**Education** [2] - 695:8,
710:2
**Edwards** [5] - 764:18,
764:20, 768:18,
769:19, 792:18
**EDWARDS** [49] -
764:21, 769:20,
769:25, 770:7,
770:10, 770:22,
771:8, 771:23,
772:2, 772:4, 773:1,
773:4, 774:15,
774:18, 775:3,
777:11, 779:1,
779:4, 779:14,
779:21, 780:20,
781:1, 781:9,
781:24, 782:10,
782:13, 782:19,
783:10, 783:16,
784:3, 785:2, 785:6,
785:14, 785:18,
788:17, 790:7,
790:14, 791:4,
791:9, 791:12,
791:14, 791:18,
792:6, 792:10,
792:19, 792:25,
793:9, 793:25, 796:2
**effort** [1] - 768:20
**efforts** [1] - 776:10
**eight** [1] - 741:12
**eighth** [1] - 730:11
**either** [7] - 692:25,
755:12, 757:16,
771:11, 777:10,
779:9, 781:15
**either/or** [1] - 779:9
**election** [12] - 690:10,
699:2, 699:5, 699:9,
699:10, 707:21,
707:22, 714:5,
755:13, 755:14,
757:1, 766:9
**election-night** [1] -
766:9
**election-related** [1] -
755:13
**element** [1] - 778:9
**eliminated** [1] -
679:12
**Elizabeth** [1] - 688:22
**eloquent** [1] - 713:1
**elsewhere** [3] - 743:7,
743:8, 758:25

**email** [3] - 683:11, 717:13, 718:4
**emails** [1] - 717:6
**embarrass** [1] - 682:14
**emotion** [1] - 791:6
**employed** [5] - 694:25, 695:14, 697:6, 697:18, 729:20
**employee** [4] - 695:16, 696:18, 706:19, 718:10
**employment** [1] - 699:23
**enabled** [1] - 683:2
**encountered** [1] - 779:7
**encourage** [1] - 691:7
**end** [5] - 685:17, 693:19, 724:16, 771:19, 772:7
**ended** [1] - 777:17
**endorse** [1] - 690:11
**enforcement** [5] - 697:20, 702:2, 702:5, 718:19, 774:22
**engaged** [1] - 691:11
**enjoy** [1] - 720:9
**enjoyed** [1] - 760:3
**Enrique** [1] - 700:2
**ensured** [1] - 771:3
**ensuring** [1] - 686:11
**entered** [1] - 703:21
**entering** [1] - 730:20
**enters** [9] - 689:8, 714:21, 720:15, 727:16, 733:1, 736:14, 738:1, 747:10, 752:5
**entire** [1] - 684:23
**entirely** [1] - 713:12
**entirety** [2] - 693:12, 693:15
**Ernest** [1] - 776:18
**err** [1] - 714:15
**escaping** [1] - 693:14
**escort** [2] - 682:7, 689:3
**essentially** [3] - 729:1, 777:6, 777:8
**establish** [4] - 783:4, 783:24, 784:1, 785:12
**established** [1] - 771:6
**establishes** [1] - 778:17
**et** [3] - 747:7, 777:3,

780:17
**evaluate** [5] - 691:23, 718:13, 718:14, 735:4, 750:25
**Evans** [1] - 766:17
**evening** [4] - 693:16, 700:16, 737:10, 750:11
**evenings** [1] - 750:14
**event** [6] - 716:9, 723:7, 732:2, 760:18, 783:6, 795:11
**events** [27] - 679:21, 683:23, 684:4, 694:8, 700:11, 700:18, 712:13, 717:1, 717:4, 723:3, 723:4, 724:10, 730:16, 730:17, 731:7, 731:13, 731:22, 742:2, 742:4, 742:12, 742:17, 750:7, 750:9, 750:25, 753:2, 753:3, 754:22
**evidence** [52] - 682:18, 684:13, 691:23, 692:3, 694:15, 698:25, 699:20, 701:2, 707:12, 707:14, 711:8, 714:3, 714:13, 716:19, 718:23, 722:20, 725:6, 725:8, 725:10, 733:24, 734:3, 734:24, 735:4, 735:21, 740:19, 742:18, 742:19, 742:20, 744:23, 746:23, 746:24, 751:1, 751:2, 758:24, 763:17, 764:25, 765:1, 765:4, 765:6, 770:3, 770:14, 776:5, 778:17, 780:23, 781:18, 782:17, 789:9, 790:17, 790:19, 790:25
**evidentiary** [2] - 764:17, 785:12
**exact** [5] - 771:18, 775:6, 775:12, 775:16
**exactly** [2] - 724:2, 795:21
**examination** [1] -

786:15
**examine** [4] - 784:19, 784:23, 786:5, 794:13
**examined** [1] - 786:4
**example** [9] - 718:17, 768:14, 770:2, 770:10, 770:11, 771:9, 772:5, 774:12, 776:14
**examples** [1] - 781:17
**Excel** [1] - 793:15
**except** [3] - 686:15, 706:3, 786:12
**exception** [3] - 686:18, 716:8, 794:12
**excited** [1] - 770:1
**excuse** [5] - 679:17, 686:16, 688:11, 742:19, 783:12
**excused** [4] - 685:16, 685:25, 686:2, 686:3
**executive** [2] - 703:19, 703:21
**exercising** [1] - 759:8
**exhibit** [1] - 771:7
**exhibits** [1] - 764:2
**exist** [2] - 765:3, 776:5
**exists** [1] - 701:21
**expect** [2] - 700:3, 732:1
**experience** [6] - 702:11, 703:2, 713:23, 741:21, 747:2, 786:24
**experienced** [2] - 735:18
**experiences** [2] - 696:8, 697:3
**Expert** [1] - 781:19
**expert** [4] - 744:20, 744:22, 781:21, 782:4
**experts** [1] - 782:3
**explain** [2] - 703:16, 708:21
**explained** [2] - 703:15, 713:24
**explains** [1] - 782:6
**explicit** [1] - 678:20
**exposed** [5] - 700:13, 723:2, 723:4, 730:15, 742:2
**exposure** [4] - 693:20, 724:9, 739:22, 743:4
**expressed** [1] - 727:1
**extend** [1] - 681:2
**extended** [1] - 760:22
**extent** [12] - 690:23,

691:9, 700:17, 719:22, 728:23, 749:22, 754:9, 754:17, 758:10, 787:17, 789:25, 795:22
**extra** [1] - 763:23
**extreme** [1] - 690:22
**extremely** [1] - 711:21
**extremists** [2] - 690:19, 690:20
**eyes** [1] - 684:20

---

# F

**F.2d** [1] - 782:15
**face** [1] - 720:24
**Facebook** [3] - 683:13, 771:11, 777:14
**facilities** [1] - 705:14
**fact** [19] - 679:5, 698:8, 698:9, 700:5, 727:12, 745:8, 746:5, 746:20, 770:14, 781:22, 781:23, 782:5, 782:20, 783:2, 783:3, 783:6, 786:12, 788:25, 789:6
**Fact** [1] - 781:20
**facts** [4] - 679:10, 692:3, 711:7, 783:19
**fair** [38] - 678:21, 679:13, 679:19, 681:22, 686:12, 693:5, 696:13, 698:10, 700:7, 703:3, 704:22, 705:16, 706:10, 709:17, 711:5, 713:14, 718:9, 731:5, 735:16, 736:2, 736:5, 740:13, 740:24, 742:11, 744:23, 747:3, 747:8, 757:15, 758:4, 767:21, 768:8, 771:1, 773:17, 789:24, 794:25
**fairest** [1] - 682:15
**fairly** [8] - 691:23, 718:25, 735:4, 740:15, 741:5, 769:12, 773:10, 780:13
**fairness** [1] - 784:18
**familiar** [6] - 681:18,

682:2, 682:19, 703:17, 707:16, 717:14
**familiarity** [1] - 679:21
**family** [12] - 683:11, 694:24, 696:11, 697:6, 697:24, 702:1, 702:12, 729:20, 730:6, 740:4, 742:25
**far** [5] - 690:8, 725:18, 725:21, 725:22, 794:20
**fashioned** [1] - 769:1
**father** [2] - 697:16, 697:25
**FBI** [11] - 688:10, 715:10, 715:14, 715:20, 716:14, 718:10, 718:12, 719:18, 770:18, 783:18, 784:12
**fearful** [1] - 753:19
**feature** [2] - 681:6, 685:13
**February** [2] - 737:5, 737:13
**Federal** [1] - 688:2
**federal** [7] - 697:7, 697:17, 697:18, 703:19, 729:21, 729:25, 741:16
**feedback** [1] - 719:25
**feelings** [2] - 740:11, 788:6
**fellow** [1] - 710:6
**Fellowship** [1] - 710:7
**felt** [2] - 705:15, 726:12
**fencing** [2] - 679:6
**fencings** [1] - 679:5
**few** [6] - 681:23, 688:20, 703:12, 704:14, 707:2, 764:1
**Fi** [1] - 683:2
**Field** [1] - 715:21
**field** [2] - 717:20, 718:2
**Fifth** [1] - 768:16
**figure** [3] - 781:5, 786:13, 790:4
**filmed** [1] - 773:13
**final** [2] - 685:17, 765:24
**finally** [1] - 686:14
**findings** [1] - 692:4
**fine** [6] - 720:21, 725:23, 745:22, 752:9, 759:15, 794:7
**finished** [1] - 685:19

**finishing** [1] - 761:21
**firearm** [1] - 740:22
**firearms** [2] - 740:11, 740:12
**firm** [3] - 701:11, 701:20
**firmer** [1] - 754:21
**firms** [2] - 701:17
**first** [22] - 686:21, 689:25, 715:8, 715:13, 721:2, 721:18, 728:3, 728:10, 737:1, 747:21, 752:18, 754:19, 763:16, 763:18, 767:13, 769:11, 771:11, 772:18, 775:11, 777:16, 784:17, 785:21
**first-person** [1] - 775:11
**five** [4] - 687:22, 698:3, 725:19, 765:23
**flag** [2] - 788:12, 791:5
**fled** [1] - 791:4
**fleet** [2] - 786:24, 787:6
**fleet's** [1] - 787:20
**flexibility** [1] - 790:17
**Floor** [2] - 786:25, 787:2
**Florida** [1] - 688:12
**focus** [4] - 694:15, 700:20, 701:1, 742:17
**focused** [1] - 708:4
**folks** [5] - 680:14, 714:4, 714:7, 724:22, 730:20
**follow** [24] - 684:3, 686:5, 700:14, 703:6, 703:9, 703:12, 705:19, 707:2, 709:18, 722:20, 724:12, 725:8, 725:13, 727:7, 734:5, 734:12, 741:21, 743:13, 748:9, 751:4, 758:17, 758:25, 772:24, 793:18
**follow-up** [7] - 703:6, 703:9, 724:12, 725:13, 743:13, 751:4, 758:17
**follow-ups** [1] - 707:2
**followed** [8] - 693:8,

693:10, 723:4, 739:12, 739:14, 742:3, 750:8
**followers** [2] - 683:12, 691:8
**following** [13] - 680:8, 685:6, 686:11, 687:23, 690:25, 734:20, 740:5, 765:7, 767:25, 768:3, 768:5, 769:3, 793:20
**follows** [1] - 682:5
**food** [1] - 708:6
**footage** [11] - 730:20, 731:9, 754:24, 755:3, 767:24, 767:25, 768:1, 768:3, 768:5, 768:6, 768:9
**forbidden** [1] - 684:15
**Force** [1] - 688:23
**forced** [1] - 789:1
**forces** [3] - 697:24, 730:6, 730:8
**foreign** [1] - 729:24
**forgetting** [1] - 693:12
**forgive** [1] - 721:22
**former** [5] - 698:8, 698:18, 712:4, 718:10
**forth** [1] - 734:24
**forthrightly** [1] - 713:24
**forty** [1] - 763:5
**forward** [2] - 689:5, 714:9
**foundation** [4] - 778:17, 785:13, 794:12, 794:16
**four** [1] - 765:23
**Fourth** [2] - 794:17, 794:19
**frankly** [4] - 679:10, 714:4, 727:4, 780:11
**fraudulent** [1] - 707:22
**free** [12] - 682:25, 683:3, 689:22, 715:5, 720:24, 727:25, 733:16, 736:20, 738:9, 747:18, 752:14, 760:1
**Freedom** [1] - 770:22
**Friday** [3] - 737:10, 763:17, 763:19
**friend** [12] - 683:11, 694:24, 697:6, 729:20, 729:23,

729:24, 730:5, 735:7, 735:8, 735:18, 742:25
**friends** [8] - 694:7, 695:22, 697:18, 697:24, 698:1, 701:6, 702:1, 702:11
**front** [11] - 689:24, 715:7, 721:1, 728:2, 733:18, 736:25, 738:11, 747:21, 752:19, 758:21, 766:17
**full** [1] - 726:23
**fully** [2] - 684:6, 780:10
**fundamental** [1] - 681:5
**fuzzy** [1] - 777:22

**G**

**G-e-e** [1] - 688:12
**GAO** [4] - 703:16, 703:25, 704:4, 708:3
**gathered** [1] - 767:11
**Gee** [1] - 688:12
**Gene** [1] - 688:18
**general** [2] - 703:20, 775:24
**General** [2] - 702:4, 744:11
**general's** [1] - 745:11
**generally** [10] - 690:8, 700:12, 707:8, 707:11, 707:19, 730:16, 747:2, 747:6, 750:8, 787:20
**gentlemen** [3] - 680:20, 687:21, 689:2
**given** [11] - 678:19, 685:21, 716:9, 716:16, 735:17, 739:22, 757:22, 758:4, 766:15, 775:25, 786:23
**glancing** [1] - 723:12
**glass** [1] - 702:17
**glasses** [3] - 689:11, 747:23, 747:25
**God** [1] - 743:19
**gosh** [1] - 708:24
**Gotcha** [1] - 750:4
**gotcha** [6] - 694:10, 697:15, 701:25, 702:7, 720:2, 753:16
**GoToMeeting** [9] - 765:8, 765:17, 766:20, 767:1,

781:14, 783:11, 783:20, 783:23, 784:11
**GoToMeetings** [1] - 783:21
**government** [64] - 679:17, 687:21, 697:7, 697:17, 697:19, 703:7, 703:20, 704:24, 713:16, 720:3, 724:13, 726:10, 726:21, 729:21, 729:25, 732:3, 733:24, 734:1, 741:14, 741:15, 743:14, 743:22, 745:13, 751:4, 751:25, 758:16, 761:25, 763:17, 764:2, 765:23, 766:1, 766:4, 767:12, 768:7, 768:10, 768:13, 768:24, 769:6, 769:21, 770:11, 771:16, 772:13, 772:19, 774:9, 774:24, 774:25, 776:10, 776:19, 777:15, 778:1, 779:18, 779:22, 782:22, 783:14, 785:15, 786:22, 787:4, 788:7, 788:18, 789:21, 790:11, 792:11, 793:11, 796:2
**Government** [1] - 692:7
**government's** [13] - 679:23, 687:23, 713:20, 734:17, 768:21, 775:13, 775:25, 778:12, 783:17, 787:11, 789:12, 791:24, 792:1
**grade** [1] - 730:11
**Grande** [1] - 708:24
**grandfather** [1] - 730:7
**grandfathers** [1] - 730:8
**grateful** [1] - 726:10
**gratitude** [1] - 681:3
**gray** [1] - 791:6
**Gray** [1] - 688:22
**great** [2] - 679:21, 752:2

**greater** [1] - 795:20
**GREENE** [2] - 678:5, 678:13
**Greene** [2] - 681:1, 688:18
**Greg** [1] - 688:22
**grocery** [1] - 686:23
**ground** [1] - 776:13
**grounds** [4] - 749:11, 750:2, 767:1, 767:5
**Grounds** [8] - 679:6, 699:22, 714:10, 730:10, 741:9, 749:8, 749:9, 775:8
**group** [10] - 691:4, 704:18, 719:13, 719:15, 748:13, 748:17, 757:17, 758:5, 766:7, 775:12
**groups** [1] - 708:15
**GS-15** [1] - 703:21
**guards** [1] - 678:9
**guess** [9] - 678:25, 690:21, 695:10, 707:10, 735:20, 735:22, 748:14, 778:18, 779:7
**guessing** [1] - 762:17
**guidance** [1] - 778:25
**guilt** [4] - 733:25, 734:1, 734:17, 735:5
**guilty** [1] - 733:23
**gun** [3] - 740:6, 740:15, 740:20
**GW** [1] - 701:9

**H**

**H-o-y-t** [1] - 782:14
**Hackett** [1] - 792:8
**half** [2] - 763:25, 769:5
**Haller** [8] - 688:6, 703:11, 707:3, 712:20, 745:7, 746:2, 786:10, 791:20
**HALLER** [41] - 688:7, 703:10, 703:23, 704:2, 704:6, 704:8, 704:22, 705:2, 705:6, 705:8, 705:16, 705:25, 706:6, 706:9, 706:14, 711:17, 725:14, 732:6, 736:9, 743:17, 743:24, 744:5, 744:9, 744:15, 745:15, 745:24, 751:7, 752:3, 763:3,

765:17, 766:22,
767:2, 767:4, 767:7,
767:9, 785:20,
786:8, 786:17,
786:19, 793:10,
794:1
**Haller's** [1] - 744:17
**Hallon** [1] - 688:21
**hallway** [3] - 787:1,
788:1, 788:4
**Hancock** [1] - 776:18
**handled** [1] - 717:20
**hands** [1] - 681:11
**handwriting** [2] -
782:3, 782:7
**hang** [2] - 781:16,
784:20
**hang-up** [1] - 784:20
**happy** [3] - 756:25,
781:13, 781:15
**hard** [2] - 745:20,
759:1
**harder** [1] - 696:19
**hardship** [1] - 737:3
**Hawley** [1] - 731:10
**head** [3] - 744:14,
752:1, 758:1
**headquarters** [5] -
715:16, 715:19,
715:20, 717:21,
717:22
**Health** [2] - 695:8,
710:2
**health** [6] - 695:8,
696:10, 701:23,
710:1, 722:4, 747:7
**hear** [17] - 686:12,
687:22, 699:14,
744:20, 750:12,
752:16, 753:12,
762:12, 762:13,
762:21, 775:23,
782:1, 786:4,
788:21, 790:24
**heard** [47] - 684:16,
690:2, 690:5, 691:6,
692:10, 692:13,
692:15, 692:25,
693:4, 694:12,
694:14, 700:13,
701:1, 706:4,
709:16, 713:16,
713:25, 721:4,
721:7, 721:12,
721:14, 721:16,
721:18, 726:15,
728:5, 728:7,
728:10, 728:13,
738:15, 738:18,
739:2, 748:3, 748:5,

748:10, 748:12,
750:25, 754:2,
754:5, 757:13,
758:4, 758:22,
758:24, 758:25,
759:1, 767:17, 786:3
**hearing** [1] - 794:21
**hearings** [13] - 693:9,
693:10, 693:17,
693:21, 693:22,
694:13, 694:14,
700:17, 739:10,
739:12, 739:19,
739:24, 794:19
**hears** [2] - 714:3,
714:13
**hearsay** [6] - 785:9,
785:10, 785:11,
785:12, 794:21,
795:23
**held** [5] - 678:4,
680:16, 689:6,
698:13, 792:17
**hello** [2] - 720:19,
747:13
**help** [1] - 722:5
**helped** [1] - 693:24
**helpful** [4] - 745:10,
764:9, 781:2, 793:21
**helpfully** [1] - 780:21
**hi** [8] - 689:15, 703:11,
714:24, 720:18,
727:19, 733:2,
736:17, 752:8
**hiding** [2] - 788:8,
791:6
**High** [1] - 740:8
**high** [2] - 757:2, 761:9
**high-level** [1] - 757:2
**highlight** [3] - 782:23,
784:4, 784:6
**highlighting** [1] -
772:9
**Hill** [9] - 688:21,
695:16, 709:20,
713:4, 752:22,
752:23, 760:21,
774:13
**hold** [1] - 698:12
**holding** [1] - 705:13
**Holt** [2] - 750:14,
750:15
**home** [2] - 702:25,
752:25
**homework** [1] -
777:20
**honest** [4] - 719:15,
735:16, 736:1
**Honor** [90] - 678:24,
679:15, 679:25,

687:20, 688:7,
688:14, 689:9,
703:8, 703:10,
707:1, 710:17,
711:17, 712:23,
713:2, 713:10,
713:17, 714:20,
714:22, 720:4,
720:7, 720:10,
720:16, 724:14,
725:12, 725:14,
726:1, 726:8,
726:16, 726:21,
727:17, 732:4,
732:6, 732:23,
736:7, 736:8, 736:9,
736:15, 737:20,
737:21, 738:3,
743:15, 743:17,
745:1, 745:15,
746:10, 746:22,
747:11, 751:7,
751:24, 752:6,
761:2, 761:7,
761:12, 761:25,
762:2, 762:10,
762:16, 763:3,
763:7, 763:9,
763:20, 763:22,
764:8, 764:19,
764:21, 764:22,
765:17, 767:2,
773:24, 774:15,
777:11, 779:14,
781:1, 782:13,
782:14, 785:22,
786:17, 786:19,
787:7, 789:11,
790:6, 791:19,
793:25, 794:1,
794:4, 794:5, 794:9,
795:4, 795:14, 796:2
**Honor's** [2] - 775:5,
794:14
**Hoover** [1] - 715:22
**hope** [5] - 679:11,
722:17, 757:18,
761:16, 762:6
**hopefully** [3] - 687:8,
761:18, 796:4
**Horn** [1] - 766:17
**host** [1] - 771:5
**hour** [2] - 761:24,
763:25
**House** [5] - 693:13,
695:3, 709:22,
786:25, 787:2
**housing** [2] - 705:1,
708:6
**Hoyt** [1] - 782:14

**hundreds** [2] - 719:7,
719:9
**hurt** [4] - 702:20,
705:21, 711:23,
712:4
**husband** [4] - 696:5,
696:25, 706:19,
710:20
**hybrid** [1] - 769:1
**hype** [1] - 792:22
**hypothetical** [1] -
696:16
**hypothetically** [1] -
744:6

**I**

**idea** [1] - 728:18
**ideally** [1] - 761:21
**identified** [6] - 690:24,
700:1, 740:4, 740:6,
770:19, 770:24
**identify** [6] - 687:12,
687:16, 756:2,
771:4, 779:11, 781:2
**identifying** [3] - 729:6,
747:5, 787:3
**ideology** [8] - 690:24,
698:20, 705:19,
705:23, 706:3,
711:19, 728:16
**immediately** [3] -
684:20, 685:2,
685:16
**impact** [3] - 699:17,
699:19, 744:7
**impacted** [1] - 759:25
**impartial** [19] - 679:14,
681:22, 682:15,
686:12, 692:4,
696:14, 698:10,
700:8, 703:4,
706:10, 709:17,
711:5, 718:9, 736:2,
740:13, 740:24,
744:24, 757:15,
758:4
**impartially** [4] -
691:23, 711:8,
740:16, 741:5
**implicit** [2] - 718:17
**implicitly** [1] - 718:18
**important** [4] - 681:8,
683:6, 683:20, 686:4
**importantly** [1] -
683:22
**imposed** [1] - 712:18
**impression** [3] -
706:4, 706:7, 756:7
**inaccurate** [1] -

756:23
**inadmissibility** [1] -
764:1
**inadmissible** [1] -
789:6
**Inaudible** [1] - 781:25
**incite** [2] - 693:24,
709:6
**inclined** [2] - 768:11,
788:13
**include** [3] - 695:3,
695:5, 783:16
**included** [2] - 716:14,
740:8
**includes** [1] - 683:18
**including** [7] - 687:5,
708:15, 746:19,
785:9, 786:25,
791:25, 792:8
**incomprehensibly** [1]
- 705:15
**inconsistent** [2] -
713:3, 713:7
**incorrect** [1] - 732:8
**incorrectly** [2] - 779:2,
779:5
**indecent** [1] - 743:4
**indeed** [1] - 681:5
**Independence** [5] -
760:19, 769:25,
770:2, 770:6, 770:23
**independent** [1] -
686:7
**indicated** [2] - 721:24,
727:10
**indication** [1] - 768:21
**indicative** [1] - 727:9
**indictment** [1] -
762:23
**indictments** [1] -
746:8
**individual** [4] -
685:22, 687:17,
691:21, 692:14
**individually** [2] -
682:9, 694:16
**individuals** [8] -
765:8, 767:16,
768:2, 769:5, 787:2,
787:3, 787:12, 788:6
**indulge** [1] - 712:6
**indulgence** [1] - 712:9
**infer** [1] - 780:17
**inferences** [6] -
788:10, 789:17,
790:11, 790:12,
790:18, 790:19
**inflammatory** [1] -
789:8
**information** [4] -

726:13, 740:23, 746:6, 755:3
**informed** [1] - 767:13
**initials** [1] - 682:6
**inject** [1] - 745:8
**injecting** [1] - 746:5
**injured** [1] - 696:10
**innocence** [2] - 734:3, 757:19
**innocent** [2] - 733:22, 734:14
**inside** [10] - 687:5, 699:22, 711:1, 730:10, 741:9, 749:8, 749:9, 749:11, 772:22, 775:8
**insignia** [2] - 756:5, 756:14
**insofar** [4] - 679:5, 712:15, 748:24, 783:11
**Inspector** [1] - 702:4
**Instagram** [1] - 683:13
**instance** [1] - 708:17
**instances** [1] - 707:12
**instruct** [1] - 684:4
**instruction** [3] - 683:19, 734:21, 758:25
**instructions** [20] - 682:7, 684:14, 685:3, 685:7, 685:10, 685:21, 685:23, 686:5, 686:11, 711:15, 726:4, 726:17, 727:8, 732:17, 734:13, 736:12, 741:22, 745:5, 751:22, 761:4
**instructs** [1] - 758:23
**insufficient** [2] - 678:19, 678:21
**intake** [1] - 719:23
**intelligence** [6] - 707:5, 707:7, 707:15, 713:5, 713:11, 714:18
**intelligent** [3] - 699:13, 699:16, 711:22
**intend** [1] - 774:9
**intended** [2] - 729:2, 769:22
**intending** [1] - 766:6
**intends** [1] - 766:4
**intention** [2] - 682:13
**intentions** [2] - 714:9, 795:23

**interact** [2] - 702:22, 717:3
**interaction** [1] - 718:2
**interfere** [2] - 734:4, 788:23
**internet** [2] - 683:4, 770:5
**interpret** [1] - 790:22
**interviewed** [1] - 703:1
**introduce** [2] - 766:4, 778:2
**introduced** [2] - 777:15, 777:22
**introducing** [1] - 776:6
**introduction** [1] - 776:14
**intruding** [1] - 721:23
**intuited** [1] - 698:6
**invade** [1] - 682:14
**inventoried** [1] - 719:20
**investigated** [2] - 704:12, 717:23
**investigating** [2] - 717:4, 717:17
**Investigation** [1] - 688:2
**investigation** [2] - 716:25, 717:15
**investigations** [1] - 717:20
**invoke** [1] - 768:16
**involve** [3] - 765:6, 791:5, 794:15
**involved** [8] - 690:10, 754:21, 754:22, 758:8, 783:21, 788:25, 792:15
**involvement** [2] - 691:2, 694:4
**involving** [4] - 690:3, 721:5, 738:16, 754:3
**irrespective** [1] - 712:18
**Isaacs** [5] - 681:1, 688:19, 688:22, 746:23, 794:16
**issue** [13] - 694:2, 701:2, 774:2, 775:18, 775:21, 775:22, 781:9, 782:14, 784:2, 785:3, 785:7, 785:16, 789:15
**issued** [2] - 685:8, 794:19
**issues** [8] - 704:9, 704:10, 708:1,

708:5, 722:4, 725:17, 764:17, 795:23
**itineraries** [1] - 737:8
**itself** [3] - 684:23, 735:9, 789:12

## J

**Jacob** [1] - 710:7
**January** [59] - 679:22, 683:23, 684:4, 686:10, 690:10, 691:2, 691:4, 691:8, 691:14, 692:18, 693:1, 693:9, 694:9, 694:13, 696:1, 696:3, 696:6, 700:17, 700:18, 700:20, 700:23, 708:13, 712:14, 712:17, 717:1, 718:11, 723:3, 723:5, 724:10, 728:19, 729:12, 730:16, 730:19, 731:2, 738:25, 739:4, 739:10, 742:2, 749:4, 749:16, 750:7, 750:18, 751:11, 752:22, 753:20, 754:15, 755:7, 758:7, 759:9, 759:13, 760:6, 760:7, 760:20, 765:10, 770:7, 786:24, 792:20, 795:19
**Jason** [1] - 732:23
**Javits** [1] - 710:7
**Jeff** [1] - 688:20
**Jennifer** [2] - 688:10, 717:10
**jeopardizes** [1] - 684:22
**Jessica** [3] - 687:25, 692:11, 765:7
**job** [7] - 692:2, 707:25, 711:7, 713:21, 729:25, 745:21, 745:23
**jobs** [1] - 695:25
**jog** [1] - 759:11
**jogging** [2] - 759:8, 759:13
**jogs** [1] - 759:10
**John** [1] - 710:11
**join** [1] - 712:20
**joining** [2] - 727:22,

762:5
**Jones** [1] - 700:2
**Josh** [2] - 731:9, 731:10
**journalists** [2] - 683:25, 684:3
**Judge** [4] - 678:5, 678:17, 680:21, 795:25
**judge** [7] - 699:20, 703:13, 714:2, 714:12, 725:6, 725:8, 758:23
**judgment** [4] - 698:23, 707:5, 707:15, 713:5
**judicial** [5] - 690:3, 721:5, 738:16, 754:3, 784:21
**Juli** [1] - 703:11
**jump** [1] - 770:1
**juries** [1] - 681:4
**juror** [44] - 678:21, 680:9, 680:10, 680:11, 681:21, 681:24, 682:4, 683:13, 684:12, 684:21, 687:11, 689:24, 696:13, 699:18, 700:25, 712:16, 713:13, 713:19, 714:2, 714:17, 715:7, 721:1, 721:19, 722:18, 728:2, 728:12, 731:16, 733:18, 735:17, 736:14, 736:24, 738:11, 740:16, 741:5, 742:16, 744:19, 745:16, 746:3, 747:20, 750:24, 752:18
**Juror** [38] - 679:17, 689:8, 689:9, 689:20, 711:16, 712:11, 714:21, 714:22, 715:3, 720:14, 720:15, 720:16, 720:22, 726:7, 727:16, 727:18, 727:23, 732:19, 733:1, 733:4, 733:7, 733:14, 736:13, 736:16, 736:22, 737:25, 738:1, 738:4, 738:7, 745:6, 747:10, 747:12, 747:16, 751:23, 752:5, 752:7,

752:12, 761:5
**JUROR** [275] - 689:11, 689:14, 689:16, 689:21, 690:7, 690:15, 690:18, 690:21, 691:5, 691:15, 691:25, 692:2, 692:7, 692:14, 692:22, 693:3, 693:11, 693:23, 694:3, 694:17, 694:20, 694:22, 695:1, 695:7, 695:13, 695:17, 695:20, 695:24, 696:4, 696:9, 696:15, 696:21, 697:1, 697:4, 697:11, 697:14, 697:16, 697:22, 697:25, 698:11, 698:15, 698:19, 698:22, 699:4, 699:12, 699:15, 699:19, 700:9, 700:14, 700:22, 701:4, 701:8, 701:14, 701:19, 701:23, 702:3, 702:9, 702:14, 702:19, 702:21, 702:24, 703:5, 703:18, 703:25, 704:4, 704:7, 704:13, 704:25, 705:7, 705:10, 705:24, 706:1, 706:8, 706:12, 706:16, 706:21, 707:10, 707:18, 707:20, 707:23, 708:2, 708:10, 708:14, 708:17, 708:23, 709:12, 709:14, 709:19, 709:21, 709:23, 710:1, 710:6, 710:10, 710:12, 710:15, 710:22, 710:24, 711:6, 711:11, 714:25, 715:4, 715:15, 715:22, 716:1, 716:4, 716:16, 716:18, 716:22, 717:2, 717:5, 717:19, 717:25, 718:3, 718:7, 718:15, 718:20, 719:1, 719:5, 719:8,

719:14, 719:22,
720:13, 720:19,
720:21, 720:23,
721:9, 721:14,
721:17, 721:21,
722:3, 722:8,
722:13, 722:15,
722:22, 722:24,
723:6, 723:10,
723:12, 723:16,
723:19, 723:22,
723:25, 724:2,
724:7, 724:11,
724:18, 725:1,
725:3, 725:9,
725:21, 725:23,
726:6, 727:20,
727:24, 728:9,
728:13, 728:17,
728:20, 728:25,
729:13, 729:15,
729:18, 729:22,
730:4, 730:7,
730:11, 730:18,
731:1, 731:4, 731:8,
731:14, 731:18,
731:24, 732:12,
732:18, 733:6,
733:8, 733:15,
734:7, 734:15,
734:19, 734:22,
735:1, 735:7,
735:11, 735:20,
735:24, 736:3,
736:18, 736:21,
736:23, 737:7,
737:17, 737:24,
738:8, 738:19,
738:24, 739:5,
739:8, 739:14,
739:21, 739:25,
740:7, 740:17,
740:25, 741:6,
741:11, 741:23,
742:5, 742:14,
742:22, 743:3,
743:8, 743:12,
743:23, 744:2,
744:8, 744:14,
744:25, 747:14,
747:17, 747:23,
747:25, 748:6,
748:8, 748:12,
748:19, 748:23,
749:2, 749:5,
749:12, 749:20,
749:24, 750:3,
750:10, 750:19,
751:3, 751:12,
751:15, 751:17,
751:20, 752:9,

752:13, 752:24,
753:1, 753:4, 753:9,
753:14, 753:20,
753:23, 754:6,
754:9, 754:14,
754:24, 755:2,
755:5, 755:9,
755:17, 755:22,
756:4, 756:11,
756:20, 756:24,
757:9, 757:18,
757:24, 758:1,
758:6, 758:13,
759:3, 759:10,
759:21, 759:24,
760:8, 760:10
**juror's** [1] - 746:13
**Jurors** [1] - 688:16
**jurors** [11] - 680:2,
680:8, 680:24,
681:5, 681:19,
682:16, 685:4,
687:6, 725:5,
746:25, 761:13
**JURY** [1] - 681:14
**jury** [47] - 678:4,
678:6, 678:8,
678:14, 678:19,
678:20, 678:21,
679:11, 680:16,
681:3, 681:17,
682:15, 682:19,
682:24, 683:7,
683:20, 684:6,
684:18, 684:22,
684:25, 685:4,
685:10, 685:13,
685:15, 685:18,
685:21, 686:12,
687:10, 689:6,
706:11, 724:21,
725:5, 725:22,
725:23, 733:23,
741:19, 741:20,
746:12, 763:15,
777:23, 779:23,
782:24, 782:25,
783:6, 789:9, 790:13
**jury's** [1] - 790:16
**justice** [1] - 681:4

**K**

**Kandaris** [2] - 770:8,
771:4
**Kathryn** [2] - 688:10,
688:11
**Katie** [1] - 688:21
**keep** [2] - 682:22,
752:16
**Keeper** [2] - 693:24,

788:3
**Keepers** [43] - 690:2,
690:6, 690:8,
690:23, 691:7,
691:11, 691:13,
691:15, 692:17,
693:22, 694:6,
704:11, 704:23,
705:18, 706:2,
707:9, 708:16,
709:16, 711:1,
712:13, 712:17,
719:12, 721:4,
721:8, 721:13,
728:6, 728:8,
728:11, 738:15,
738:20, 739:3,
739:23, 748:4,
748:11, 754:2,
755:25, 756:3,
756:9, 756:15,
757:6, 757:10,
783:21
**Kelly** [2] - 692:11,
766:11
**Kellye** [1] - 777:14
**Kennedy** [2] - 710:9,
710:11
**Kennedy's** [1] - 710:8
**kind** [12] - 692:5,
718:17, 719:15,
729:6, 729:24,
732:2, 737:3,
756:12, 757:2,
765:13, 783:5, 789:7
**knowledge** [5] -
719:18, 729:15,
746:7, 788:17
**known** [7] - 721:8,
721:13, 728:8,
728:11, 748:3,
748:11, 757:6
**Kuylen** [1] - 688:3
**KUYLEN** [1] - 688:3

**L**

**Labor** [2] - 695:8,
710:2
**ladies** [3] - 680:20,
687:21, 689:2
**last** [11] - 687:3,
698:3, 710:25,
727:4, 730:21,
745:16, 746:10,
761:13, 779:15,
791:19, 792:13
**Laughter** [1] - 739:20
**Laura** [1] - 680:25
**Laurie** [1] - 688:23

**law** [21] - 681:7,
682:18, 684:14,
697:20, 701:8,
701:9, 701:10,
701:11, 701:13,
701:15, 701:17,
701:19, 701:20,
701:24, 702:2,
702:5, 718:19,
734:5, 741:22,
774:21
**laws** [1] - 740:12
**lawsuit** [3] - 745:23,
745:24, 746:6
**lawyer** [1] - 794:8
**lawyers** [4] - 682:14,
685:3, 686:18,
746:19
**lay** [1] - 794:11
**layer** [1] - 780:4
**layperson** [1] - 777:9
**learn** [2] - 699:7,
741:3
**learned** [5] - 691:19,
709:4, 748:24,
753:14, 757:23
**learning** [4] - 722:3,
722:6, 726:11, 727:1
**least** [11] - 680:8,
694:5, 706:2,
751:25, 755:24,
765:23, 771:15,
782:8, 783:17,
792:14, 793:13
**leave** [3] - 685:22,
739:16, 790:3
**leaving** [1] - 776:25
**led** [1] - 768:10
**lede** [1] - 768:25
**left** [10] - 711:16,
720:14, 726:7,
732:19, 736:13,
737:25, 745:6,
751:23, 753:4, 761:5
**legal** [7] - 701:7,
727:6, 727:8,
733:22, 734:12,
779:17, 780:6
**legitimate** [1] - 699:10
**Lesley** [1] - 688:22
**less** [2] - 719:10,
731:6
**Lester** [2] - 750:14,
750:15
**level** [3] - 703:19,
757:2, 765:14
**levels** [1] - 765:3
**life** [2] - 708:5, 727:10
**likely** [4] - 740:19,
755:17, 759:14

**limitation** [2] - 793:6,
794:20
**limitations** [2] - 790:7,
790:9
**limited** [2] - 739:22,
792:7
**limiting** [1] - 767:12
**limits** [2] - 741:14,
794:22
**line** [12] - 679:18,
679:24, 680:9,
680:10, 680:11,
680:12, 704:12,
705:17, 716:14,
792:10
**lines** [1] - 746:17
**list** [5] - 687:11,
687:13, 692:15,
700:1, 766:17
**listed** [1] - 692:12
**listen** [6] - 686:6,
700:15, 725:5,
725:6, 725:8, 725:9
**listened** [2] - 739:11,
770:25
**literally** [2] - 790:1,
790:23
**live** [8] - 730:18,
741:11, 752:21,
752:22, 755:18,
771:12, 777:14,
778:13
**lived** [4] - 727:10,
753:22, 758:8,
760:20
**local** [1] - 741:17
**locally** [1] - 737:12
**located** [2] - 753:17,
775:7
**location** [3] - 678:15,
686:24, 771:19
**Logan** [1] - 727:11
**long-term** [1] - 744:1
**look** [13] - 689:4,
768:1, 777:1, 783:8,
783:12, 785:18,
786:18, 788:21,
789:25, 790:10,
794:25, 795:3,
795:17
**looked** [2] - 719:24,
774:19
**looking** [2] - 704:14,
761:18
**looks** [1] - 764:7
**Louisiana** [1] - 710:11
**Luis** [1] - 688:21

**M**

**ma'am** [10] - 692:6, 709:9, 720:18, 724:15, 725:15, 726:2, 733:2, 747:13, 751:9, 751:18
**MACHADO** [27] - 679:25, 680:2, 680:5, 706:18, 706:22, 713:10, 720:7, 725:15, 725:24, 726:8, 732:7, 732:13, 736:8, 737:21, 751:8, 751:13, 751:16, 751:24, 752:2, 752:4, 759:7, 759:15, 759:23, 760:5, 760:9, 760:23, 762:2
**Machado** [2] - 707:3, 762:1
**magazine** [1] - 683:1
**magic** [1] - 761:15
**Maier** [1] - 688:4
**main** [1] - 715:20
**maintain** [1] - 696:23
**major** [2] - 743:20, 750:21
**makers** [1] - 681:7
**Mall** [8] - 754:25, 755:1, 755:6, 755:10, 755:19, 755:23, 760:15, 760:22
**managed** [2] - 717:21, 717:22
**management** [2] - 708:3, 744:3
**manipulated** [1] - 714:7
**manner** [4] - 711:9, 774:25, 775:3, 776:20
**manning** [1] - 774:14
**march** [1] - 754:15
**marching** [3] - 753:12, 754:25, 755:1
**Marine** [1] - 698:1
**married** [1] - 696:18
**mask** [14] - 686:15, 686:20, 686:25, 689:22, 715:5, 720:24, 727:25, 733:16, 736:20, 738:9, 747:18, 752:14, 762:11, 762:15

**masking** [4] - 686:16, 686:17, 687:1, 687:7
**mass** [1] - 717:6
**match** [1] - 777:8
**matter** [4] - 718:5, 746:18, 776:12, 788:3
**matters** [4] - 682:12, 708:12, 717:18, 747:7
**Matthew** [1] - 688:4
**mayor** [1] - 744:13
**McIntyre** [1] - 732:24
**McWhirter** [1] - 688:22
**mean** [42] - 678:12, 690:14, 690:16, 690:18, 693:23, 695:2, 697:18, 698:19, 698:22, 700:14, 707:11, 712:24, 715:20, 718:1, 723:9, 723:15, 723:16, 755:5, 756:11, 757:18, 760:10, 773:6, 775:19, 776:23, 778:16, 783:2, 784:15, 785:21, 786:3, 788:21, 788:23, 789:7, 789:8, 789:15, 789:24, 791:8, 791:10, 794:25, 795:11, 795:12, 795:17, 795:21
**means** [9] - 679:8, 683:10, 683:24, 685:15, 703:17, 705:9, 760:15, 768:12, 781:23
**meant** [1] - 705:13
**meantime** [1] - 781:6
**measures** [2] - 759:18, 759:22
**media** [21] - 683:18, 683:22, 684:2, 684:5, 684:16, 685:8, 691:7, 692:17, 694:4, 701:1, 701:15, 706:5, 723:2, 723:3, 728:22, 753:15, 756:24, 757:11, 757:13, 757:23
**medical** [2] - 746:25, 747:1
**Meggs** [20] - 681:1, 688:8, 692:11, 703:11, 712:14,

712:19, 746:1, 763:1, 763:2, 766:11, 766:22, 767:4, 769:16, 786:21, 787:11, 791:25, 792:5, 792:21
**Meggs's** [1] - 791:22
**Mehta** [1] - 680:21
**member** [9] - 683:12, 685:24, 691:11, 694:24, 697:6, 703:18, 710:4, 729:20, 743:1
**members** [23] - 685:8, 690:4, 691:3, 694:5, 697:24, 702:1, 702:12, 708:5, 730:6, 739:3, 740:3, 749:4, 754:4, 754:16, 754:20, 755:4, 757:16, 758:5, 768:14, 788:25, 790:2, 790:24, 790:25
**memory** [1] - 777:21
**men** [1] - 748:14
**mental** [2] - 696:10, 747:7
**mentioned** [11] - 687:14, 697:8, 700:3, 700:5, 704:18, 705:3, 707:4, 707:7, 708:18, 717:10, 731:19
**mentions** [1] - 713:6
**mere** [1] - 700:5
**merits** [1] - 785:12
**messages** [7] - 712:3, 766:10, 766:12, 793:12, 793:14, 793:16, 793:19
**met** [3] - 697:4, 706:20, 779:18
**metadata** [1] - 770:4
**method** [3] - 770:4, 773:2, 773:3
**Metropolitan** [1] - 702:22
**Mexico** [2] - 737:14, 737:15
**Michael** [1] - 681:1
**microphone** [1] - 752:16
**might** [22] - 684:15, 686:9, 686:24, 687:2, 690:11, 690:18, 694:6, 694:7, 699:12,

699:15, 700:6, 703:17, 725:18, 729:4, 734:8, 736:3, 745:11, 764:23, 772:14, 777:17, 778:5, 781:1
**military** [2] - 704:25, 708:6
**mind** [6] - 692:1, 699:5, 748:21, 757:6, 757:24, 758:3, 758:7, 758:11, 785:14
**minimum** [2] - 682:22
**minor** [1] - 702:14
**minorities** [2] - 705:4, 711:23
**minors** [3] - 698:5, 705:5, 705:6
**minutes** [9] - 750:15, 761:24, 762:2, 762:18, 762:22, 763:3, 763:25, 764:11, 764:13
**miscommunication** [1] - 769:21
**misread** [1] - 734:8
**misremembering** [1] - 777:18
**missed** [1] - 761:6
**missing** [1] - 786:10
**mission** [3] - 728:16, 739:7, 756:18
**misspelled** [1] - 727:14
**misspoken** [1] - 777:14
**mistake** [1] - 733:11
**misunderstood** [1] - 749:13
**mobile** [4] - 683:3, 683:7, 684:9, 725:21
**mode** [2] - 683:5, 769:11
**moment** [1] - 734:11
**Monday** [1] - 746:12
**month** [2] - 687:3, 737:5
**months** [1] - 737:17
**Monument** [1] - 755:20
**Moore** [2] - 688:10, 717:10
**Morelock** [1] - 688:20
**morning** [9] - 700:16, 724:15, 746:13, 750:11, 761:20, 763:16, 763:19, 777:13, 796:6
**most** [9] - 682:15,

685:14, 699:13, 699:16, 716:1, 725:19, 731:12, 755:17, 759:13
**mostly** [2] - 704:16, 704:25
**motion** [6] - 678:5, 678:17, 678:18, 795:9, 795:13
**move** [4] - 693:7, 713:8, 726:8, 746:14
**moved** [2] - 695:25, 725:16
**movement** [1] - 775:16
**movements** [1] - 775:8
**moving** [3] - 771:17, 775:12, 791:2
**Muir** [2] - 750:13, 750:14

**N**

**name** [13] - 680:21, 688:9, 688:10, 692:25, 693:12, 693:14, 717:10, 717:14, 721:18, 728:13, 732:21, 732:23, 738:23
**named** [1] - 688:12
**names** [10] - 687:11, 687:12, 687:14, 687:15, 687:16, 687:17, 687:22, 699:25, 700:2, 717:11
**national** [4] - 704:9, 704:10, 708:1, 708:4
**nature** [1] - 735:3
**near** [1] - 685:17
**nearly** [1] - 772:20
**need** [17] - 681:11, 686:20, 716:10, 725:8, 745:14, 758:23, 759:15, 768:12, 769:14, 773:7, 773:8, 773:11, 773:12, 782:12, 788:19, 793:23
**needed** [1] - 726:13
**needing** [2] - 770:11, 770:12
**negative** [1] - 714:18
**neighborhood** [3] - 727:11, 752:22, 753:7
**neighbors** [1] - 753:22

**never** [6] - 697:4, 717:15, 721:14, 721:16, 734:1, 748:10
**new** [3] - 687:16, 775:20, 776:13
**news** [47] - 683:21, 683:24, 683:25, 684:9, 684:16, 684:19, 693:16, 700:11, 700:12, 700:13, 700:15, 700:16, 706:5, 723:2, 723:3, 723:6, 724:1, 724:5, 724:9, 724:11, 728:24, 729:1, 730:15, 730:17, 731:7, 731:12, 738:20, 738:23, 742:1, 742:3, 742:12, 742:16, 748:13, 750:6, 750:9, 750:11, 750:12, 750:16, 753:15, 753:18, 754:6, 754:7, 754:12, 754:24, 756:6
**newspaper** [1] - 683:21
**newsrooms** [1] - 729:5
**next** [3] - 717:7, 737:11, 762:23
**nice** [1] - 730:2
**night** [2] - 754:6, 766:9
**nobody** [3] - 731:24, 776:15, 780:12
**noise** [1] - 750:12
**none** [5] - 686:21, 704:4, 740:21, 784:18, 787:25
**nonetheless** [1] - 712:14
**nonpartisan** [2] - 704:1, 711:9
**normal** [1] - 760:13
**normally** [2] - 716:16, 760:3
**Norman** [1] - 688:3
**NOTE** [20] - 678:2, 689:8, 711:16, 714:21, 720:14, 720:15, 726:7, 727:16, 732:19, 733:1, 736:13, 736:14, 737:25, 738:1, 745:6, 747:10, 751:23,

752:5, 761:5, 792:17
**note** [3] - 678:6, 727:8, 779:15
**noted** [1] - 678:22
**nothing** [2] - 726:1, 738:25
**notice** [1] - 760:12
**noticed** [1] - 725:16
**notifications** [1] - 684:8
**notify** [2] - 685:1, 685:11
**notwithstanding** [2] - 727:12, 740:14
**novel** [3] - 776:6, 777:25
**novelly** [1] - 782:8
**November** [3] - 755:14, 755:15, 783:25
**number** [8] - 679:12, 703:14, 717:9, 718:12, 719:5, 761:15, 763:15, 766:9
**numbers** [1] - 680:3

## O

**o'clock** [1] - 782:12
**Oath** [46] - 681:13, 690:2, 690:5, 690:8, 690:23, 691:7, 691:11, 691:13, 691:15, 692:17, 693:22, 693:24, 694:6, 704:11, 704:23, 705:18, 706:2, 707:9, 708:16, 709:16, 711:1, 712:13, 712:17, 719:12, 721:4, 721:8, 721:13, 728:6, 728:8, 728:11, 738:15, 738:20, 739:3, 739:23, 748:4, 748:11, 754:2, 755:25, 756:3, 756:9, 756:15, 757:6, 757:10, 783:21, 788:3
**object** [6] - 678:18, 711:18, 711:19, 712:5, 766:13, 766:23
**objecting** [7] - 712:21, 764:12, 767:1, 767:4, 793:17,

793:18, 795:8
**objection** [8] - 765:25, 766:18, 766:24, 787:9, 787:14, 787:16, 789:20, 791:20
**objections** [8] - 678:22, 720:3, 736:6, 737:19, 758:15, 759:6, 765:2, 791:15
**objectively** [2] - 713:22, 718:25
**obligation** [2] - 734:2
**observation** [1] - 793:21
**observations** [1] - 753:7
**observe** [3] - 712:11, 753:2, 793:21
**observed** [3] - 735:17, 769:13, 787:1
**obtained** [2] - 768:6, 776:19
**obvious** [2] - 679:20, 718:9
**obviously** [3] - 760:10, 761:17, 790:16
**occasions** [2] - 755:6, 755:24
**occurred** [1] - 730:25
**odd** [2] - 778:19, 783:4
**off-the-cuff** [1] - 776:23
**offend** [1] - 745:19
**offer** [1] - 734:3
**offered** [1] - 770:10
**Office** [2] - 692:8, 715:21
**office** [7] - 695:4, 701:10, 710:8, 717:20, 745:11
**officer** [6] - 685:2, 685:12, 696:5, 696:18, 696:25, 729:24
**Officer** [1] - 688:24
**officers** [3] - 767:16, 767:23, 774:14
**oftentimes** [1] - 785:9
**Oliver** [1] - 688:4
**omnibus** [1] - 795:16
**once** [3] - 681:11, 701:9, 702:15
**one** [49] - 679:11, 682:9, 685:13, 685:15, 687:5, 693:11, 693:14,

693:18, 698:1, 699:1, 699:7, 708:17, 708:19, 710:17, 716:12, 718:20, 724:20, 726:9, 734:7, 734:8, 739:15, 740:5, 743:21, 755:24, 758:17, 761:21, 765:18, 765:20, 765:24, 766:1, 766:9, 766:18, 769:23, 771:9, 771:10, 778:22, 779:15, 779:24, 781:16, 782:10, 783:16, 783:19, 783:23, 786:14, 788:14, 789:12, 790:2, 791:3, 792:22
**online** [3] - 683:4, 683:10, 683:15
**open** [5] - 714:8, 770:13, 771:15, 785:16, 791:19
**opening** [12] - 762:17, 762:21, 781:10, 786:22, 787:5, 789:23, 790:9, 790:15, 790:16, 790:20, 791:16
**openings** [7] - 761:17, 761:20, 761:23, 763:14, 763:17, 787:21, 788:15
**openness** [1] - 714:6
**operational** [2] - 716:7, 716:8
**opinion** [4] - 713:12, 736:1, 794:19
**opinions** [2] - 698:16, 724:24
**opponent** [1] - 746:4
**opponents** [1] - 745:24
**opportunity** [1] - 794:13
**oppose** [2] - 679:23, 794:22
**opposed** [4] - 712:24, 747:5, 765:2, 773:5
**option** [1] - 783:16
**options** [1] - 783:16
**order** [1] - 685:8
**ordinary** [1] - 681:6
**organization** [35] - 684:10, 690:2, 690:3, 690:8, 691:19, 691:20, 692:21, 692:23,

693:2, 721:4, 721:5, 721:8, 721:13, 721:19, 728:5, 728:8, 728:11, 728:22, 728:24, 738:15, 738:16, 739:23, 748:3, 748:10, 749:1, 749:4, 754:2, 754:3, 754:13, 754:20, 755:4, 756:25, 757:2, 757:6
**organization's** [3] - 728:16, 739:7, 756:18
**organize** [1] - 719:24
**organized** [1] - 740:7
**organizing** [1] - 755:23
**otherwise** [5] - 717:14, 774:11, 776:7, 784:23, 786:13
**outbreak** [1] - 687:2
**outcome** [5] - 690:9, 699:1, 699:5, 699:10, 735:13
**outside** [6] - 678:4, 689:6, 746:13, 746:17, 766:13, 772:21, 787:12, 791:1, 793:17
**outweigh** [1] - 787:24
**outweighing** [1] - 789:4
**outweighs** [1] - 787:19
**overall** [1] - 742:3
**overdo** [1] - 762:19
**overnight** [4] - 788:14, 788:20, 789:10, 793:5
**overruled** [1] - 746:15
**oversight** [1] - 703:24
**own** [1] - 753:19

## P

**p.m** [1] - 796:7
**page** [33] - 689:25, 693:6, 693:7, 694:21, 699:24, 701:6, 703:14, 709:9, 709:11, 715:8, 721:2, 721:23, 723:1, 728:3, 729:17, 730:14, 733:19, 733:20, 733:21, 737:1, 738:12,

740:2, 741:18, 741:24, 742:24, 747:22, 749:7, 750:5, 752:20, 753:25, 770:20
**paid** [1] - 737:16
**paint** [1] - 746:17
**paper** [2] - 693:16, 742:8
**paraphernalia** [1] - 755:11
**paraphrasing** [1] - 788:8
**parents** [2] - 702:25, 705:12
**park** [1] - 735:12
**Parker** [2] - 680:25
**Parkland** [2] - 740:6, 740:8
**parsoned** [1] - 766:7
**part** [19] - 681:25, 683:17, 701:11, 704:19, 704:23, 707:24, 716:2, 716:7, 716:13, 716:23, 717:15, 719:25, 725:19, 729:10, 782:4, 782:5, 783:24
**participate** [1] - 716:25
**participated** [1] - 753:3
**particular** [9] - 698:16, 699:3, 712:15, 768:4, 770:18, 777:1, 780:12, 783:21, 784:18
**particularly** [2] - 678:7, 678:16
**particulars** [1] - 786:5
**parties** [19] - 681:24, 682:10, 682:16, 683:10, 683:16, 687:15, 771:13, 771:24, 772:6, 772:7, 772:16, 774:3, 775:6, 775:9, 776:9, 778:4, 780:2, 780:7, 781:2
**parts** [2] - 716:3, 765:3
**party** [4] - 745:24, 746:4, 768:7, 771:17
**passionately** [1] - 712:12
**past** [5] - 703:20, 750:1, 751:14, 751:15, 774:18
**path** [1] - 760:13

**patience** [2] - 688:17, 752:11
**Patricia** [1] - 688:12
**Paul** [1] - 688:24
**pause** [2] - 727:12, 786:23
**pay** [1] - 722:19
**pedestrian** [1] - 760:21
**Pelosi's** [2] - 790:2, 790:25
**Pensions** [2] - 695:8, 710:2
**people** [34] - 679:12, 684:17, 687:5, 687:13, 692:12, 698:17, 699:16, 700:1, 700:4, 700:6, 705:21, 712:4, 713:18, 716:11, 717:4, 717:11, 717:17, 717:21, 717:22, 719:24, 746:18, 753:2, 753:11, 755:11, 756:2, 775:12, 777:3, 787:25, 788:7, 788:25, 791:7, 792:8, 792:15
**people's** [1] - 772:22
**perceived** [1] - 778:13
**performing** [1] - 681:8
**perhaps** [5] - 683:19, 692:25, 727:8, 770:18, 778:21
**period** [4] - 695:23, 750:19, 760:22, 793:17
**permanent** [3] - 703:24, 703:25, 744:1
**permit** [1] - 768:12
**permits** [1] - 780:22
**permitted** [2] - 784:21, 790:12
**person** [14] - 679:18, 686:24, 696:24, 706:20, 707:13, 729:4, 732:21, 757:19, 769:11, 773:12, 775:11, 783:23, 794:10, 794:11
**personal** [4] - 682:12, 696:23, 737:4, 753:6
**personally** [3] - 691:17, 705:14, 717:12
**perspective** [4] - 713:20, 714:1,

757:3, 783:17
**Phoenix** [2] - 770:22
**phone** [4] - 765:20, 778:5, 784:7
**phones** [1] - 683:3
**photograph** [2] - 773:9, 782:16
**physical** [1] - 725:17
**physically** [2] - 696:9, 715:15
**pick** [4] - 689:25, 738:12, 752:19, 761:14
**picked** [1] - 744:19
**pictures** [1] - 750:20
**pieces** [3] - 764:25, 765:4, 765:6
**pin** [2] - 782:11, 783:7
**Pinkerton** [1] - 726:17
**place** [4] - 678:7, 683:5, 686:9, 773:11
**plainly** [2] - 714:12, 789:2
**plan** [1] - 787:5
**planning** [1] - 735:14
**plans** [1] - 787:4
**planted** [1] - 745:14
**plants** [1] - 745:13
**play** [5] - 681:5, 746:12, 791:11, 795:21
**played** [4] - 712:16, 739:3, 749:4, 786:22
**plenty** [1] - 746:18
**pockets** [1] - 709:5
**podcast** [4] - 769:25, 770:2, 770:7, 770:23
**podcasts** [2] - 683:22, 770:15
**point** [15] - 683:7, 684:18, 693:4, 705:10, 712:5, 761:22, 766:3, 766:5, 766:14, 771:12, 780:24, 781:6, 786:10, 787:7, 792:22
**pointed** [1] - 726:11
**poke** [1] - 791:18
**police** [2] - 702:25, 703:1
**Police** [7] - 687:24, 696:5, 696:18, 696:25, 702:23, 706:20, 774:13
**policy** [2] - 705:11, 716:6
**political** [8] - 698:7, 698:13, 703:24, 713:12, 741:3,

743:25, 744:4, 745:17
**politically** [2] - 690:15, 690:17
**portfolio** [1] - 708:4
**portion** [3] - 678:2, 728:24, 781:23
**portrayal** [1] - 757:13
**portrayed** [2] - 732:10, 757:11
**poses** [1] - 779:12
**position** [19] - 703:23, 708:8, 708:12, 743:20, 743:24, 744:1, 744:2, 744:7, 745:15, 745:20, 764:10, 772:12, 775:13, 775:25, 778:12, 779:8, 785:3, 791:24, 792:1
**positions** [1] - 704:3
**positive** [2] - 687:6, 735:13
**possessing** [1] - 740:22
**possession** [1] - 740:20
**possibility** [2] - 785:1, 786:2
**possible** [6] - 682:16, 692:22, 779:1, 779:4, 782:20, 782:21
**possibly** [3] - 684:23, 687:3, 778:14
**post** [1] - 755:14
**Post** [2] - 683:25, 742:8
**post-election** [1] - 755:14
**posting** [3] - 683:12, 684:1, 730:3
**postings** [1] - 684:6
**posts** [1] - 770:23
**potential** [5] - 680:24, 683:13, 693:1, 746:19, 757:13
**potentially** [4] - 691:7, 704:11, 767:14, 768:16
**practice** [1] - 701:11
**preconceived** [1] - 712:18
**preconceptions** [2] - 698:17, 713:25
**predicate** [1] - 780:11
**preferences** [2] - 734:9, 734:10
**prejudge** [1] - 682:17
**prejudges** [1] - 714:17

**prejudice** [6] - 678:20, 712:19, 713:22, 787:19, 787:24, 789:4
**prejudiced** [1] - 712:15
**prejudicial** [9] - 678:7, 678:16, 711:21, 786:8, 786:12, 787:23, 788:12, 789:5, 789:6
**prepared** [7] - 678:3, 773:15, 773:16, 776:7, 777:12, 783:13, 783:14
**presence** [4] - 680:16, 689:6, 692:17, 708:18
**present** [9] - 680:8, 680:13, 696:3, 737:3, 768:2, 769:12, 776:15, 782:22, 784:19
**presented** [4] - 684:13, 722:20, 731:22, 790:19
**presently** [1] - 695:11
**President** [8] - 690:9, 694:7, 698:4, 698:9, 698:18, 698:23, 699:9, 712:4
**press** [2] - 741:17, 768:14
**presumably** [3] - 679:8, 767:20, 768:4
**presume** [2] - 734:13, 757:19
**presumed** [1] - 733:22
**prevent** [1] - 687:8
**prevents** [1] - 722:1
**previous** [1] - 784:16
**previously** [2] - 772:6, 782:17
**principle** [1] - 733:22
**principles** [1] - 734:5
**privacy** [1] - 682:14
**probative** [5] - 787:18, 787:19, 787:24, 789:4, 795:20
**problem** [5] - 679:10, 745:17, 773:15, 781:3, 784:1
**problematic** [2] - 775:13, 778:11
**problems** [1] - 725:18
**procedures** [1] - 709:4
**proceed** [2] - 681:10, 694:8
**proceeding** [5] - 679:11, 784:14,

788:24, 789:1, 794:15
**proceedings** [6] - 686:9, 687:7, 690:3, 721:5, 738:16, 754:3
**Proceedings** [4] - 678:4, 680:16, 689:6, 796:7
**process** [20] - 679:11, 681:20, 681:23, 681:25, 682:20, 682:24, 683:8, 683:20, 684:18, 684:22, 684:24, 684:25, 685:4, 685:13, 685:15, 685:19, 686:12, 720:1, 775:5, 779:10
**processed** [2] - 719:19, 719:20
**profession** [1] - 701:7
**professional** [1] - 696:23
**proffer** [1] - 776:4
**program** [2] - 717:21, 717:22
**progress** [1] - 796:4
**promise** [1] - 682:21
**proof** [2] - 733:25, 776:4
**Propes** [1] - 688:21
**PROPES** [1] - 688:21
**proposed** [2] - 681:25, 767:12
**proposing** [1] - 792:4
**propounded** [1] - 768:22
**propriety** [1] - 776:25
**PROSPECTIVE** [275] - 689:11, 689:14, 689:16, 689:21, 690:7, 690:15, 690:18, 690:21, 691:5, 691:15, 691:25, 692:2, 692:7, 692:14, 692:22, 693:3, 693:11, 693:23, 694:3, 694:17, 694:20, 694:22, 695:1, 695:7, 695:13, 695:17, 695:20, 695:24, 696:4, 696:9, 696:15, 696:21, 697:1, 697:4, 697:11, 697:14, 697:16, 697:22, 697:25, 698:11, 698:15, 698:19,

698:22, 699:4, 699:12, 699:15, 699:19, 700:9, 700:14, 700:22, 701:4, 701:8, 701:14, 701:19, 701:23, 702:3, 702:9, 702:14, 702:19, 702:21, 702:24, 703:5, 703:18, 703:25, 704:4, 704:7, 704:13, 704:25, 705:7, 705:10, 705:24, 706:1, 706:8, 706:12, 706:16, 706:21, 707:10, 707:18, 707:20, 707:23, 708:2, 708:10, 708:14, 708:17, 708:23, 709:12, 709:14, 709:19, 709:21, 709:23, 710:1, 710:6, 710:10, 710:12, 710:15, 710:22, 710:24, 711:6, 711:11, 714:25, 715:4, 715:15, 715:22, 716:1, 716:4, 716:16, 716:18, 716:22, 717:2, 717:5, 717:19, 717:25, 718:3, 718:7, 718:15, 718:20, 719:1, 719:5, 719:8, 719:14, 719:22, 720:13, 720:19, 720:21, 720:23, 721:9, 721:14, 721:17, 721:21, 722:3, 722:8, 722:13, 722:15, 722:22, 722:24, 723:6, 723:10, 723:12, 723:16, 723:19, 723:22, 723:25, 724:2, 724:7, 724:11, 724:18, 725:1, 725:3, 725:9, 725:21, 725:23, 726:6, 727:20, 727:24, 728:9, 728:13, 728:17, 728:20, 728:25, 729:13, 729:15, 729:18, 729:22, 730:4, 730:7,

730:11, 730:18, 731:1, 731:4, 731:8, 731:14, 731:18, 731:24, 732:12, 732:18, 733:6, 733:8, 733:15, 734:7, 734:15, 734:19, 734:22, 735:1, 735:7, 735:11, 735:20, 735:24, 736:3, 736:18, 736:21, 736:23, 737:7, 737:17, 737:24, 738:8, 738:19, 738:24, 739:5, 739:8, 739:14, 739:21, 739:25, 740:7, 740:17, 740:25, 741:6, 741:11, 741:23, 742:5, 742:14, 742:22, 743:3, 743:8, 743:12, 743:23, 744:2, 744:8, 744:14, 744:25, 747:14, 747:17, 747:23, 747:25, 748:6, 748:8, 748:12, 748:19, 748:23, 749:2, 749:5, 749:12, 749:20, 749:24, 750:3, 750:10, 750:19, 751:3, 751:12, 751:15, 751:17, 751:20, 752:9, 752:13, 752:24, 753:1, 753:4, 753:9, 753:14, 753:20, 753:23, 754:6, 754:9, 754:14, 754:24, 755:2, 755:5, 755:9, 755:17, 755:22, 756:4, 756:11, 756:20, 756:24, 757:9, 757:18, 757:24, 758:1, 758:6, 758:13, 759:3, 759:10, 759:21, 759:24, 760:8, 760:10
**protest** [5] - 691:9, 698:4, 705:3, 705:20, 707:21
**protesting** [2] - 705:15, 755:23
**protests** [3] - 698:3, 711:24, 740:3

**Proud** [5] - 704:18, 708:16, 708:18, 709:5, 709:6
**prove** [4] - 706:11, 712:2, 734:3, 734:17
**proven** [1] - 733:24
**provide** [9] - 711:15, 726:3, 732:17, 745:5, 751:21, 761:3, 781:6, 788:18, 794:19
**provided** [4] - 726:10, 729:11, 783:19, 791:20
**providing** [2] - 790:8, 795:21
**province** [1] - 776:11
**psychiatrist** [1] - 746:20
**psychologist** [2] - 746:11, 746:20
**public** [5] - 685:9, 686:17, 695:8, 701:15, 710:1
**purport** [1] - 772:17
**purported** [1] - 778:20
**purports** [5] - 775:10, 775:15, 778:18, 780:3, 780:13
**purpose** [3] - 739:7, 756:18, 784:20
**purposefully** [1] - 730:22
**purposes** [1] - 785:8
**push** [1] - 684:8
**pushes** [1] - 760:18
**pushing** [1] - 792:12
**puts** [1] - 712:2
**putting** [1] - 786:1

## Q

**qualified** [6] - 680:3, 680:4, 751:25, 761:15, 761:19, 763:15
**quality** [1] - 708:5
**quality-of-life** [1] - 708:5
**quantity** [1] - 719:3
**quarterback** [1] - 746:13
**questioned** [4] - 699:1, 707:4, 707:5, 747:1
**questioning** [5] - 685:22, 686:1, 687:18, 689:4, 745:8
**questionnaire** [22] - 679:19, 679:21,

681:24, 682:4, 683:17, 687:10, 687:11, 689:24, 715:7, 715:9, 721:1, 721:19, 721:23, 722:12, 724:16, 728:2, 728:12, 733:18, 736:24, 738:11, 747:20, 752:18
**questionnaires** [1] - 678:20
**questions** [29] - 681:21, 681:23, 682:3, 682:10, 682:11, 685:20, 706:24, 713:4, 722:11, 724:12, 724:19, 724:21, 725:12, 725:14, 725:25, 726:23, 727:4, 727:7, 727:14, 741:24, 746:16, 758:7, 758:11, 761:10, 764:1, 765:16, 772:14, 788:18, 791:23
**Questions** [5] - 723:1, 724:16, 730:14, 741:25, 750:5
**quickly** [1] - 706:18
**quietly** [1] - 682:25
**quite** [7] - 697:14, 702:24, 727:13, 772:24, 773:14, 781:22, 783:1

## R

**racial** [1] - 748:15
**racist** [8] - 690:24, 705:19, 705:23, 706:2, 711:19, 711:24, 712:2
**racists** [2] - 706:11, 713:6
**radio** [2] - 683:21, 700:15
**raise** [5] - 681:11, 766:3, 775:18, 775:22, 794:3
**raised** [5] - 726:22, 765:13, 771:10, 772:2, 772:5
**raising** [3] - 766:2, 766:18, 785:4
**Rakoczy** [6] - 687:19, 726:20, 732:20, 764:17, 792:18, 792:20

**RAKOCZY** [26] -
687:20, 703:8,
713:17, 720:4,
724:14, 724:19,
725:2, 725:4,
725:11, 725:22,
726:21, 732:4,
732:23, 736:7,
737:20, 743:15,
746:22, 751:5,
758:17, 758:20,
759:5, 761:24,
763:20, 763:22,
764:9, 764:18
**rallies** [6] - 698:3,
740:2, 755:13,
755:15, 755:16,
756:10
**rally** [4] - 707:17,
740:6, 740:14
**ran** [2] - 791:7, 791:8
**Rasheed** [3] - 765:19,
766:1, 783:14
**rather** [4] - 687:7,
727:6, 767:23, 788:6
**reach** [1] - 768:12
**reached** [2] - 771:20,
772:7
**reaching** [1] - 777:17
**reaction** [1] - 777:18
**read** [40] - 683:1,
683:3, 684:15,
686:6, 686:8,
687:22, 689:12,
690:1, 690:5,
691:18, 692:10,
692:13, 693:16,
693:17, 694:12,
700:13, 701:1,
709:16, 721:3,
721:7, 721:12,
724:5, 726:16,
728:5, 728:7, 731:6,
731:12, 738:14,
738:18, 739:2,
742:13, 742:17,
748:3, 748:4,
748:25, 754:1,
754:5, 787:8, 793:5,
793:7
**reading** [2] - 684:5,
689:11
**reads** [1] - 729:1
**ready** [1] - 680:15
**real** [2] - 692:25, 784:2
**realistically** [2] -
761:18, 763:18
**reality** [1] - 789:5
**realize** [1] - 729:25
**really** [6] - 719:9,

723:6, 726:12,
746:11, 750:11,
750:21
**reason** [18] - 679:1,
684:11, 687:1,
711:18, 712:20,
713:14, 717:3,
717:16, 718:17,
718:24, 732:8,
734:4, 735:6,
743:10, 749:23,
764:24, 776:5, 791:4
**reasonable** [5] -
733:25, 734:17,
735:5, 790:18
**reasons** [2] - 686:21,
792:3
**recalling** [2] - 757:7,
795:15
**receive** [2] - 684:9,
684:14
**received** [3] - 685:23,
728:12, 765:22
**recent** [2] - 731:12,
751:13
**recently** [3] - 731:9,
743:4, 776:13
**Recess** [1] - 764:14
**recognize** [2] -
687:16, 699:25
**recognized** [1] -
687:12
**recollect** [1] - 759:22
**recollection** [5] -
693:21, 719:11,
739:23, 759:19,
770:16
**Reconstruction** [1] -
702:4
**reconvene** [1] - 796:3
**record** [8] - 678:6,
678:17, 678:23,
679:1, 712:10,
759:10, 783:18,
784:12
**recorded** [2] - 773:5,
776:19
**recording** [8] -
765:19, 767:1,
783:12, 784:7,
784:10, 786:6,
786:7, 794:10
**records** [3] - 773:19,
783:20, 784:11
**Redden** [1] - 763:8
**REDDEN** [1] - 763:9
**referenced** [1] -
793:14
**referred** [1] - 792:22
**referring** [1] - 783:2

**refrain** [1] - 746:24
**regard** [4] - 706:18,
713:11, 751:9, 759:8
**regarding** [2] -
684:19, 719:12
**regularly** [5] - 713:21,
731:6, 754:7,
755:22, 760:11
**reiterate** [2] - 712:25,
789:11
**relate** [1] - 766:11
**related** [3] - 679:22,
687:8, 755:13
**relates** [1] - 751:1
**relating** [1] - 708:13
**relationship** [8] -
692:18, 692:19,
696:13, 696:17,
696:20, 696:23,
700:6, 746:18
**relatives** [1] - 701:7
**release** [2] - 794:18,
794:21
**relevance** [7] - 764:1,
764:4, 765:2,
765:12, 787:14,
787:17, 788:22
**relevant** [1] - 789:3
**reliable** [1] - 776:20
**reliably** [1] - 691:6
**relieved** [1] - 686:2
**relocate** [1] - 789:1
**rely** [5] - 784:24,
785:8, 785:12,
785:24, 786:14
**remain** [3] - 679:13,
685:16, 758:3
**remains** [2] - 768:20,
787:18
**remarks** [1] - 682:6
**remember** [10] -
693:4, 701:19,
738:19, 741:13,
754:24, 760:5,
762:23, 774:17,
789:19, 795:12
**reminded** [1] - 777:16
**reminds** [1] - 780:21
**remove** [9] - 689:22,
715:5, 720:24,
727:25, 733:16,
736:20, 738:9,
747:18, 752:14
**renew** [2] - 678:17,
678:18
**repeat** [1] - 695:15
**rephrase** [1] - 705:22
**rephrasing** [1] - 699:5
**report** [2] - 743:24,
744:12

**reported** [1] - 678:3
**reporter** [3] - 794:11,
795:5, 795:6
**REPORTER** [2] -
769:24, 782:1
**REPORTER'S** [20] -
678:2, 689:8,
711:16, 714:21,
720:14, 720:15,
726:7, 727:16,
732:19, 733:1,
736:13, 736:14,
737:25, 738:1,
745:6, 747:10,
751:23, 752:5,
761:5, 792:17
**represent** [4] - 688:19,
703:11, 712:7,
756:21
**represents** [1] -
773:10
**request** [1] - 747:3
**require** [3] - 684:23,
686:17, 719:17
**required** [3] - 686:16,
686:22
**requirement** [1] -
781:18
**research** [4] - 683:10,
683:15, 686:7,
757:10
**reservations** [2] -
722:19, 758:3
**reserving** [1] - 763:9
**resolve** [1] - 793:23
**resolved** [2] - 758:11,
758:13
**respect** [6] - 724:22,
724:24, 729:11,
753:13, 776:10,
776:11
**respectfully** [1] -
764:23
**response** [3] - 703:14,
703:15, 754:20
**responses** [2] - 682:3,
745:18, 761:9
**responsibilities** [3] -
699:18, 715:25,
716:13
**responsive** [1] -
727:13
**rest** [2] - 682:12, 720:9
**restaurant** [1] - 686:23
**restrict** [1] - 785:11
**restricted** [1] - 790:21
**restrictions** [3] -
684:11, 684:22,
686:2
**rests** [1] - 734:1

**result** [3] - 686:12,
702:23, 789:1
**retained** [1] - 754:12
**retired** [2] - 688:2,
697:17
**return** [2] - 682:18,
686:4
**review** [9] - 704:14,
704:19, 716:22,
719:24, 720:1,
767:23, 767:25,
768:3, 768:5
**reviewed** [7] - 704:23,
719:4, 719:20,
767:24, 768:6,
772:15, 775:14
**reviewing** [3] -
716:11, 716:14,
717:8
**revised** [1] - 763:11
**revisit** [1] - 789:21
**revolve** [1] - 791:21
**revolving** [1] - 792:2
**Rhodes** [6] - 692:11,
692:16, 765:24,
769:2, 793:13
**Richard** [1] - 688:4
**right-wing** [2] - 690:8,
704:17
**Rio** [1] - 708:24
**riot** [1] - 788:4
**rioters** [1] - 735:12
**Roger** [1] - 700:2
**role** [8] - 681:5,
712:16, 714:2,
715:25, 717:14,
728:19, 739:3, 749:3
**rolling** [1] - 781:5
**room** [7] - 787:4,
787:13, 787:25,
790:2, 791:3, 791:4,
791:7
**ROSSI** [50] - 678:24,
679:15, 688:14,
688:16, 699:14,
706:25, 707:16,
707:19, 707:22,
707:25, 708:8,
708:11, 708:21,
709:9, 709:13,
709:15, 709:20,
709:22, 709:24,
710:4, 710:9,
710:11, 710:13,
710:17, 710:20,
710:23, 710:25,
711:10, 712:23,
713:1, 714:20,
720:10, 726:1,
726:16, 744:17,

745:1, 746:10,
747:8, 761:2, 761:6,
761:12, 763:5,
763:7, 794:4, 794:9,
795:4, 795:7,
795:14, 795:16,
795:25
**Rossi** [15] - 688:15,
688:18, 689:1,
706:17, 706:23,
710:16, 746:9,
746:23, 747:4,
763:4, 781:12,
781:14, 791:20,
794:2
**Rotunda** [1] - 768:5
**route** [1] - 755:19
**rude** [1] - 685:6
**Rule** [2] - 780:22,
795:8
**rule** [8] - 686:18,
782:7, 783:3,
785:14, 785:22,
785:23, 795:8, 795:9
**ruled** [3] - 766:8,
766:10, 795:23
**rules** [3] - 746:23,
776:5, 785:11
**ruling** [5] - 771:21,
779:13, 788:13,
792:11, 792:14
**run** [5] - 724:23,
756:10, 760:3,
760:12, 760:14
**running** [6] - 731:10,
755:10, 755:16,
755:18, 784:4, 784:8
**runs** [1] - 701:14
**Ruth** [1] - 680:25

## S

**safety** [3] - 709:3,
753:19, 753:21
**samples** [1] - 782:7
**Sandra** [1] - 680:25
**Santoro** [1] - 688:23
**satisfies** [1] - 781:18
**saw** [5] - 730:20,
748:13, 768:8,
774:11, 774:20
**scaffolding** [4] -
678:8, 678:11,
679:1, 679:2
**scale** [1] - 789:13
**scales** [1] - 789:14
**scene** [3] - 767:21,
778:3, 778:20
**schedule** [1] - 703:20
**scheduled** [4] - 687:3,

737:5, 737:6, 737:14
**School** [1] - 740:8
**school** [3] - 701:9,
701:15, 722:9
**searching** [1] - 729:2
**seat** [3] - 725:17,
733:3, 738:2
**seated** [2] - 680:19,
681:16
**second** [16] - 687:1,
733:12, 751:24,
767:14, 769:18,
771:9, 771:11,
775:3, 780:1, 780:7,
780:11, 781:16,
784:3, 784:16,
786:23, 793:6
**secondary** [1] - 780:1
**secure** [2] - 760:6,
760:12
**security** [10] - 685:2,
685:12, 704:9,
704:10, 708:1,
708:4, 708:13,
759:17, 759:22,
760:11
**see** [27] - 678:8,
678:13, 685:5,
686:14, 710:25,
713:8, 723:7,
723:10, 724:1,
724:17, 730:18,
740:20, 743:19,
750:1, 753:7,
753:11, 755:22,
764:13, 771:17,
776:23, 777:17,
777:19, 783:8,
784:7, 790:24, 796:6
**seed** [1] - 745:14
**seeing** [3] - 753:18,
755:16, 755:25
**seeking** [2] - 786:5,
788:23
**select** [3] - 682:15,
685:17, 763:15
**selected** [8] - 682:17,
683:9, 684:12,
722:18, 731:15,
742:15, 750:23,
757:15
**selection** [15] - 678:6,
679:11, 681:17,
682:19, 682:24,
683:8, 683:20,
684:18, 684:22,
684:25, 685:4,
685:10, 685:13,
685:15, 685:19
**semi** [1] - 731:9

**semi-recently** [1] -
731:9
**Senate** [7] - 695:4,
695:8, 709:23,
709:24, 710:2, 711:3
**senator** [1] - 710:5
**Senator** [6] - 695:10,
695:11, 697:10,
710:8, 710:20,
731:10
**sends** [1] - 792:21
**senior** [2] - 703:19,
703:21
**sensationalized** [1] -
750:20
**sense** [29] - 678:9,
681:19, 690:20,
692:4, 692:20,
693:8, 713:3, 717:5,
717:25, 719:3,
719:23, 723:12,
730:14, 730:24,
737:2, 739:11,
740:18, 742:1,
742:3, 747:4, 749:3,
750:6, 750:8,
754:21, 756:18,
756:22, 761:22,
764:23
**sent** [1] - 793:12
**separate** [3] - 705:11,
792:19, 793:1
**September** [9] -
766:10, 766:12,
791:21, 791:22,
792:1, 793:3,
793:12, 793:16
**Sergeant** [1] - 687:25
**series** [1] - 681:21
**serve** [6] - 681:6,
735:16, 737:4,
741:5, 757:15
**served** [1] - 697:25
**service** [15] - 681:3,
681:9, 681:20,
684:6, 685:21,
685:25, 686:3,
703:19, 703:22,
708:5, 729:24,
741:19, 743:18,
744:16, 744:18
**services** [2] - 743:19,
744:3
**SES** [6] - 703:15,
703:16, 703:23,
704:2, 708:8, 708:12
**set** [16] - 691:22,
694:13, 700:25,
711:20, 712:12,
712:19, 731:16,

741:21, 742:16,
747:1, 750:24,
759:2, 759:18,
761:10, 763:24,
774:22
**several** [4] - 719:16,
737:4, 754:15,
754:16
**shake** [1] - 713:14
**shakes** [1] - 744:14
**share** [7] - 700:12,
716:3, 721:25,
729:4, 730:16,
735:6, 776:22
**shared** [1] - 696:7
**shifts** [1] - 734:1
**shooting** [1] - 731:19
**short** [1] - 750:19
**shortly** [2] - 730:19,
761:20
**show** [12] - 711:14,
732:16, 745:4,
751:21, 761:1,
772:22, 778:3,
778:6, 784:8,
784:11, 787:4, 791:9
**showing** [2] - 750:20,
782:22
**shown** [1] - 691:17
**shows** [5] - 714:6,
775:6, 775:11,
775:15, 778:2
**shut** [1] - 753:9
**shutdown** [2] -
741:14, 741:16
**shy** [1] - 682:5
**sic** [4] - 724:15, 766:7,
770:22, 781:19
**sic]** [2] - 680:12, 758:7
**side** [5] - 679:3,
702:16, 714:15,
716:7, 768:19
**significantly** [1] -
759:25
**silent** [1] - 683:5
**similar** [1] - 778:6
**simple** [1] - 684:11
**simply** [10] - 685:6,
745:19, 747:4,
749:7, 778:16,
779:15, 781:20,
785:24, 786:11,
788:13
**sister** [2] - 701:8,
701:13
**sister-in-law** [2] -
701:8, 701:13
**sit** [3] - 722:19,
725:18, 740:15
**site** [1] - 704:21

**sites** [3] - 684:2,
708:25, 709:2
**sitting** [5] - 678:15,
688:19, 702:15,
725:22, 725:23
**situational** [2] -
704:20, 709:2
**six** [1] - 687:3
**Sixth** [1] - 755:18
**size** [1] - 716:9
**slight** [1] - 713:10
**slightly** [1] - 780:16
**slow** [1] - 770:1
**slowly** [1] - 725:16
**smile** [2] - 763:7,
794:5
**Snapchat** [1] - 683:11
**social** [8] - 683:18,
683:22, 684:2,
684:5, 684:16,
691:7, 692:17, 694:4
**solely** [3] - 714:3,
714:13, 733:24
**someone** [11] - 711:2,
711:20, 711:23,
713:11, 718:18,
729:4, 767:9, 769:7,
771:13, 773:16,
774:20
**sometimes** [3] -
700:16, 704:2,
785:10
**somewhere** [1] -
723:23
**son** [1] - 743:3
**soon** [1] - 686:1
**SoRelle** [1] - 777:14
**SoRelle's** [1] - 771:11
**sorry** [19] - 678:13,
694:21, 695:20,
695:21, 707:5,
710:18, 710:23,
712:23, 713:13,
720:10, 733:9,
733:11, 733:13,
747:24, 772:3,
773:16, 773:23,
790:8
**sort** [15] - 691:5,
691:12, 693:17,
693:18, 701:11,
702:19, 704:16,
705:14, 709:2,
709:3, 728:23,
742:6, 748:14,
748:15, 771:25
**sorts** [1] - 785:8
**sotto** [1] - 792:17
**sought** [1] - 700:19
**sounded** [1] - 717:14

**sounds** [5] - 730:2, 753:12, 777:3, 778:21, 780:17
**source** [1] - 768:7
**sources** [1] - 684:16
**southwest** [3] - 698:5, 704:15, 705:12
**spaces** [1] - 686:17
**Speaker's** [3] - 787:1, 787:12, 791:2
**speaking** [5] - 686:15, 686:19, 689:5, 705:18, 707:10
**special** [2] - 716:19, 722:8
**Special** [4] - 688:3, 688:4, 702:4
**specific** [14] - 691:2, 691:6, 692:18, 709:2, 710:5, 719:14, 729:3, 738:25, 741:13, 745:23, 747:5, 755:4, 759:16, 781:3
**specifically** [6] - 700:19, 744:21, 764:25, 766:18, 776:24, 789:19
**specifics** [3] - 692:25, 738:22
**specimen** [1] - 781:21
**speculate** [1] - 785:2
**speculating** [1] - 782:20
**spend** [3] - 682:20, 729:3, 788:13
**spending** [1] - 741:14
**Sperry** [1] - 688:23
**spin** [1] - 696:16
**spoken** [1] - 697:2
**spotlight** [1] - 768:19
**spreadsheet** [2] - 793:15, 793:19
**staff** [5] - 685:24, 710:4, 788:25, 790:2, 791:1
**stage** [1] - 717:7
**stamp** [3] - 775:10, 784:4, 784:7
**stamps** [1] - 772:17
**stand** [4] - 681:11, 770:17, 779:16, 788:23
**standing** [1] - 757:19
**stands** [3] - 728:16, 756:19, 794:8
**start** [8] - 681:20, 681:23, 683:15, 684:24, 690:12, 711:17, 715:13,

765:15
**started** [4] - 681:2, 683:20, 692:23, 702:16
**starting** [3] - 694:23, 701:12, 754:19
**state** [1] - 764:24
**State** [2] - 679:7, 679:19
**statement** [4] - 732:11, 762:17, 777:25, 792:20
**statements** [11] - 766:3, 766:6, 766:14, 781:14, 791:21, 792:2, 792:7, 793:3, 793:11, 793:15, 795:24
**States** [2] - 680:25, 687:24
**status** [3] - 772:12, 774:9, 775:25
**Steal** [1] - 707:17
**Steele** [1] - 681:1
**step** [8] - 772:1, 775:5, 779:10, 780:1, 780:7, 780:11, 784:3, 791:15
**Stephen** [1] - 766:16
**steps** [2] - 768:4, 779:22
**Stewart** [2] - 692:11, 692:16
**stick** [2] - 760:16, 788:13
**still** [9] - 685:10, 695:19, 695:23, 707:14, 721:12, 724:23, 728:6, 729:23, 768:20
**stip** [1] - 772:13
**stipulate** [6] - 766:16, 766:19, 771:13, 772:20, 776:7, 783:13
**stipulated** [4] - 771:17, 773:20, 773:25, 784:16
**stipulating** [2] - 772:10, 772:14
**stipulation** [9] - 766:5, 771:20, 772:1, 772:3, 772:8, 772:10, 775:1, 777:17, 780:2
**stipulations** [7] - 764:2, 764:4, 765:1, 766:15, 767:12, 768:21, 768:22

**stolen** [2] - 699:9, 714:5
**Stone** [1] - 700:2
**stop** [3] - 702:15, 702:16, 729:8
**Stop** [1] - 707:16
**stopped** [2] - 730:23, 732:9
**store** [1] - 686:23
**stories** [3] - 683:24, 729:11, 750:18
**storming** [1] - 750:21
**strange** [1] - 777:5
**strategy** [1] - 716:6
**street** [2] - 753:10
**Street** [1] - 760:14
**streets** [1] - 760:16
**stricken** [1] - 679:24
**strict** [1] - 685:3
**strictly** [1] - 684:15
**strike** [4] - 714:19, 726:14, 727:15, 761:8
**strikes** [1] - 761:19
**striking** [2] - 679:23, 714:15
**strong** [1] - 740:11
**struck** [1] - 727:1
**students** [1] - 740:8
**stuff** [1] - 756:14
**subcommittee** [6] - 695:9, 709:22, 709:23, 709:24, 709:25, 710:2
**subject** [4] - 701:13, 703:24, 746:18, 786:14
**submitted** [4] - 716:10, 716:20, 765:24, 783:23
**subpoena** [1] - 768:13
**subscription** [1] - 742:7
**success** [1] - 729:7
**sued** [1] - 744:11
**suggest** [1] - 746:17
**suggested** [3] - 725:5, 769:18, 772:1
**suggesting** [3] - 707:21, 726:25, 783:3
**suit** [1] - 745:8
**suite** [2] - 787:1, 787:12
**summary** [4] - 693:17, 783:20, 784:11, 788:11
**summation** [1] - 788:7
**Sunday** [1] - 742:8
**Superior** [2] - 778:1,

778:23
**supervised** [2] - 794:18, 794:21
**supervisory** [1] - 744:3
**support** [4] - 690:11, 690:22, 692:3, 698:8
**supported** [2] - 690:9, 698:8, 712:3
**supporters** [7] - 698:17, 705:17, 705:21, 707:6, 707:8, 707:11, 713:5
**supports** [1] - 698:23
**suppose** [3] - 773:18, 776:23, 777:8
**supposed** [2] - 699:20, 719:25
**suppositions** [1] - 758:5
**supremacist** [2] - 757:2, 757:5
**surely** [1] - 788:22
**surf** [1] - 683:4
**surface** [1] - 765:14
**sworn** [2] - 681:12, 684:12
**system** [3] - 681:4, 713:23, 719:23

## T

**tackle** [1] - 727:7
**talks** [1] - 783:20
**Tarrio** [1] - 700:2
**Task** [1] - 688:23
**teach** [1] - 701:14
**teaches** [1] - 701:13
**team** [2] - 708:3, 708:24
**teams** [1] - 708:20
**technically** [1] - 717:19
**Ted** [1] - 710:9
**tee** [1] - 764:17
**television** [2] - 683:21, 739:16
**telework** [1] - 739:15
**temp** [1] - 701:9
**ten** [1] - 682:5
**tend** [1] - 762:18
**term** [4] - 690:17, 738:20, 744:1, 748:15
**terminology** [1] - 775:5
**terms** [6] - 694:11, 719:2, 753:6, 757:13, 789:4, 795:23

**terribly** [3] - 745:9, 745:13, 793:21
**testified** [3] - 743:4, 765:20, 786:24
**testify** [7] - 687:14, 718:12, 732:21, 767:20, 767:23, 783:15, 787:6
**testifying** [1] - 686:19
**testimony** [26] - 700:4, 718:13, 718:14, 718:18, 718:23, 718:24, 722:20, 744:20, 744:21, 746:19, 747:7, 767:13, 767:16, 769:7, 771:6, 772:11, 784:14, 784:20, 784:24, 785:25, 786:3, 786:14, 787:20, 787:22, 788:5, 790:24
**tests** [1] - 687:6
**text** [5] - 683:11, 766:10, 766:12, 793:12, 793:19
**texts** [1] - 766:9
**themselves** [2] - 745:20, 788:9
**thereafter** [1] - 730:20
**therefore** [1] - 775:16
**they've** [2] - 766:7, 768:22
**thinking** [2] - 714:17, 734:9
**third** [4] - 768:7, 774:3, 775:20, 776:9
**third-party** [1] - 768:7
**thoughts** [2] - 776:23, 795:3
**thousand** [1] - 717:8
**thousands** [2] - 719:7, 719:8
**three** [1] - 737:9
**threw** [1] - 795:1
**Thursday** [4] - 761:20, 763:16, 763:17, 763:23
**tied** [1] - 741:16
**tight** [1] - 760:6
**timeline** [1] - 783:22
**timing** [1] - 678:15
**tip** [4] - 716:14, 719:11, 783:18, 783:23
**tips** [8] - 716:10, 716:14, 717:8, 719:3, 719:19, 789:13

816

**title** [2] - 723:13, 723:15
**titled** [1] - 781:19
**titles** [1] - 787:4
**today** [14] - 681:4, 681:8, 681:18, 682:2, 685:13, 685:19, 685:25, 686:21, 720:20, 758:20, 760:11, 768:11, 770:1, 796:5
**together** [3] - 719:15, 771:18, 781:2
**toll** [1] - 696:11
**tomorrow** [13] - 679:8, 680:14, 737:8, 761:14, 761:15, 761:17, 761:19, 762:11, 762:14, 763:15, 791:13, 796:3, 796:4
**tonight** [1] - 679:7
**took** [2] - 730:11, 794:10
**top** [1] - 749:14
**touch** [3] - 682:12, 707:25, 708:12
**touched** [1] - 703:13
**tour** [1] - 730:12
**Traci** [1] - 688:21
**training** [8] - 766:11, 791:22, 791:25, 792:2, 792:8, 792:16, 793:3, 793:14
**trainings** [1] - 792:3
**transcript** [3] - 678:3, 787:8, 793:5
**transcripts** [3] - 765:22, 794:15, 794:23
**translate** [1] - 729:5
**travel** [1] - 737:6
**Tread** [1] - 756:14
**treaded** [1] - 776:13
**treatment** [2] - 698:5, 705:3
**trial** [28] - 678:2, 678:15, 684:13, 684:23, 686:18, 687:2, 687:6, 687:8, 687:14, 691:20, 700:3, 700:5, 722:21, 757:19, 767:14, 769:2, 769:18, 771:11, 775:20, 777:16, 782:2, 786:24, 787:9, 787:10, 793:7, 793:13

**Trial** [1] - 792:7
**trials** [3] - 769:23, 774:18, 784:16
**tried** [4] - 723:1, 730:14, 737:2, 750:6
**Trier** [1] - 781:20
**trier** [7] - 781:22, 782:5, 782:20, 783:2, 783:3, 783:5
**trip** [2] - 737:8, 737:9
**trips** [1] - 737:5
**troops** [1] - 704:15
**trouble** [2] - 734:20, 736:3
**troubled** [1] - 726:20
**truck** [1] - 709:8
**true** [3] - 683:8, 691:20, 740:17
**truly** [1] - 711:22
**Trump** [10] - 690:9, 693:13, 698:23, 699:9, 705:11, 705:18, 705:21, 707:8, 707:11, 713:5
**Trump's** [4] - 694:7, 698:4, 705:3, 707:6
**trust** [2] - 718:18, 718:20
**truth** [2] - 714:15, 758:14
**try** [6] - 680:14, 682:22, 700:14, 700:25, 750:13, 762:19
**trying** [9] - 680:3, 693:8, 705:21, 721:9, 741:25, 742:1, 745:18, 782:5, 786:13
**turn** [26] - 684:8, 689:25, 694:18, 699:24, 701:6, 715:8, 721:2, 721:23, 722:25, 724:3, 724:15, 728:3, 729:16, 730:13, 733:19, 737:1, 738:12, 740:2, 741:24, 742:23, 747:21, 749:7, 750:5, 752:20, 753:25
**TV** [7] - 683:25, 700:16, 700:22, 724:3, 724:4, 739:15, 753:4
**tweet** [1] - 683:11
**tweeting** [1] - 684:1
**tweets** [1] - 684:5
**twice** [1] - 791:24

**two** [21] - 686:21, 727:4, 739:15, 759:11, 769:4, 769:22, 769:23, 772:1, 774:18, 775:5, 779:10, 779:16, 779:22, 781:4, 782:24, 783:19, 784:15, 787:22, 792:19, 793:1, 793:22
**two-step** [3] - 772:1, 775:5, 779:10
**type** [3] - 746:24, 756:13, 756:16

## U

**U.S** [7] - 680:21, 694:25, 706:20, 708:13, 723:23, 723:25, 782:14
**ultimate** [1] - 776:11
**ultimately** [1] - 714:10
**unable** [1] - 721:24
**unanimously** [1] - 733:23
**unavailable** [1] - 785:22
**unavoidable** [1] - 682:23
**unclear** [3] - 757:24, 757:25, 765:21
**under** [7] - 685:3, 744:12, 785:22, 785:23, 794:12, 795:9, 795:13
**undergrad** [1] - 729:23
**underlying** [1] - 691:12
**understandings** [1] - 712:13
**understood** [2] - 748:1, 786:17
**unfairly** [1] - 789:9
**unfold** [1] - 742:7
**unfortunately** [1] - 680:6
**Union** [1] - 679:7
**unit** [2] - 716:5, 716:6
**United** [2] - 680:24, 687:24
**unlawfully** [1] - 740:22
**unless** [2] - 685:16, 733:23
**unlike** [1] - 686:22
**unquestionably** [1] - 787:23

**untruthful** [1] - 707:12
**up** [42] - 679:8, 689:25, 693:7, 695:17, 695:18, 702:16, 703:6, 703:9, 703:12, 708:19, 709:18, 716:24, 724:12, 725:13, 733:2, 738:2, 738:12, 743:13, 748:9, 751:4, 752:16, 752:19, 758:17, 758:21, 759:18, 761:14, 764:17, 764:24, 769:10, 769:22, 770:1, 771:19, 772:7, 775:21, 777:8, 777:17, 781:15, 783:9, 784:20, 787:20, 791:20, 794:8
**up-front** [1] - 758:21
**updates** [1] - 762:8
**uphill** [1] - 711:25
**ups** [1] - 707:2
**Ura** [1] - 688:24
**useful** [1] - 745:13

## V

**V-a-n-B-e-n-s-c-h-o-t -e-n** [1] - 688:1
**vacation** [1] - 737:15
**Vallejo** [2] - 770:8, 771:4
**Valley** [1] - 708:24
**value** [5] - 787:18, 787:19, 787:24, 789:5, 795:20
**VanBenschoten** [1] - 688:1
**vandalism** [1] - 702:19
**various** [3] - 765:3, 772:22, 783:20
**VENIRE** [1] - 681:14
**venire** [4] - 678:4, 678:19, 680:17, 689:7
**venue** [1] - 678:18
**verdict** [1] - 682:18
**versus** [1] - 718:21
**vessel** [1] - 779:24
**victim** [3] - 702:12, 743:1, 743:4
**video** [56] - 730:21, 730:22, 731:20, 731:21, 732:2, 732:10, 765:22,

767:17, 767:19, 768:1, 768:6, 768:7, 768:14, 768:24, 769:12, 769:15, 773:5, 773:9, 773:13, 774:16, 775:11, 775:16, 776:3, 776:4, 776:6, 776:8, 776:13, 776:14, 776:18, 777:2, 777:8, 778:5, 780:1, 780:16, 780:18, 782:8, 782:9, 782:23, 784:4, 784:5, 786:21, 787:1, 787:5, 787:9, 787:24, 788:2, 788:10, 788:11, 789:12, 789:13, 790:23, 790:25, 791:9, 792:22
**Video** [2] - 778:22
**videos** [27] - 711:1, 730:25, 732:9, 742:6, 765:9, 766:16, 767:14, 769:4, 771:12, 772:8, 772:10, 772:15, 772:16, 772:18, 772:21, 774:19, 774:24, 775:4, 775:21, 777:14, 777:15, 779:16, 781:3, 792:2, 792:7, 792:14, 793:2
**view** [2] - 699:2, 699:11
**viewed** [1] - 739:11
**viewing** [2] - 754:11, 759:17
**views** [5] - 698:7, 698:13, 698:16, 713:8, 741:4
**violates** [1] - 684:21
**violence** [6] - 690:11, 690:22, 693:25, 696:10, 702:11, 709:6
**violent** [3] - 691:12, 691:13, 691:16
**visited** [2] - 708:23, 709:2
**visiting** [3] - 708:19, 708:25, 741:13
**visits** [1] - 704:21
**visual** [1] - 773:9
**voce** [1] - 792:17
**voice** [1] - 752:16

**voices** [1] - 771:4
**voluntarily** [1] - 686:22
**vote** [1] - 696:24
**Vox** [1] - 728:22

### W

**wait** [3] - 682:22, 682:23
**waiting** [2] - 682:20, 682:24
**waiving** [1] - 795:8
**walk** [6] - 685:5, 735:12, 749:25, 750:1, 751:10, 760:1
**walked** [1] - 739:17
**walking** [1] - 751:9
**wants** [3] - 775:18, 775:22, 781:12
**warranted** [1] - 705:15
**Washington** [7] - 683:25, 715:16, 715:21, 727:10, 742:8, 755:13, 755:19
**watch** [7] - 686:8, 700:16, 723:6, 724:4, 750:11, 750:13, 754:6
**watched** [9] - 693:11, 693:14, 693:16, 693:18, 730:21, 731:7, 731:20, 742:6, 750:17
**watching** [8] - 700:22, 730:23, 730:25, 731:21, 732:9, 735:12, 767:20, 778:22
**Watkins** [2] - 692:11, 765:7
**Watkins's** [1] - 795:18
**ways** [2] - 714:6, 775:19
**weapons** [1] - 740:20
**wear** [1] - 686:25
**wearing** [3] - 686:15, 755:11, 756:10
**weather** [1] - 750:13
**web** [1] - 770:20
**website** [3] - 770:19, 770:23, 770:24
**week** [6] - 725:19, 737:11, 737:13, 737:14, 739:16, 767:13
**weekend** [1] - 767:11
**weeks** [2] - 681:24, 687:3

**welcome** [3] - 680:21, 738:5, 778:24
**west** [1] - 679:3
**what'll** [1] - 682:19
**white** [3] - 693:13, 757:1, 757:4
**White** [1] - 693:13
**whole** [2] - 706:3, 727:10
**Wi** [1] - 683:2
**Wi-Fi** [1] - 683:2
**widespread** [1] - 678:19
**wife** [1] - 737:13
**William** [3] - 678:3, 681:1, 688:19
**willing** [1] - 690:22
**window** [1] - 678:14
**wing** [3] - 690:8, 690:13, 704:17
**wish** [3] - 682:15, 682:25, 713:16
**Witness** [2] - 744:14, 781:20
**witness** [9] - 702:13, 745:16, 763:18, 770:12, 774:10, 778:13, 781:21, 784:6, 785:22
**witness's** [1] - 772:11
**witnessed** [1] - 767:22
**witnesses** [6] - 686:19, 687:23, 688:20, 768:16, 772:13, 774:22
**woman** [4] - 688:11, 693:12, 696:4, 711:22
**won** [1] - 707:21
**Woodward** [7] - 764:12, 769:21, 772:1, 781:4, 788:22, 790:10, 791:18
**WOODWARD** [20] - 712:6, 712:8, 764:7, 767:10, 769:16, 773:20, 773:23, 774:2, 774:5, 774:8, 776:2, 781:25, 782:3, 782:6, 786:21, 787:16, 789:11, 789:23, 790:6, 793:5
**Woodward's** [2] - 772:11, 777:25
**word** [2] - 690:12, 768:15
**words** [5] - 757:4, 779:9, 783:5, 791:5,

795:18
**works** [4] - 679:19, 696:4, 701:8, 706:19
**worn** [3] - 778:2, 778:5, 778:7
**worried** [1] - 727:5
**worse** [2] - 768:14, 768:15
**write** [1] - 729:7

### Y

**years** [7] - 697:17, 698:3, 704:14, 707:13, 719:16, 741:12, 741:20
**yellow** [2] - 756:5, 756:13
**yesterday** [1] - 679:9
**you-all** [7] - 687:10, 744:12, 761:22, 764:13, 779:8, 793:22, 795:2
**young** [1] - 702:24
**yourself** [6] - 686:20, 697:2, 701:16, 702:8, 702:12, 747:14
**yourselves** [2] - 681:3, 683:1
**youths** [1] - 702:15

### Z

**Zaremba** [1] - 678:3
**Zello** [9] - 765:7, 767:2, 767:3, 781:12, 781:15, 794:6, 794:9, 794:10, 795:8