<pre>
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
      UNITED STATES OF AMERICA,      )  Criminal Action
 3                                   )  No. 1:22-cr-00028-APM
                          Plaintiff, )
 4                                   )  Jury Trial - Day 17
      vs.                            )  (afternoon session)
 5                                   )
      SANDRA R. PARKER, et al.       )  Washington, D.C.
 6                                   )  February 28, 2023
                          Defendants.)  Time:  1:30 p.m.
 7    _____

 8             Transcript of Jury Trial - Day 17
                          Held Before
 9             The Honorable Amit P. Mehta
                  United States District Judge
10    _____

11                    A P P E A R A N C E S

12    For the Government:      Kathryn L. Rakoczy
                               Troy A. Edwards, Jr.
13                             Jeffrey S. Nestler
                               UNITED STATES ATTORNEY'S OFFICE
14                             FOR THE DISTRICT OF COLUMBIA
                               601 D Street, Northwest
15                             Washington, D.C. 20579

16                             Alexandra S. Hughes
                               Louis J. Manzo
17                             U.S. DEPARTMENT OF JUSTICE
                               950 Pennsylvania Avenue, Northwest
18                             Washington, D.C. 20530

19    For the Defendant Sandra Ruth Parker:
                               John L. Machado
20                             LAW OFFICE OF JOHN MACHADO
                               503 D Street, Northwest, Suite 310
21                             Washington, D.C. 20001

22    For the Defendant Bennie Alvin Parker:
                               Stephen F. Brennwald
23                             BRENNWALD & ROBERTSON, LLP
                               922 Pennsylvania Avenue, Southeast
24                             Washington, D.C. 20003

25
</pre>

```
 1              A P P E A R A N C E S, continued

 2      For the Defendant Laura Steele:
                              Peter A. Cooper
 3                            PETER A. COOPER
                              400 5th Street, Northwest, Suite 350
 4                            Washington, D.C. 20001

 5      For the Defendant Connie Meggs:
                              Stanley E. Woodward, Jr.
 6                            BRAND WOODWARD LAW
                              1808 Park Road, Northwest
 7                            Washington, D.C. 20010

 8                            Juli Zsuzsa Haller
                              LAW OFFICES OF JULIA HALLER
 9                            601 Pennsylvania Avenue, Northwest
                              Washington, D.C. 20036
10
        For the Defendant William Isaacs:
11                            Eugene J. Rossi
                              CARLTON FIELDS, P.A.
12                            1025 Thomas Jefferson Street, Northwest
                              Washington, D.C. 20007
13
                              Charles Greene
14                            LAW OFFICE OF CHARLES M. GREENE, P.A.
                              55 East Pine Street
15                            Orlando, Florida 32801

16      For the Defendant Michael L. Greene:
                              Britt Redden
17                            REDDEN LAW, PLLC
                              3300 Oak Lawn Avenue, Suite 700
18                            Dallas, Texas 75219

19                            William Lee Shipley, Jr.
                              LAW OFFICES OF WILLIAM L. SHIPLEY
20                            P.O. Box 745
                              Kailua, Hawaii 96734
21      _____

22      Stenographic Official Court Reporter:
                              Nancy J. Meyer
23                            Registered Diplomate Reporter
                              Certified Realtime Reporter
24                            333 Constitution Avenue, Northwest
                              Washington, D.C. 20001
25                            202-354-3118
```

1                          **I N D E X**

2                                                        PAGE:

3     **Witnesses:**

4     Jeffrey Morelock
          Direct Examination, cont'd, By Mr. Woodward...... 4879
5         Direct Examination By Mr. Brennwald............. 4919
          Direct Examination By Mr. Shipley............... 4925
6         Cross-Examination By Ms. Rakoczy................ 4931
          Redirect Examination By Mr. Woodward............ 4947
7         Redirect Examination By Mr. Shipley............. 4955

8     Stephen Brown
          Direct Examination By Mr. Woodward.............. 4956
9         Direct Examination By Mr. Machado.............. 4990
          Direct Examination By Mr. Rossi................. 4991
10        Cross-Examination By Mr. Nestler................ 4995
          Redirect Examination By Mr. Woodward............ 5009

11

12

13    **Exhibits Admitted:**

14        Government Exhibit 50.S.7.174................... 4936
          Government Exhibit 10102........................ 4942

15

16        Defendant Meggs Exhibit CM 65.................. 4881
          Defendant Meggs Exhibit CM 66.................. 4882
17        Defendant Meggs Exhibit CM 68.................. 4949
          Defendant Meggs Exhibit CM 69.................. 4965
18        Defendant Meggs Exhibit CM 70.................. 4970
          Defendant Meggs Exhibit CM 71.................. 4975
19        Defendant Meggs Exhibit CM 72.................. 4982
          Defendant Meggs Exhibit CM 75.................. 4987
20        Defendant Meggs Exhibit CM 76.................. 5010

21

22

23

24

25

```
1                    P R O C E E D I N G S
2              (REPORTER'S NOTE:  The a.m. portion of the trial was
3    reported by William P. Zaremba, who prepared said transcript.)
4              (Proceedings held outside the presence of the jury.)
5         THE COURT:  Bring Mr. Morelock back into the
6    courtroom, please.
7              Would anybody have a problem with starting at 9:15
8    tomorrow?  I have to, unfortunately, conclude the day to catch
9    a flight at 3:30.  I'll try and steal a little extra time
10   tomorrow morning.
11             (Off the record.)
12             MR. MACHADO:  Your Honor, just so you know, there was
13   a 45-minute entry as far as -- I guess some jury is being
14   picked or something, and so we'll plan accordingly, but --
15             THE COURT:  So get here earlier.
16             MR. SHIPLEY:  I thought 45 minutes would be enough.
17             THE COURT:  The length of the jury line isn't going
18   to really --
19             (Proceedings held in the presence of the jury.)
20             THE COURTROOM DEPUTY:  Jury panel.
21             THE COURT:  All right.  Have a seat, everyone.
22        Welcome back.  I hope everyone had a nice lunch hour.
23             We are ready to continue.
24        Mr. Woodward.
25             MR. WOODWARD:  Thank you, Your Honor.
```

```
1                    CROSS-EXAMINATION, continuing
2     BY MR. WOODWARD:
3     Q.  Mr. Morelock, let me just ask:  During the break, did you
4     have any conversations with anybody about your testimony?
5     A.  No, I did not.
6     Q.  Okay.  I think where we left off, I had asked you about the
7     events of January 6th.  Did you travel to Washington, D.C., on
8     January 6th?
9     A.  Not on January 6th.  I believe it was January 5th.
10    Q.  Fair enough.
11         Did you travel to Washington, D.C., for the events of
12    January 6th?
13    A.  Yes, I did.
14    Q.  Could you tell the ladies and gentlemen of the jury about
15    how that came about.
16    A.  I don't remember exactly, but there was a plan made where I
17    met several members of the Oath Keepers in Lake City, Florida.
18    Q.  I'm just going to interrupt you, and I apologize in
19    advance.
20         Do you recall how you first came to learn that there
21    would be an event in Washington, D.C., on January 5th or 6th?
22    A.  I believe it was via the Signal chats.  I'm not sure, but I
23    think that's how I learned about it.
24              MR. WOODWARD:  If we could just for the witness,
25    please.
```

```
 1              Mr. Douyon, are we on CM 63?
 2              64.  Thank you, sir.
 3              We seek to move to admit CM 64.
 4                  MS. RAKOCZY:  No objection.
 5                  (Defendant Meggs Exhibit CM 64 admitted into
 6      evidence.)
 7                  MR. WOODWARD:  If we could publish for the witness
 8      and the jury.
 9      BY MR. WOODWARD:
10      Q.  Forgive me for some lawyerly questions here.  But do you
11      know who Donald Trump is?
12      A.  Yes, I do.
13      Q.  And are you familiar with Twitter?
14      A.  Yes, I am.
15      Q.  Are you familiar with the tweet that you see here before
16      you?
17      A.  I may have seen it, but -- I think I've seen it.
18      Q.  Do you know whether either former President Trump or anyone
19      else had discussed an event on January 6th before this tweet?
20      A.  Not that I know of.
21      Q.  Okay.  And the date of the tweet -- you see down there --
22      is December 19th?
23      A.  Yes, according to what I'm looking at.
24      Q.  Okay.  Of 2020?
25      A.  Correct.
```

1   Q.  Okay.  And so the first time you remember hearing about an

2   event in Washington, D.C., you think, was in the Signal chats?

3   A.  I believe so, yes.

4   Q.  Okay.  And what do you recall knowing about the --

5           MR. WOODWARD:  Just me, please, Mr. Douyon --

6   BY MR. WOODWARD:

7   Q.  -- about the Signal -- about the event in Washington, D.C.?

8   A.  That the Oath Keepers were asked to provide personal

9   security for several -- I don't know what you'd call them --

10  speakers that would be speaking over those couple days.

11          MR. WOODWARD:  You can take that down, Mr. Douyon.

12          Court's indulgence.

13          Okay.  For the witness and the government, please.  We

14  would seek to admit as CM 65.

15          MR. NESTLER:  No objection.

16          THE COURT:  CM 65 will be admitted.

17          (Defendant Meggs Exhibit CM 65 admitted into

18  evidence.)

19          MR. WOODWARD:  If we can publish for the jury.

20  BY MR. WOODWARD:

21  Q.  Mr. Morelock, this is not what a Signal chat looks like;

22  correct?

23  A.  I don't remember what a Signal chat looks like.

24          MR. WOODWARD:  Okay.  If -- just for the witness,

25  please.

```
 1    BY MR. WOODWARD:
 2    Q.  Do you recognize what we're looking at here?
 3    A.  Yeah.  I think that's Signal.
 4         MR. WOODWARD:  And if the government wouldn't object,
 5    can we just show as a demonstrative, the screen here.  We'll
 6    designate this as CM 66.
 7         MS. RAKOCZY:  No objection.
 8         MR. WOODWARD:  Okay.
 9         (Defendant Meggs Exhibit CM 66 admitted into
10    evidence.)
11         MR. WOODWARD:  And so if we could pub- -- we're not
12    moving to admit, just as a demonstrative.
13         THE COURT:  Okay.
14         MR. WOODWARD:  So if we can publish for the jury.
15    BY MR. WOODWARD:
16    Q.  Do you recognize what we're looking at here?
17    A.  Yeah, I'm not familiar with the particulars, but yeah, I
18    recognize that as Signal.
19    Q.  Sure.  And are you familiar with the OK FL DC OP Jan 6
20    chat?
21    A.  I -- yeah, I vaguely remember that.
22    Q.  Okay.  And you recall being a member of that chat back at
23    this time?
24    A.  I don't know.  I was a member of several of them.  I don't
25    remember which ones.
```

1    Q.   Okay.  And do you recall that there were a number of

2    messages that you received in the chats that you were in?

3    A.   Correct.

4    Q.   Hundreds?

5    A.   I don't know the number.

6    Q.   More than a thousand?

7    A.   I don't know the number.

8    Q.   Okay.  And that it would -- it would take us some time to

9    read them all?

10   A.   Is that a question?

11   Q.   Yes.

12   A.   Probably, yes.

13   Q.   And so does this refresh your recollection of what Signal

14   looks like in its native form?

15   A.   Yes, sir.

16   Q.   All right.  So if we could go back to CM 65, that's not

17   what Signal looks like?

18   A.   No, apparently not.

19   Q.   Right.  And you didn't make this exhibit, did you?

20   A.   No.

21   Q.   Okay.  In this exhibit, you'll see that there is a "From"

22   field on the top left-hand corner; correct?

23   A.   Correct.

24   Q.   Do you know who Gray Gator 1 is?

25   A.   I don't remember.

1    Q.  And do you know what "Gray" represents or signifies?

2    A.  No, sir.

3    Q.  And do you recall learning -- well, you testified that you

4    recall learning that the group would be providing security on

5    January 6th?

6    A.  Correct.

7    Q.  All right.  And if you could, would you read this message

8    from Gray Gator 1 to the jury, please.

9    A.  "Okay.  Gentlemen and ladies, we have the detail.  I just

10   have to get someone else for Stone.  We are PSD for 8

11   congressmen and we will be inside the wire for trumps speech

12   working the outside near the wire while Secret Service has the

13   inside."

14   Q.  And this purports to be from January 3rd of 2021?

15   A.  Correct.

16   Q.  And this message, please.

17   A.  "We will rotate main guys on each stage.  There are 7

18   stages.  We will have approximately 15-20 minutes to move our

19   VIPs approximately a mile each time through the crowd.  We have

20   to look and be bad ass and very aggressive."

21   Q.  And if you would just start with "We no longer have."

22   A.  "We no longer have stone at all.  Tuesday is a light

23   detail.  Maybe a few Hollywood types.  But those will be short

24   and sweet."

25   Q.  And so do you have an understanding of whether the

1  Oath Keepers were originally to be providing security for

2  Roger Stone on January 5th and 6th?

3  A.  I think that's what was supposed to have happened.

4  Q.  And do you have an understanding of whether that plan

5  changed at some point in advance of January 6th?

6  A.  Yes, it did.

7  Q.  And so what was your understanding of who the Oath Keepers

8  would be providing security for on January 6th?

9  A.  I believe it was Ali Alexander.

10  Q.  Who is Ali Alexander?

11  A.  Just a political speaker.

12  Q.  Political of what?

13  A.  Pro-Trump, I guess.

14  Q.  Okay.  So how if -- do you recall how you were asked to

15  come to Washington, D.C., for the events of January 5th and

16  6th?

17  A.  No, sir.

18  Q.  Okay.  Do you recall how you traveled from -- to

19  Washington, D.C., for the events of January 5th and 6th?

20  A.  Yes, sir.

21  Q.  How did you do that?

22  A.  I drove to -- from my area where I live near Pensacola,

23  Florida, to Lake City, Florida, to a car dealership and met up

24  with other Oath Keepers.

25  Q.  Do you recall the names of anyone that you met up with?

1    A.  Kelly Meggs, Connie Meggs.  I think there was -- there was

2    one other person, but I can't remember his name.  It might have

3    been Joe.

4    Q.  Okay.  Do you see Kelly Meggs in the courtroom here today?

5    A.  No, sir.

6    Q.  Do you see Connie Meggs in the courtroom here today?

7    A.  Yes, sir.

8    Q.  Could you point her out for us, please.

9    A.  (Witness complying.)

10        She just waved to me.  She's wearing a blue mask and

11   a --

12   Q.  It's hard for the court reporter to take that down.

13   A.  Okay.

14   Q.  How would you describe what she's wearing?

15   A.  She's got a blue face mask on, a black suit jacket, and a

16   white, possibly, scarf.

17   Q.  Was that -- my word -- "rendezvous" in Lake City, was that

18   the first time you had met Connie Meggs before?

19   A.  No, sir.

20   Q.  When had you previously met her?

21   A.  She was on one of the Roger Stone details that I talked

22   about earlier today.

23   Q.  Was she there with anyone else?

24   A.  Yes, sir.

25   Q.  Do you recall any names?

1    A.  I believe it was her son.  I don't remember his name.

2    Q.  Okay.

3    A.  And then there were a couple other Oath Keepers.

4    Q.  Was she there with Kelly Meggs?

5    A.  No, sir.

6    Q.  Okay.  Had you met Kelly Meggs before the rendezvous at the

7    Lake City location?

8    A.  Yes, sir.

9    Q.  And when was that?

10   A.  I believe the first time I met him was at the first Million

11   MAGA March, or whatever it was called, in D.C.

12   Q.  Okay.  So did you then drive from Lake City, Florida,

13   towards Washington, D.C.?

14   A.  I didn't drive, no.

15   Q.  You're very good at answering questions.

16       Did you then ride in a vehicle toward Washington, D.C.?

17   A.  Yes, sir.

18   Q.  Who was driving?

19   A.  Kelly Meggs.

20   Q.  And about how long was that?  Well, where did you go?

21   A.  We drove from Lake City to the Jacksonville, Florida, area

22   and met up with more Oath Keepers.  I believe it was at a truck

23   stop.

24   Q.  Did anyone else join you in the vehicle then?

25   A.  Yes, sir.

1    Q.  Do you recall the name of those people or person?

2    A.  I think his name was Caleb.

3    Q.  And what vehicle were you riding in?

4    A.  I think it was Kelly Meggs's truck.

5    Q.  A pickup truck?

6    A.  Yes, sir.

7    Q.  Okay.  From Jacksonville, where did you go?

8    A.  We drove to another Oath Keepers property in North Carolina

9    somewhere.  I don't remember the town.

10   Q.  Roughly, how long a drive was that?

11   A.  Six hours.  Five, six, seven hours.

12   Q.  A long time in the car?

13   A.  Yes, sir.

14   Q.  With four people?

15   A.  Yes, sir.

16   Q.  Other people?

17   A.  Four other people; correct.

18   Q.  From -- what did you do in North Carolina?

19   A.  Basically, went to sleep.

20   Q.  Could you describe the surroundings.

21   A.  It was, basically, a camp-type setting; a hunting camp, I

22   think it was.

23   Q.  Did you sleep in a tent?

24   A.  No.  I slept in a shed, basically.

25   Q.  Could you tell us more about that.

1    A.  It seemed to be some kind of shed, and there was -- they

2    had some cots for us, fold-out cots.

3    Q.  How many, were you, sleeping in the cots?

4    A.  Just a guess, maybe ten.

5    Q.  Okay.  And do you recall whether Connie Meggs slept on a

6    cot that night?

7    A.  No.  I think her and Kelly Meggs slept in their truck

8    because there wasn't enough room.

9    Q.  Was it warmer in the truck?

10   A.  I didn't go in there.

11   Q.  Fair enough.

12          The -- the next morning, did you travel anywhere?

13   A.  Yes, sir.

14   Q.  Where did you go?

15   A.  We drove to Washington -- no, we didn't go to

16   Washington, D.C.  We drove to a hotel in Virginia.

17   Q.  Do you remember the name of the hotel?

18   A.  No, sir.

19   Q.  What did you do there?

20   A.  We placed -- a lot of us were carrying weapons.  So we left

21   our weapons in the hotel room.

22   Q.  Were you carrying weapons?

23   A.  Yes, sir.

24   Q.  And what kind of weapons were you carrying?

25   A.  I had two pistols.

1    Q.  What kind of pistols?

2    A.  One was a small Glock .380, concealable pistol; and the

3    other was an AR-type pistol.

4    Q.  Do you have a license to carry those firearms?

5    A.  Yes, sir.

6    Q.  What kind of license?

7    A.  It's a Florida concealed weapons and firearms license.

8    Q.  Do you have any other license or authority to carry

9    weapons?

10    A.  No, sir.

11    Q.  Why did you leave those firearms in Virginia?

12    A.  Because my license was not valid in D.C.

13    Q.  Was it valid in Virginia?

14    A.  Yes, sir.

15    Q.  Could you explain to the ladies and gentlemen of the

16    jury how that works, a Florida license is valid in Virginia.

17    A.  There are several states that Florida has a -- that's a

18    big -- I can't say that word -- recipro- --

19    Q.  Reciprocal?

20    A.  That's it.

21         They basically honor each other's licenses.  Not all

22    states honor Florida permits.  Not all states have permits,

23    but --

24    Q.  And you knew that Washington, D.C., did not honor your

25    Florida license?

1    A.  Yes, sir.

2    Q.  Why did you want a firearm with you if you weren't going to

3    bring it into Washington, D.C.?

4    A.  It's my constitutional right to carry one for protection.

5    I'm a former police officer.  I know things happen, so I have

6    it for protection.

7    Q.  Do you know why others left firearms at the hotel in

8    Washington, D.C.?

9    A.  No, not for sure.  I would assume because they didn't have

10   permits for Washington, D.C.

11   Q.  Are you aware of anyone bringing a firearm into

12   Washington, D.C., that was with the Oath Keepers?

13   A.  I think there was one Texas constable -- constable that

14   might have had a federal permit to carry because he was a law

15   enforcement officer, but I don't remember if he was in

16   Washington, D.C., or not at that time.

17   Q.  Okay.  Are you familiar with the concept of a QRF?

18   A.  Yes.

19   Q.  What is a QRF?

20   A.  QRF stands for quick reaction force.

21   Q.  And what is a quick reaction force?

22   A.  From what I was told, it's just if something happens, they,

23   basically, come in and save everybody.

24   Q.  And so did you have an understanding of whether there was a

25   QRF for the Oath Keepers on January 5th and 6th?

1    A.  I was made aware of that, I guess, during the Signal chats,

2    yes.

3    Q.  Okay.  And did you understand the -- the firearms that

4    you were leaving in Virginia, they were being left with the

5    QRF?

6    A.  I don't know specifically if I -- I left them in the hotel

7    room.  So I can't remember details when it comes to that.

8    Q.  Did you leave them there for others' use?

9    A.  No, sir.

10   Q.  Did you have any expectation that anyone else would be

11   using those firearms?

12   A.  No, sir.

13   Q.  So those firearms were for your use and only your use?

14   A.  Correct.

15   Q.  Okay.  After you left the hotel, where did you go?

16   A.  I went to -- I can't remember the hotel, but it's a hotel

17   that Ali Alexander was staying in in downtown D.C.

18   Q.  So you entered the District at this point?

19   A.  Correct.

20   Q.  Why were you going to the hotel where Ali Alexander was

21   staying?

22   A.  It was myself and one other Oath Keeper were supposed to

23   meet up with him and provide additional security on top of the

24   security that he already had.

25   Q.  Did you, in fact, provide that additional security?

```
1    A.  Yes, sir.

2    Q.  And what did that entail?

3    A.  Basically, just doing what his paid security told us to do.

4    Just being an extra set of eyes.

5    Q.  Well, without telling us what the security said, what --

6    what were you doing?  What was your -- were you standing?  Were

7    you just walking?

8    A.  Just standing in his vicinity, making sure no one bothered

9    him.

10   Q.  Now, you testified that you were a licensed security

11   officer?  Yes?

12   A.  Yes, sir.

13   Q.  And you provided security in the past?

14   A.  Yes, sir.

15   Q.  Paid professional security?

16   A.  Yes, sir.

17   Q.  What -- what was your intention if anything were to happen

18   to Ali Alexander?

19   A.  The training -- I've had formal training in that.  Training

20   dictates that you get the person you're protecting and you get

21   them out of harm's way.  You, basically, grab them and run.

22   Q.  After you confront those who are attacking you?

23   A.  You don't confront attackers.  You defend yourself or you

24   defend the person -- the person you're protecting, but you

25   don't stay there and engage in any kind of fight.  You just get
```

1    the person and you leave.

2    Q.  And so if anything were to happen to Mr. Alexander, your

3    plan was to leave with him away from --

4    A.  I was not in charge of making plans for that.  We would,

5    basically, do what his paid security, the primary security

6    people, told us to do.  But getting your person you're

7    protecting and getting them out of the way is just a common

8    technique.

9    Q.  Well, it sounds like if they told you to go and confront

10   these people over here, that's not something that you would

11   have done?

12   A.  No, sir.

13   Q.  And so if they were to instruct you to do anything other

14   than to remove Mr. Alexander, you would not have followed

15   their --

16   A.  Correct.  Correct.

17   Q.  So the only thing you were going to do as part of your

18   security was to remove your protectee?

19   A.  Correct.

20   Q.  All right.  Now, after -- did Mr. Alexander do anything on

21   the 5th of January that you recall?

22   A.  I believe he gave one or two speeches, when myself and the

23   other Oath Keeper -- I don't remember his name.  I think his

24   nickname was Tampa Tom -- but when we got to Alexander's hotel,

25   he was already making a speech somewhere else, so we had to

1    wait for him.

2    Q.  And so after -- what happened next?

3    A.  He came back to the hotel with his group, and then I

4    believe we escorted him to another speech.

5    Q.  And then what happened?

6    A.  He gave a speech, and we went back to the hotel.

7    Q.  At some point you returned to the hotel that evening?

8    A.  Correct.

9    Q.  What -- did you intend to speak with Mr. Alexander that

10   evening?

11   A.  I did speak with him.

12   Q.  What -- what about?  Just the subject matter.

13   A.  Just introduced myself and told him we were there and,

14   basically, that we would listen to his security and do whatever

15   he needed us to do.

16   Q.  And did you expect to have a conversation with him about

17   the events of the next day?

18   A.  Yes.  At one point I think we were supposed to have a

19   meeting and bring -- some other -- other Oath Keepers were

20   going to attend, but Mr. Alexander canceled that meeting.

21   Q.  Okay.  And so what did you understand your responsibilities

22   to be on the 6th of January?

23   A.  Basically, just do whatever his security told us to do.

24   Q.  All right.  Would you walk us through that day.  What

25   happens?

1    A.  Started very early, probably around 6 o'clock in the

2    morning.  He -- Mr. Alexander had to get to the area where the

3    President was speaking fairly early.  Myself and the other Oath

4    Keeper that I know as Tampa Tom went with Mr. Alexander -- I

5    don't know, five or six of his people, I guess, or his group,

6    and his two security people to the venue where the President

7    was speaking.

8    Q.  What -- what did you wear that day?

9    A.  I think I just wore a black jacket and jeans.

10   Q.  Do you know what a plate carrier is?

11   A.  Yes, I do.

12   Q.  Did you wear a plate carrier?

13   A.  No, sir.

14   Q.  Why not?

15   A.  I didn't need one.

16   Q.  Do you know what a ballistic helmet is?

17   A.  Yes, sir.

18   Q.  Did you wear a ballistic helmet?

19   A.  No, sir.

20   Q.  Why not?

21   A.  I didn't think I needed one.

22           MR. WOODWARD:  Okay.  If we could return -- I'm so

23   sorry, Mr. Douyon -- 60 -- 67 for the record, if we could turn

24   to CM 67 --

25           THE COURTROOM DEPUTY:  65.

1          MR. WOODWARD:  That sounded better.  65.  CM 65.

2     BY MR. WOODWARD:

3     Q.  Do you see the message here?

4     A.  Yes, sir.

5     Q.  And do you recall the OK FL DC OP Jan 6 chat?

6     A.  Yes, sir.

7     Q.  Could you read that for us, please.

8     A.  "Okay.  We are not going full camo of any kind.  Let's stay

9     jeans or khakis with plate carriers, et cetera.  They want us

10    to be more no National Guard look.  So bring the stuff you need

11    but let's not look National Guard!!  This is a change.  Please

12    make sure we adjust!!!"

13    Q.  Now, the plate carriers you disagree with?

14    A.  Correct.

15    Q.  Not necessary?

16    A.  Correct.

17    Q.  What about the jeans or khakis?

18    A.  Yeah, I mean, that's -- sounds fine to me.

19    Q.  Could you read this one for us as well, please.

20    A.  "OK 2 calls tonight.  I'll cover the first call.  85

21    people, approximately 25 congressmen, and the organizers of the

22    event, and all speakers were in the call."

23    Q.  Do you know whether Mr. Alexander had organized an event

24    for January 5th and 6th?

25    A.  I believe he was scheduled to speak on several different

1    stages, I think he said, but I don't know if he organized it or

2    not.

3    Q.  Fair enough.

4         If you could read this for us, please.

5    A.  "The first thing we need to do is rally at freedom square

6    as close to noon as possible.  I told them we would not have

7    the full team yet.  So those RV guys can meet us in there after

8    they get settled.  We will set up a QRF vehicle at camp so all

9    gear goes there with Kane."

10   Q.  Do you know who Kane is?

11   A.  I think he might have been the person at the hotel, but I'm

12   not sure.

13   Q.  Do you know the name of the person with whom you left your

14   firearms?

15   A.  No, sir.

16   Q.  Any concern about that?

17   A.  I trusted the Oath Keepers; at that time, anyway.

18   Q.  If you could read this one for us, please.

19   A.  "We will be doing a stage guard at freedom square.  Then we

20   will all go to Willard for check in as VIP security team.  May

21   be one of us or just a few.  As people arrive you will be

22   additional stage support or crowd observation.  It's gonna be

23   very hectic."

24   Q.  Does that refresh your recollection of what hotel

25   Mr. Alexander was staying in?

1    A.   No, sir.  I don't know if it was the Willard or not.

2    Q.   Fair enough.

3         I don't think you need to read this, but the jury can

4    have it.

5         But if you would read this message for us, please.

6    A.   "Attire is no full camo.  They don't want us to be National

7    Guard look.  So jeans or khaki 511 combat pants, et cetera and

8    an OK shirt.  Same for Wednesday.  Plate carriers, et cetera

9    will be on for both days.  That was from call 2.  Radio

10   programming also Tuesday night.  But, basically, when the SEC

11   service" -- I'm guessing that's Secret Service -- "comes in,

12   they will launch warlock and comms are gone!"

13   Q.   Did you have any issue with cell service on January 6th?

14   A.   Yes, sir.

15   Q.   What was that issue?

16   A.   It was, basically, nonexistent.

17   Q.   Does that include your ability to send messages, whether

18   SMS or a text or an iMessage or Signal?

19   A.   Correct.  It seemed to be very slow or -- I don't know if

20   all of them even went through.

21   Q.   And do you know what warlock is?

22   A.   No, sir.

23   Q.   Okay.  If you could read this for us.

24   A.   "They mentioned us on the call with congressmen and they

25   wanted to say thank you, all, for providing and protecting us.

1   Wednesday we will be working with or more likely around Secret

2   Service not with!!"

3   Q.  Did you work with the Secret Service on January 6th?

4   A.  No, sir.

5   Q.  If you would read this for us, please.

6   A.  "Let's look like we know what we are doing.  Primarily

7   scanning the crowd.  Wednesday we will be RP at 6:00 a.m. so

8   don't plan on being out playing hero on Tuesday and be late for

9   detail Wednesday."

10  Q.  You chuckled reading that.

11  A.  Yes, sir.

12  Q.  Do you know whether those you were with had the same level

13  of security training that you had?

14  A.  No, they didn't.

15  Q.  Do you know for a fact they did not?

16  A.  Not for a fact, but in my observation of the way they

17  worked, they didn't or don't.

18  Q.  Would you elaborate on that observation for us.

19  A.  I remember at times I just had to explain the concept of,

20  like I just did earlier, getting the person you're protecting

21  away from a threat instead of engaging or getting in fights

22  with a threat.  And I don't know who I would -- was talking to,

23  but they were, basically, like, well, we're not going to run

24  from anybody, but.

25  Q.  Would you read this for us.

1    A.  "Everything else is still unfolding" -- excuse me -- "the

2    organizers haven't even posted a final schedule because so many

3    bee faces are coming out to talk.  But Wednesday is 6:00 a.m.

4    until 8 minimum."

5    Q.  8 a.m. or p.m.?

6    A.  Sorry, a.m.

7    Q.  Well, 6:00 a.m. until?

8    A.  8 minimum.

9    Q.  Were you -- did you have an expectation as to whether you'd

10    be finished providing security at 8:00 a.m.?

11    A.  No.  I knew it was going to last longer than that.

12    Q.  8:00 p.m.?

13    A.  Is this -- I'm -- I don't know what date this is talking

14    about.  If it's talking about -- or if you're -- what are you

15    asking me?  Please repeat the question.

16    Q.  How long did you expect to be providing security on

17    January 6th, 2021?

18    A.  Pretty much all day.

19    Q.  Up until the time we've been discussing -- so that's the

20    early morning of January 6th, 2021 -- do you have an opinion as

21    to whether the folks you were working with were specially

22    organized?

23    A.  There was some level of organization, but not a lot.

24    Q.  Sir, you're under oath.  Yes?

25    A.  Yes.

1    Q.  Was there much organization on January 6th, 2021?

2    A.  No.

3              MS. RAKOCZY:  Objection.  Asked and answered.

4              MR. WOODWARD:  Fair enough.

5    BY MR. WOODWARD:

6    Q.  What happened after you were -- how did you get from your

7    hotel to the area where you were providing security on

8    January 6th, 2021?

9    A.  We took a golf cart.

10   Q.  You took a golf cart from your hotel?

11   A.  Correct.

12   Q.  Do you know who provided the golf cart?

13   A.  No, sir.

14   Q.  Who drove the golf cart?

15   A.  It might have been one of Mr. Alexander's paid security

16   team, but I don't remember for sure.

17   Q.  And do you recall where the golf cart took you that

18   morning?

19   A.  To an entrance into the secured area around where the

20   President was speaking.

21   Q.  All right.  And what happened when you arrived at the

22   entrance?

23   A.  We waited around for a while.  I don't know how long.  It

24   took a while to get our passes to go into the secured area.

25             MR. WOODWARD:  If we could publish for the jury

1   what's already been admitted as CM 28.

2          MS. RAKOCZY:  No objection.

3   BY MR. WOODWARD:

4   Q.  Do you recognize this picture?

5   A.  No, sir, I don't think I've seen that picture before.

6   Q.  That's not the pass you received on January 6th?

7   A.  It's not the pass I personally received.  It kind of looks

8   like it, but I don't remember for sure what they looked like.

9   Q.  Your pass looked different from this?

10  A.  I don't remember what my pass looked like.

11  Q.  Okay.  After you received your pass, where did you go?

12  A.  We went into the main area of the venue, and then we went

13  into, I guess, what could be described as VIP seating.

14  Q.  And when you say "we," to whom are you referring?

15  A.  Myself, the other Oath Keeper I know as Tampa Tom,

16  Mr. Alexander, several of his people.

17  Q.  When you referred to the security screening -- if I

18  could -- for the record, this is CM 29 already in evidence.  Do

19  you recognize this screening here depicted in the photograph?

20  A.  Yes, that looks like the area we entered through.

21  Q.  And that looks like -- do you recognize this individual

22  here?

23  A.  Yeah.  I believe that's that Alex Jones person.

24  Q.  Okay.  So after passing through security, you went to a VIP

25  area with Ali Alexander?

1    A.  Correct.

2    Q.  Were there any other Oath Keepers with you?

3    A.  The one that I know as Tampa Tom.

4    Q.  That's it?

5    A.  Correct.

6    Q.  Were other Oath Keepers permitted into the secured area?

7    A.  Eventually they showed up, but they didn't come in with

8    us.

9    Q.  Where did they go?

10   A.  I don't know.

11   Q.  If I could show you what's already been admitted into

12   evidence as to CM 32.

13        Do you recognize the logos on the back of these shirts?

14   A.  Yes, I do.

15   Q.  And those are Oath Keepers logos?

16   A.  Correct.

17   Q.  Is this where you were sitting on January 6th?

18   A.  No, I did not sit with them.

19   Q.  Where were you sitting?

20   A.  If -- if we were facing the stage, I sat on the far right,

21   probably 15, 20 rows back.

22   Q.  So, actually, if you touch that screen there in front of

23   you, it will make a mark that everyone can see.

24   A.  You can't really see where I was, but probably under --

25   under there; but there's an aisle, like, right here that goes

1    all the way to the stage.  So I was on this other side of the

2    aisle with Tampa Tom and one of Mr. Alexander's security

3    persons.

4    Q.  Were you closer to the stage than these Oath Keepers are?

5    A.  Yes.

6    Q.  Roughly how -- did you see President Trump speak that day?

7    A.  Yes, I did.

8    Q.  Roughly how far were you from President Trump when he

9    spoke?

10   A.  Just estimating, 40, 50 yards, I guess.  Kind of at an

11   angle.  He would have been off to my left.

12   Q.  Pretty close?

13   A.  40 or 50 yards.

14   Q.  Is that close?

15   A.  I don't know what you would consider close.  I -- the

16   closest I've ever been to a President.  But, yeah, I guess it

17   was close.

18   Q.  How did you feel sitting so close to a sitting President of

19   the United States?

20   A.  It was cold that day.  I was freezing.  That's how I felt.

21   Q.  That was an honest answer, sir.

22   A.  Coming from Florida, I was freezing.

23   Q.  Were you interested in the President's speech that day?

24   A.  Not really.

25   Q.  Because you were there to provide security?

1    A.  Correct.

2    Q.  And did you have an understanding of what was to happen

3    after the President spoke that day?

4    A.  Yes, I do.

5    Q.  What were you to do?

6    A.  We were supposed to walk with Mr. Alexander, his security

7    team, and what they told us would be a large group of people.

8    We were supposed to walk them to the Capitol so Mr. Alexander

9    could give a speech.

10   Q.  You were supposed to do that?

11   A.  Correct.

12   Q.  Did you not, in fact, do that?

13   A.  No, sir.

14   Q.  Could you tell us what happened.

15   A.  Mr. Alexander, his security team, and the -- I don't

16   know -- three or four other people -- not his whole group that

17   went in there.  They were permitted to -- I don't know if it

18   was a Secret Service agent or a D.C. police officer or Capitol

19   police officer, but they moved the barricade in front of the

20   stage and allowed them to pass through and cut across this

21   grassy area, but they wouldn't let anyone else go through

22   there.

23          So we kind of met back up outside of the VIP area.

24   Q.  Who was the "we" that you refer to?

25   A.  Myself, Tampa Tom, and then some of those Oath Keepers that

1    were pictured in that photo that you just showed me.

2    Q.  Did you have an expectation as to whether you would be

3    linking back up with Mr. Alexander?

4    A.  That was the plan.

5    Q.  Now, you are you aware, sir -- well, are you aware that

6    other members of the Oath Keepers did wear plate carriers to

7    the event of January 6th?

8    A.  Yes.  Later I found that out.

9    Q.  Do you know whether they wore them into the protected area?

10   A.  No, they didn't.

11   Q.  Why not?

12   A.  I don't think the Secret Service let them in there -- would

13   let them in there wearing that.

14   Q.  After you finished -- or left -- after the President

15   finished speaking, what did you do?

16   A.  As I just said, I just met up with the other Oath Keepers

17   outside of the VIP area.  They did say that they needed to go

18   get their plate carriers; that they had left them somewhere

19   outside the secured perimeter.

20   Q.  Did you have an understanding -- where were you expecting

21   to take Mr. Alexander after the speech?

22   A.  All I knew was we were supposed to go to the Capitol and

23   there was a stage there.  I was -- I don't know if upset was

24   the right word, but concerned that I didn't know where the

25   stage was or where to -- where to escort the people that I --

1    that were left for us to escort.  I didn't know where they were

2    supposed to go because Mr. Alexander and his security team and

3    other folks, they left us, basically.

4    Q.  Did you have any way of contacting Mr. Alexander?

5    A.  Yes.  I had -- I think I had his direct number.  I'm not

6    sure.  I don't remember.  But there was a -- a female

7    assistant -- or I don't know what her position was, but I had

8    her phone number also.  There were a few people from his group

9    that we did find inside of the secured perimeter.

10   Q.  And what did you do once you found them?

11   A.  We all started walking out of the secured perimeter and, I

12   guess, towards the Capitol.

13   Q.  You were escorting the people from Mr. Alexander's group

14   toward the Capitol?

15   A.  Correct.  But some of the Oath Keepers then had to go get

16   their plate carriers or whatever they needed to get.  So we got

17   separated from them.

18   Q.  What did you do next?

19   A.  We, basically, started walking up, I guess, Pennsylvania

20   Avenue towards the Capitol, hoping that I could catch up with

21   everybody.

22   Q.  Who were you with?

23   A.  It was myself and an Oath Keeper named Alondra or -- I

24   think her name was Alondra.  The Oath Keeper named Caleb that

25   rode up in Mr. Meggs's truck with us.  There was a female from

1    Alexander's group.  I can't remember what her name was.  So

2    just the four of us, basically.

3    Q.  And you were walking up Pennsylvania with the purpose of

4    escorting that female someplace?

5    A.  Well, the purpose was to meet up with the main group of

6    everybody, but at that point, that person kind of became my

7    responsibility, I felt.  So yes.

8    Q.  Where did you go next?

9    A.  We stopped at some point.  I believe it's freedom square.

10   There's a statue of a horse, a guy on a horse.  I don't know

11   who it is.

12   Q.  Sorry to say that there are many of those in

13   Washington, D.C.

14   A.  All right.

15        So that's where we stopped to try to either wait for the

16   rest of the Oath Keepers or catch up to somebody, but she was

17   having problems -- "she" being the female from Alexander's

18   group -- with her legs and having problems walking.  So we were

19   going very slow, and she needed a rest at that point too.

20   Q.  Do you recall any specifics about her, what she looked

21   like, what she was wearing?

22   A.  She was an African American female, heavy set.  That's

23   about all I remember.

24   Q.  What color clothes she was wearing?

25   A.  I don't remember.

1  Q.  Did you eventually link up with other members of the

2  Oath Keepers?

3  A.  Yes.

4  Q.  And when did that happen?

5  A.  I don't remember how long we waited, but we found them on

6  Pennsylvania Avenue, not too far away towards the Capitol from

7  freedom square or plaza.

8  Q.  At some -- were they ahead of you or behind you?

9  A.  I think they were initially behind us, but somehow they

10  walked by us, and I think I saw just a couple stragglers and

11  ended up catching up to them that way.  I don't remember for

12  sure, though.

13  Q.  Okay.  And then what happened?

14  A.  And then we walked to the Capitol.

15  Q.  Do you recall where about the Capitol you were?

16  A.  I remember when -- I guess we got to the Capitol Grounds,

17  we kind of veered off to the left, is all I remember.  There

18  was a security guard -- a security checkpoint, a vehicle

19  checkpoint or gate manned by, I think it was a Capitol Police

20  officer.  So that's where we went.  She wasn't stopping anybody

21  or anything like that.  So we just walked up the sidewalk by

22  that gate.

23  Q.  Were there a lot of people in the area while you were

24  there?

25  A.  Yes, sir.

1    Q.  How many?

2    A.  I didn't count them.

3    Q.  More than ten?

4    A.  Yes.

5    Q.  More than a hundred?

6    A.  Probably.

7    Q.  Well, describe the scene for us.  What are you seeing

8    unfold at the Capitol at this time?

9    A.  There were just a lot of people.  Most of them walking

10   towards the Capitol.

11   Q.  Not all of them?

12   A.  No, not all of them.

13   Q.  Did you see anyone engaged in behavior you found

14   unacceptable?

15   A.  No, sir.

16   Q.  What happened after you passed this Capitol Police

17   officer?

18   A.  We turned left and went up a sidewalk.  The sidewalk seemed

19   like it might have been a circular sidewalk, is all I can

20   remember.  It was kind of wide.

21   Q.  Where did you go next?

22   A.  I don't know how far up that sidewalk we went.  30, 40,

23   50 yards.  I don't remember.  And then we just kind of stopped

24   and regrouped.

25   Q.  As -- you mean you're referring to the group of

1      Oath Keepers?

2      A.  Correct.

3      Q.  And then what happened?

4      A.  Somewhere around that point, I think I heard somebody yell

5      something about the Capitol had been breached.

6      Q.  You don't know who yelled that?

7      A.  No, sir.

8      Q.  Did anyone say anything else?

9      A.  Yeah.  There was a lot of -- a lot of people yelling.

10     Q.  What about any of the members of the Oath Keepers that had

11     grouped up with you?

12     A.  Yes, sir.  Kelly Meggs pulled me aside from the group and

13     said something along the lines of what do you think we should

14     do?  I said I think we should get our person, find the people

15     we're supposed to protect, and get the heck out of here because

16     I know the Capitol Police and riot squads are going to show up,

17     and we do not want to be in the way.

18     Q.  What, if anything, did Kelly say in response?

19     A.  He said that -- something along the lines -- I don't

20     remember his exact words -- he said this is our opportunity.  I

21     do remember the word "opportunity," but.

22     Q.  What did you understand Mr. Meggs to mean?

23     A.  I didn't know for sure.  I could only assume that --

24               MS. RAKOCZY:  Objection.

25               THE COURT:  Sustained.

```
1     BY MR. WOODWARD:

2     Q.  What was your understanding?

3     A.  Of?

4     Q.  I don't want you to assume.  What did you understand

5     Mr. Meggs to mean?

6               MS. RAKOCZY:  Objection.

7               THE COURT:  Just rephrase the question.

8     BY MR. WOODWARD:

9     Q.  What was your -- what did Mr. Meggs mean?

10              MS. RAKOCZY:  Objection.  The witness just said he

11    could only speculate.

12              THE COURT:  Ask him what his understanding was.

13    BY MR. WOODWARD:

14    Q.  What was your -- what was your -- what was your

15    understanding?

16    A.  I understood that they would go help the Capitol Police

17    with crowd control --

18    Q.  Why?

19    A.  -- based on the security details, I guess you would call,

20    that I described earlier today.

21    Q.  What, if anything, did you do next?

22    A.  I told him that I needed to go find Mr. Alexander, and also

23    help this lady that was having trouble walking get out of the

24    area.

25    Q.  Did you, in fact, help this -- help that lady?
```

1    A.  Yes.

2    Q.  What -- where did you go?

3    A.  Her and I left everyone else and walked back down

4    Pennsylvania Avenue, I believe.  We went a couple blocks

5    down Pennsylvania Avenue away from the Capitol, and then at

6    some point we turned right because her husband was in a

7    vehicle somewhere and was going to pick her up once we got past

8    the point where D.C. police were allowing traffic.  So I walked

9    her to an intersection so she could be picked up by her

10   husband.

11   Q.  Was she then picked up by her husband?

12   A.  Yes, sir.

13   Q.  And then what did you do?

14   A.  I went back to the hotel.

15   Q.  And then what?

16   A.  I think I took a nap.

17   Q.  Did you leave the hotel again that day?

18   A.  No, sir.

19   Q.  Why not?

20   A.  There was a curfew.

21   Q.  The next morning, what did you do?

22   A.  Kelly Meggs picked us up, myself and Tampa Tom; drove us to

23   the hotel where we had dropped off the weapons.

24   Q.  Did you do anything at the hotel?

25   A.  I picked up my weapons.

1    Q.  Then what?

2    A.  We drove back to Florida.

3    Q.  Straight to Florida from Washington, D.C.?

4    A.  Yes, sir.

5    Q.  How long a drive was that?

6    A.  I don't remember.  It was long.  Fifteen hours, something

7    like that.

8    Q.  How would you describe the mood in the car on your drive

9    back to Florida?

10   A.  I don't really remember for sure.  I know they were a bit

11   worried about what had happened.

12   Q.  So it was not boisterous?

13   A.  No, sir.

14   Q.  Did there come a time that you learned that there had been

15   violence at the Capitol Building that day?

16   A.  Was that a question or -- I don't remember exactly when I

17   learned there was violence.

18   Q.  But did you come to learn that there had been violence at

19   the Capitol that day?

20   A.  Yes.

21   Q.  And what, if anything, did you think about that?

22   A.  I thought it -- the whole thing was unnecessary.

23   Q.  What was unnecessary?

24   A.  Just everybody that went into the Capitol.

25   Q.  Why?

1    A.  It's illegal.  And I don't see what the point was.

2    Q.  Did you have an understanding about whether the

3    Oath Keepers had always cooperated with law enforcement in the

4    past?

5              MS. RAKOCZY:  Objection.

6              THE COURT:  I'll sustain the objection.  It's veers

7    on 404(b) evidence, I think.

8              MR. WOODWARD:  It's a quote from --

9              THE COURT:  I'm sorry?

10             MR. WOODWARD:  It's a quote.  I can show him the

11   transcript.

12             THE COURT:  If you could get on the phone,

13   Mr. Woodward.

14             (Bench conference on the record.)

15             THE COURT REPORTER:  Hold on.

16             MS. RAKOCZY:  Yes, Your Honor, I believe Mr. Woodward

17   said that the witness has testified to in the past, and I said

18   that doesn't make this less hearsay.  He testified previously

19   in the grand jury on a hearing of this magnitude, and also he

20   has -- he cannot possibly have laid a foundation to answer that

21   question.  It also calls for a legal conclusion.

22             MR. WOODWARD:  It's actually not his grand jury

23   testimony.  It's his testimony before the January 6th

24   committee.

25             THE COURT:  Well, whatever the case may be, I think

1    what you can ask him is that when he was with the Oath Keepers,

2    did he observe them cooperating with law enforcement.

3                 MR. WOODWARD:  Fair enough.

4                 THE COURT:  Okay.

5                 (Proceedings held in open court.)

6                 MR. WOODWARD:  Court's indulgence.

7    BY MR. WOODWARD:

8    Q.  Prior to January 6th, were you aware of rhetorical

9    conversations occurring in the Oath Keepers Signal chats?

10                MS. RAKOCZY:  Objection to form.

11                THE COURT:  Sustained.

12   BY MR. WOODWARD:

13   Q.  Prior to January 6th, did you observe or otherwise read

14   messages in Oath Keeper chats that gave you pause?

15   A.  Not that I remember.

16   Q.  Do you recall reading any Oath Keeper chats about the

17   Insurrection Act?

18   A.  No, I don't.

19   Q.  Do you recall --

20   A.  I'm sorry.  About the act?

21   Q.  Yes.

22   A.  I don't think it was in a chat.  I just remember that

23   letter that -- Stewart Rhodes had posted an open letter or open

24   letters, but I don't remember if those were posted in the chat

25   or not.

1    Q.  And so you remember Stewart Rhodes's open letters to former

2    President Trump?

3    A.  I do not remember them verbatim.  I just remember that he

4    wrote a couple.

5    Q.  And did those letters give you any pause?

6    A.  I didn't really understand them completely, and I didn't

7    even actually read the whole -- either of them.  I think I

8    remember reading bits and pieces, but I didn't pay much

9    attention to them.

10   Q.  Why not?

11   A.  I really wasn't familiar with an insurrection.  I know I

12   wanted no part of one.  So I didn't really bother reading them.

13   I wasn't in the Oath Keepers for any kind of political reasons

14   at all.

15   Q.  Did you have any -- did you later come to learn that

16   members of the Oath Keepers entered the Capitol Building on

17   January 6th?

18   A.  Yes, I do.

19   Q.  Did you have any inkling at all that there was a plan to

20   enter the Capitol Building on January 6th?

21   A.  No, sir.

22   Q.  Did you have any inkling at all that there was a plan to

23   stop the vote count on January 6th?

24   A.  No, sir.

25   Q.  Did you have any inkling at all that there was a plan to

1    stop the certification of the Electoral College on January 6th?

2    A.  No, sir.

3              MR. WOODWARD:  I have nothing further, Your Honor.

4              THE COURT:  Mr. Brennwald, do you have some

5    questions?

6              MR. BRENNWALD:  I would do my direct, I guess, in my

7    case.

8              THE COURT:  Correct.  It would be questions in

9    Mr. Parker's case.

10                        DIRECT EXAMINATION

11   BY MR. BRENNWALD

12   Q.  Good morning, Mr. Morelock.

13   A.  Hello.

14   Q.  Welcome to D.C.

15   A.  Thank you.

16   Q.  It's -- I just checked.  It's 78 in Pensacola where you're

17   from.  56 outside here.  Sorry about that.

18              THE COURT REPORTER:  Mr. Brennwald, can you move that

19   over.

20              MR. BRENNWALD:  Oh, I'm so sorry, ma'am.  Yes, ma'am.

21   I keep forgetting you have your headphones on and you have to

22   hear it through the system.  Sorry about that.

23   BY MR. BRENNWALD:

24   Q.  Mr. Morelock, just a few questions.

25              When you came to Washington, D.C., on -- was it

1 January 4th or 5th or 3rd?

2 A. I don't remember for sure.  I think it was the 5th.

3 Q. Okay.  Were you present for events on -- at Freedom Plaza

4 on January 5th, the day before January 6th?

5 A. Yes.  Mr. Alexander spoke there at night on the 5th.

6 Q. Okay.  So did you get there that morning to D.C., or had

7 you gotten there the night before?

8 A. I don't know for sure, but sometime around 12, 1 o'clock,

9 I'm guessing.

10 Q. Okay.  And when you came to Washington, D.C., from

11 Pensacola, Florida, by way of, I guess, North Carolina, in

12 part, you brought not one but two weapons with you.  Is that

13 what you said earlier?

14 A. Yes, sir.

15 Q. One was a .380 handgun?

16 A. Yes, sir.

17 Q. And one was an AR-15?

18 A. An AR-15 pistol.

19 Q. Pistol.  Okay.

20   Why two guns?  Why did you need two guns for protection?

21 A. I don't know.

22 Q. Okay.  You testified that in your prior activities with the

23 Oath Keepers, you -- at least in one instance -- were not paid

24 for your services but reimbursed for your expenses; is that

25 correct?

1   A.  Yes, sir.

2   Q.  Could you just briefly tell us what expenses you were

3   reimbursed for.  And I don't want to go into a long

4   explanation, just -- was it hotel expenses?  Was it parking?

5   What was it for?

6   A.  Car rental, hotel, gas, and food, I believe.

7   Q.  And did you drive -- you drove a car, obviously, if you had

8   a car rental?

9   A.  Yes, sir.

10  Q.  You didn't fly to any location?

11  A.  Correct.

12  Q.  Okay.  I just want to make sure I understood you correctly.

13  You testified that you provided security services even before

14  you were a member of Oath Keepers; correct?

15  A.  Do you mean professionally or --

16  Q.  Well, earlier you testified that in Louisville you provided

17  security when you weren't even a member of the Oath Keepers;

18  correct?

19  A.  Correct.

20  Q.  Okay.  So you didn't have to be a member of the

21  Oath Keepers to provide security at these events that

22  Oath Keepers might be at; correct?

23  A.  Correct.

24  Q.  Okay.  You talk about walking to the Capitol on January 6th

25  from the Ellipse with a woman -- I think you referred to as

```
 1    Alondra; right?

 2    A.  I don't know for sure if that's the pronunciation, but.

 3    Q.  Alondra Propes?

 4    A.  I don't know what her last name is.

 5            MR. BRENNWALD:  For the court reporter, P-r-o-p-e-s.

 6    BY MR. BRENNWALD:

 7    Q.  And then also with a man named Caleb?

 8    A.  Correct.

 9    Q.  All right.  Did you ever learn his name was Berry -- had

10    the last name Berry?

11    A.  Not that I'm aware.  I don't know.

12    Q.  Okay.  Is it fair to say he was a young kid?

13    A.  Yes.

14    Q.  Okay.  And you also were escorting an African American

15    woman from the Ellipse to the Capitol; correct?

16    A.  Correct.

17    Q.  And her name was, as far as you recall, Shanelle.  Do you

18    remember that?

19            THE COURT:  Hang on.  Mr. Brennwald, this is a direct

20    examination.

21            MR. BRENNWALD:  I understand.  I'm trying to move it

22    along.

23    BY MR. BRENNWALD:

24    Q.  Do you know the name of the person?

25            MR. BRENNWALD:  Otherwise, I have to refresh his
```

1   memory.  It'll take time, but we can do that.

2   A.  I don't remember for sure.  That kind of sounds familiar,

3   but I don't know for sure.

4   BY MR. BRENNWALD:

5   Q.  Okay.  Do you remember tesifi- --

6         MR. BRENNWALD:  Court's indulgence.

7   BY MR. BRENNWALD:

8   Q.  Do you recall -- I just want to make sure I ask you this

9   the right way.  Do you recall testifying in the past -- where

10  you were asked questions by a prosecutor in a room?

11  A.  Yes.

12  Q.  Okay.  And do you recall telling that prosecutor that your

13  recollection of the name of the woman you were escorting was

14  Shanelle?

15  A.  I don't remember that specifically.

16  Q.  Okay.  Is it fair to say that internet service that day was

17  pretty much impossible and you couldn't really get through to

18  anybody that way?  Do you recall that?

19  A.  Cell service, maybe.  I don't remember trying internet

20  service, but the cell service was bad.

21  Q.  Okay.  You also remember -- do you remember whether or not

22  the lady you were escorting could walk at the same speed as

23  everybody else?

24  A.  No, she walked slower.

25  Q.  Okay.  And did that cause you to become separated from your

1    group?

2    A.  Yes.

3    Q.  Okay.  Eventually, did you ever catch up to Kelly Meggs

4    when you were on the east side in front of the Capitol?

5    A.  I don't know what side was what, but we did catch up with

6    him, yes.

7    Q.  Okay.  And do you remember having a discussion with

8    Mr. Meggs on the east side of the Capitol?

9    A.  I don't know what side of the Capitol it was, sir.

10   Q.  Okay.  I'm sorry.

11        Do you remember having a discussion with Mr. Meggs

12   outside the Capitol, on whichever side you were?

13   A.  Yes, sir.

14   Q.  Okay.  And I believe you told Mr. Woodward that Mr. Meggs

15   said that the Capitol had been breached?

16   A.  I don't remember if he said that or who said that.

17   Q.  Do you remember Mr. Meggs asking you what he -- what you

18   thought you-all should do?

19   A.  I don't remember his exact words, but I think that was

20   the -- the gist of it.

21   Q.  Okay.  And what do you recall him saying to you?

22            THE COURT:  Hasn't he already testified about this?

23            MR. BRENNWALD:  I'm sorry?

24            THE COURT:  He's already testified about this.

25            MR. BRENNWALD:  Okay.

1  BY MR. BRENNWALD:

2  Q.  I just want to specifically direct you -- I just want to

3  make sure because I was writing notes, and I'm supposed to be

4  in another hearing right now, and so I was checking my email.

5        Did you say to Mr. Woodward that Mr. Meggs said --

6        THE COURT:  Mr. Brennwald, the fact that you weren't

7  paying attention is not an excuse to re-ask the question.

8        MR. BRENNWALD:  I'm sorry, Your Honor.

9        Sorry for that, Your Honor.

10        That's all I have.  Thank you.  Sorry, sir.  I hope you

11  have a safe trip back.

12        THE WITNESS:  Thank you.

13        THE COURT:  Does anybody else seek to call -- excuse

14  me -- question the witness in their case in chief?

15        MR. GREENE:  No questions from Mr. Isaacs,

16  Your Honor.

17        THE COURT:  Thank you, Mr. Greene.

18        MR. MACHADO:  None from Sandra Parker.

19                    DIRECT EXAMINATION

20  BY MR. SHIPLEY:

21  Q.  Good afternoon, Mr. Morelock.  My name is William Shipley.

22  I represent Michael Greene.  Do you know Michael Greene?

23  A.  Yes, sir.

24  Q.  How did you come to be acquainted with Michael Greene?

25  A.  Through the Oath Keepers.

4926

1   Q.  Okay.  And what did you know about Michael Greene's

2   background?

3   A.  I believe he is former military, former law enforcement.

4   Q.  Did you ever discuss that with him?

5   A.  I believe so.

6   Q.  Okay.  And you indicated that -- that in addition to -- or

7   that as part of your work history, you'd worked for a

8   contractor that provided security services overseas; right?

9   A.  It was law enforcement services overseas.

10   Q.  Okay.  And did you ever discuss that subject with

11   Michael Greene?

12   A.  Probably.

13   Q.  Okay.  Are you aware of Mr. Greene's experience in that?

14         MS. RAKOCZY:  Objection.  Hearsay, lack of foundation

15   other than hearsay.

16         THE COURT:  I'll give a little rope.  Go ahead.

17         THE WITNESS:  Could you repeat that, please.

18   BY MR. SHIPLEY:

19   Q.  Did you discuss with Mr. Greene his experiences in that

20   regard?

21   A.  In regards to working overseas?

22   Q.  Correct.

23   A.  I don't remember.

24   Q.  Okay.  From your discussion, did you have a view of whether

25   your experiences were similar?

1    A.   Yes.

2    Q.   Okay.  And what was your -- what's your recollection of --

3    of the nature of his as compared to yours?

4    A.   I believed he was a little more experienced than me.

5    Q.   Okay.  And did you work with him at various -- where you

6    would -- where you were both there for -- in connection with

7    the Oath Keepers?

8    A.   Are you talking about a specific date or --

9    Q.   I'm just asking you in general.  We'll get to specifics.

10   A.   Yes, we worked together.

11   Q.   Okay.  And you testified earlier that you went to

12   Louisville; correct?

13   A.   Correct.

14   Q.   And was Mr. Greene in Louisville?

15   A.   Actually, he was.

16   Q.   Did you work with him there?

17   A.   I don't think I worked directly with him, no.

18   Q.   Okay.  Did you -- do you recall what his role was?

19   A.   I believe he was a leader in Louisville.

20   Q.   Okay.  And -- and so you were involved in some kind of site

21   security there?

22   A.   Correct.

23   Q.   And -- and Mr. Greene was somebody -- were you responsible

24   for following Mr. Greene's directions?

25   A.   Yes, basically.

```
1    Q.  Okay.  Whatever group you were with; correct?

2    A.  It was broken up into smaller groups, and each group had

3    their own leader.

4    Q.  Okay.  Did Mr. Greene lead your group?

5    A.  No, sir.

6    Q.  Did -- I'm sorry?

7    A.  No, sir.

8    Q.  Did he lead another group that you know of?

9    A.  I don't know what he did.

10   Q.  Okay.  Fair enough.

11        Was Mr. Greene in Washington, D.C., on January 6th?

12   A.  I did not see him there.

13   Q.  Okay.  Did you interact with him at all, whether -- face to

14   face or otherwise?

15   A.  I believe I either texted him or called him at one point.

16   Q.  So you did seek communications from him?

17   A.  Correct.

18   Q.  Okay.  And based on what you saw in your own experience,

19   what was his role on January 6th?

20   A.  Based on what I saw?  I didn't see him do anything, sir.

21   Q.  Your experience.  Based on what you read or what you heard.

22        MS. RAKOCZY:  Objection as to hearsay.

23        MR. SHIPLEY:  I'm asking what his understanding was

24   based upon what he saw or heard.

25        THE COURT:  Go ahead.  You can answer.
```

```
 1    A.  I'm sorry.  I didn't understand.

 2              THE COURT:  Rephrase the question, please.

 3              MR. SHIPLEY:  Okay.

 4    BY MR. SHIPLEY:

 5    Q.  Based on what you saw and you heard, what did you believe

 6    Michael Greene's role was on January 6th?

 7    A.  I believe he was either the leader or one of the leaders.

 8    Q.  Okay.  Leader of what?

 9    A.  The Oath Keepers, the main call to action.

10    Q.  Okay.  But what was that?  What was the function?

11    A.  I don't understand your question.  He was --

12    Q.  Well, why were you there?

13    A.  I was there to provide security.

14    Q.  Okay.  And -- and were you aware of other Oath Keepers

15    there?

16    A.  Yes, sir.

17    Q.  Were you aware of any other Oath Keepers there for any

18    other purpose other than security?

19    A.  No, sir.  No, sir.

20    Q.  Okay.  So Mr. Greene was providing leadership for what?  A

21    security operation?

22    A.  Yes, sir.

23    Q.  Okay.  And did you have occasion to work with Mr. Greene

24    after January 6th?

25    A.  No, sir.
```

```
1    Q.  Did you ever work with Mr. Greene in Michigan in connection

2    with Kellye SoRelle?

3    A.  Yes, sir.

4    Q.  Okay.  What was that?

5    A.  That was a -- I guess you would call it a bodyguard detail,

6    personal security detail.

7    Q.  Okay.  And so was it just the two of you, or were there

8    others?

9    A.  At one -- mostly it was just myself and Mr. Greene, but at

10   one point there was another Oath Keeper -- I think he was an

11   Oath Keeper -- he was a Texas constable.

12   Q.  Okay.  And that personal security detail, that bodyguard

13   detail with Kellye SoRelle, was that similar to what had taken

14   place in Washington, D.C.?

15   A.  Do you mean on January 6th?

16   Q.  On January 6th.

17   A.  As far as what I was doing with Mr. Alexander, yes, it was

18   similar.

19   Q.  Okay.  And was Mr. Greene your leader or supervisor in

20   Michigan?

21   A.  I don't necessarily know if he was the leader, but he -- he

22   was in charge.  I mean, like I said, he seemed a little more

23   experienced than me, so he was pretty much running things, yes.

24   Q.  You worked together?

25   A.  Yes, sir.
```

1          MR. SHIPLEY:  Okay.  No further questions.

2          THE COURT:  Okay.  Cross-examination.

3                      CROSS-EXAMINATION

4     BY MS. RAKOCZY:

5     Q.  Good afternoon, Mr. Morelock.  How are you today?

6     A.  Good, ma'am.

7     Q.  Okay.  So you joined the Oath Keepers sometime in 2020; is

8     that right?

9     A.  Yes, ma'am.

10    Q.  Okay.  And when you joined, did you learn who the leader of

11    the organization was?

12    A.  Yes, ma'am.

13    Q.  And who was that?

14    A.  Stewart Rhodes.

15    Q.  Okay.  And when you joined the Oath Keepers, were you added

16    to certain Signal group chats?

17    A.  Yes, ma'am.

18    Q.  And did you use your real name or a moniker/nickname on the

19    site, on the chats?

20    A.  I believe when I first started, I used my real name, and

21    then eventually I used a nickname.

22    Q.  And what was that nickname?

23    A.  Whippit.

24    Q.  Is that W-h-i-p-i-t?

25    A.  I don't know if there was two Ps in there or not.  I don't

1    remember.

2    Q.  Okay.  Why did you use that name?

3    A.  Actually, Kellye SoRelle gave it to me for some reason.  I

4    can't remember the details.

5    Q.  And Kellye SoRelle is Stewart Rhodes's girlfriend, fair to

6    say?

7    A.  I don't know what their status is now.

8    Q.  At the time that you were protecting her, say the fall of

9    2020, was she in something of a romantic relationship with

10   Mr. Rhodes?

11   A.  She said she was, yes.

12   Q.  Okay.  And you for a period of time protected Ms. SoRelle.

13   You did some security work for her; is that fair to say?

14   A.  Yes, ma'am.

15   Q.  And you drove her from Detroit down to North Carolina and

16   then back up to D.C.?

17   A.  Yes, ma'am.

18   Q.  And you did some of that work with Michael Greene; is that

19   right?

20   A.  Yes, ma'am.

21   Q.  Okay.  So at some point in the fall of 2020, you went to an

22   operation in Louisville, Kentucky; right?

23   A.  Yes, ma'am.

24   Q.  Okay.  And you weren't even a member of the Oath Keepers at

25   that time; right?

1    A.   No, ma'am.

2    Q.   You saw some information online and went; right?

3    A.   Yes, ma'am.

4    Q.   You weren't vetted for that, were you?

5    A.   I sent them an email with an overview of my law enforcement

6    and security qualifications, but I don't know what they did

7    with it.

8    Q.   Okay.  And you showed up in Louisville; right?

9    A.   Yes, ma'am.

10   Q.   And you're assigned some kind of security post?

11   A.   Yes, ma'am.

12   Q.   Okay.  And you brought your firearm; right?

13   A.   Yes, ma'am.

14   Q.   And then you also went to an event in Lafayette; is that

15   right?

16   A.   Yes, ma'am.

17   Q.   And you said you went there because there was an

18   expectation there might be a riot; is that right?

19   A.   That's the gist of it.  I don't remember exact words, but

20   yes.

21   Q.   But you can't tell us why there was this expectation there

22   was going to be a riot?

23   A.   There was some kind of group doing an armed protest.  It

24   was -- it started with an N, but I can't remember.

25   Q.   Okay.  So some group was doing a protest, and so you-all

1    had to go because you thought there might be a riot; right?

2    A.  I didn't know if there would be a riot.  That's what I was

3    told.

4    Q.  And so this is what you were doing for the Oath Keepers in

5    the fall of 2020, appearing places that you guys appointed

6    yourself to deal with anticipated riots?

7    A.  Yes, ma'am.

8    Q.  Let's shift our focus now to a little bit to November of

9    2020 after the election.  Do you remember in November of 2020

10   there was a presidential election?

11   A.  Yes, ma'am.

12   Q.  Okay.  And you were on the Signal group chats at this time,

13   fair to say?

14   A.  Yes, ma'am.

15   Q.  It sounds like you did not read those group chats super

16   well; is that fair to say?

17   A.  I didn't pay a lot of attention to them, no, ma'am.

18   Q.  You do recall that Stewart Rhodes in the November-December,

19   after the election, period published two open letters on the

20   Oath Keepers website, I think you told us?

21   A.  Yes, ma'am.

22   Q.  And did you get notification of those as a member of the

23   Oath Keepers?

24   A.  I may have.  I don't remember, though.

25   Q.  And sounds like you did not read those particularly

1    carefully either, fair to say?

2    A.  No, ma'am.

3    Q.  Were you in any kind of a leadership position in the

4    Oath Keepers?

5    A.  No, ma'am.

6    Q.  And were you particularly close to Stewart Rhodes?

7    A.  Not particularly.  I mean, we spent time, as I testified

8    earlier, that long drive.

9    Q.  And were you particularly close to Kelly Meggs?

10   A.  Other than the time I spent doing the bodyguard detail, no.

11   Q.  Okay.  And that bodyguard detail was for a man named

12   Roger Stone; right?

13   A.  No, I meant Kelly Meggs -- or I'm sorry.  Kellye SoRelle --

14   or SoRelle's detail.

15   Q.  Did Kelly Meggs do that Kellye SoRelle security work at

16   some point too?

17   A.  No.

18   Q.  Oh, okay.

19   A.  I don't think so.

20   Q.  When you say apart from that time -- I want to talk about

21   Kelly Meggs.

22   A.  Okay.

23   Q.  Were you particularly close with Kelly Meggs?

24   A.  Not close.  I mean, we would chat every now and then, but.

25   Q.  Okay.  So at some point in time, you got the idea that

1    you would come to Washington, D.C., for January 6th; is that

2    right?

3    A.  Yes, ma'am.

4    Q.  Okay.  And the Oath Keepers were having some chats about

5    coming to D.C. for January 6th on the Signal groups; right?

6    A.  Yes, ma'am.

7            MS. RAKOCZY:  Okay.  Could we bring up just for the

8    witness Government's Exhibit 50.S.7.174.

9            So at this point in time, we would seek to admit this

10   into evidence, Your Honor.

11           THE COURT:  Any objection?  I think you-all admitted

12   it.

13           MS. RAKOCZY:  This is the same exhibit that has been

14   admitted -- or it's a page from the exhibit that was admitted

15   as Defense CM 60-something.

16           THE COURT:  All right.  So 50.S.7.174 is admitted.

17           (Government Exhibit 50.S.7.174 admitted into

18   evidence.)

19           MS. RAKOCZY:  If we can publish for the jury now.

20   BY MS. RAKOCZY:

21   Q.  Mr. Morelock, do you recall reading this message with Mr.

22   Woodward on direct examination?

23   A.  Yes, ma'am.

24   Q.  Okay.  And this was a message in the chat called

25   OK FL DC OP Jan 6.  Do you see that?

1    A.  Yes, ma'am.

2    Q.  Is that a chat you were part of?

3    A.  I don't remember for sure.

4    Q.  Okay.

5    A.  I would assume so, but I don't remember for sure.

6    Q.  Okay.  And I think that Mr. Woodward read you a number of

7    messages from someone who in this exhibit was called Gray

8    Gator, but that was -- they were actually from somebody called

9    OK Gator 1; isn't that right?

10   A.  I remember reading the ones from Gray Gator.

11   Q.  On direct examination; right?

12   A.  Yes, ma'am.

13   Q.  And you said you did not know who Gray Gator was; right?

14   A.  I don't remember, ma'am.

15   Q.  And OK Gator 1 was Kelly Meggs; right?

16           MR. WOODWARD:  Objection.

17           THE COURT:  Overruled.

18   A.  I don't remember for sure.

19   BY MS. RAKOCZY:

20   Q.  Okay.

21           MS. RAKOCZY:  We can take that exhibit down.  Thank

22   you.

23   BY MS. RAKOCZY:

24   Q.  Mr. Morelock, you told us that you have some background in

25   security work; is that right?

1     A.   Yes, ma'am.

2     Q.   Okay.  So when you came to D.C. and you had an

3     understanding that you might do some security work, did you

4     have an expectation of what that might be like based on your

5     past experiences?

6     A.   Yes, ma'am.

7     Q.   Okay.  You told us that on January 6th you wore jeans; is

8     that fair to say?

9     A.   It was either jeans -- it might have been the -- the khaki

10    pants with a lot of pockets, the 5.11 tacticals.  I don't

11    remember which.

12    Q.   And you did not wear a protective vest, did you?

13    A.   No, ma'am.

14    Q.   And you did not wear a helmet, did you?

15    A.   No, ma'am.

16    Q.   And so with your security experience, you did not feel like

17    that was necessary to do the security detail you were doing

18    that day; right?

19    A.   Correct.

20    Q.   Now, some other Oath Keepers brought protective vests with

21    plate carriers that day; right?

22    A.   Yes, ma'am.

23    Q.   And other members of your group from Florida brought

24    helmets; right?

25    A.   Yes, ma'am.

1  Q.  And the United States Secret Service would not let them

2  bring that equipment into the area on the Ellipse where some

3  speeches were going on on the morning of January 6th; right?

4  A.  That's what they said.

5  Q.  Okay.  And after you left the event at the Ellipse, you

6  said that you started marching towards the Capitol; is that

7  right?

8  A.  I was walking.

9  Q.  And you were walking with some folks who you thought that

10  you were supposed to be protecting; right?

11  A.  Correct.

12  Q.  Because it was important to you if you were doing security

13  to stay with the people you were protecting; right?

14  A.  Correct.

15  Q.  Okay.  Now, you told us on direct examination that when

16  you're doing security work, if there's a threat, you, quote,

17  get the person you're protecting and get them out of harm's

18  way; right?

19  A.  Yes.

20  Q.  Okay.  And as you approached the Capitol Grounds on

21  January 6th, you could see that there was a not great situation

22  unfolding there; right?

23  A.  As I was approaching, I don't remember seeing anything that

24  was -- seemed to be a threat.

25  Q.  As you got closer, could you see that there was a

1    tremendous crowd there?

2    A.  On the side that we were on -- I mean, there was a lot of

3    people.  I don't know if tremendous would be an accurate

4    description or not.

5    Q.  You don't recall seeing hundreds, if not, thousands of

6    people on the Capitol Grounds?

7    A.  Yes, I do.  Hundreds, probably.

8    Q.  Okay.  And you knew when you got to the Capitol Grounds

9    that you were going to take your protectees and not go any

10   further; right?  That's what you told us on direct?

11   A.  Correct.

12   Q.  You told us that when you were working at the event at the

13   Ellipse on the morning of January 6th, that you were not

14   working with the Secret Service; right?

15   A.  Correct.

16   Q.  In fact, the Secret Service, as you said, would not allow

17   any Oath Keepers to bring their protective gear and helmets

18   into the Ellipse area; correct?

19   A.  That's what the other Oath Keepers told me.

20   Q.  Okay.  And you did not know on January 6th very many

21   details about what it was you were supposed to be doing, did

22   you?

23   A.  Correct.

24   Q.  You did not know where any stages were going to be that you

25   were allegedly escorting people to; right?

```
 1    A.  Correct.
 2    Q.  And you described that there was a person who you were
 3    with, allegedly protecting, but you didn't know that person's
 4    name; right?
 5    A.  I -- I knew her name at the time, but I don't remember it
 6    anymore.
 7    Q.  Okay.  And you told us that you trusted the Oath Keepers
 8    at that time.  Do you remember saying that on direct
 9    examination?
10    A.  Yes.
11    Q.  But not now?
12    A.  No.
13    Q.  Why not?
14    A.  Because they clearly abandoned the reason that we went up
15    there for, and I'm talking about myself and the group of -- I
16    guess you could call it Kelly Meggs's group.  They, basically,
17    abandoned what we were supposed to do and pretty much left me.
18    Q.  What do you mean by that?
19    A.  Well, you know, after we had that discussion, myself and
20    Kelly Meggs, I talked about where he used the word
21    "opportunity," that's where we went our separate ways.  They,
22    basically, left to go towards the Capitol, and at that point I
23    knew that, you know, riot police were going to show up and it
24    was time to go.
25    Q.  And you said that Mr. Words- -- Mr. Meggs used that word
```

1    "opportunity" after he or someone else mentioned that the

2    Capitol had been breached; right?

3    A.  Correct.

4    Q.  Was that a good thing or a bad thing to you that the

5    Capitol had been breached?

6    A.  That would be a bad thing, ma'am.

7         MS. RAKOCZY:  I would like to bring up on the

8    screen now Government's Exhibit 10102.  Just for the witness,

9    please.

10   BY MS. RAKOCZY:

11   Q.  Mr. Morelock, do you recognize the area depicted in this

12   photograph?

13   A.  No, I don't think I went that far.

14   Q.  Okay.  And do you recognize the person depicted -- I'll

15   draw a square around him here.

16   A.  I think that might be Tampa Tom -- yeah, Tampa Tom.

17   Q.  Does that appear generally consistent with the person you

18   knew as Tampa Tom on January 6th?

19   A.  I'm not 100 percent sure, but I think so.

20        MS. RAKOCZY:  Your Honor, at this point in time we

21   would seek to admit Government's Exhibit 10102.

22        MR. WOODWARD:  Objection to foundation.

23        THE COURT:  I'll admit it.  I think it's sufficient

24   to publish it to the jury.  Go ahead.

25        (Government Exhibit 10102 admitted into evidence.)

1           MS. RAKOCZY:  And if we may publish the photograph.

2     BY MS. RAKOCZY:

3     Q.  Mr. Morelock, do you -- I know you say you did not go this

4     far on January 6th.  Do you recognize the building in the

5     background?

6     A.  I recognize the building, yes, ma'am.

7     Q.  What is that?

8     A.  That's the Capitol.

9     Q.  Okay.  And I'm just going to draw, again, a square around

10    this person here.  You said that might Tampa Tom; right?

11    A.  Correct.

12    Q.  Okay.  And Tampa Tom was one of the people you walked with

13    to the Capitol; right?

14    A.  Not at first.  We got separated.

15    Q.  And then you caught back up with him?

16    A.  Yes.

17    Q.  Okay.

18    A.  I think.  I'm not quite sure, ma'am, but.

19    Q.  And Tampa Tom was not wearing a helmet that day; right?

20    A.  No, ma'am.

21    Q.  And Tampa Tom was not wearing a protective vest that day;

22    correct?

23    A.  No, ma'am.

24    Q.  And can you see in the background behind Tampa Tom there

25    are some bike racks that appear to have been knocked over?

1    A.  Yes, ma'am.

2    Q.  Okay.  And you're saying you don't think you ever got this

3    close to the Capitol Building on January 6th; correct?

4    A.  Not that I remember, no.

5    Q.  Okay.  Thank you.

6         MS. RAKOCZY:  We can take that exhibit down.

7    BY MS. RAKOCZY:

8    Q.  And you said that when Mr. Meggs said to you, "This is our

9    opportunity," you left the Capitol area; correct?

10   A.  Yes.

11   Q.  And you left with the people you were supposed to be

12   protecting; right?

13   A.  I only left with the one female.

14   Q.  And you made sure that person got to where they needed to

15   go to be safe; correct?

16   A.  Correct.

17   Q.  And so far as you understand, Mr. Meggs and the rest of his

18   group kept on walking to the Capitol; right?

19   A.  Correct.  I don't know for sure where they went, but that's

20   what I assumed when I left.

21   Q.  And you said that that day Michael Greene was the leader of

22   the Oath Keepers; correct?

23   A.  I think he was.

24   Q.  And I think you described him as a leader of the call to

25   action; right?

```
1    A.  I believe so, yes, ma'am.

2    Q.  He was in charge; correct?

3    A.  Yes, ma'am.

4    Q.  If he gave a command that day, that was something that you

5    were supposed to comply with as somebody who was not a leader

6    of the Oath Keepers; right?

7    A.  Correct.

8    Q.  You said that on January 7th you rode back to Florida with

9    some of the people you had come up with; right?

10   A.  Yes, ma'am.

11   Q.  So that was Kelly Meggs; right?

12   A.  Yes, ma'am.

13   Q.  And his wife, Connie Meggs; correct?

14   A.  Yes, ma'am.

15   Q.  And a man named Joe?

16   A.  I believe so.

17   Q.  And do you remember whether there was also a young man who

18   rode back to Florida with you?

19   A.  Yes, ma'am.

20   Q.  Do you remember his name?

21   A.  Caleb.

22   Q.  Okay.  And you said that the mood in the car, I think you

23   said, people seemed worried; is that right?

24   A.  Yes, ma'am.

25           MS. RAKOCZY:  Thank you.  I have no further
```

```
 1    questions.

 2               THE COURT:  Mr. Woodward, any redirect?

 3               MR. WOODWARD:  A little bit, yes.

 4               THE COURT:  Long?

 5               MR. WOODWARD:  More than five minutes.

 6               THE COURT:  Okay.  All right.  Why don't we take our

 7    afternoon break before the redirect examination begins.  So it

 8    is now -- it's a little bit before 3:15 -- excuse me.

 9    3 o'clock.  Let's plan to resume at 3:15.  We'll see everybody

10    shortly.

11               Thank you all very much.

12               (Proceedings held outside the presence of the jury.)

13               THE COURT:  All right.  Mr. Morelock, I'll ask you to

14    step down and not discuss your testimony during the break.

15               Thank you, sir.

16               Okay.  See everybody starting at 3:15.  Thank you, all.

17               (Recess taken.)

18               (Proceedings held in the presence of the jury.)

19               THE COURTROOM DEPUTY:  Jury panel.

20               THE COURT:  Mr. Morelock, you can come back up.

21               All right.  Have a seat, everyone.  Welcome back,

22    everybody.  All right.  Let's get going forward with the

23    afternoon -- or second leg of the afternoon.

24               Mr. Woodward.

25               MR. WOODWARD:  Thank you, Your Honor.  Redirect.
```

```
 1                        REDIRECT EXAMINATION

 2   BY MR. WOODWARD:

 3   Q.  Mr. Morelock, again, just to confirm, did you speak with

 4   anyone about your testimony during our break?

 5   A.  No, sir.

 6   Q.  All right.  Now, Mr. Morelock, Ms. Rakoczy asked you a

 7   number of questions about messages that you read or didn't

 8   read; correct?

 9   A.  Yes, sir.

10   Q.  Let me just ask:  Do you recall ever exchanging any

11   communications directly with Connie Meggs?

12   A.  I don't think I did.  I don't remember for sure, but

13   probably not.

14   Q.  Never texted with her?

15   A.  I don't think so.

16   Q.  Don't know whether she had a moniker in Signal?

17   A.  Not that I remember or know.

18   Q.  All right.  And speaking of your Signal moniker, you said

19   that was Whippit?

20   A.  Yes, sir.

21   Q.  Do you know whether anyone had the moniker Whip?

22   A.  Yes, sir.

23   Q.  And who had that moniker?

24   A.  Mr. Greene.

25   Q.  And so do you know why your moniker was Whippit?
```

```
1    A.  No, sir.

2    Q.  But Ms. SoRelle gave you the moniker Whippit?

3    A.  Yes, sir, I believe so.

4    Q.  All right.  In Signal, did you yourself change your name to

5    Whippit, or did somebody else do that for you?

6    A.  I think I did.  I don't remember for sure, but I think I

7    did.

8    Q.  All right.  So you accepted the nickname Whippit?

9    A.  Yes.

10   Q.  Now, Ms. Rakoczy also asked you about the location of

11   stages on -- on January 5th and 6th.  Do you recall that?

12   A.  Yes, sir.

13            MR. WOODWARD:  All right.  If we could just show the

14   witness, please.

15   BY MR. WOODWARD:

16   Q.  Do you recognize what we have here?

17   A.  Yes, sir.

18   Q.  And what is it?

19   A.  A map of Washington, D.C.

20   Q.  And to the best of your knowledge, is that a fair and

21   accurate map of Washington, D.C.?

22   A.  Yes, sir.

23            MR. WOODWARD:  We would seek to move this into

24   evidence as CM 68.

25            MS. RAKOCZY:  No objection.
```

```
1              THE COURT:  68 is admitted.

2              (Defendant Meggs Exhibit CM 68 admitted into

3    evidence.)

4              MR. WOODWARD:  If we could publish for the jury.

5    BY MR. WOODWARD:

6    Q.  Do you recall where former President Trump spoke on

7    January 6th, 2021?

8    A.  I think it's the green space, way down under the

9    White House.

10   Q.  Okay.  Do you see the White House in this map?

11   A.  Yes, sir.

12   Q.  Would you just touch that for us.

13   A.  (Witness complying.)

14   Q.  A little bit more than that.  There you go.

15   A.  (Witness complying.)

16   Q.  And does it have the words "The White House" underneath it?

17   A.  Yes, sir.

18   Q.  Now, when you arrived in Washington, D.C., on January 5th,

19   did you know where the stage was that Ali Alexander was to

20   speak at?

21   A.  On January 5th or January 6th?

22   Q.  On January 5th.  Did you know where his stage was on

23   January 5th?

24   A.  I think I remember either his security or someone from his

25   organization saying it was at freedom square or Freedom Plaza.
```

1   Q.  I understand.  But I want to be very specific in my

2   question.  When you arrived in Washington, D.C., after having

3   come from the hotel, did you know before you spoke to his

4   security where that stage was going to be?

5   A.  I don't think so.

6   Q.  And so you learned where the stage was going to be when you

7   arrived in Washington, D.C.?

8   A.  I think so.

9   Q.  And you think that somebody with his crew told you where

10  that stage was going to be?

11  A.  Yes, sir.

12  Q.  And you managed to provide security for Ali Alexander on

13  January 5th?

14  A.  Yes, sir.

15  Q.  Even though you didn't know where the stage was before

16  leaving for Washington, D.C.?

17  A.  Correct.

18  Q.  All right.  Then if we go back to my beautiful map that I

19  most certainly did not create.  You -- you went from the White

20  House toward the Capitol Building -- correct? -- on

21  January 6th?

22  A.  Yes, sir.

23  Q.  All right.  And so you walked down Pennsylvania Avenue;

24  correct?

25  A.  I don't know if that's Pennsylvania Avenue, but, yes, I did

1    walk down Pennsylvania Avenue.

2    Q.  How did you know you were walking down Pennsylvania Avenue?

3    A.  There's a sign that said Pennsylvania Avenue.

4    Q.  Pretty good indication of what street you're walking on;

5    correct?

6    A.  Yes, sir.  I just meant the street that you highlighted

7    there.  I don't know what street that is.

8    Q.  And when you arrived at the Capitol Grounds, did you walk

9    through the -- how did you get -- where did you go when you

10   arrived at the Capitol Grounds?

11   A.  We approached a -- I guess it's a vehicle gate.  There was

12   a -- a guard house, a -- I believe she was a Capitol Police

13   officer, and --

14   Q.  And, roughly, on this map, where was that vehicle gate?

15   A.  I don't know.

16   Q.  Well, was it over here?

17   A.  Somewhere in here.

18   Q.  All right.  And when you arrived at that vehicle gate,

19   where did you go?

20   A.  I remember --

21          MS. RAKOCZY:  I'm sorry.  Just for the record, could

22   we have a description of where the witness circled.

23          MR. WOODWARD:  Oh, Ms. Rakoczy.

24          The witness has circled an area to the west of the

25   Capitol Building.  That's the -- the northwest, where there is

1    still green on the map.

2              THE COURT:  It's not terribly descriptive, but go

3    ahead.

4              MR. WOODWARD:  I'm a lawyer, Judge, not a

5    cryptographer.

6              THE COURT:  She's done a better job than you have at

7    that.

8              MR. MACHADO:  That's the Archives Metro, if that

9    helps.

10             THE COURT:  Yeah, it's not the Archives Metro, but

11   that's okay.

12             MR. WOODWARD:  The witness has circled an area to the

13   top of the Reflecting Pool.

14   BY MR. WOODWARD:

15   Q.  And then where did you go, sir?

16   A.  I -- to the left.  This way.

17   Q.  And the witness has drawn a line in the direction of the --

18   north of the Capitol dome there on Exhibit 69 -- 68.  Excuse

19   me.

20             Where -- if you recall, where did you stop?

21   A.  I don't remember.  There was a lot of people.  The

22   sidewalks all kind of looked the same.

23   Q.  If I could show the witness what is already in evidence as

24   Government 67 -- 1673.  Do you recall whether you were able to

25   see the steps of the Capitol over on this side?

1    A.  I think I -- I saw these steps.  I'm not sure.

2    Q.  All right.  So you were somewhere -- the witness has

3    circled the northeast section of the Capitol Building.  So you

4    don't think you made it any further than this northeast corner

5    of the Capitol Building, sir?

6    A.  I think as far as I went was probably right in here

7    somewhere.

8    Q.  And then from there, you would have headed north?

9    A.  Are you talking about when I left the grounds?

10   Q.  Yes, sir.

11   A.  I don't remember.  I think I came back -- is this

12   Pennsylvania Avenue?

13   Q.  Yes, sir.

14   A.  I think I came back out and went that way.

15   Q.  Okay.

16          MR. WOODWARD:  Just me, please, Mr. Douyon.

17   BY MR. WOODWARD:

18   Q.  Now, Ms. Rakoczy asked you about -- she asked you about --

19   I believe your testimony was that you parted ways with

20   Mr. Meggs at that area; correct?

21   A.  Correct.

22   Q.  And she asked you about Mr. Meggs's final words to you.  Do

23   you remember that?

24   A.  Yes, I do.

25   Q.  In your experience with the Oath Keepers, all of the events

1    that you attended providing security, personal security, and --

2    and other security, what was your view as to whether the

3    Oath Keepers were cooperative with law enforcement?

4    A.   They were very cooperative.

5    Q.   And so on January 6th, 2021, when Mr. Meggs said that this

6    was your opportunity, what do you recall his meaning being?

7             MS. RAKOCZY:  Objection.

8             THE COURT:  Sustained.

9    BY MR. WOODWARD:

10   Q.   Well, did -- have you previously -- on January 6th, 2021,

11   when Mr. Meggs said that this was your opportunity, what did

12   you understand that to mean --

13            MS. RAKOCZY:  Same objection.

14   BY MR. WOODWARD:

15   Q.   -- to you?

16            MS. RAKOCZY:  And asked and answered, and beyond the

17   scope of redirect.

18            THE COURT:  Well, not beyond the scope of redirect,

19   but it has been asked already.  But go ahead.  I'll overrule

20   the objection.  You can ask him one more time.  Go ahead.

21   Don't worry about it.

22   BY MR. WOODWARD:

23   Q.   On January 6th, 2021, when Mr. Meggs said to you that this

24   was your opportunity, what did that mean to you?

25   A.   He did not say this is your opportunity.  He said, "This is

1    our opportunity."

2    Q.  And for you, what did that mean?

3    A.  I thought it meant that him and the other Oath Keepers

4    would go help the police.

5          MR. WOODWARD:  Thank you, sir.  No further questions,

6    Your Honor.

7          THE COURT:  Okay.  Mr. Shipley, any redirect?

8          MR. SHIPLEY:  Just a couple, Your Honor.

9                    REDIRECT EXAMINATION

10   BY MR. SHIPLEY

11   Q.  Mr. Morelock, right at the end of the cross-examination by

12   Ms. Rakoczy, she asked you if Michael Greene was the leader on

13   January 6th.  Do you remember that?

14   A.  Yes, sir.

15   Q.  Okay.  And then she asked you if Michael Greene was the

16   leader of the call to action.  Do you remember that?

17   A.  Yes, sir.

18   Q.  Okay.  Did you come to Washington, D.C., in response to the

19   call to action?

20   A.  Yes, sir.

21   Q.  Okay.  Did you come to Washington, D.C., to obstruct

22   Congress?

23   A.  No, sir.

24          MR. SHIPLEY:  Thank you, Your Honor.

25          THE COURT:  Mr. Morelock, thank you for your time and

```
1    testimony, sir.  Safe travels home.

2              THE WITNESS:  Thank you, sir.

3              (Witness excused.)

4              THE COURT:  All right.  Mr. Woodward, any additional

5    witnesses?

6              MR. WOODWARD:  Yes, sir.  Mrs. Meggs calls

7    Stephen Brown.

8              THE COURTROOM DEPUTY:  Please raise your right hand.

9              (Oath administered.)

10             THE WITNESS:  I do.

11             THE COURT:  All right.  Mr. Brown, welcome.

12         Mr. Woodward, whenever you're ready.

13             MR. WOODWARD:  Thank you, Your Honor.

14                        DIRECT EXAMINATION

15   BY MR. WOODWARD:

16   Q.  Mr. Brown, if you could just bring that microphone towards

17   your face there.

18         And if you could state your full name and spell it for

19   the record, please.

20   A.  My name is Stephen Brown, S-t-e-p-h-e-n B-r-o-w-n.

21   Q.  Now, Mr. Brown, are you here voluntarily today?

22   A.  No.

23   Q.  Did you receive a subpoena to be here today?

24   A.  I did, from you -- or from the table.

25   Q.  Dare I ask, by whom did -- from whom did you receive a
```

1    subpoena?

2    A.   These guys.  I'd have to look that up, actual --

3    Q.   Can I -- well, I'll come back to that.

4    A.   Okay.  From the court, it was here.

5    Q.   Mr. Brown, are you employed?

6    A.   Yes.

7    Q.   What do you do?

8    A.   I'm an event planner.

9    Q.   What is an event planner?

10   A.   So if you've been to a conference or major festival,

11   concert, we are the people behind the scenes that get all the

12   permitting, get all the transactions, and to make that event

13   actually come to place and happen.  And then the client comes

14   in and speaks or whatever they're doing.

15   Q.   How long have you been doing that?

16   A.   A long time.  1996.

17   Q.   Do you work for a company?

18   A.   I am one of the companies.  I am -- I am the event planning

19   company.  We are two or three companies that are involved in

20   the entertainment industry.

21   Q.   And where are you based?

22   A.   Lakeland, Florida.

23   Q.   Do you have any experience with event planning in

24   Washington, D.C.?

25   A.   Lots of, yeah.

1    Q.  And could you explain why you have experience in

2    Washington, D.C.

3    A.  We're a preferred vendor for things like national parks,

4    and we have been involved in working in D.C., probably, for the

5    last 15 years with events that range from anything from a few

6    thousand to one hundred, one hundred fifty thousand people,

7    attendees.

8    Q.  Have you ever planned an event involving the

9    Capitol Police?

10   A.  Yes.

11   Q.  Is that different from the National Park Service?

12   A.  The criterias are different in terms of what -- what you

13   can and can't do, but that's just semantics.  The permitting

14   is a set procedure that you have to abide to, literally, by the

15   law.  And you have the A, B, Cs of what they require you to do.

16   Q.  And how did you come to learn how to do this process?

17   A.  So originally, I'm -- as you may detect, my accent isn't

18   very Floridian, so when I came over to the United States in

19   1994, I was already an event planning administrator; having run

20   some of the largest organizations in the United Kingdom.  And

21   so a lot of the experience I gained was from the entertainment

22   industry in the UK where we would regularly do large-scale

23   events, and then we brought that experience over into the

24   United States.

25   Q.  Well, you're based in Florida.  Are your customers all

1    located in Florida?

2    A.  Customers are worldwide.  Depending where a client would

3    like to hold an event, we will then use the principles behind

4    what we have learned over the years and plan accordingly to

5    have all the preparations and the -- particularly the permits.

6    Q.  And so is your geographic location, your physical location

7    in Lakeland, is that relevant to your experience working with

8    the National Park Service, Capitol Police, et cetera?

9    A.  I fly to -- I mean, I basically -- it doesn't really matter

10   where I live because the work is here.  So the permitting

11   offices are here in D.C., and so whenever we apply for any

12   permits, then we would fly up, go and see the necessary people;

13   and that would include anything from the mayor's office,

14   Homeland Security, all the way through to national parks, Metro

15   police, D.C. police, et cetera.

16   Q.  Well, could you walk us through what is a -- what does a

17   typical process entail for applying for a permit?

18   A.  So you're approaching Resource Group, which is the company

19   name, and you're saying that you would like an event planned.

20   We would then ask what is the location, the timing, the city.

21   Once we've decided that -- in this case we were in

22   Washington, D.C., so we'll use D.C. as a format.  And then we

23   will want to know:  Is it going to be open air?  Is going to be

24   inside a building?  And, you know, what are your crowd

25   expectations for that?

1    That then gives us parameters to be able to go to the

2    necessary different agencies that are required, and then we

3    work backwards with the fire marshal, with the police, and all

4    the strat- -- strategic offices that are involved in bringing

5    an actual event into place and fruition.

6    Q.  Is the District of Columbia unique in the way that -- in

7    the way that it has law enforcement?

8    A.  Yeah.  You have a lot more.  You know, we've --

9    particularly once you begin to go into some of the larger

10   public areas, like, for instance, the National Mall, Capitol,

11   where you now have multiple LEO agencies, and so then -- now

12   you're coordinating different LEOs altogether.

13   Q.  What is LEO?

14   A.  Sorry.  Law enforcement officer.

15   Q.  That's L-E-O?

16       Roughly, what -- could you list the law enforcement

17   agencies that you have experience working with?

18   A.  Yeah.  FBI, Homeland Security, D.C. police, Metro, Rangers,

19   U.S. ATF, national parks, to name a few.

20   Q.  What about the Capitol Police?

21   A.  Capitol Police, yes.  Obviously.

22   Q.  So if I wanted to give a speech on or near the Capitol, how

23   would that process work?  What would we do?

24   A.  So, obviously, we've moved on between you and I in an

25   engagement level now, and so now it's -- comes down to dates

1    and availability of space.

2         And we would now begin discussions with Capitol Police

3    directly asking them which of the areas -- I don't know if

4    everybody knows, but Capitol Grounds are split up into distinct

5    areas that you can book to do First Amendment and other

6    speeches from.

7         And so now it would then come to a point we would

8    basically say to them, you know, we'd like this area, or is

9    this area available.  If not, what is available at the time and

10   the day we're looking for something, and they will then walk us

11   through what is available on the calendar.  It's not always a

12   point where, you know, you may want something and they may turn

13   around and say, no, it's already prebooked.

14   Q.  Well, you've answered the question of your geographic

15   location.  But why would I choose you as my event planner?

16   A.  We're very good at what we do.  We're well-known in the

17   D.C. commercial market.  We know a lot of the fire marshals and

18   the police officers that are involved in the actual day-to-day

19   work involved with different events, particularly if you --

20   Capitol Police, national parks.  We know a lot of the staff on

21   our -- if I was allowed to use my phone, I would show you.  You

22   know, we could just scoot down and I could pull up all that

23   personal cell phone numbers and everything else.  We have a

24   long-lasting relationship over the last 15 or more years that

25   we've worked within the D.C. area, particularly with national

1    parks, the Mall, and Capitol.

2    Q.  Roughly how many events have you planned in

3    Washington, D.C.?

4    A.  I've lost count.  There was some years we would be doing

5    two to three 50,000-attendee events on the National Mall, so

6    we've done, certainly, more than 50.  Large-scale events.

7    Q.  Were you hired to be an event planner on January 6th, 2021?

8    A.  Yes.

9    Q.  Before we get to that, let's back up and -- how did that

10   come to be?

11   A.  Resource Group was approached by Ali Alexander.

12   Q.  Who is Ali Alexander?

13   A.  Ali Alexander was the person that hired Resource Group to

14   do an event for January the 6th.

15   Q.  Now, do you know whether Ali Alexander has political views?

16   A.  Yes, he does.

17   Q.  And is he more conservative-leaning or liberal-leaning?

18   A.  Ali would fall under a conservative.

19   Q.  And what about your company; does your company only service

20   conservative organizations?

21   A.  We probably have worked with more conservatives in light of

22   the fact that they tend -- you tend to get grouped within a

23   certain group.  So if you're doing a lot of either religious or

24   conservative, you get grouped into that bracket.  And a lot of

25   the industry works by word of mouth.  If you're doing a good

1    job, you get a lot of recommendations, and people will just

2    call you up and say you did a job or conference or something

3    for this person, and, you know, we'd be interested in using

4    you.

5    Q.  So speaking of Ali Alexander, were you serving as an event

6    planner in December of 2020 in Washington, D.C.?

7    A.  I was.

8    Q.  And could you tell us about that.

9    A.  So that event -- are you referring to the one that

10   Ali Alexander spoke at on the Mall?

11   Q.  Yes.

12   A.  So that event, we were the event planners for that on the

13   National Mall, and Ali Alexander was one of the speakers, main

14   speakers.

15   Q.  Do you recall the name of that event?  Was it Jericho?

16   A.  Jericho March.

17   Q.  And who hired you to do the Jericho event in December?

18   A.  That event, originally I -- I was brought in by a couple --

19   and I would have to look up Arianna's last name, but she was

20   the first contact that brought me into that discussion.

21   Q.  It was somebody other than Ali Alexander?

22   A.  Oh, yes.  Sorry.  Yes, it was another.

23   Q.  Okay.  And, separately, are you familiar with an

24   organization known as the Oath Keepers?

25   A.  Yes, I am.

1    Q.  Prior to January 6th, how were you familiar with that

2    organization?

3    A.  I had seen Oath Keepers function in the role of security at

4    events that I'd heard of in D.C., but I had seen at Jericho

5    March that they were providing security for personnel that were

6    speaking at the Jericho March event itself.

7    Q.  And do you know whether the Oath Keepers were providing

8    security for Ali Alexander at the Jericho March?

9    A.  Yes, they were.

10   Q.  So after the Jericho March, Mr. Alexander reached out to

11   you?

12   A.  Yes.

13   Q.  And as a result of that outreach, what, if anything, did

14   you do?

15   A.  So initially after having agreed, signing a contract,

16   having been paid a deposit, then made the plans with

17   Capitol Police, discussed with them.  First of all, asking

18   them, you know, for dates and times.  That's, obviously, the

19   first thing that's necessary.  And once we'd secured a time and

20   a date for that, then it was down to the actual what are the

21   needs, the requirements, and then ticking the necessary boxes

22   off of who we approached, who's giving us permission, and how

23   that would work through Capitol Police.

24   Q.  And did there come a time when you applied for a permit on

25   behalf of Mr. Alexander?

```
1    A.  Yes.
2               MR. WOODWARD:  If we could share with just the
3    witness, please.
4    BY MR. WOODWARD:
5    Q.  Do you recognize this document?
6    A.  Yes.
7    Q.  What is it?
8    A.  This is a standard application for permit on the
9    Capitol Grounds.
10              MR. WOODWARD:  We would seek to move into evidence
11   CM 69.
12              MR. NESTLER:  No objection, Your Honor.
13              THE COURT:  All right.  CM 69 is admitted.
14              (Defendant Meggs Exhibit CM 69 admitted into
15   evidence.)
16              MR. WOODWARD:  If we could publish for the jury,
17   please.
18          If we could just walk the jury through the various forms
19   here.
20   BY MR. WOODWARD:
21   Q.  Do you see the field organization and/or spokesperson?
22   A.  Yes.
23   Q.  And what organization did you apply for a permit on behalf
24   of?
25   A.  The permitting was applied for under the name of One Nation
```

1    Under God.

2    Q.  Do you know whose organization One Nation Under God is?

3    A.  Yes.  Originally, One Nation Under God was -- sorry.  I've

4    forgotten the lady's name who has since died.  She was working

5    with Ali Alexander, but her -- her company was involved, and

6    she actually owned One Nation Under God.

7    Q.  And do you know whether Ali Alexander had any affiliation

8    with One Nation Under God on January 6th, 2021?

9    A.  Originally, they were going to -- they were looking to do

10   an event the day before, originally, and she wanted to do

11   something -- my gosh.  I can't remember her name -- she wanted

12   to do something the day before, and Ali wanted to do something

13   on the 6th.  And so what actually happened was between them,

14   Ali became the one that wanted to do the event on the 6th.

15   Q.  Do you know who Nathan Martin is?

16   A.  Yes.

17   Q.  Who is Nathan Martin?

18   A.  Nathan Martin worked with Ali Alexander.

19   Q.  And do you see his email address in this form?

20   A.  Yes.

21   Q.  Did you include him as the contact person in --

22   A.  Nathan was the contact person for things that we did with

23   Capitol Police on behalf of Ali Alexander.

24   Q.  All right.  And do you see the date of the event?

25   A.  Yes, first -- January the 6th, yes.

1    Q.  And underneath that, specific area of U.S. Capitol Grounds,

2    could you tell us what that is.

3    A.  Yes.  So, as I mentioned earlier, the Capitol Grounds are

4    actually split up into designated areas.  The West Front grassy

5    area, the Senate park, memorial park, et cetera, as well as the

6    actual grounds itself.  And on this permit, Capitol Police

7    allocates it Capitol Grounds Plot No. 9.

8    Q.  And how would one understand where the various plots are on

9    the Capitol Grounds?

10   A.  There is a map that Capitol Police provide with all of

11   the -- shall we say dashed lines that cover the areas so you

12   have 9, 10, 11 -- 8, 9, 10, and 11 that run across the back of

13   the Capitol, and that's -- that's the breakdown of how they

14   work out which area you're going to be in.

15   Q.  And did you have a copy of that map when you applied for

16   this permit?

17   A.  The Capitol Police send a copy out, and so -- in this case,

18   when we were looking at January 6th, the Area 9 was the only

19   area that was available on the day.  It was -- there wasn't any

20   other choice.  The others were taken.

21   Q.  Why were the other areas taken that day?

22   A.  They got there before I did.

23   Q.  Taken by whom?

24   A.  Oh, I'm sorry.  By other clients and other event planners.

25   Q.  So other event planners had already secured all of the

```
1    areas outside the Capitol?

2    A.   Yes.

3    Q.   Area 9 was the last area left --

4    A.   It was.

5    Q.   -- on December 21st, 2020?

6    A.   Yes.

7    Q.   Which is when you applied for this permit?

8    A.   It is.

9    Q.   And under Box 13, Estimated Number of Participants, what --

10   what information did you provide there?

11   A.   We provided the numbers would be 50 to 500.

12   Q.   Where did that number come from?

13   A.   Expectancy of crowd that will -- the -- the crowd number

14   was allowed to be in an area.

15   Q.   Finally, you've also checked the box Demonstration.

16   A.   Yes.

17   Q.   What -- what did that mean to you?

18   A.   A demonstration is First Amendment free speech.  It gives

19   public people the right to meet together and to be able to

20   speak.

21   Q.   On the next page, Box 15:  Will electrical power be

22   required?  Could you explain that for us, please.

23   A.   Yes.  Obviously, when you have a lot of public address

24   systems, amplification, et cetera, they need power, and so --

25   they flat out -- Capitol asked, you know:  What are you doing?
```

1    Will you need power?  And that would have meant running cables

2    all over the grass.  So we said no.

3    Q.  So how does one provide power for the public address

4    system?

5    A.  So with technology being what it is, you are able --

6    everybody is used to Tesla and satellite -- sorry, solar and

7    everything else.  So we now have the capability to provide

8    large electrical current from a battery supply, and so we don't

9    actually need to have battery -- we don't need an actual plug

10   into battery.  We can just use batteries that are remote.  We

11   don't have to plug into a wall or pull from a generator.

12   Q.  And did you sign this document?

13   A.  Yes.

14   Q.  Now, did you ultimately receive a permit?

15            MR. WOODWARD:  Just me, please, Mr. Douyon.

16   A.  Yes, we did, signed from Capitol Police.

17            MR. WOODWARD:  And if I could show just the witness

18   what we will mark as CM 70.

19   BY MR. WOODWARD:

20   Q.  Do you recognize this document?

21   A.  Yeah.  This is the actual permit relating to the day and

22   the conditions and everything that's involved.

23            MR. WOODWARD:  We would move into evidence CM 70.

24            MR. NESTLER:  No objection.

25            THE COURT:  CM 70 is admitted.

1            (Defendant Meggs Exhibit CM 70 admitted into

2      evidence.)

3            MR. WOODWARD:   Publish for the jury, please, and if

4      we could walk the jury through this document.

5      BY MR. WOODWARD:

6      Q.   Sponsoring organization?

7      A.   Is One Nation Under God.

8      Q.   Area of Capitol Grounds to be involved?

9      A.   So -- now, this -- in this case this is a case where, in

10     discussion, Areas 8 and 9, 10 and 11 were the areas that wanted

11     to be used, and in between the course of conversation, between

12     Capitol Police and myself, Area 9 was no longer available.

13     Somebody else had taken that.  And if you look at this

14     document, you'll see that we actually ended up with the grassy

15     Area 8 by Constitution Avenue.

16     Q.   And so you had conversations with Capitol Police about the

17     event that you were planning?

18     A.   Correct.  And Area 8 was their recommendation for us -- or

19     for the event we were planning, I should say.

20     Q.   Now, under Section 3, the date there is?

21     A.   Wednesday, January the 6th.

22     Q.   And the time?

23     A.   0800, 8 o'clock in the morning until 1800, 6:00 p.m.

24     Q.   Do you know where that information come from?

25     A.   That came from negotiations with Capitol Police.

1    Basically, you can work with them on the amount of time that

2    you're there.  You have to be reasonable and provide as to why

3    you need a period of time.  So, for instance, in the case of

4    this, it was a ten-hour period, and that included us being able

5    to bring the trucks -- well, you can't actually drive a truck

6    or a forklift or anything onto the grass or the

7    Capitol Grounds, so everything has to be moved manually by

8    labor, and by what we call stagehands.  And so all of the

9    equipment, the staging, PA, the microphones, everything was

10   brought from the roadside, which would've been

11   Constitutional [sic] -- and in this case you're not allowed to

12   use the entrances by Capitol itself; you have to use the far

13   entrance at the end of the Capitol Grounds.

14          So we have to bring the team of stagehands in to move

15   all of that equipment.  So the 0800 allows us to do setup time

16   of approximately four to five hours.

17   Q.  Did you -- did you set up the area on the morning of

18   January 6th itself?

19   A.  Yes, we did.

20   Q.  And how long did that take you?

21   A.  Approximately four, four and a half hours.

22   Q.  What time did you understand the event to be beginning that

23   day?

24   A.  I'd have to refresh my memory.  I --

25   Q.  We'll come back.  We'll come back to that.

1    A.  Okay.  Thanks.

2    Q.  The time there, though, that was the negotiated time --

3    A.  Correct.

4    Q.  -- again, with Capitol Police?

5    A.  Yes.

6    Q.  Now, number of participants, what -- what number do we see

7    there?

8    A.  Number of participants is 50.

9    Q.  Do we know where that number came from?

10   A.  Capitol Police.

11   Q.  Why did they select 50 as the number of participants?

12   A.  That's their jurisdiction.

13   Q.  Their prerogative?

14   A.  Prerogative, yeah.

15   Q.  Under props and equipment, we have some very specific

16   information.

17   A.  Yes.

18   Q.  What is the source of that information?

19   A.  Well, we were the event planners, and so we would ask in

20   our conversations with clients:  What are you looking to do?

21   What do you need on the day?  What are you providing?  What

22   is -- what is being brought in?  So things -- for instance, the

23   handheld signs would be coming from the client, but the podium

24   would be coming from Resource Group.  The stage, the

25   megaphones, the portable sound systems, and then the whole

1    breakdown, all of that equipment, would come from us.

2    Q.   Are there restrictions on what you are allowed to do for

3    these events?

4    A.   Oh, yes.

5    Q.   Could you, generally, describe those restrictions?

6    A.   Well, obviously, one of the large ones is the -- you know,

7    you can't bring in a sound system that basically covers all of

8    the back end of the Capitol Grounds.  You have to have

9    directionality, and you have to be able to provide some means

10   of crowd control.

11   Q.   And what about the stage?  Is that something that you

12   assemble?

13   A.   The stage is built from scratch.  So we have carpenters

14   come in and what we call stage decks, and they are engineered

15   to take legs that screw into the base and then are screwed

16   together and bolted together to form an OSHA-agreed-upon

17   staging weight limit, size, et cetera.

18   Q.   Now, there is highlighting here in this section.  Do you

19   see that?

20   A.   Yes.

21   Q.   And is that highlighting yours?

22   A.   No, that's -- that's -- again, this is from Capitol Police

23   and from the Architect of the Capitol.

24   Q.   And so they're wanting to call this to your attention?

25   A.   Yes.  This also is the same as NPS, National Park Service.

```
 1    It relates to all the grass and the grounds around the -- D.C.

 2    Q.  Okay.  Now, did, in fact, you erect a stage for the event

 3    that you were planning on January 6th, 2021?

 4    A.  Absolutely.

 5    Q.  Do you recall what it looked like?  What its dimensions,

 6    size were?

 7    A.  So we normally would work within -- first of all, there's a

 8    minimum height, maximum height, so you're not allowed to have

 9    anything higher than 2 feet.  And then the actual stage that we

10    built on the day was 12-foot by 12-foot.

11    Q.  Did you have a microphone at that stage?

12    A.  We had a podium and a microphone, microphone stands, yes.

13    Q.  And how was that powered?

14    A.  Again, the microphone was on a cable and that ran through

15    to a sound mixer, and the sound mixer was then cabled out to

16    two amplifiers that were powered by the battery system that

17    we discussed earlier that provide the power to run the PA

18    system.

19    Q.  Was that a 2400-watt inverter battery power supply?

20    A.  Correct.  Yes.

21          MR. WOODWARD:  Just me, please, Mr. Douyon.

22          And if we could, for the witness, please.

23    BY MR. WOODWARD:

24    Q.  Do you recognize this document here?

25    A.  Yes.
```

1    Q.  Let me just scroll through it for both your and the

2    government's benefit.

3         What is this?

4    A.  This is a text from Ali Alexander regarding what is

5    happening, some event details, what time he's getting there --

6    Nathan's involved in the conversations -- and what is -- what

7    is happening on the actual date.

8    Q.  Did you provide these screen captures to the government?

9    A.  Yes.

10             MR. WOODWARD:  We would seek to admit CM 71.

11             MR. NESTLER:  No objection to that.  I don't believe

12   they were provided to the government, Mr. Woodward.

13             MR. WOODWARD:  They're all in USAfx.

14             MR. NESTLER:  They were provided to you.

15             MR. WOODWARD:  Okay.

16             MR. NESTLER:  We have no objection.

17             (Defendant Meggs Exhibit CM 71 admitted into

18   evidence.)

19   BY MR. WOODWARD:

20   Q.  Did you provide these -- so the record is clear, did

21   you provide these screen captures to someone other than

22   yourself?

23   A.  Yes.  Yes.

24   Q.  Are these fair and accurate copies of --

25   A.  They're from my phone, yes.

1    Q.   Thank you, sir.

2    A.   They're screenshots, yes.

3             MR. WOODWARD:   If we could publish for the jury,

4    please.

5    BY MR. WOODWARD:

6    Q.   Now, as you are planning this event for January 6th, are

7    you communicating with Mr. Alexander?

8    A.   Yes.

9    Q.   Is the map that we see here a copy of the map to which you

10   were referring?

11   A.   Yes.   This -- this is the -- this is the map that is

12   presented and provided by Capitol Police in discussion with any

13   event planners as to what the areas are available and what --

14   what is available for use.

15   Q.   And what does the red signify?

16   A.   The red is a -- basically, the red is tarmac.   It's paths

17   paved, and the green is the grass areas.

18   Q.   Could you host an event in these red areas down here?

19   A.   No.   No.   That's off-limits.

20   Q.   And, for the record, I'm circling -- or indicating the

21   areas to the north and south of the Capitol Building.

22            So the areas where you could obtain a permit to host an

23   event, are they numbered?

24   A.   Yes, they are.

25   Q.   What are they numbered?

1    A.   Numbers are reading from left to right, 8, 9, 10, and 11.

2    Q.   How about above that?

3    A.   Then above that, obviously, you've got Library of Congress

4    and the -- the Jefferson Building.  And there are another

5    series of available spaces -- 19, 20, 22, et cetera -- that are

6    in that area as well.

7    Q.   Do you know whether those areas, 20, 21, 19, 22, were

8    available on January 6th?

9    A.   They were not.

10   Q.   So when you applied for that permit, you knew that the only

11   available area was Area No. 8?

12   A.   Yes.  In the original documentation that you showed me and

13   in the application for the permit, there -- the original was --

14   we wanted 9.  10 would have been great, 9 or 10, but we

15   originally put 9 down as a document, and the Capitol Police

16   came back and said 9, 10, and 11 were not available.  Only 8 is

17   available.

18   Q.   All right.  And I'm just going to scroll through, here,

19   some more messages.  Do you know whether your messages are blue

20   or are they gray?

21   A.   I think my messages are blue.

22   Q.   And on the right-hand side of the exhibit; correct?

23   A.   Yes.

24   Q.   Here are you -- what do you say here?

25   A.   So BearCom is -- this text that you're seeing here is

1    regarding radios that were being used.  The client asked us to

2    bring in X amount of radios to be used for communication

3    between themselves and their staff and event staff that were

4    there on the premises.

5    Q.  Why would you want a radio for an event?

6    A.  If there is a possibility that there's a lot of people

7    going to be here -- a lot of people could be 50,000 -- then

8    there is a significant draw on the cell tower usage, and so

9    it's fairly feasible that during the course of a day, you may

10   find that your cell phone -- in actual fact, you're not

11   actually able to make a lot of conversations because you get a

12   lot of dropped space.

13        And the radios work on a different frequency completely

14   from the 5G and the 4G cell phone towers, and they're probably

15   a good line of sight, maybe half a mile line of sight, so we

16   can communicate very quickly and say could you bring such and

17   such, we need more water at this place, et cetera.

18   Q.  And so did you often use radios when you served as an event

19   planner?

20   A.  All events have radios.

21   Q.  Why did you need Mr. Alexander to send you new radios?

22   A.  So the radios in question here, send radio here, if you can

23   FedEx the two-day, and send me a copy is where he actually

24   ended up keeping -- he didn't keep it, but in the pack-up in

25   the finalization of the day, two of the radios went AWOL.  And

1    when they were found, I sent this off saying, hey, these radios

2    have been found, can you send them to the address that's

3    enclosed there.

4    Q.  I understand.  So this is not referring to the event on

5    January 6th.  This is referring to the prior event that you had

6    served as an event planner for?

7    A.  Correct.

8    Q.  Okay.  Moving forward, here are you discussing the

9    available plots?

10   A.  Yes.  So this talks about the application.  It says, you

11   know, I put the application in, and it's looking to be 8 and 9

12   plots.  8 or 9.  And that's because I'm having a physical

13   conversation with one of the Capitol officers, and we're going

14   through what is available on the -- 9.  And Ali is replying

15   back, you know, can we get 10 or 9.  That was our provisional

16   first, and you saw the application for 9.  And eventually it

17   comes back, and Capitol Police delegated we were in 8.

18   Q.  All right.  And then you also testified that there had been

19   some discussion about posting an event on the 5th; correct?

20   A.  Yes.

21   Q.  Ultimately, you did not serve as an event planner for any

22   event on the 5th?

23   A.  No.

24   Q.  Do you know whether Mr. Alexander spoke at any event on the

25   5th?

1    A.  I don't.

2    Q.  And is there more discussion here about completing the

3    application for the permit?

4    A.  Yeah.

5         THE COURT:  Mr. Woodward, could I ask you to get on

6    the phone, please.

7         (Bench conference on the record.)

8         THE COURT:  This is extremely fascinating testimony,

9    and as much as we would all like to learn about how to build a

10   stage on the Capitol Grounds, I would ask you to speed this up

11   and get to the points you need to get to, please.

12        MR. WOODWARD:  Yes, sir.

13        (Proceedings held in open court.)

14   BY MR. WOODWARD:

15   Q.  Now, at some point did you have a discussion with

16   Mr. Alexander about who would be speaking at the event on

17   January 6th?

18   A.  Yes.

19   Q.  Why did you have that discussion?

20   A.  As part of the event planning, one of the things that we

21   have to be aware of is how to -- first of all, how are we

22   getting speakers on and off the stage?  How do we get access --

23   where are they coming from, egress, and basically wanting to

24   know that.  And so, you know, my role as the event planner is

25   to be able to put all that together.  Often we will put that

1      together in a spreadsheet, and the spreadsheet will then say

2      this is the timeline of somebody coming and going, and it may

3      even be as in-depth detail as who is picking them up.  Are they

4      coming from a hotel?  Are they being delivered?  Are they

5      coming by Uber, or, you know, is a -- is a car -- service car

6      actually going to go pick them up from somewhere and deliver

7      them?

8      Q.  Does that list of names -- is that changing over the course

9      of the time that you're --

10     A.  On a daily basis.  It's pretty usual at a conference that

11     we are planning that right up until -- within a couple of days

12     or, certainly, maybe, the day before.  I've actually been on

13     conferences where we have done things and we've moved speakers

14     on the actual day from a morning spot to an evening spot for

15     some reason.  So movement is very, very usual.

16     Q.  And on January 6th was it your expectation that members of

17     Congress would be speaking at Mr. Alexander's event?

18     A.  Yes.

19     Q.  And how does that factor into your planning and

20     deliberations?

21     A.  So that factors in a number of things, you know, because

22     now we're back to talking to -- okay, is LEO involved with

23     that?  Are Secret Service involved?  What -- what does that

24     equation look like?  And that very much raises a question on

25     how are people getting to and from staging areas.

1          MR. WOODWARD:  If we could show the witness and the

2     government, seek to admit as CM --

3     BY MR. WOODWARD:

4     Q.  Mr. Brown, do you recognize this document?

5     A.  This is one of the spreadsheets, yes.

6     Q.  Fair and accurate copy of one of your emails?

7     A.  Yeah.  This is a copy.

8          MR. WOODWARD:  -- CM 72.

9          MR. NESTLER:  No objection.

10         THE COURT:  All right.  Admitted and publish it,

11    please.

12         (Defendant Meggs Exhibit CM 72 admitted into

13    evidence.)

14    BY MR. WOODWARD:

15    Q.  If I could just direct your attention down to that last

16    name there.  Was Roger Stone --

17    A.  Roger Stone, uh-huh.

18    Q.  Was he an anticipated speaker at Mr. Alexander's event?

19    A.  Yes, he was.

20         MR. WOODWARD:  Just me, please, Mr. Douyon.

21         And for the witness and the government.

22    BY MR. WOODWARD:

23    Q.  Do you recognize this document?

24    A.  Yes.  Again, this is a -- a possible list of people and,

25    particularly, speaking times.

1    Q.  And do you see the names of any members of Congress on this

2    list?

3    A.  Yes.

4    Q.  Could you read those for the jury, please.

5    A.  Marjorie Taylor Greenes [sic], Vernon Jones.  There's some

6    senators:  Doug Mastriano, Anthony Kern, Lauren Boebert.

7    Q.  And based on this list here, did you have an

8    understanding of when the event was anticipated to conclude

9    that day?

10   A.  Yes.

11   Q.  What time was that?

12   A.  1700, 5:00 p.m.

13          MR. WOODWARD:  Just me, please, Mr. Douyon.

14   BY MR. WOODWARD:

15   Q.  Now, at an event that you are an event planner for, will

16   there -- do you have experience with private security?

17   A.  Yes.

18   Q.  Do such events typically involve private security?

19   A.  Yes, they do.

20   Q.  Have you worked with the various private security companies

21   that are based here in Washington, D.C.?

22   A.  Yes.

23   Q.  Could you name a few of them.

24   A.  So the ones we would work with here would be -- Apollo

25   would be one, and then -- I'm sorry.  My brain is fried today.

1    Q.  We've been billed with the last slot.  So we'll keep

2    moving.

3    A.  Yeah.  Okay.  But there is one in particular that we have

4    used for the last five years on a regular basis.

5    Q.  Does -- excuse me.  I shouldn't talk over you.

6         Does Apollo do this for free?

7    A.  No.

8    Q.  So when you plan an event and you're asked to bring in

9    Apollo as security, Apollo is being paid for the security that

10   they're providing?

11   A.  Yes.

12   Q.  And what does that security entail?

13   A.  So D.C. has a policy where, you know, security is not

14   allowed to carry, and so normally they would be dressed

15   appropriately for the day.  Some would be in suits.  Others --

16   others would be in casual clothing.  And the security would

17   then have a similar list to what we're working from as to who

18   is coming in, what times, where they're meeting them, how

19   they're getting on and off.  We would literally go through all

20   the data of who, what, where, when, why, and what they need to

21   cover.

22   Q.  And why would I -- if I were hosting such an event, why

23   would I want private security at the event?

24   A.  Normally, you want private security because you're looking

25   to provide a form of protection, even if it's just from people

4985

1    coming up and crowding around somebody, wanting to shake hands,

2    let alone, you know, protection of further threats.  But the

3    protection is there for the actual clients' guests, for their

4    safety.

5    Q.  Do you know who Ali Alexander hired to provide security for

6    his event on January 6th, 2021?

7    A.  Yes.

8    Q.  Who?

9    A.  Oath Keepers.

10   Q.  Did he pay the Oath Keepers to provide security?

11   A.  That transaction, I never saw.

12           MR. WOODWARD:  If we could show the witness, please.

13   BY MR. WOODWARD:

14   Q.  Do you recognize this document?

15   A.  Yeah.  This is a PSD, yes.

16   Q.  Fair and accurate copy of an email you received?

17   A.  It is.  It's from one of our emails, yes.

18           MR. WOODWARD:  Seek to admit CM 73.

19           MR. NESTLER:  No objection.

20           MR. WOODWARD:  Mr. Douyon thinks 4.

21           THE COURT:  I think it's 74 but --

22           MR. WOODWARD:  74.  Thank you, Your Honor.

23           THE COURT:  It's admitted.

24           (Defendant Meggs Exhibit CM 74 admitted into

25   evidence.)

1    BY MR. WOODWARD:

2    Q.   Could you describe for us the information that you're being

3    provided here.

4    A.   Yes, it's a -- so it's from Ali Alexander, and --

5    Q.   Just take a second and look at that, please.

6    A.   So I'm sending this to Ali Alexander, and it's a list from

7    Oath Keepers of who is going to be available that particular

8    weekend.

9    Q.   Okay.  And who do you write is providing lead on the team?

10   A.   The lead on the team in this case is Gator, otherwise known

11   as Kelly Meggs.

12   Q.   Did you know Kelly Meggs?

13   A.   No.

14   Q.   Do you know who you received that information from?

15   A.   I mean, it -- from the information on the form, it's coming

16   from, I would say, Gator.

17   Q.   And does the form include a list of the individuals, as

18   well as their Signal monikers?

19   A.   Their monikers, yes.  Yes, it does.

20   Q.   Are you familiar -- I'm sorry.  I'm talking over you.

21        Were you familiar with the Signal app at this time?

22   A.   Yes.

23   Q.   The first name here is -- is Kelly Meggs; correct?

24   A.   Correct.

25   Q.   And the second is Connie Meggs?

1    A.  Yes.

2    Q.  But would you agree there's no moniker next to

3    Connie Meggs?

4    A.  No.

5            MR. WOODWARD:  Okay.  Just me, please, Mr. Douyon.

6    BY MR. WOODWARD:

7    Q.  Did the Oath Keepers, in fact, provide security on

8    January 6th?

9    A.  They were there in person, yes.

10   Q.  How do you know that?

11   A.  Physically saw people of Oath Keepers.

12   Q.  Did there come a time when you were also added to a chat on

13   Signal with the Oath Keepers?

14   A.  Yes.

15           MR. WOODWARD:  If we could publish for the witness,

16   please.

17           Seek to admit as CM 75.

18   BY MR. WOODWARD:

19   Q.  Just generally --

20           MR. WOODWARD:  No objections?

21           THE COURT:  75 will be admitted.

22           (Defendant Meggs Exhibit CM 75 admitted into

23   evidence.)

24   BY MR. WOODWARD:

25   Q.  Just generally speaking, were there a number of chats --

1          THE COURT:  Hold on.  Is there any objection to him

2     seeing 75?

3          MR. NESTLER:  No, Your Honor.

4          THE COURT:  All right.  Are you --

5          MR. WOODWARD:  No, sir.  Changing my exam on the fly.

6          THE COURT:  Thank you.  Go ahead.

7          MR. WOODWARD:  The jury can read.

8     BY MR. WOODWARD:

9     Q.  Just, generally speaking, were there a number of messages

10    exchanged between you and the Oath Keepers concerning the event

11    on January 6th?

12    A.  Yes.

13    Q.  And why would that have happened?

14    A.  Basically, they had been -- I was told that they were the

15    security detail for the event, and so I was asked to be part

16    and asked to -- Stewart Rhodes actually brought me in and said,

17    you know, Steve would be an observer to what was going on.

18    This would give him the benefit of discussion that was

19    happening during the day.

20    Q.  Was it helpful for to you to have an understanding of what

21    the plan was on that day?

22    A.  Yes, because it meant I could immediately look at

23    something, and it was -- you've got push notification within

24    Signal.  So every time something came up, then it would come up

25    on the front of your phone and show what was happening.

1    Q.  And did you have an understanding of whether any of the

2    speakers that were planned for Mr. Alexander's event on

3    January 6th were coming from somewhere else?

4    A.  There were other events that were happening on January 6th

5    in D.C., and my understanding was that some of the same

6    speakers would be at other rallies that would be, then, also

7    coming to the Capitol Grounds Area 8.

8    Q.  And was there an event at which former President Trump

9    spoke on January 6th?

10   A.  Yes.

11   Q.  And do you know whether any of the planned speakers at

12   Mr. Alexander's event attended President Trump's speech?

13   A.  As far as I'm aware, a number of them attended the actual

14   event itself.

15   Q.  Do you know who Marsha Lessard is?

16   A.  I've heard the name, but no.

17              MR. WOODWARD:  Just for me, please, Mr. Douyon.

18   BY MR. WOODWARD:

19   Q.  Now, ultimately, on January 6th things did not go as

20   planned, did they?

21   A.  No.

22   Q.  Did Mr. Alexander speak at the stage you erected?

23   A.  No, not at all.

24   Q.  Do you know why not?

25   A.  My understanding was he was delayed and there -- after

1    leaving from the Trump event coming to the Capitol Grounds,

2    there was something else that was happening.  And he had an

3    opportunity and spoke there at that; that delayed him in coming

4    to the Capitol Grounds.  And during that time period of delay,

5    there was the issues with the actual Capitol itself.

6    Q.  The riot at the Capitol?

7    A.  The riots.  Okay.

8            MR. WOODWARD:  No further questions, Your Honor.

9            THE COURT:  Thank you, Mr. Woodward.

10            MR. MACHADO:  We'll need your assistance, if you

11    don't mind.

12            MR. WOODWARD:  Would you like 62, the slide deck?

13    That was a joke.

14                    DIRECT EXAMINATION

15    BY MR. MACHADO:

16    Q.  I'll take this off for a sec.

17            Good afternoon, sir.

18    A.  Hi.

19    Q.  I'm just covering a brief section, which I'm being

20    assisted.

21            MR. MACHADO:  Thank you so much.

22    BY MR. MACHADO:

23    Q.  You're being shown on the screen CM 74.  Do you see that,

24    sir?

25    A.  Listed PSD, yes.

1    Q.   Okay.  I want to direct your attention to the list below.

2    And, actually, if you can start from the beginning and just

3    kind of -- okay.  So with regard to the people that went, do

4    you know where these names came from?

5    A.   The names were all supplied by -- in this case it came from

6    OK Gator.

7    Q.   And who is OK Gator?

8    A.   Kelly.

9    Q.   Okay.  All right.  Thank you.

10        Nothing further.

11                       DIRECT EXAMINATION

12   BY MR. ROSSI:

13   Q.   Good morning, Mr. Brown.

14   A.   Good afternoon.

15   Q.   I need a cup of coffee.

16        Good afternoon.  I'm Gene Rossi.  I represent

17   William Isaacs.

18   A.   Okay.

19            MR. ROSSI:  I'd like to bring up that document that

20   Mr. Machado just had.

21        Thank you so much.

22        And I'd like to go to the bottom.

23   BY MR. ROSSI:

24   Q.   And just for the jury's benefit, this is CM 74.  It's the

25   contract between Mr. Alexander and the Oath Keepers; correct?

```
 1    A.  This -- if this is the one we've just looked at, that top
 2    heading where it says this is the PSD?  Is it the same
 3    document?  Then, yes, this is --
 4    Q.  Right?
 5    A.  -- this is the Oath Keepers saying who is going to be
 6    available to provide security protection on the day of
 7    January 6th.
 8    Q.  Okay.  And this -- this has a list of the individuals who
 9    would be part of the security detail for the Area 8 event?
10              MR. NESTLER:  Objection.  Leading.
11              MR. ROSSI:  He's absolutely right.
12    BY MR. ROSSI:
13    Q.  This list is of what?
14    A.  My understanding is this list is a list of personnel
15    providing security for areas during the day.
16    Q.  More than just Area 8?
17    A.  Yes.
18    Q.  All right.  And based on your personal knowledge, could it
19    include also the rally at the Ellipse?
20              MR. NESTLER:  Objection.  Calls for hearsay.
21    BY MR. ROSSI:
22    Q.  Were you involved at all in the organization for the event
23    on the Ellipse?
24    A.  No.
25    Q.  All right.  At the bottom are two names.  Do you see that?
```

```
1    A.  Yes.

2    Q.  Okay.  A William Isaacs.  Do you know William Isaacs?

3    A.  No.

4    Q.  Do you know who Shelby Cobra is?

5    A.  No.

6    Q.  Is that a no?

7    A.  No.  A car manufacturer.

8              MR. ROSSI:  Beg the Court's indulgence.

9    BY MR. ROSSI:

10   Q.  And I don't want to bring up that list, but we had a list

11   of speakers?

12   A.  Right.

13   Q.  And when -- when was the first speaker going to speak at

14   Area 8, if you remember?

15   A.  If I remember.

16   Q.  Would you like to see the list?

17   A.  Yes, please.

18   Q.  Please.  I'm showing you CM 73 in evidence.

19   A.  Right.

20   Q.  CM 73.

21   A.  So the list that you're showing me -- again, this is one of

22   the -- we had the discussion earlier about do things move, do

23   people move.  This is a classic example of this; is a -- this

24   would have been a lovely time scale to have had.  But as the

25   event at the Ellipse ran over so dramatically, none of this
```

1    list and these times would be correct.  This is a planned idea

2    that we would have wanted and looked at, but the actuality

3    didn't -- was not a reality.

4    Q.  How many events have you done in the nation's capital

5    at the Capitol and the Mall since you came here, I think,

6    in '94?

7    A.  Probably, maybe, I think, 50.

8    Q.  All right.  And when you have a big event, there may be

9    competing areas where there are demonstrations; correct?

10   A.  Yes.

11   Q.  All right.  And so it's -- and for each event, would you

12   try to have security, if there's an important individual like a

13   senator or member of Congress?

14   A.  Well, they normally have SS covering themselves.  So I

15   mean, that's not normally an option, unless we're providing

16   transportation as well as -- in other words, service

17   vehicles -- and then, yes, we would have somebody in their

18   vehicles or in -- in our vehicles picking them up.

19   Q.  And individuals would go from one demonstration or area to

20   another?

21   A.  Yes, that's very common.

22   Q.  And security details may go from one demonstration or area

23   to another?

24   A.  Yes.  A detail -- PSDs regularly are involved with a person

25   as well as an event.  And so there would be a group of security

1    people that stayed at a particular event -- in this case,

2    Area 8 -- and then there would be another group of people that

3    literally could be all over the city going from event to event

4    to event with the person that they were traveling with.

5                MR. ROSSI:  Thank you, sir.  Have a good afternoon.

6                THE COURT:  Okay.  Any cross-examination from the

7    government?

8                          CROSS-EXAMINATION

9    BY MR. NESTLER:

10   Q.  Good afternoon, sir.

11   A.  Hello, mate.

12   Q.  How are you?

13   A.  Good.

14               MR. NESTLER:  Ms. Badalament --

15   BY MR. NESTLER:

16   Q.  First, I want to ask you, that stage on Area 8 --

17   A.  Yes.

18   Q.  -- it's pretty small; right?

19   A.  12 by 12, yes.

20   Q.  So 12 by 12 --

21   A.  Yes.

22   Q.  -- feet but can only handle a few people standing on it;

23   right?

24   A.  Yeah.  The -- the goal -- the idea on that day, one of the

25   things we discussed, was to have two or three people on the

1    stage.

2    Q.  And 2 feet off the ground is shorter than where you are

3    sitting right now?

4    A.  Sure.

5    Q.  So pretty close to the ground?

6    A.  Yes.

7    Q.  And there were no chairs in your area; right?

8    A.  No.

9    Q.  No badges in order to be in your area?

10   A.  People were wearing their own badges, but we were not

11   providing lanyards or any color markings for the day.

12   Q.  You didn't need anyone to have a badge to come to your

13   area?

14   A.  No.

15   Q.  And you didn't provide any?

16   A.  No.  It was a First Amendment speech that day and -- that

17   day.

18          MR. NESTLER:  Okay.  Let's go to CM 72, please,

19   Ms. Badalament.

20   BY MR. NESTLER:

21   Q.  I think that Mr. Woodward just showed this to you.

22          So you said that this email was from Ali Alexander;

23   right?

24   A.  Correct.

25   Q.  And this was for your event on Area 8?

1    A.   Yes.

2    Q.   How is that possible if we're talking about reserved

3    seating and you said there was no seating?

4    A.   Okay.  So in reference to reserved seating, then the only

5    reserved seating I know on the day was at the Ellipse.

6    Q.   So this was not your event; correct?

7    A.   I stand corrected.

8    Q.   And you indicated here in this email from Ali Alexander

9    there were 200 to 300 silver badges; right?

10   A.   There were.

11   Q.   And that was also not for your event?

12   A.   The badges -- the 200 to 300 badges were not, no.  They

13   were -- they were to do with the Ellipse.

14   Q.   So when you testified on direct examination that this was a

15   list of people speaking at your event, that was wrong?

16   A.   The names on the list are the names that are on the list of

17   people speaking.

18   Q.   Well, because you put these names from the Ellipse event to

19   your event; right?

20   A.   We didn't provide any of the names for the Ellipse or for

21   the event on Area 8.  That was -- the listing was produced from

22   Ali Alexander.  So he was speaking.

23   Q.   So he gave you a bunch of names?

24   A.   He gave a list of who he was looking -- asking to speak,

25   who he reached out to.

4998

1    Q.  You didn't verify that?

2    A.  If you're asking me, no, I didn't.  The quick answer is no,

3    I didn't.  I didn't have to.  That wasn't my job.

4              MR. NESTLER:  And if we could go to CM 71, please,

5    Ms. Badalament.

6    BY MR. NESTLER:

7    Q.  I think that's a list of text messages you had with

8    Ali Alexander.

9              MR. NESTLER:  First of all, if we could zoom in at

10   the top, Ms. Badalament.

11   BY MR. NESTLER:

12   Q.  You have him saved in your phone as Ali Alexandra; is that

13   right?

14   A.  Yes.

15             MR. NESTLER:  If we can zoom out.  If we can go to

16   page 10, please, Ms. Badalament.  And if we could -- let's see.

17   If we zoom in on the top portion.

18   BY MR. NESTLER:

19   Q.  So this is Ali Alexander asking you to throw the members

20   of Congress that are listed on a website onto the schedule;

21   right?

22   A.  Correct.

23   Q.  And then a spot for, quote, ministers; right?

24   A.  Yes, religious clergy.

25   Q.  And so he's just giving you this assignment, and you're

1   doing what he's asking?

2   A.  He's telling me where to get the information from to put

3   onto a spreadsheet.

4   Q.  So when Mr. Woodward showed you the list of all the members

5   of Congress, that's just because you grabbed members of

6   Congress's names from this website, WildProtest.com, and put

7   them on a list?

8   A.  Very probably.

9         MR. NESTLER:  And if we could zoom out, please,

10   Ms. Badalament.  And if could now zoom in on this portion.

11   BY MR. NESTLER:

12   Q.  And you said you would do it, and he said, "I don't care

13   what it looks like."  Do you see that?

14   A.  That's what it says?

15         MR. NESTLER:  And if we go down to the next page,

16   please, Ms. Badalament, page 11.

17   BY MR. NESTLER:

18   Q.  And do you see here --

19         MR. NESTLER:  Well, if you can go back a little bit,

20   I guess, to the bottom of page 10.  Scroll and start looking

21   down to here.  Just scroll until -- or zoom in, please,

22   Ms. Badalament.

23         Thank you.

24         Sorry.  Working with a text message is more complicated

25   for me.  Ms. Badalament knows what she's doing.

1    BY MR. NESTLER:

2    Q.  All right.  So you see here, Mr. Alexander says, "We need

3    to keep the permit for as long as possible."  Do you see that?

4    A.  I do.

5    Q.  And then you wrote, "Okay.  So back to 4:00 or 5:00 p.m.?"

6    A.  Correct.

7    Q.  And then he wrote, "5:00 p.m., please"?

8    A.  Yes.

9    Q.  And you said, "Okay.  I'll add some more members.  LOL."

10   A.  Yep.

11   Q.  Never mind you, zero people spoke at your event on

12   January 6th; right?

13   A.  Correct.

14          MR. NESTLER:  Now, if we can go to page 13, please,

15   Ms. Badalament.  And if we can scroll in on the bottom portion.

16   Zoom in on the bottom portion here.

17   BY MR. NESTLER:

18   Q.  This is Mr. Alexander telling you that he's telling

19   everybody else they're going to have a million people in D.C.;

20   right?

21   A.  That's what it says.

22   Q.  And he sent this message to you?

23   A.  Yes.

24          MR. NESTLER:  And if we could zoom out, please,

25   Ms. Badalament, and go to the next page.

1    BY MR. NESTLER:

2    Q.  You wrote, "Awesome."  Do you see that?

3    A.  Yes.

4              MR. NESTLER:  And if we could zoom in on the top

5    portion there, please.

6    BY MR. NESTLER:

7    Q.  And then Mr. Alexander wrote, "In case you get blowback";

8    right?

9    A.  It does say that.

10   Q.  And then you wrote, "LOL.  You're only saying they're

11   coming, not that they'll be at Capitol.  I hope 2 million

12   come"; right?

13   A.  Referring to the public attendees, yes.

14   Q.  But you knew your permit was for 50 people?

15   A.  Correct.

16   Q.  No seating?

17   A.  Right.

18   Q.  No VIP area?

19   A.  No.

20   Q.  A few people on the stage?

21   A.  Two or three.

22   Q.  All right.  Now, you were a part of a couple different --

23             MR. NESTLER:  You can take that down, Ms. Badalament.

24   BY MR. NESTLER:

25   Q.  -- a couple different Signal chats?

1    A.  Yes.

2    Q.  And you thought it was important to be part of those Signal

3    chats; right?

4    A.  Yes.  To observe, see what was going on, yes.

5            MR. NESTLER:  And if we can pull up CM 75, please,

6    which Mr. Woodward introduced, and go to Slide 10.

7    BY MR. NESTLER:

8    Q.  And this is you asking one of those chats, "Do we have

9    anyone doing cyber investigations into Antifa or other

10   disruptive groups?"  Right?

11   A.  Yes.

12   Q.  Why were you asking about that?

13   A.  It's one of the things as an event planner we want to know

14   what's happening, in terms of is there any threat.  In fact, is

15   there a threat escalation.  And the organizations that we

16   regularly work with have that availability, and they'll talk

17   with LEOs and talk about what are they saying and what

18   investigations are they doing in reference to, you know, what

19   the threat level is on that day, as to what police are going to

20   be involved.

21   Q.  And you thought the Oath Keepers had someone who were doing

22   these cyber investigations?

23   A.  I did.

24   Q.  And what do you think that person's name was?

25   A.  Sorry.  Vacant.

1    Q.  Did you think it was Horse Whisperer?

2    A.  Yes, I did.

3    Q.  So you thought Horse Whisperer was doing these cyber

4    investigations?

5    A.  I did, yes.

6    Q.  And that's what Gator 1 told you?

7              MS. HALLER:  Objection.

8              THE COURT:  Overruled.

9    BY MR. NESTLER:

10   Q.  Gator 1 told you that Horse Whisperer was doing cyber

11   investigations; right?

12   A.  I would have to look it up in the file, but, yes, I believe

13   so.

14             MR. NESTLER:  Okay.  And if we could go to Government

15   Exhibit 9902, please, Ms. Badalament, in evidence.  And Slide

16   1.

17   BY MR. NESTLER:

18   Q.  You were on this DC OP: Jan 6 21 chat?

19   A.  Yes.

20   Q.  And so this is Horse Whisperer at 1:04 p.m. telling

21   everyone else on the chat, including you --

22   A.  Yep.

23   Q.  -- "Patriots storming the closed area of the

24   Capitol Grounds by the scaffolding.  National Guard called in.

25   Incoming."  Do you see that?

1    A.  I do.

2    Q.  Do you remember getting that message from Horse Whisperer

3    that day?

4    A.  It was one of many that came in on the day.  So I -- it's

5    on, you know, Signal so it's coming in.

6    Q.  And it was important for you to get the push notifications

7    on Signal; right?

8    A.  Yes.

9          MR. NESTLER:  And if we can go to the third page,

10   please, Ms. Badalament.

11   BY MR. NESTLER:

12   Q.  And here, about 16 minutes later, Horse Whisperer tells

13   that same group, including you, "American blood in the Capitol

14   steps.  Officers down."  Do you see that?

15   A.  I do.

16         MR. NESTLER:  And if we can now go to 9220, please,

17   Ms. Badalament, also already in evidence, and go to page 3.

18   BY MR. NESTLER:

19   Q.  And this is what Signal looks like on your phone when you

20   are getting on your phone; right?

21   A.  Correct.

22   Q.  And do you see here at 2:26 p.m., somebody with a phone

23   number ending in 0404 writes, "They got scared and ran when

24   they heard people at the door"?

25   A.  Yes.

1    Q.  With a video of inside of Congress; right?

2    A.  That's what the video screenshot looks like.

3              MR. NESTLER:  And if we can go to the next page,

4    please, Ms. Badalament.

5              MR. WOODWARD:  Your Honor, can we get on the phone?

6              THE COURT:  Is your objection regarding the scope?

7              MR. WOODWARD:  Yes.

8              THE COURT:  I mean, I do think we're outside the

9    scope here, Mr. Nestler.

10             MR. NESTLER:  This is the last piece of it,

11   Your Honor.  This was what Mr. Brown is looking at in the chat

12   that day at that time.

13             MR. WOODWARD:  There's a lot of chats we didn't show.

14             THE COURT:  I'll allow this one given that this is

15   something that he would have seen that day and then --

16             MR. NESTLER:  Thank you, Your Honor.

17   BY MR. NESTLER:

18   Q.  And you see this person Horse Whisperer, the person you

19   thought was the intel analyst, wrote at 2:27 p.m. to the same

20   chat that you're in, "We, the people, have taken the Capitol.

21   Congress forced to recess."

22   A.  It says that.

23   Q.  And at the time did you think the Oath Keepers were those

24   people who were taking Congress?

25   A.  No, I did not.

1          MR. NESTLER:  Now, we can take that down, please,

2     Ms. Badalament.

3     BY MR. NESTLER:

4     Q.  And so we talked earlier about how the Oath Keepers

5     were supposed to be providing security from your perspective;

6     right?

7     A.  That was my understanding of the day.

8     Q.  But they were not real security personnel, were they?

9     A.  As an organization -- a lot of events that we will do will

10    also have what we would call volunteer security, which is an

11    unpaid -- in other words, a nonprofessional team that would

12    come in and work alongside.

13         Normally, what we would have in that case is there would

14    be a lead of somebody who was a professional.  And they would

15    then provide instruction to the others, so.

16    Q.  And you've worked with professional security?

17    A.  I work -- we work with professional security, yes.

18    Q.  And you talked about Apollo and maybe a company called

19    Archangel?

20    A.  Yes.

21    Q.  The Oath Keepers are not them?

22    A.  They are not.

23    Q.  In fact, you thought that Ali Alexander was only using the

24    Oath Keepers because he was kind of a prima donna and he wanted

25    to have a bunch of people around him; right?

```
1    A.  He is -- he's security-minded in context of having a lot of

2    people around, large entourage.

3    Q.  Did you think that he was a prima donna and that's why he

4    wanted people like the Oath Keepers around him?

5    A.  Yeah, I think -- yes.

6    Q.  Now, we talked about these two different Signal chats.  You

7    know there were a lot of other Signal chats; right?

8    A.  I was on two.

9    Q.  Right.  And so you assumed that people like Gator 1 and

10   Stewart Rhodes were talking to each other on chats that you

11   were not a member; right?

12   A.  I'm not aware of any of the other chats that were -- I only

13   saw the two on the -- that I was personally involved in, and I

14   can't speak into if there were others.

15   Q.  Right.  No.  I know you only saw those two, but don't you

16   assume they were talking --

17               MR. WOODWARD:  Objection.

18   BY MR. NESTLER:

19   Q.  -- without you?

20               THE COURT:  Hang on.

21   A.  I don't know.

22               THE COURT:  He's answered the question.  Go ahead.

23   BY MR. NESTLER:

24   Q.  You don't know if they were talking without you?

25   A.  No.
```

1    Q.  Did you think they were cluing you in to everything they

2    were doing that day?

3                MR. WOODWARD:  Objection.

4                THE COURT:  That's speculative.  It's sustained.  Go

5    ahead.  Next question, please.

6    BY MR. NESTLER:

7    Q.  Now, you don't -- what about Ali Alexander?  Do you think

8    that he was talking to Stewart Rhodes separately?

9    A.  If he was then, he wasn't -- as far as I'm -- as far as I

10   know, he wasn't doing it via any of the Signal chats.

11   Q.  So if they were talking on a Signal thread like Friends of

12   Stone, you weren't a member of that?

13   A.  No, I was not.

14   Q.  And you wouldn't know what they would be discussing?

15   A.  No.

16   Q.  And so you set up your small stage at Area 8; correct?

17   A.  12 by 12, 2 feet high.

18   Q.  Which is on the northeast, off the grounds of the Capitol;

19   right?

20   A.  Well, it's in the background -- the Capitol Grounds, yeah,

21   behind the Capitol.

22   Q.  Not a single person ever showed up?

23   A.  There were a lot of people there on the day.  There was

24   nothing for people to come and stand around and observe.  There

25   was no -- there was no speaking from the platform.

1    Q.  Gator 1, your contact at the Oath Keepers, you'd never met

2    him; right?

3    A.  Right.

4    Q.  Never showed up?

5    A.  Not to me personally on the day at the stage.

6              MR. NESTLER:  No further questions.

7              THE COURT:  All right.  Mr. Woodward, any redirect?

8              MR. WOODWARD:  Yes, sir.

9                         REDIRECT EXAMINATION

10   BY MR. WOODWARD

11   Q.  Mr. Brown, I'm showing you what has been admitted as CM 71.

12   Mr. Nestler asked you about this.  Do you recall those

13   questions?

14   A.  Yes.

15   Q.  And he asked you about Mr. Alexander's request that you

16   throw members of Congress from WildProtest.com onto a list of

17   speakers that day.

18   A.  Right.

19   Q.  All right.  And to do that you would have had to go to that

20   website WildProtest.com; right?

21   A.  Right.

22              MR. WOODWARD:  All right.  Just the witness, please,

23   Mr. Douyon.

24        Too many windows open.

25   ///

1    BY MR. WOODWARD:

2    Q.  Do you recognize what I've displayed here for you?

3    A.  Yeah.  This looks like the page.

4    Q.  Let me just scroll through it all for you.

5         Is this a true and accurate copy of what the website

6    looked for [sic], to the best of your recollection?

7    A.  To the best of my recollection, yes.

8              MR. WOODWARD:  I would seek to admit as CM 76.

9              MR. NESTLER:  No objection.

10             MR. WOODWARD:  Publish to the jury, please.

11             (Defendant Meggs Exhibit CM 76 admitted into

12   evidence.)

13   BY MR. WOODWARD:

14   Q.  What does the -- what do the letters in the red banner say?

15   A.  "President Trump wants you in DC January 6."

16   Q.  And that map, does that star indicate the area where your

17   event was to be held on January 6th?

18   A.  Yes.

19   Q.  And do -- these invited speakers and guests, are those

20   names that appeared on the list that Mr. Nestler showed you?

21   A.  They are some of them, yes.

22   Q.  Including members of Congress?

23   A.  Yeah.  There's more on the list than as is on the

24   WildProtest site.

25             MR. WOODWARD:  Just me, please, Mr. Douyon.

1    BY MR. WOODWARD:

2    Q.  And Mr. Nestler asked you about CM -- I think it's 74 --

3    72.  Excuse me.  CM 72.  These members -- these individuals, if

4    they had been speaking at the event on the Ellipse that

5    morning, would that have been important for you to know?

6    A.  Only in the context of how are they getting from the

7    Ellipse to getting to our stage.

8    Q.  And why?  Explain that.

9    A.  Obviously, on the day itself, there was a large, massive

10   crowd of people.  And so with all the street closures that were

11   in place -- and we'd given out some details regarding that.

12   Because we'd been in contact with D.C. police, Metro, and DOT

13   to find out what areas they were going to close off, what

14   diversions they had.  Then if people -- I -- I doubt these

15   people would have walked from the Ellipse to the Capitol.  It's

16   more likely service cars, vehicles would have picked them up,

17   then it's important for us to know what time they're arriving;

18   more importantly, where they're getting dropped off.

19   Q.  Do members of Congress ever change their schedules?

20   A.  Oh, heck, yes.

21   Q.  And what happens when a speaker that you're expecting

22   changes their schedule at the last minute?  What is your job as

23   the event planner for -- for an event like this?

24   A.  So what happens in that case is that we immediately look at

25   what's the list.  We try and keep the list as intact as

1   possible.  So if somebody takes out -- let's say we have a

2   10:15 to 10:30 spot and they drop out.  Instead of moving

3   everybody up, we look to fill that spot and maintain the

4   integrity of the rest of the times onwards so that you don't,

5   you know, suddenly displace 20 people.  You're only moving one

6   person at a time.

7   Q.  So would it have been important for you to know --

8   A.  Yes.

9   Q.  -- who was anticipated to be speaking at the event on the

10  Ellipse that morning?

11  A.  Yes, it would.

12  Q.  Presumably, they would have been unavailable to you?

13  A.  Correct.

14  Q.  Now, Mr. Nestler asked you whether anybody showed up --

15  well, sorry.  One more question.

16       He asked you about how many people could stand on the

17  stage.  Was it your expectation that members of Congress would

18  come and speak and stand around and wait?

19            MR. NESTLER:  Objection.  Leading.

20            THE COURT:  It's okay.  It's overruled.  Go ahead.

21  BY MR. WOODWARD:

22  Q.  When a member of Congress speaks --

23  A.  Right.

24  Q.  -- do they step to the side on the stage and wait for

25  everyone else to finish speaking?

1    A.   No.   That would be fairly unusual.   In fact, that would be

2    very unusual.   They are brought, they come up, they speak, and

3    then they -- they leave.

4    Q.   So how many people did you need to stand on that stage at

5    any given time?

6    A.   So what we would -- what we would plan would be for an

7    MC -- the microphones that we planned for for the day was for

8    an MC to be able to do an introduction and say this person is

9    now speaking and then for the person to be able to go up to a

10   microphone and speak from the podium and -- normally

11   protection -- PSD would be around.   They would be at the front,

12   not on the stage itself.

13   Q.   Now, did you have any inkling at all the effort you had put

14   into in organizing this event was intended for no speakers?

15   A.   Oh, no.   This -- my understanding was there was a -- there

16   was going to be speakers definitely on the stage during the

17   day.

18   Q.   All day long?

19   A.   Yes.   We were planning on that.   I mean, the -- the money

20   that we'd spent on the battery units were designed for that, to

21   be able to ensure that there was public address throughout the

22   whole day.

23   Q.   At the end of the day, did you pack up your equipment and

24   leave with it?

25   A.   On January 6th itself, that was?

1    Q.  Yes.

2    A.  So the answer to that is no.  There was a Capitol lockdown,

3    and we were not allowed to bring trucks back into the Capitol

4    area.

5              MR. WOODWARD:  Thank you, Your Honor.

6              THE COURT:  Mr. Brown, thank you very much for your

7    time and testimony.  Safe travels home, sir.

8              Thank you.

9              (Witness excused.)

10             THE COURT:  All right.  Can I ask all counsel to get

11   on the phone, please.

12             (Bench conference on the record.)

13             THE COURT:  All right.  Mr. Woodward, what's on tap

14   for tomorrow, and what time can we start?

15             MR. WOODWARD:  So we would anticipate the testimony

16   of Mrs. Meggs.  And then the only other witness I anticipate

17   would be an impeachment witness, an FBI agent.  So that's 10,

18   15 minutes, depending if the government intends to

19   cross-examine their agent.

20             THE COURT:  All right.  So can you be here at 9:15,

21   or is Ms. Haller going to handle the direct?

22             MR. WOODWARD:  I cannot be here at 9:15.  Let me

23   consult with Ms. Haller and Ms. Meggs about starting at 9:15

24   without me.

25             THE COURT:  Okay.

1          MR. WOODWARD:  Just a few minutes of the Court's

2     time, not the jury's time.

3          THE COURT:  Okay.

4          (Proceedings held in open court.)

5          THE COURT:  Instead of putting on a witness for

6     10 minutes, we will adjourn for the day.

7          Just a couple of things about the schedule for tomorrow.

8     As you will recall, we are not sitting Thursday because I have

9     an out-of-town commitment.  I need to get to the airport by

10    5:00 -- or, actually, the flight is at 5:00.  So I need to get

11    there earlier than 5:00.  So we'll probably finish up tomorrow

12    around 3:30, give or take, depending on the time and where we

13    are with the witness.

14         I'd like to get started a little earlier, at 9:15, but

15    that's subject to some further discussions.  So I'll ask you

16    all to presume we are starting at 9:15 unless you hear from us.

17    If you hear from Mr. Douyon, he'll let you know it's the

18    ordinary 9:30.  But presume tomorrow we'll start at 9:15.  Does

19    that work for everybody?

20         UNIDENTIFIED JUROR:  Will we get a text?

21         THE COURT:  If you do not get a text tonight, assume

22    we're starting at 9:15.  Okay?  If you do get a text, that will

23    mean you're being notified that we'll start at 9:30.  All

24    right?

25         Everybody on board with how we're going to do this?

1           Okay.  Great.

2           Thank you all very much.  We look forward to seeing

3   you-all in the morning.

4               (Proceedings held outside the presence of the jury.)

5           THE COURT:  Okay.  Have a seat, everyone.

6       So while Mr. Woodward and Ms. Haller are discussing

7   matters, Mr. Brennwald, are you up next in presenting your

8   case?

9           MR. BRENNWALD:  I think so, yes.

10          THE COURT:  Okay.  All right.  So you'll be prepared

11  tomorrow to begin, if time is -- if we have time?

12          MR. BRENNWALD:  Yes.

13          THE COURT:  Okay.

14          MR. BRENNWALD:  I was ready yesterday.

15          THE COURT:  Excuse me?

16          MR. BRENNWALD:  I was ready yesterday.

17          THE COURT:  And -- okay.  All right.  So I don't

18  think we'll get much beyond that tomorrow.

19      So I just need to know from Mr. Woodward and Ms. Haller

20  what time we can get started.  That's what I want to ask.

21      And, Mr. Rossi, you've got your expert coming in Friday?

22          MR. ROSSI:  She'll be available Friday or Monday,

23  depending on the schedule with the Court.

24          THE COURT:  Okay.  Yeah.  We'll just see where we are

25  at the end of the day tomorrow and thinking through whether you

```
 1     should have her come on Friday or Monday.
 2               MR. NESTLER:  Just to confirm, Friday's schedule is
 3     going to be 9:00 to 12:30?
 4               THE COURT:  I hope so.
 5               MR. NESTLER:  Okay.  Thank you.
 6               MR. ROSSI:  I'm sorry.  I didn't hear Mr. Nestler.
 7               THE COURT:  Friday's schedule will be 9:00 to 12:30.
 8               MR. ROSSI:  Thank you.
 9               THE COURT:  All right.  Instead of having everybody
10     wait, why don't you --
11               MS. HALLER:  We're so sorry, Your Honor.  We can make
12     9:15 work for the Court, if --
13               THE COURT:  Are you sure?
14               MS. HALLER:  Your Honor, in the perfect world we
15     would ask for the 9:30.  That gives him more time to try to be
16     here for -- I'm doing the direct.  So we're trying to work out
17     the timing because he didn't know for sure how long he'll be at
18     the doctor, but he anticipates 10:00 a.m.  So, you know, 9:30
19     would be easier for the team.
20               THE COURT:  So -- hang on.  Is my understanding that
21     there's no expectation he'll actually be here by 9:30?
22               MS. HALLER:  No, I don't think he can be here by
23     9:30.
24               THE COURT:  So he's here at 10:00 regardless of when
25     you start?
```

1          MS. HALLER:  No, it's just a timing question, as far

2     as -- but I'm doing direct.  So it's okay.  We'll do --

3          THE COURT:  All right.  So why don't we get started

4     at 9:15.

5          MS. HALLER:  Okay.

6          THE COURT:  And then there was the open issue of

7     reading prior testimony.  Have you-all resolved where we are on

8     that?  Is that going to happen tomorrow or --

9          MR. NESTLER:  We provided Mr. Woodward back our

10    proposed redactions after his proposed redactions.

11         MR. MACHADO:  I think we're okay with it, but I defer

12    to Mr. Woodward.

13         MR. WOODWARD:  I want to give it some thought, in the

14    interest of transparency.  I think Mr. Nestler fairly is asking

15    for all of the government's exhibits to be in, with the reading

16    of the transcript to include Mr. Cummings' assault rifle, which

17    they would intend to display to the jury.  And the Court knows

18    I have feelings about that.  So I'll sleep on it.  We may not

19    do that.  We may conclude with Ms. Meggs, with the impeachment,

20    and then --

21         THE COURT:  And will the agent be available tomorrow?

22         MS. RAKOCZY:  We have not been told what the

23    impeachment is so it's hard to prepare.

24         MR. NESTLER:  Yeah.  Agent Palian is -- is available.

25         THE COURT:  Okay.  He -- he's the -- he was in the

1    particular interview with Mr. Berry?

2             MR. NESTLER:  Correct.  Agent Palian and former

3    Agent Drew are the two agents who were present.  I assume

4    they're going to choose Mr. Palian, but I'll ask Agent Drew if

5    she wants to come back.

6             MR. WOODWARD:  Agent Palian would be more than

7    acceptable for this challenge.

8             MR. NESTLER:  I've given him the 302 and the videos

9    we've talked about.  So he should be prepared to answer

10   Mr. Woodward's questions.

11            MR. WOODWARD:  Three to five questions.  That's it.

12            THE COURT:  I mean, if it's to complete the

13   impeachment, I think it should be short.

14            Okay.  All right.  So that's the schedule over the next

15   24-plus hours.

16            Anything else before we adjourn?

17            MR. NESTLER:  Can we ask a favor of the Court.

18            There was an issue with the reporter yesterday

19   afternoon.  We have not gotten the transcript yet.  Is it

20   possible for the Court to provide a copy of the Court's order

21   which the Court read into the record yesterday to the parties

22   so we can have it more expeditiously?

23            THE COURT:  Sure.  On the -- with the understanding

24   that my -- what I said on the transcript is not word for word

25   what's actually on the paper.  I mean, it is probably about

1    85 to 90 percent, but it's not fully there.

2            MR. NESTLER:  We appreciate that.  Just in the

3    interest of timing because the experts might be testifying

4    pretty soon.

5            Thank you.

6            THE COURT:  We can send that to you.

7            MS. RAKOCZY:  Your Honor, in terms of order, if we

8    have time tomorrow after the conclusion of the Meggs's case and

9    Mr. Parker's testimony, is -- would it be Sandra Parker who

10   would be next, just in terms of defendants?  I know --

11           MR. MACHADO:  Well, I -- I can say that if Sandra

12   Parker doesn't testify, I'm more than happy to proceed.  If she

13   does testify, she'll be ready; but I will not have given them

14   the 24-hour notice that they're asking for, unless they can

15   consider this to be the -- the notice.

16           THE COURT:  Maybe I'm misunderstanding you,

17   Mr. Machado.  Are you -- are you intending to call any other

18   witness other than your client?

19           MR. MACHADO:  No, Your Honor.  There will be some

20   exhibits that we'll move in and -- but I think if -- if Sandra

21   Parker does not testify, our presentation is going to be no

22   more than 15 minutes.

23           THE COURT:  Okay.  And then do you have any other

24   witnesses, Mr. Brennwald?  Are you anticipating any other

25   witnesses?

```
 1            MR. BRENNWALD:  No, Your Honor.

 2            MR. ROSSI:  Your Honor, obviously, Dr. Sperry is a

 3     witness for us.  We will call Elizabeth Beth Santoro, William

 4     Isaacs' mother, and then we're still debating whether to put

 5     Mr. Isaacs on.

 6            THE COURT:  I think the question is -- I think it's

 7     unlikely that we would get to another defendant tomorrow, but

 8     is -- seems unlikely tomorrow we're going to get through two

 9     defendants and their cross-examinations all by 3:30 with the

10     lunch.  So whoever is next should anticipate starting on

11     Friday.

12            MR. NESTLER:  Mr. Isaacs, I think, would be next on

13     the order of the indictment.

14            THE COURT:  Right.

15            MR. ROSSI:  Right.

16            THE COURT:  So I think it's probably -- well, let's

17     see where we are before we tee up exactly when your experts

18     should be here.  So, okay.

19          Thank you, everyone.  Have a good evening.  Don't wait

20     for me, please.

21            (Proceedings were concluded at 4:59 p.m.)

22

23            (Proceedings recorded by mechanical stenography;

24     transcript produced by computer-aided transcription.)

25
```

1              CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER

2

3              I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                        Dated this 28th day of February, 2023.

10

11                       /s/ Nancy J. Meyer
                         Nancy J. Meyer
12                       Official Court Reporter
                         Registered Diplomate Reporter
13                       Certified Realtime Reporter
                         333 Constitution Avenue Northwest
14                       Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

**'**

**'94** [1] - 4994:6

## 0

**0404** [1] - 5004:23
**0800** [2] - 4970:23, 4971:15

## 1

**1** [10] - 4883:24, 4884:8, 4920:8, 4937:9, 4937:15, 5003:6, 5003:10, 5003:16, 5007:9, 5009:1
**10** [13] - 4967:12, 4970:10, 4977:1, 4977:14, 4977:16, 4979:15, 4998:16, 4999:20, 5002:6, 5014:17, 5015:6
**100** [1] - 4942:19
**10102** [3] - 4942:8, 4942:21, 4942:25
**10102......................**
[1] - 4877:14
**10:00** [2] - 5017:18, 5017:24
**10:15** [1] - 5012:2
**10:30** [1] - 5012:2
**11** [6] - 4967:12, 4970:10, 4977:1, 4977:16, 4999:16
**12** [7] - 4920:8, 4995:19, 4995:20, 5008:17
**12-foot** [2] - 4974:10
**12:30** [2] - 5017:3, 5017:7
**13** [2] - 4968:9, 5000:14
**15** [6] - 4904:21, 4958:5, 4961:24, 4968:21, 5014:18, 5020:22
**15-20** [1] - 4884:18
**16** [1] - 5004:12
**1673** [1] - 4952:24
**1700** [1] - 4983:12
**1800** [1] - 4970:23
**19** [2] - 4977:5, 4977:7
**1994** [1] - 4958:19
**1996** [1] - 4957:16
**19th** [1] - 4880:22
**1:04** [1] - 5003:20

## 2

**2** [6] - 4897:20, 4899:9, 4974:9, 4996:2, 5001:11, 5008:17
**20** [4] - 4904:21, 4977:5, 4977:7, 5012:5
**200** [2] - 4997:9, 4997:12
**2020** [9] - 4880:24, 4931:7, 4932:9, 4932:21, 4934:5, 4934:9, 4963:6, 4968:5
**2021** [13] - 4884:14, 4901:17, 4901:20, 4902:1, 4902:8, 4949:7, 4954:5, 4954:10, 4954:23, 4962:7, 4966:8, 4974:3, 4985:6
**21** [2] - 4977:7, 5003:18
**21st** [1] - 4968:5
**22** [2] - 4977:5, 4977:7
**24-hour** [1] - 5020:14
**24-plus** [1] - 5019:15
**2400-watt** [1] - 4974:19
**25** [1] - 4897:21
**28** [1] - 4903:1
**29** [1] - 4903:18
**2:26** [1] - 5004:22
**2:27** [1] - 5005:19

## 3

**3** [3] - 4946:9, 4970:20, 5004:17
**30** [1] - 4911:22
**300** [2] - 4997:9, 4997:12
**302** [1] - 5019:8
**32** [1] - 4904:12
**380** [2] - 4890:2, 4920:15
**3:15** [3] - 4946:8, 4946:9, 4946:16
**3:30** [2] - 4878:9, 5015:12, 5021:9
**3rd** [2] - 4884:14, 4920:1

## 4

**4** [1] - 4985:20
**40** [3] - 4905:10, 4905:13, 4911:22
**404(b** [1] - 4916:7

**45** [1] - 4878:16
**45-minute** [1] - 4878:13
**4879** [1] - 4877:4
**4881** [1] - 4877:15
**4882** [1] - 4877:16
**4919** [1] - 4877:5
**4925** [1] - 4877:5
**4931** [1] - 4877:6
**4936** [1] - 4877:13
**4942** [1] - 4877:14
**4947** [1] - 4877:6
**4949** [1] - 4877:16
**4955** [1] - 4877:7
**4956** [1] - 4877:8
**4965** [1] - 4877:17
**4970** [1] - 4877:17
**4975** [1] - 4877:18
**4982** [1] - 4877:18
**4987** [1] - 4877:19
**4990** [1] - 4877:9
**4991** [1] - 4877:9
**4995** [1] - 4877:10
**4:00** [1] - 5000:5
**4:59** [1] - 5021:21
**4G** [1] - 4978:14
**4th** [1] - 4920:1

## 5

**5.11** [1] - 4938:10
**50** [9] - 4905:10, 4905:13, 4911:23, 4962:6, 4968:11, 4972:8, 4972:11, 4994:7, 5001:14
**50,000** [1] - 4978:7
**50,000-attendee** [1] - 4962:5
**50.S.7.174** [3] - 4936:8, 4936:16, 4936:17
**50.S.7.174..............**
.. [1] - 4877:13
**500** [1] - 4968:11
**5009** [1] - 4877:10
**5010** [1] - 4877:19
**511** [1] - 4899:7
**56** [1] - 4919:17
**5:00** [6] - 4983:12, 5000:5, 5000:7, 5015:10, 5015:11
**5G** [1] - 4978:14
**5th** [21] - 4879:9, 4879:21, 4885:2, 4885:15, 4885:19, 4891:25, 4894:21, 4897:24, 4920:2, 4920:4, 4920:5, 4948:11,

**4949:18, 4949:21, 4949:22, 4949:23, 4950:13, 4979:19, 4979:22, 4979:25

## 6

**6** [6] - 4882:19, 4896:1, 4897:5, 4936:25, 5003:18, 5010:15
**60** [1] - 4896:23
**60-something** [1] - 4936:15
**62** [1] - 4990:12
**63** [1] - 4880:1
**64** [3] - 4880:2, 4880:3, 4880:5
**65** [7] - 4881:14, 4881:16, 4881:17, 4883:16, 4896:25, 4897:1
**65...................** [1] - 4877:15
**66** [2] - 4882:6, 4882:9
**66...................** [1] - 4877:16
**67** [3] - 4896:23, 4896:24, 4952:24
**68** [4] - 4948:24, 4949:1, 4949:2, 4952:18
**68...................** [1] - 4877:16
**69** [4] - 4952:18, 4965:11, 4965:13, 4965:14
**69...................** [1] - 4877:17
**6:00** [4] - 4900:7, 4901:3, 4901:7, 4970:23
**6th** [84] - 4879:7, 4879:8, 4879:9, 4879:12, 4879:21, 4880:19, 4884:5, 4885:2, 4885:5, 4885:8, 4885:16, 4885:19, 4891:25, 4895:22, 4897:24, 4899:13, 4900:3, 4901:17, 4901:20, 4902:1, 4902:8, 4903:6, 4904:17, 4907:7, 4916:23, 4917:8, 4917:13, 4918:17, 4918:20, 4918:23, 4919:1, 4920:4, 4921:24, 4928:11, 4928:19,

4929:6, 4929:24, 4930:15, 4930:16, 4936:1, 4936:5, 4938:7, 4939:3, 4939:21, 4940:13, 4940:20, 4942:18, 4943:4, 4944:3, 4948:11, 4949:7, 4949:21, 4950:21, 4954:5, 4954:10, 4954:23, 4955:13, 4962:7, 4962:14, 4964:1, 4966:8, 4966:13, 4966:14, 4966:25, 4967:18, 4970:21, 4971:18, 4974:3, 4976:6, 4977:8, 4979:5, 4980:17, 4981:16, 4985:6, 4987:8, 4988:11, 4989:3, 4989:4, 4989:9, 4989:19, 4992:7, 5000:12, 5010:17, 5013:25

## 7

**7** [1] - 4884:17
**70** [4] - 4969:18, 4969:23, 4969:25, 4970:1
**70...................** [1] - 4877:17
**71** [4] - 4975:10, 4975:17, 4998:4, 5009:11
**71...................** [1] - 4877:18
**72** [5] - 4982:8, 4982:12, 4996:18, 5011:3
**72...................** [1] - 4877:18
**73** [3] - 4985:18, 4993:18, 4993:20
**74** [6] - 4985:21, 4985:22, 4985:24, 4990:23, 4991:24, 5011:2
**75** [5] - 4987:17, 4987:21, 4987:22, 4988:2, 5002:5
**75...................** [1] - 4877:19
**76** [2] - 5010:8, 5010:11
**76...................** [1] - 4877:19
**78** [1] - 4919:16
**7th** [1] - 4945:8

**8**

**8** [24] - 4884:10, 4901:4, 4901:5, 4901:8, 4967:12, 4970:10, 4970:15, 4970:18, 4970:23, 4977:1, 4977:11, 4977:16, 4979:11, 4979:12, 4979:17, 4989:7, 4992:9, 4992:16, 4993:14, 4995:2, 4995:16, 4996:25, 4997:21, 5008:16
**85** [2] - 4897:20, 5020:1
**8:00** [2] - 4901:10, 4901:12

**9**

**9** [17] - 4967:7, 4967:12, 4967:18, 4968:3, 4970:10, 4970:12, 4977:1, 4977:14, 4977:15, 4977:16, 4979:11, 4979:12, 4979:14, 4979:15, 4979:16
**90** [1] - 5020:1
**9220** [1] - 5004:16
**9902** [1] - 5003:15
**9:00** [2] - 5017:3, 5017:7
**9:15** [10] - 4878:7, 5014:20, 5014:22, 5014:23, 5015:14, 5015:16, 5015:18, 5015:22, 5017:12, 5018:4
**9:30** [6] - 5015:18, 5015:23, 5017:15, 5017:18, 5017:21, 5017:23

**A**

**a.m** [8] - 4878:2, 4900:7, 4901:3, 4901:5, 4901:6, 4901:7, 4901:10, 5017:18
**abandoned** [2] - 4941:14, 4941:17
**abide** [1] - 4958:14
**ability** [1] - 4899:17
**able** [11] - 4952:24, 4960:1, 4968:19, 4969:5, 4971:4, 4973:9, 4978:11,

4980:25, 5013:8, 5013:9, 5013:21
**absolutely** [2] - 4974:4, 4992:11
**accent** [1] - 4958:17
**acceptable** [1] - 5019:7
**accepted** [1] - 4948:8
**access** [1] - 4980:22
**according** [1] - 4880:23
**accordingly** [2] - 4878:14, 4959:4
**accurate** [6] - 4940:3, 4948:21, 4975:24, 4982:6, 4985:16, 5010:5
**acquainted** [1] - 4925:24
**Act** [1] - 4917:17
**act** [1] - 4917:20
**action** [4] - 4929:9, 4944:25, 4955:16, 4955:19
**activities** [1] - 4920:22
**actual** [14] - 4957:2, 4960:5, 4961:18, 4964:20, 4967:6, 4969:9, 4969:21, 4974:9, 4975:7, 4978:10, 4981:14, 4985:3, 4989:13, 4990:5
**actuality** [1] - 4994:2
**add** [1] - 5000:9
**added** [2] - 4931:15, 4987:12
**addition** [1] - 4926:6
**additional** [4] - 4892:23, 4892:25, 4898:22, 4956:4
**address** [5] - 4966:19, 4968:23, 4969:3, 4979:2, 5013:21
**adjourn** [2] - 5015:6, 5019:16
**adjust** [1] - 4897:12
**administered** [1] - 4956:9
**administrator** [1] - 4958:19
**admit** [11] - 4880:3, 4881:14, 4882:12, 4936:9, 4942:21, 4942:23, 4975:10, 4982:2, 4985:18, 4987:17, 5010:8
**Admitted** [1] - 4877:12
**admitted** [27] - 4880:5, 4881:16, 4881:17,

4882:9, 4903:1, 4904:11, 4936:11, 4936:14, 4936:16, 4936:17, 4942:25, 4949:1, 4949:2, 4965:13, 4965:14, 4969:25, 4970:1, 4975:17, 4982:10, 4982:12, 4985:23, 4985:24, 4987:21, 4987:22, 5009:11, 5010:11
**advance** [2] - 4879:19, 4885:5
**affiliation** [1] - 4966:7
**African** [2] - 4909:22, 4922:14
**afternoon** [11] - 4925:21, 4931:5, 4946:7, 4946:23, 4990:17, 4991:14, 4991:16, 4995:5, 4995:10, 5019:19
**agencies** [3] - 4960:2, 4960:11, 4960:17
**Agent** [4] - 5018:24, 5019:2, 5019:3, 5019:4
**agent** [5] - 4906:18, 5014:17, 5014:19, 5018:21, 5019:6
**agents** [1] - 5019:3
**aggressive** [1] - 4884:20
**agree** [1] - 4987:2
**agreed** [2] - 4964:15, 4973:16
**ahead** [11] - 4910:8, 4926:16, 4928:25, 4942:24, 4952:3, 4954:19, 4954:20, 4988:6, 5007:22, 5008:5, 5012:20
**aided** [1] - 5021:24
**air** [1] - 4959:23
**airport** [1] - 5015:9
**aisle** [2] - 4904:25, 4905:2
**Alex** [1] - 4903:23
**Alexander** [63] - 4885:9, 4885:10, 4892:17, 4892:20, 4893:18, 4894:2, 4894:14, 4894:20, 4895:9, 4895:20, 4896:2, 4896:4, 4897:23, 4898:25, 4903:16, 4903:25, 4906:6, 4906:8, 4906:15, 4907:3,

4907:21, 4908:2, 4908:4, 4913:22, 4920:5, 4930:17, 4949:19, 4950:12, 4962:11, 4962:12, 4962:13, 4962:15, 4963:5, 4963:10, 4963:13, 4963:21, 4964:8, 4964:10, 4964:25, 4966:5, 4966:7, 4966:18, 4966:23, 4975:4, 4976:7, 4978:21, 4979:24, 4980:16, 4985:5, 4986:4, 4986:6, 4989:22, 4991:25, 4996:22, 4997:8, 4997:22, 4998:8, 4998:19, 5000:2, 5000:18, 5001:7, 5006:23, 5008:7
**Alexander's** [11] - 4894:24, 4902:15, 4905:2, 4908:13, 4909:1, 4909:17, 4981:17, 4982:18, 4989:2, 4989:12, 5009:15
**Alexandra** [1] - 4998:12
**Ali** [37] - 4885:9, 4885:10, 4892:17, 4892:20, 4893:18, 4903:25, 4949:19, 4950:12, 4962:11, 4962:12, 4962:13, 4962:15, 4962:18, 4963:5, 4963:10, 4963:13, 4963:21, 4964:8, 4966:5, 4966:7, 4966:12, 4966:14, 4966:18, 4966:23, 4975:4, 4979:14, 4985:5, 4986:4, 4986:6, 4996:22, 4997:8, 4997:22, 4998:8, 4998:12, 4998:19, 5006:23, 5008:7
**allegedly** [2] - 4940:25, 4941:3
**allocates** [1] - 4967:7
**allow** [2] - 4940:16, 5005:14
**allowed** [8] - 4906:20, 4961:21, 4968:14, 4971:11, 4973:2, 4974:8, 4984:14, 5014:3

**allowing** [1] - 4914:8
**allows** [1] - 4971:15
**Alondra** [4] - 4908:23, 4908:24, 4922:1, 4922:3
**alone** [1] - 4985:2
**alongside** [1] - 5006:12
**altogether** [1] - 4960:12
**Amendment** [3] - 4961:5, 4968:18, 4996:16
**American** [3] - 4909:22, 4922:14, 5004:13
**amount** [2] - 4971:1, 4978:2
**amplification** [1] - 4968:24
**amplifiers** [1] - 4974:16
**analyst** [1] - 5005:19
**angle** [1] - 4905:11
**answer** [6] - 4905:21, 4916:20, 4928:25, 4998:2, 5014:2, 5019:9
**answered** [4] - 4902:3, 4954:16, 4961:14, 5007:22
**answering** [1] - 4887:15
**Anthony** [1] - 4983:6
**anticipate** [3] - 5014:15, 5014:16, 5021:10
**anticipated** [4] - 4934:6, 4982:18, 4983:8, 5012:9
**anticipates** [1] - 5017:18
**anticipating** [1] - 5020:24
**Antifa** [1] - 5002:9
**anyway** [1] - 4898:17
**apart** [1] - 4935:20
**Apollo** [5] - 4983:24, 4984:6, 4984:9, 5006:18
**apologize** [1] - 4879:18
**app** [1] - 4986:21
**appear** [2] - 4942:17, 4943:25
**appeared** [1] - 5010:20
**appearing** [1] - 4934:5
**application** [6] - 4965:8, 4977:13,

4979:10, 4979:11, 4979:16, 4980:3
**applied** [5] - 4964:24, 4965:25, 4967:15, 4968:7, 4977:10
**apply** [2] - 4959:11, 4965:23
**applying** [1] - 4959:17
**appointed** [1] - 4934:5
**appreciate** [1] - 5020:2
**approached** [4] - 4939:20, 4951:11, 4962:11, 4964:22
**approaching** [2] - 4939:23, 4959:18
**appropriately** [1] - 4984:15
**AR** [1] - 4890:3
**AR-15** [2] - 4920:17, 4920:18
**AR-type** [1] - 4890:3
**Archangel** [1] - 5006:19
**Architect** [1] - 4973:23
**Archives** [2] - 4952:8, 4952:10
**area** [46] - 4885:22, 4887:21, 4896:2, 4902:7, 4902:19, 4902:24, 4903:12, 4903:20, 4903:25, 4904:6, 4906:21, 4906:23, 4907:9, 4907:17, 4910:23, 4913:24, 4939:2, 4940:18, 4942:11, 4944:9, 4951:24, 4952:12, 4953:20, 4961:8, 4961:9, 4961:25, 4967:1, 4967:5, 4967:14, 4967:19, 4968:3, 4968:14, 4970:8, 4971:17, 4977:6, 4977:11, 4994:19, 4994:22, 4996:7, 4996:9, 4996:13, 5001:18, 5003:23, 5010:16, 5014:4
**Area** [14] - 4967:18, 4970:12, 4970:15, 4970:18, 4977:11, 4989:7, 4992:9, 4992:16, 4993:14, 4995:2, 4995:16, 4996:25, 4997:21, 5008:16
**areas** [18] - 4960:10, 4961:3, 4961:5,

4967:4, 4967:11, 4967:21, 4968:1, 4970:10, 4976:13, 4976:17, 4976:18, 4976:21, 4976:22, 4977:7, 4981:25, 4992:15, 4994:9, 5011:13
**Areas** [1] - 4970:10
**Arianna's** [1] - 4963:19
**armed** [1] - 4933:23
**arrive** [1] - 4898:21
**arrived** [7] - 4902:21, 4949:18, 4950:2, 4950:7, 4951:8, 4951:10, 4951:18
**arriving** [1] - 5011:17
**aside** [1] - 4912:12
**ass** [1] - 4884:20
**assault** [1] - 5018:16
**assemble** [1] - 4973:12
**assigned** [1] - 4933:10
**assignment** [1] - 4998:25
**assistance** [1] - 4990:10
**assistant** [1] - 4908:7
**assisted** [1] - 4990:20
**assume** [7] - 4891:9, 4912:23, 4913:4, 4937:5, 5007:16, 5015:21, 5019:3
**assumed** [2] - 4944:20, 5007:9
**ATF** [1] - 4960:19
**attackers** [1] - 4893:23
**attacking** [1] - 4893:22
**attend** [1] - 4895:20
**attended** [3] - 4954:1, 4989:12, 4989:13
**attendees** [2] - 4958:7, 5001:13
**attention** [6] - 4918:9, 4925:7, 4934:17, 4973:24, 4982:15, 4991:1
**attire** [1] - 4899:6
**authority** [1] - 4890:8
**availability** [2] - 4961:1, 5002:16
**available** [19] - 4961:9, 4961:11, 4967:19, 4970:12, 4976:13, 4976:14, 4977:5, 4977:8,

4977:11, 4977:16, 4977:17, 4979:9, 4979:14, 4986:7, 4992:6, 5016:22, 5018:21, 5018:24
**Avenue** [11] - 4908:20, 4910:6, 4914:4, 4914:5, 4950:23, 4950:25, 4951:1, 4951:2, 4951:3, 4953:12, 4970:15
**aware** [12] - 4891:11, 4892:1, 4907:5, 4917:8, 4922:11, 4926:13, 4929:14, 4929:17, 4980:21, 4989:13, 5007:12
**Awesome** [1] - 5001:2
**AWOL** [1] - 4978:25

# B

**B-r-o-w-n** [1] - 4956:20
**background** [5] - 4926:2, 4937:24, 4943:5, 4943:24, 5008:20
**backwards** [1] - 4960:3
**bad** [4] - 4884:20, 4923:20, 4942:4, 4942:6
**Badalament** [17] - 4995:14, 4996:19, 4998:5, 4998:10, 4998:16, 4999:10, 4999:16, 4999:22, 4999:25, 5000:15, 5000:25, 5001:23, 5003:15, 5004:10, 5004:17, 5005:4, 5006:2
**badge** [1] - 4996:12
**badges** [5] - 4996:9, 4996:10, 4997:9, 4997:12
**ballistic** [2] - 4896:16, 4896:18
**banner** [1] - 5010:14
**barricade** [1] - 4906:19
**base** [1] - 4973:15
**based** [12] - 4913:19, 4928:18, 4928:20, 4928:21, 4928:24, 4929:5, 4938:4, 4957:21, 4958:25, 4983:7, 4983:21, 4992:18

**basis** [2] - 4981:10, 4984:4
**batteries** [1] - 4969:10
**battery** [6] - 4969:8, 4969:9, 4969:10, 4974:16, 4974:19, 5013:20
**BearCom** [1] - 4977:25
**beautiful** [1] - 4950:18
**became** [2] - 4909:6, 4966:14
**become** [1] - 4923:25
**bee** [1] - 4901:3
**beg** [1] - 4993:8
**begin** [3] - 4960:9, 4961:2, 5016:11
**beginning** [2] - 4971:22, 4991:2
**begins** [1] - 4946:7
**behalf** [3] - 4964:25, 4965:23, 4966:23
**behavior** [1] - 4911:13
**behind** [6] - 4910:8, 4910:9, 4943:24, 4957:11, 4959:3, 5008:21
**below** [1] - 4991:1
**Bench** [3] - 4916:14, 4980:7, 5014:12
**benefit** [3] - 4975:2, 4988:18, 4991:24
**Berry** [3] - 4922:9, 4922:10, 5019:1
**best** [3] - 4948:20, 5010:6, 5010:7
**Beth** [1] - 5021:3
**better** [2] - 4897:1, 4952:6
**between** [7] - 4960:24, 4966:13, 4970:11, 4978:3, 4988:10, 4991:25
**beyond** [3] - 4954:16, 4954:18, 5016:18
**big** [2] - 4890:18, 4994:8
**bike** [1] - 4943:25
**billed** [1] - 4984:1
**bit** [6] - 4915:10, 4934:8, 4946:3, 4946:8, 4949:14, 4999:19
**bits** [1] - 4918:8
**black** [2] - 4886:15, 4896:9
**blocks** [1] - 4914:4
**blood** [1] - 5004:13
**blowback** [1] - 5001:7
**blue** [4] - 4886:10,

**basis** ... (continued)
4886:15, 4977:19, 4977:21
**board** [1] - 5015:25
**bodyguard** [4] - 4930:5, 4930:12, 4935:10, 4935:11
**Boebert** [1] - 4983:6
**boisterous** [1] - 4915:12
**bolted** [1] - 4973:16
**book** [1] - 4961:5
**bother** [1] - 4918:12
**bothered** [1] - 4893:8
**bottom** [5] - 4991:22, 4992:25, 4999:20, 5000:15, 5000:16
**Box** [2] - 4968:9, 4968:21
**box** [1] - 4968:15
**boxes** [1] - 4964:21
**bracket** [1] - 4962:24
**brain** [1] - 4983:25
**breached** [4] - 4912:5, 4924:15, 4942:2, 4942:5
**break** [4] - 4879:3, 4946:7, 4946:14, 4947:4
**breakdown** [2] - 4967:13, 4973:1
**Brennwald** [6] - 4919:4, 4919:18, 4922:19, 4925:6, 5016:7, 5020:24
**BRENNWALD** [21] - 4919:6, 4919:11, 4919:20, 4919:23, 4922:5, 4922:6, 4922:21, 4922:23, 4923:6, 4923:7, 4924:23, 4924:25, 4925:1, 4925:8, 5016:9, 5016:12, 5016:14, 5016:16, 5021:1
**Brennwald**............. [1] - 4877:5
**brief** [1] - 4990:19
**briefly** [1] - 4921:2
**bring** [18] - 4878:5, 4891:3, 4895:19, 4897:10, 4936:7, 4939:2, 4940:17, 4942:7, 4956:16, 4971:5, 4971:14, 4973:7, 4978:2, 4978:16, 4984:8, 4991:19, 4993:10, 5014:3

**bringing** [2] - 4891:11, 4960:4
**broken** [1] - 4928:2
**brought** [11] - 4920:12, 4933:12, 4938:20, 4938:23, 4958:23, 4963:18, 4963:20, 4971:10, 4972:22, 4988:16, 5013:2
**Brown** [8] - 4877:8, 4956:7, 4956:11, 4956:16, 4956:20, 4957:5, 4991:13, 5009:11
**brown** [4] - 4956:21, 4982:4, 5005:11, 5014:6
**build** [1] - 4980:9
**building** [3] - 4943:4, 4943:6, 4959:24
**Building** [10] - 4915:15, 4918:16, 4918:20, 4944:3, 4950:20, 4951:25, 4953:3, 4953:5, 4976:21, 4977:4
**built** [2] - 4973:13, 4974:10
**bunch** [2] - 4997:23, 5006:25

**C**

**cable** [1] - 4974:14
**cabled** [1] - 4974:15
**cables** [1] - 4969:1
**Caleb** [4] - 4888:2, 4908:24, 4922:7, 4945:21
**calendar** [1] - 4961:11
**camo** [2] - 4897:8, 4899:6
**camp** [3] - 4888:21, 4898:8
**camp-type** [1] - 4888:21
**canceled** [1] - 4895:20
**cannot** [2] - 4916:20, 5014:22
**capability** [1] - 4969:7
**capital** [1] - 4994:4
**Capitol** [110] - 4906:8, 4906:18, 4907:22, 4908:12, 4908:14, 4908:20, 4910:6, 4910:14, 4910:15, 4910:16, 4910:19, 4911:8, 4911:10, 4911:16, 4912:5,

4912:16, 4913:16, 4914:5, 4915:15, 4915:19, 4915:24, 4918:16, 4918:20, 4921:24, 4922:15, 4924:4, 4924:8, 4924:9, 4924:12, 4924:15, 4939:6, 4939:20, 4940:6, 4940:8, 4941:22, 4942:2, 4942:5, 4943:8, 4943:13, 4944:3, 4944:9, 4944:18, 4950:20, 4951:8, 4951:10, 4951:12, 4951:25, 4952:18, 4952:25, 4953:3, 4953:5, 4958:9, 4959:8, 4960:10, 4960:20, 4960:21, 4960:22, 4961:2, 4961:4, 4961:20, 4962:1, 4964:17, 4964:23, 4965:9, 4966:23, 4967:1, 4967:3, 4967:6, 4967:7, 4967:9, 4967:10, 4967:13, 4967:17, 4968:1, 4968:25, 4969:16, 4970:8, 4970:12, 4970:16, 4970:25, 4971:7, 4971:12, 4971:13, 4972:4, 4972:10, 4973:8, 4973:22, 4973:23, 4976:12, 4976:21, 4977:15, 4979:13, 4979:17, 4980:10, 4989:7, 4990:1, 4990:4, 4990:5, 4990:6, 4994:5, 5001:11, 5003:24, 5004:13, 5005:20, 5008:18, 5008:20, 5008:21, 5011:15, 5014:2, 5014:3
**captures** [2] - 4975:8, 4975:21
**car** [10] - 4885:23, 4888:12, 4915:8, 4921:6, 4921:7, 4921:8, 4945:22, 4981:5, 4993:7
**care** [1] - 4999:12
**carefully** [1] - 4935:1
**Carolina** [4] - 4888:8, 4888:18, 4920:11, 4932:15

**carpenters** [1] - 4973:13
**carrier** [2] - 4896:10, 4896:12
**carriers** [7] - 4897:9, 4897:13, 4899:8, 4907:6, 4907:18, 4908:16, 4938:21
**carry** [5] - 4890:4, 4890:8, 4891:4, 4891:14, 4984:14
**carrying** [3] - 4889:20, 4889:22, 4889:24
**cars** [1] - 5011:16
**cart** [5] - 4902:9, 4902:10, 4902:12, 4902:14, 4902:17
**case** [18] - 4916:25, 4919:7, 4919:9, 4925:14, 4959:21, 4967:17, 4970:9, 4971:3, 4971:11, 4986:10, 4991:5, 4995:1, 5001:7, 5006:13, 5011:24, 5016:8, 5020:8
**casual** [1] - 4984:16
**catch** [5] - 4878:8, 4908:20, 4909:16, 4924:3, 4924:5
**catching** [1] - 4910:11
**caught** [1] - 4943:15
**cell** [7] - 4899:13, 4923:19, 4923:20, 4961:23, 4978:8, 4978:10, 4978:14
**certain** [2] - 4931:16, 4962:23
**certainly** [3] - 4950:19, 4962:6, 4981:12
**certification** [1] - 4919:1
**cetera** [10] - 4897:9, 4899:7, 4899:8, 4959:8, 4959:15, 4967:5, 4968:24, 4973:17, 4977:5, 4978:17
**chairs** [1] - 4996:7
**challenge** [1] - 5019:7
**change** [3] - 4897:11, 4948:4, 5011:19
**changed** [1] - 4885:5
**changes** [1] - 5011:22
**changing** [2] - 4981:8, 4988:5
**charge** [3] - 4894:4, 4930:22, 4945:2
**chat** [15] - 4881:21,

4881:23, 4882:20, 4882:22, 4897:5, 4917:22, 4917:24, 4935:24, 4936:24, 4937:2, 4987:12, 5003:18, 5003:21, 5005:11, 5005:20
**chats** [22] - 4879:22, 4881:2, 4883:2, 4892:1, 4917:9, 4917:14, 4917:16, 4931:16, 4931:19, 4934:12, 4934:15, 4936:4, 4987:25, 5001:25, 5002:3, 5002:8, 5005:13, 5007:6, 5007:7, 5007:10, 5007:12, 5008:10
**check** [1] - 4898:20
**checked** [2] - 4919:16, 4968:15
**checking** [1] - 4925:4
**checkpoint** [2] - 4910:18, 4910:19
**chief** [1] - 4925:14
**choice** [1] - 4967:20
**choose** [2] - 4961:15, 5019:4
**chuckled** [1] - 4900:10
**circled** [4] - 4951:22, 4951:24, 4952:12, 4953:3
**circling** [1] - 4976:20
**circular** [1] - 4911:19
**city** [2] - 4959:20, 4995:3
**City** [6] - 4879:17, 4885:23, 4886:17, 4887:7, 4887:12, 4887:21
**classic** [1] - 4993:23
**clear** [1] - 4975:20
**clearly** [1] - 4941:14
**clergy** [1] - 4998:24
**client** [5] - 4957:13, 4959:2, 4972:23, 4978:1, 5020:18
**clients** [2] - 4967:24, 4972:20
**clients'** [1] - 4985:3
**close** [4] - 4898:6, 4905:12, 4905:14, 4905:15, 4905:17, 4905:18, 4935:6, 4935:9, 4935:23, 4935:24, 4944:3, 4996:5, 5011:13
**closed** [1] - 5003:23

**closer** [2] - 4905:4, 4939:25
**closest** [1] - 4905:16
**closures** [1] - 5011:10
**clothes** [1] - 4909:24
**clothing** [1] - 4984:16
**cluing** [1] - 5008:1
**CM** [54] - 4877:15, 4877:16, 4877:16, 4877:17, 4877:17, 4877:18, 4877:18, 4877:19, 4877:19, 4880:1, 4880:3, 4880:5, 4881:14, 4881:16, 4881:17, 4882:6, 4882:9, 4883:16, 4896:24, 4897:1, 4903:1, 4903:18, 4904:12, 4936:15, 4948:24, 4949:2, 4965:11, 4965:13, 4965:14, 4969:18, 4969:23, 4969:25, 4970:1, 4975:10, 4975:17, 4982:2, 4982:8, 4982:12, 4985:18, 4985:24, 4987:17, 4987:22, 4990:23, 4991:24, 4993:18, 4993:20, 4996:18, 4998:4, 5002:5, 5009:11, 5010:8, 5010:11, 5011:2, 5011:3
**Cobra** [1] - 4993:4
**coffee** [1] - 4991:15
**cold** [1] - 4905:20
**College** [1] - 4919:1
**color** [2] - 4909:24, 4996:11
**Columbia** [1] - 4960:6
**combat** [1] - 4899:7
**coming** [19] - 4901:3, 4905:22, 4936:5, 4972:23, 4972:24, 4980:23, 4981:2, 4981:4, 4981:5, 4984:18, 4985:1, 4986:15, 4989:3, 4989:7, 4990:1, 4990:3, 5001:11, 5004:5, 5016:21
**command** [1] - 4945:4
**commercial** [1] - 4961:17
**commitment** [1] - 5015:9
**committee** [1] - 4916:24

**common** [2] - 4894:7, 4994:21
**comms** [1] - 4899:12
**communicate** [1] - 4978:16
**communicating** [1] - 4976:7
**communication** [1] - 4978:2
**communications** [2] - 4928:16, 4947:11
**companies** [3] - 4957:18, 4957:19, 4983:20
**company** [7] - 4957:17, 4957:19, 4959:18, 4962:19, 4966:5, 5006:18
**compared** [1] - 4927:3
**competing** [1] - 4994:9
**complete** [1] - 5019:12
**completely** [2] - 4918:6, 4978:13
**completing** [1] - 4980:2
**complicated** [1] - 4999:24
**comply** [1] - 4945:5
**complying** [3] - 4886:9, 4949:13, 4949:15
**computer** [1] - 5021:24
**computer-aided** [1] - 5021:24
**concealable** [1] - 4890:2
**concealed** [1] - 4890:7
**concept** [2] - 4891:17, 4900:19
**concern** [1] - 4898:16
**concerned** [1] - 4907:24
**concerning** [1] - 4988:10
**concert** [1] - 4957:11
**conclude** [3] - 4878:8, 4983:8, 5018:19
**concluded** [1] - 5021:21
**conclusion** [2] - 4916:21, 5020:8
**conditions** [1] - 4969:22
**conference** [6] - 4916:14, 4957:10, 4963:2, 4980:7,

4981:10, 5014:12
**conferences** [1] - 4981:13
**confirm** [2] - 4947:3, 5017:2
**confront** [3] - 4893:22, 4893:23, 4894:9
**Congress** [15] - 4955:22, 4977:3, 4981:17, 4983:1, 4994:13, 4998:20, 4999:5, 5005:1, 5005:21, 5005:24, 5009:16, 5010:22, 5011:19, 5012:17, 5012:22
**Congress's** [1] - 4999:6
**congressmen** [3] - 4884:11, 4897:21, 4899:24
**connection** [2] - 4927:6, 4930:1
**Connie** [8] - 4886:1, 4886:6, 4886:18, 4889:5, 4945:13, 4947:11, 4986:25, 4987:3
**conservative** [4] - 4962:17, 4962:18, 4962:20, 4962:24
**conservative-leaning** [1] - 4962:17
**conservatives** [1] - 4962:21
**consider** [2] - 4905:15, 5020:15
**consistent** [1] - 4942:17
**constable** [3] - 4891:13, 4930:11
**Constitution** [1] - 4970:15
**constitutional** [1] - 4891:4
**Constitutional** [1] - 4971:11
**consult** [1] - 5014:23
**cont'd** [1] - 4877:4
**contact** [5] - 4963:20, 4966:21, 4966:22, 5009:1, 5011:12
**contacting** [1] - 4908:4
**context** [2] - 5007:1, 5011:6
**continue** [1] - 4878:23
**continuing** [1] - 4879:1

**contract** [2] - 4964:15, 4991:25
**contractor** [1] - 4926:8
**control** [2] - 4913:17, 4973:10
**conversation** [3] - 4895:16, 4970:11, 4979:13
**conversations** [6] - 4879:4, 4917:9, 4970:16, 4972:20, 4975:6, 4978:11
**cooperated** [1] - 4916:3
**cooperating** [1] - 4917:2
**cooperative** [2] - 4954:3, 4954:4
**coordinating** [1] - 4960:12
**copies** [1] - 4975:24
**copy** [9] - 4967:15, 4967:17, 4976:9, 4978:23, 4982:6, 4982:7, 4985:16, 5010:5, 5019:20
**corner** [2] - 4883:22, 4953:4
**correct** [90] - 4880:25, 4881:22, 4883:3, 4883:22, 4883:23, 4884:6, 4884:15, 4888:17, 4892:14, 4892:19, 4894:16, 4894:19, 4895:8, 4897:14, 4897:16, 4899:19, 4902:11, 4904:1, 4904:5, 4904:16, 4906:1, 4906:11, 4908:15, 4912:2, 4919:8, 4920:25, 4921:11, 4921:14, 4921:18, 4921:19, 4921:22, 4921:23, 4922:8, 4922:15, 4922:16, 4926:22, 4927:12, 4927:13, 4927:22, 4928:1, 4928:17, 4938:19, 4939:11, 4939:14, 4940:11, 4940:15, 4940:18, 4940:23, 4941:1, 4942:3, 4943:11, 4943:22, 4944:3, 4944:9, 4944:15, 4944:16, 4944:19, 4944:22, 4945:2, 4945:7, 4945:13,

4947:8, 4950:17, 4950:20, 4950:24, 4951:5, 4953:20, 4953:21, 4970:18, 4972:3, 4974:20, 4977:22, 4979:7, 4979:19, 4986:23, 4986:24, 4991:25, 4994:1, 4994:9, 4996:24, 4997:6, 4998:22, 5000:6, 5000:13, 5001:15, 5004:21, 5008:16, 5012:13, 5019:2
**corrected** [1] - 4997:7
**correctly** [1] - 4921:12
**cot** [1] - 4889:6
**cots** [3] - 4889:2, 4889:3
**counsel** [1] - 5014:10
**count** [3] - 4911:2, 4918:23, 4962:4
**couple** [11] - 4881:10, 4887:3, 4910:10, 4914:4, 4918:4, 4955:8, 4963:18, 4981:11, 5001:22, 5001:25, 5015:7
**course** [3] - 4970:11, 4978:9, 4981:8
**court** [6] - 4886:12, 4917:5, 4922:5, 4957:4, 4980:13, 5015:4
**Court** [6] - 5016:23, 5017:12, 5018:17, 5019:17, 5019:20, 5019:21
**COURT** [102] - 4878:5, 4878:15, 4878:17, 4878:21, 4881:16, 4882:13, 4912:25, 4913:7, 4913:12, 4916:6, 4916:9, 4916:12, 4916:15, 4916:25, 4917:4, 4917:11, 4919:4, 4919:8, 4919:18, 4922:19, 4924:22, 4924:24, 4925:6, 4925:13, 4925:17, 4926:16, 4928:25, 4929:2, 4931:2, 4936:11, 4936:16, 4937:17, 4942:23, 4946:2, 4946:4, 4946:6, 4946:13, 4946:20, 4949:1, 4952:2, 4952:6, 4952:10, 4954:8,

4954:18, 4955:7, 4955:25, 4956:4, 4956:11, 4965:13, 4969:25, 4980:5, 4980:8, 4982:10, 4985:21, 4985:23, 4987:21, 4988:1, 4988:4, 4988:6, 4990:9, 4995:6, 5003:8, 5005:6, 5005:8, 5005:14, 5007:20, 5007:22, 5008:4, 5009:7, 5012:20, 5014:6, 5014:10, 5014:13, 5014:20, 5014:25, 5015:3, 5015:5, 5015:21, 5016:5, 5016:10, 5016:13, 5016:15, 5016:17, 5016:24, 5017:4, 5017:7, 5017:9, 5017:13, 5017:20, 5017:24, 5018:3, 5018:6, 5018:21, 5018:25, 5019:12, 5019:23, 5020:6, 5020:16, 5020:23, 5021:6, 5021:14, 5021:16
**Court's** [6] - 4881:12, 4917:6, 4923:6, 4993:8, 5015:1, 5019:20
**courtroom** [3] - 4878:6, 4886:4, 4886:6
**COURTROOM** [4] - 4878:20, 4896:25, 4946:19, 4956:8
**cover** [3] - 4897:20, 4967:11, 4984:21
**covering** [2] - 4990:19, 4994:14
**covers** [1] - 4973:7
**create** [1] - 4950:19
**crew** [1] - 4950:9
**criterias** [1] - 4958:12
**cross** [5] - 4931:2, 4955:11, 4995:6, 5014:19, 5021:9
**Cross** [2] - 4877:6, 4877:10
**CROSS** [3] - 4879:1, 4931:3, 4995:8
**cross-examination** [3] - 4931:2, 4955:11, 4995:6
**Cross-Examination** [2] - 4877:6, 4877:10

**CROSS-EXAMINATION** [3] - 4879:1, 4931:3, 4995:8
**cross-examinations** [1] - 5021:9
**cross-examine** [1] - 5014:19
**crowd** [10] - 4884:19, 4898:22, 4900:7, 4913:17, 4940:1, 4959:24, 4968:13, 4973:10, 5011:10
**crowding** [1] - 4985:1
**cryptographer** [1] - 4952:5
**Cs** [1] - 4958:15
**Cummings'** [1] - 5018:16
**cup** [1] - 4991:15
**curfew** [1] - 4914:20
**current** [1] - 4969:8
**customers** [2] - 4958:25, 4959:2
**cut** [1] - 4906:20
**cyber** [4] - 5002:9, 5002:22, 5003:3, 5003:10

# D

**D.C** [60] - 4879:7, 4879:11, 4879:21, 4881:2, 4881:7, 4885:15, 4885:19, 4887:11, 4887:13, 4887:16, 4889:16, 4890:12, 4890:24, 4891:3, 4891:8, 4891:10, 4891:12, 4891:16, 4892:17, 4906:18, 4909:13, 4914:8, 4915:3, 4919:14, 4919:25, 4920:6, 4920:10, 4928:11, 4930:14, 4932:16, 4936:1, 4936:5, 4938:2, 4948:19, 4948:21, 4949:18, 4950:2, 4950:7, 4950:16, 4955:18, 4955:21, 4957:24, 4958:2, 4958:4, 4959:11, 4959:15, 4959:22, 4960:18, 4961:17, 4961:25, 4962:3, 4963:6, 4964:4, 4974:1, 4983:21, 4984:13, 4989:5, 5000:19, 5011:12

**daily** [1] - 4981:10
**dare** [1] - 4956:25
**dashed** [1] - 4967:11
**data** [1] - 4984:20
**date** [7] - 4880:21, 4901:13, 4927:8, 4964:20, 4966:24, 4970:20, 4975:7
**dates** [2] - 4960:25, 4964:18
**day-to-day** [1] - 4961:18
**days** [3] - 4881:10, 4899:9, 4981:11
**DC** [5] - 4882:19, 4897:5, 4936:25, 5003:18, 5010:15
**deal** [1] - 4934:6
**dealership** [1] - 4885:23
**debating** [1] - 5021:4
**December** [5] - 4880:22, 4934:18, 4963:6, 4963:17, 4968:5
**decided** [1] - 4959:21
**deck** [1] - 4990:12
**decks** [1] - 4973:14
**defend** [2] - 4893:23, 4893:24
**Defendant** [20] - 4877:15, 4877:16, 4877:16, 4877:17, 4877:17, 4877:18, 4877:18, 4877:19, 4877:19, 4880:5, 4881:17, 4882:9, 4949:2, 4965:14, 4970:1, 4975:17, 4982:12, 4985:24, 4987:22, 5010:11
**defendant** [1] - 5021:7
**defendants** [2] - 5020:10, 5021:9
**Defense** [1] - 4936:15
**defer** [1] - 5018:11
**definitely** [1] - 5013:16
**delay** [1] - 4990:4
**delayed** [2] - 4989:25, 4990:3
**delegated** [1] - 4979:17
**deliberations** [1] - 4981:20
**deliver** [1] - 4981:6
**delivered** [1] - 4981:4
**Demonstration** [1] - 4968:15
**demonstration** [3] -

4968:18, 4994:19, 4994:22
**demonstrations** [1] - 4994:9
**demonstrative** [2] - 4882:5, 4882:12
**depicted** [3] - 4903:19, 4942:11, 4942:14
**deposit** [1] - 4964:16
**depth** [1] - 4981:3
**DEPUTY** [4] - 4878:20, 4896:25, 4946:19, 4956:8
**describe** [6] - 4886:14, 4888:20, 4911:7, 4915:8, 4973:5, 4986:2
**described** [4] - 4903:13, 4913:20, 4941:2, 4944:24
**description** [2] - 4940:4, 4951:22
**descriptive** [1] - 4952:2
**designate** [1] - 4882:6
**designated** [1] - 4967:4
**designed** [1] - 5013:20
**detail** [15] - 4884:9, 4884:23, 4900:9, 4930:5, 4930:6, 4930:12, 4930:13, 4935:10, 4935:11, 4935:14, 4938:17, 4981:3, 4988:15, 4992:9, 4994:24
**details** [8] - 4886:21, 4892:7, 4913:19, 4932:4, 4940:21, 4975:5, 4994:22, 5011:11
**detect** [1] - 4958:17
**Detroit** [1] - 4932:15
**dictates** [1] - 4893:20
**died** [1] - 4966:4
**different** [11] - 4897:25, 4903:9, 4958:11, 4958:12, 4960:2, 4960:12, 4961:19, 4978:13, 5001:22, 5001:25, 5007:6
**dimensions** [1] - 4974:5
**direct** [15] - 4908:5, 4919:6, 4922:19, 4925:2, 4936:22, 4937:11, 4939:15,

4968:18, 4994:19, 4994:22
**demonstrations** [1] - 4994:9
**Direct** [6] - 4877:4, 4877:5, 4877:5, 4877:8, 4877:9, 4877:9
**DIRECT** [5] - 4919:10, 4925:19, 4956:14, 4990:14, 4991:11
**direction** [1] - 4952:17
**directionality** [1] - 4973:9
**directions** [1] - 4927:24
**directly** [3] - 4927:17, 4947:11, 4961:3
**disagree** [1] - 4897:13
**discuss** [4] - 4926:4, 4926:10, 4926:19, 4946:14
**discussed** [4] - 4880:19, 4964:17, 4974:17, 4995:25
**discussing** [4] - 4901:19, 4979:8, 5008:14, 5016:6
**discussion** [13] - 4924:7, 4924:11, 4926:24, 4941:19, 4963:20, 4970:10, 4976:12, 4979:19, 4980:2, 4980:15, 4980:19, 4988:18, 4993:22
**discussions** [2] - 4961:2, 5015:15
**displace** [1] - 5012:5
**display** [1] - 5018:17
**displayed** [1] - 5010:2
**disruptive** [1] - 5002:10
**distinct** [1] - 4961:4
**District** [2] - 4892:18, 4960:6
**diversions** [1] - 5011:14
**doctor** [1] - 5017:18
**document** [12] - 4965:5, 4969:12, 4969:20, 4970:4, 4970:14, 4974:24, 4977:15, 4982:4, 4982:23, 4985:14, 4991:19, 4992:3
**documentation** [1] - 4977:12
**dome** [1] - 4952:18
**Donald** [1] - 4880:11

**done** [5] - 4894:11, 4952:6, 4962:6, 4981:13, 4994:4
**donna** [2] - 5006:24, 5007:3
**door** [1] - 5004:24
**DOT** [1] - 5011:12
**doubt** [1] - 5011:14
**Doug** [1] - 4983:6
**Douyon** [15] - 4880:1, 4881:5, 4881:11, 4896:23, 4953:16, 4969:15, 4974:21, 4982:20, 4983:13, 4985:20, 4987:5, 4989:17, 5009:23, 5010:25, 5015:17
**down** [24] - 4880:21, 4881:11, 4886:12, 4914:3, 4914:5, 4932:15, 4937:21, 4944:6, 4946:14, 4949:8, 4950:23, 4951:1, 4951:2, 4960:25, 4961:22, 4964:20, 4976:18, 4977:15, 4982:15, 4999:15, 4999:21, 5001:23, 5004:14, 5006:1
**downtown** [1] - 4892:17
**Dr** [1] - 5021:2
**dramatically** [1] - 4993:25
**draw** [3] - 4942:15, 4943:9, 4978:8
**drawn** [1] - 4952:17
**dressed** [1] - 4984:14
**Drew** [2] - 5019:3, 5019:4
**drive** [8] - 4887:12, 4887:14, 4888:10, 4915:5, 4915:8, 4921:7, 4935:8, 4971:5
**driving** [1] - 4887:18
**drop** [1] - 5012:2
**dropped** [3] - 4914:23, 4978:12, 5011:14
**drove** [10] - 4885:22, 4887:21, 4888:8, 4889:15, 4889:16, 4902:14, 4914:22, 4915:2, 4921:7, 4932:15
**during** [9] - 4879:3, 4892:1, 4946:14, 4947:4, 4978:9, 4988:19, 4990:4,

4992:15, 5013:16

**E**

**early** [3] - 4896:1,
4896:3, 4901:20
**easier** [1] - 5017:19
**east** [2] - 4924:4,
4924:8
**effort** [1] - 5013:13
**egress** [1] - 4980:23
**either** [9] - 4880:18,
4909:15, 4918:7,
4928:15, 4929:7,
4935:1, 4938:9,
4949:24, 4962:23
**elaborate** [1] -
4900:18
**election** [3] - 4934:9,
4934:10, 4934:19
**Electoral** [1] - 4919:1
**electrical** [2] -
4968:21, 4969:8
**Elizabeth** [1] - 5021:3
**Ellipse** [17] - 4921:25,
4922:15, 4939:2,
4939:5, 4940:13,
4940:18, 4992:19,
4992:23, 4993:25,
4997:5, 4997:13,
4997:18, 4997:20,
5011:4, 5011:7,
5011:15, 5012:10
**email** [6] - 4925:4,
4933:5, 4966:19,
4985:16, 4996:22,
4997:8
**emails** [2] - 4982:6,
4985:17
**employed** [1] - 4957:5
**enclosed** [1] - 4979:3
**end** [5] - 4955:11,
4971:13, 4973:8,
5013:23, 5016:25
**ended** [3] - 4910:11,
4970:14, 4978:24
**ending** [1] - 5004:23
**enforcement** [10] -
4891:15, 4916:3,
4917:2, 4926:3,
4926:9, 4933:5,
4954:3, 4960:7,
4960:14, 4960:16
**engage** [1] - 4893:25
**engaged** [1] - 4911:13
**engagement** [1] -
4960:25
**engaging** [1] -
4900:21
**engineered** [1] -

4973:14
**ensure** [1] - 5013:21
**entail** [3] - 4893:2,
4959:17, 4984:12
**enter** [1] - 4918:20
**entered** [3] - 4892:18,
4903:20, 4918:16
**entertainment** [2] -
4957:20, 4958:21
**entourage** [1] - 5007:2
**entrance** [3] -
4902:19, 4902:22,
4971:13
**entrances** [1] -
4971:12
**entry** [1] - 4878:13
**equation** [1] - 4981:24
**equipment** [6] -
4939:2, 4971:9,
4971:15, 4972:15,
4973:1, 5013:23
**erect** [1] - 4974:2
**erected** [1] - 4989:22
**escalation** [1] -
5002:15
**escort** [2] - 4907:25,
4908:1
**escorted** [1] - 4885:4
**escorting** [6] -
4908:13, 4909:4,
4922:14, 4923:13,
4923:22, 4940:25
**Estimated** [1] - 4968:9
**estimating** [1] -
4905:10
**et** [10] - 4897:9,
4899:7, 4899:8,
4959:8, 4959:15,
4967:5, 4968:24,
4973:17, 4977:5,
4978:17
**evening** [4] - 4895:7,
4895:10, 4981:14,
5021:19
**event** [100] - 4879:21,
4880:19, 4881:2,
4881:7, 4897:22,
4897:23, 4907:7,
4933:14, 4939:5,
4940:12, 4957:8,
4957:9, 4957:12,
4957:18, 4957:23,
4958:8, 4958:19,
4959:3, 4959:19,
4960:5, 4961:15,
4962:7, 4962:14,
4963:5, 4963:9,
4963:12, 4963:15,
4963:17, 4963:18,
4964:6, 4966:10,

4966:14, 4966:24,
4967:24, 4967:25,
4970:17, 4970:19,
4971:22, 4972:19,
4974:2, 4975:5,
4976:6, 4976:13,
4976:18, 4976:23,
4978:3, 4978:5,
4978:18, 4979:4,
4979:5, 4979:6,
4979:19, 4979:21,
4979:22, 4979:24,
4980:16, 4980:20,
4980:24, 4981:17,
4982:18, 4983:8,
4983:15, 4984:8,
4984:22, 4984:23,
4985:6, 4988:10,
4988:15, 4989:2,
4989:8, 4989:12,
4989:14, 4990:1,
4992:9, 4992:22,
4993:25, 4994:8,
4994:11, 4994:25,
4995:1, 4995:3,
4995:4, 4996:25,
4997:6, 4997:11,
4997:15, 4997:18,
4997:19, 4997:21,
5000:11, 5002:13,
5010:17, 5011:4,
5011:23, 5012:9,
5013:14
**events** [21] - 4879:7,
4879:11, 4885:15,
4885:19, 4895:17,
4920:3, 4921:21,
4953:25, 4958:5,
4958:23, 4961:19,
4962:2, 4962:5,
4962:6, 4964:4,
4973:3, 4978:20,
4983:18, 4989:4,
4994:4, 5006:9
**eventually** [5] -
4904:7, 4910:1,
4924:3, 4931:21,
4979:16
**evidence** [24] -
4880:6, 4881:18,
4882:10, 4903:18,
4904:12, 4916:7,
4936:10, 4936:18,
4942:25, 4948:24,
4949:3, 4952:23,
4965:10, 4965:15,
4969:23, 4970:2,
4975:18, 4982:13,
4985:25, 4987:23,
4993:18, 5003:15,
5004:17, 5010:12

**exact** [3] - 4912:20,
4924:19, 4933:19
**exactly** [3] - 4879:16,
4915:16, 5021:17
**exam** [1] - 4988:5
**examination** [10] -
4922:20, 4931:2,
4936:22, 4937:11,
4939:15, 4941:9,
4946:7, 4955:11,
4995:6, 4997:14
**EXAMINATION** [11] -
4879:1, 4919:10,
4925:19, 4931:3,
4947:1, 4955:9,
4956:14, 4990:14,
4991:11, 4995:8,
5009:9
**Examination** [11] -
4877:4, 4877:5,
4877:5, 4877:6,
4877:6, 4877:7,
4877:8, 4877:9,
4877:9, 4877:10,
4877:10
**examinations** [1] -
5021:9
**examine** [1] - 5014:19
**example** [1] - 4993:23
**exchanged** [1] -
4988:10
**exchanging** [1] -
4947:10
**excuse** [8] - 4901:1,
4925:7, 4925:13,
4946:8, 4952:18,
4984:5, 5011:3,
5016:15
**excused** [2] - 4956:3,
5014:9
**Exhibit** [29] - 4877:13,
4877:14, 4877:15,
4877:16, 4877:16,
4877:17, 4877:17,
4877:18, 4877:18,
4877:19, 4877:19,
4880:5, 4881:17,
4882:9, 4936:8,
4936:17, 4942:8,
4942:21, 4942:25,
4949:2, 4952:18,
4965:14, 4970:1,
4975:17, 4982:12,
4985:24, 4987:22,
5003:15, 5010:11
**exhibit** [8] - 4883:19,
4883:21, 4936:13,
4936:14, 4937:7,
4937:21, 4944:6,
4977:22

**exhibits** [2] - 5018:15,
5020:20
**Exhibits** [1] - 4877:12
**expect** [2] - 4895:16,
4901:16
**expectancy** [1] -
4968:13
**expectation** [9] -
4892:10, 4901:9,
4907:2, 4933:18,
4933:21, 4938:4,
4981:16, 5012:17,
5017:21
**expectations** [1] -
4959:25
**expecting** [2] -
4907:20, 5011:21
**expeditiously** [1] -
5019:22
**expenses** [3] -
4920:24, 4921:2,
4921:4
**experience** [12] -
4926:13, 4928:16,
4928:21, 4938:16,
4953:25, 4957:23,
4958:1, 4958:21,
4958:23, 4959:7,
4960:17, 4983:16
**experienced** [2] -
4927:4, 4930:23
**experiences** [3] -
4926:19, 4926:25,
4938:5
**expert** [1] - 5016:21
**experts** [2] - 5020:3,
5021:17
**explain** [5] - 4890:15,
4900:19, 4958:1,
4968:22, 5011:8
**explanation** [1] -
4921:4
**extra** [2] - 4878:9,
4893:4
**extremely** [1] - 4980:8
**eyes** [1] - 4893:4

**F**

**face** [4] - 4886:15,
4928:13, 4928:14,
4956:17
**faces** [1] - 4901:3
**facing** [1] - 4904:20
**fact** [14] - 4892:25,
4900:15, 4900:16,
4906:12, 4913:25,
4925:6, 4940:16,
4962:22, 4974:2,
4978:10, 4987:7,

5002:14, 5006:23, 5013:1
**factor** [1] - 4981:19
**factors** [1] - 4981:21
**fair** [19] - 4879:10, 4889:11, 4898:3, 4899:2, 4902:4, 4917:3, 4922:12, 4923:16, 4928:10, 4932:5, 4932:13, 4934:13, 4934:16, 4935:1, 4938:8, 4948:20, 4975:24, 4982:6, 4985:16
**fairly** [4] - 4896:3, 4978:9, 5013:1, 5018:14
**fall** [4] - 4932:8, 4932:21, 4934:5, 4962:18
**familiar** [11] - 4880:13, 4880:15, 4882:17, 4882:19, 4891:17, 4918:11, 4923:2, 4963:23, 4964:1, 4986:20, 4986:21
**far** [16] - 4878:13, 4904:20, 4905:8, 4910:6, 4911:22, 4922:17, 4930:17, 4942:13, 4943:4, 4944:17, 4953:6, 4971:12, 4989:13, 5008:9, 5018:1
**fascinating** [1] - 4980:8
**favor** [1] - 5019:17
**FBI** [2] - 4960:18, 5014:17
**feasible** [1] - 4978:9
**federal** [1] - 4891:14
**FedEx** [1] - 4978:23
**feelings** [1] - 5018:18
**feet** [4] - 4974:9, 4995:22, 4996:2, 5008:17
**felt** [2] - 4905:20, 4909:7
**female** [6] - 4908:6, 4908:25, 4909:4, 4909:17, 4909:22, 4944:13
**festival** [1] - 4957:10
**few** [10] - 4884:23, 4898:21, 4908:8, 4919:24, 4958:5, 4960:19, 4983:23, 4995:22, 5001:20, 5015:1
**field** [2] - 4883:22,

4965:21
**fifteen** [1] - 4915:6
**fifty** [1] - 4958:6
**fight** [1] - 4893:25
**fights** [1] - 4900:21
**file** [1] - 5003:12
**fill** [1] - 5012:3
**final** [2] - 4901:2, 4953:22
**finalization** [1] - 4978:25
**finally** [1] - 4968:15
**fine** [1] - 4897:18
**finish** [2] - 5012:25, 5015:11
**finished** [3] - 4901:10, 4907:14, 4907:15
**fire** [2] - 4960:3, 4961:17
**firearm** [3] - 4891:2, 4891:11, 4933:12
**firearms** [8] - 4890:4, 4890:7, 4890:11, 4891:7, 4892:3, 4892:11, 4892:13, 4898:14
**First** [3] - 4961:5, 4968:18, 4996:16
**first** [20] - 4879:20, 4881:1, 4886:18, 4887:10, 4897:20, 4898:5, 4931:20, 4943:14, 4963:20, 4964:17, 4964:19, 4966:25, 4974:7, 4979:16, 4980:21, 4986:23, 4993:13, 4995:16, 4998:9
**five** [6] - 4888:11, 4896:5, 4946:5, 4971:16, 4984:4, 5019:11
**FL** [3] - 4882:19, 4897:5, 4936:25
**flat** [1] - 4968:25
**flight** [2] - 4878:9, 5015:10
**Florida** [21] - 4879:17, 4885:23, 4887:12, 4887:21, 4890:7, 4890:16, 4890:17, 4890:22, 4890:25, 4905:22, 4915:2, 4915:3, 4915:3, 4915:9, 4920:11, 4938:23, 4945:8, 4945:18, 4957:22, 4958:25, 4959:1
**Floridian** [1] - 4958:18
**fly** [4] - 4921:10,

4959:9, 4959:12, 4988:5
**focus** [1] - 4934:8
**fold** [1] - 4889:2
**fold-out** [1] - 4889:2
**folks** [3] - 4901:21, 4908:3, 4939:9
**followed** [1] - 4894:14
**following** [1] - 4927:24
**food** [1] - 4921:6
**force** [2] - 4891:20, 4891:21
**forced** [1] - 5005:21
**forgetting** [1] - 4919:21
**forgive** [1] - 4880:10
**forgotten** [1] - 4966:4
**forklift** [1] - 4971:6
**form** [7] - 4883:14, 4917:10, 4966:19, 4973:16, 4984:25, 4986:15, 4986:17
**formal** [1] - 4893:19
**format** [1] - 4959:22
**former** [8] - 4880:18, 4891:5, 4918:1, 4926:3, 4949:6, 4989:8, 5019:2
**forms** [1] - 4965:18
**forward** [3] - 4946:22, 4979:8, 5016:2
**foundation** [3] - 4916:20, 4926:14, 4942:22
**four** [7] - 4888:14, 4888:17, 4906:16, 4909:2, 4971:16, 4971:21
**free** [2] - 4968:18, 4984:6
**Freedom** [2] - 4920:3, 4949:25
**freedom** [5] - 4898:5, 4898:19, 4909:9, 4910:7, 4949:25
**freezing** [2] - 4905:20, 4905:22
**frequency** [1] - 4978:13
**Friday** [4] - 5016:21, 5016:22, 5017:1, 5021:11
**Friday's** [2] - 5017:2, 5017:7
**fried** [1] - 4983:25
**Friends** [1] - 5008:11
**Front** [1] - 4967:4
**front** [5] - 4904:22, 4906:19, 4924:4,

4988:25, 5013:11
**fruition** [1] - 4960:5
**full** [4] - 4897:8, 4898:7, 4899:6, 4956:18
**fully** [1] - 5020:1
**function** [2] - 4929:10, 4964:3

## G

**gained** [1] - 4958:21
**gas** [1] - 4921:6
**gate** [5] - 4910:19, 4910:22, 4951:11, 4951:14, 4951:18
**Gator** [15] - 4883:24, 4884:8, 4937:8, 4937:9, 4937:10, 4937:13, 4937:15, 4986:10, 4986:16, 4991:6, 4991:7, 5003:6, 5003:10, 5007:9, 5009:1
**gear** [2] - 4898:9, 4940:17
**Gene** [1] - 4991:16
**general** [1] - 4927:9
**generally** [5] - 4942:17, 4973:5, 4987:19, 4987:25, 4988:9
**generator** [1] - 4969:11
**gentlemen** [3] - 4879:14, 4884:9, 4890:15
**geographic** [2] - 4959:6, 4961:14
**girlfriend** [1] - 4932:5
**gist** [2] - 4924:20, 4933:19
**given** [5] - 5005:14, 5011:11, 5013:5, 5019:8, 5020:13
**Glock** [1] - 4890:2
**goal** [1] - 4995:24
**God** [6] - 4966:1, 4966:2, 4966:3, 4966:6, 4966:8, 4970:7
**golf** [5] - 4902:9, 4902:10, 4902:12, 4902:14, 4902:17
**gonna** [1] - 4898:22
**gosh** [1] - 4966:11
**Government** [6] - 4877:13, 4877:14, 4936:17, 4942:25, 4952:24, 5003:14

**government** [8] - 4881:13, 4882:4, 4975:8, 4975:12, 4982:2, 4982:21, 4995:7, 5014:18
**Government's** [3] - 4936:8, 4942:8, 4942:21
**government's** [2] - 4975:2, 5018:15
**grab** [1] - 4893:21
**grabbed** [1] - 4999:5
**grand** [2] - 4916:19, 4916:22
**grass** [4] - 4969:2, 4971:6, 4974:1, 4976:17
**grassy** [3] - 4906:21, 4967:4, 4970:14
**Gray** [6] - 4883:24, 4884:1, 4884:8, 4937:7, 4937:10, 4937:13
**gray** [1] - 4977:20
**great** [3] - 4939:21, 4977:14, 5016:1
**green** [3] - 4949:8, 4952:1, 4976:17
**GREENE** [1] - 4925:15
**Greene** [20] - 4925:17, 4925:22, 4925:24, 4926:11, 4926:19, 4927:14, 4927:23, 4928:4, 4928:11, 4929:20, 4929:23, 4930:1, 4930:9, 4930:19, 4932:18, 4944:21, 4947:24, 4955:12, 4955:15
**Greene's** [4] - 4926:1, 4926:13, 4927:24, 4929:6
**Greenes** [1] - 4983:5
**ground** [2] - 4996:2, 4996:5
**grounds** [4] - 4953:9, 4967:6, 4974:1, 5008:18
**Grounds** [22] - 4910:16, 4939:20, 4940:6, 4940:8, 4951:8, 4951:10, 4961:4, 4965:9, 4967:1, 4967:3, 4967:7, 4967:9, 4970:8, 4971:7, 4971:13, 4973:8, 4980:10, 4989:7, 4990:1, 4990:4, 5003:24, 5008:20

**Group** [4] - 4959:18, 4962:11, 4962:13, 4972:24

**group** [30] - 4884:4, 4895:3, 4896:5, 4906:7, 4906:16, 4908:8, 4908:13, 4909:1, 4909:5, 4909:18, 4911:25, 4912:12, 4924:1, 4928:1, 4928:2, 4928:4, 4928:8, 4931:16, 4933:23, 4933:25, 4934:12, 4934:15, 4938:23, 4941:15, 4941:16, 4944:18, 4962:23, 4994:25, 4995:2, 5004:13

**grouped** [3] - 4912:11, 4962:22, 4962:24

**groups** [3] - 4928:2, 4936:5, 5002:10

**Guard** - 4897:10, 4897:11, 4899:7, 5003:24

**guard** [3] - 4898:19, 4910:18, 4951:12

**guess** [18] - 4878:13, 4885:13, 4889:4, 4892:1, 4896:5, 4903:13, 4905:10, 4905:16, 4908:12, 4908:19, 4910:16, 4913:19, 4919:6, 4920:11, 4930:5, 4941:16, 4951:11, 4999:20

**guessing** [2] - 4899:11, 4920:9

**guests** [2] - 4985:3, 5010:19

**guns** [2] - 4920:20

**guy** [1] - 4909:10

**guys** [4] - 4884:17, 4898:7, 4934:5, 4957:2

---

**H**

**half** [2] - 4971:21, 4978:15

**HALLER** [6] - 5003:7, 5017:11, 5017:14, 5017:22, 5018:1, 5018:5

**Haller** [4] - 5014:21, 5014:23, 5016:6, 5016:19

**hand** [3] - 4883:22, 4956:8, 4977:22

**handgun** [1] - 4920:15

**handheld** [1] - 4972:23

**handle** [2] - 4995:22, 5014:21

**hands** [1] - 4985:1

**hang** [3] - 4922:19, 5007:20, 5017:20

**happy** [1] - 5020:12

**hard** [2] - 4886:12, 5018:23

**harm's** [2] - 4893:21, 4939:17

**headed** [1] - 4953:8

**heading** [1] - 4992:2

**headphones** [1] - 4919:21

**hear** [4] - 4919:22, 5015:16, 5015:17, 5017:6

**heard** [7] - 4912:4, 4928:21, 4928:24, 4929:5, 4964:4, 4989:16, 5004:24

**hearing** [3] - 4881:1, 4916:19, 4925:4

**hearsay** [5] - 4916:18, 4926:14, 4926:15, 4928:22, 4992:20

**heavy** [1] - 4909:22

**heck** [2] - 4912:15, 5011:20

**hectic** [1] - 4898:23

**height** [2] - 4974:8

**held** [9] - 4878:4, 4878:19, 4917:5, 4946:12, 4946:18, 4980:13, 5010:17, 5015:4, 5016:4

**hello** [2] - 4919:13, 4995:11

**helmet** [4] - 4896:16, 4896:18, 4938:14, 4943:19

**helmets** [2] - 4938:24, 4940:17

**help** [5] - 4913:16, 4913:23, 4913:25, 4955:4

**helpful** [1] - 4988:20

**helps** [1] - 4952:9

**hero** [1] - 4900:8

**hi** [1] - 4990:18

**high** [1] - 5008:17

**higher** [1] - 4974:9

**highlighted** [1] - 4951:6

**highlighting** [2] - 4973:18, 4973:21

**hired** [4] - 4962:7,

---

4962:13, 4963:17, 4985:5

**history** [1] - 4926:7

**Hold** [1] - 4916:15

**hold** [2] - 4959:3, 4988:1

**Hollywood** [1] - 4884:23

**home** [2] - 4956:1, 5014:7

**Homeland** [2] - 4959:14, 4960:18

**honest** [1] - 4905:21

**Honor** [28] - 4878:12, 4878:25, 4916:16, 4919:3, 4925:8, 4925:9, 4925:16, 4936:10, 4942:20, 4946:25, 4955:6, 4955:8, 4955:24, 4956:13, 4965:12, 4985:22, 4988:3, 4990:8, 5005:5, 5005:11, 5005:16, 5014:5, 5017:11, 5017:14, 5020:7, 5020:19, 5021:1, 5021:2

**honor** [3] - 4890:21, 4890:22, 4890:24

**hope** [4] - 4878:22, 4925:10, 5001:11, 5017:4

**hoping** [1] - 4908:20

**Horse** [7] - 5003:1, 5003:3, 5003:10, 5003:20, 5004:2, 5004:12, 5005:18

**horse** [2] - 4909:10

**host** [2] - 4976:18, 4976:22

**hosting** [1] - 4984:22

**hotel** [25] - 4889:16, 4889:17, 4889:21, 4891:7, 4892:6, 4892:15, 4892:16, 4892:20, 4894:24, 4895:3, 4895:6, 4895:7, 4898:11, 4898:24, 4902:7, 4902:10, 4914:14, 4914:17, 4914:23, 4914:24, 4921:4, 4921:6, 4950:3, 4981:4

**hour** [2] - 4878:22, 4971:4

**hours** [6] - 4888:11, 4915:6, 4971:16, 4971:21, 5019:15

---

**House** [4] - 4949:9, 4949:10, 4949:16, 4950:20

**house** [1] - 4951:12

**hundred** [3] - 4911:5, 4958:6

**hundreds** [3] - 4883:4, 4940:5, 4940:7

**hunting** [1] - 4888:21

**husband** [3] - 4914:6, 4914:10, 4914:11

---

**I**

**idea** [3] - 4935:25, 4994:1, 4995:24

**illegal** [1] - 4916:1

**iMessage** [1] - 4899:18

**immediately** [2] - 4988:22, 5011:24

**impeachment** [4] - 5014:17, 5018:19, 5018:23, 5019:13

**important** [7] - 4939:12, 4994:12, 5002:2, 5004:6, 5011:5, 5011:17, 5012:7

**importantly** [1] - 5011:18

**impossible** [1] - 4923:17

**in-depth** [1] - 4981:3

**include** [6] - 4899:17, 4959:13, 4966:21, 4986:17, 4992:19, 5018:16

**included** [1] - 4971:4

**including** [3] - 5003:21, 5004:13, 5010:22

**incoming** [1] - 5003:25

**indicate** [1] - 5010:16

**indicated** [2] - 4926:6, 4997:8

**indicating** [1] - 4976:20

**indication** [1] - 4951:4

**indictment** [1] - 5021:13

**individual** [2] - 4903:21, 4994:12

**individuals** [4] - 4986:17, 4992:8, 4994:19, 5011:3

**indulgence** [4] - 4881:12, 4917:6, 4923:6, 4993:8

---

**industry** [3] - 4957:20, 4958:22, 4962:25

**information** [9] - 4933:2, 4968:10, 4970:24, 4972:16, 4972:18, 4986:2, 4986:14, 4986:15, 4999:2

**inkling** [4] - 4918:19, 4918:22, 4918:25, 5013:13

**inside** [5] - 4884:11, 4884:13, 4908:9, 4959:24, 5005:1

**instance** [4] - 4920:23, 4960:10, 4971:3, 4972:22

**instead** [4] - 4900:21, 5012:2, 5015:5, 5017:9

**instruct** [1] - 4894:13

**instruction** [1] - 5006:15

**Insurrection** [1] - 4917:17

**insurrection** [1] - 4918:11

**intact** [1] - 5011:25

**integrity** [1] - 5012:4

**intel** [1] - 5005:19

**intend** [2] - 4895:9, 5018:17

**intended** [1] - 5013:14

**intending** [1] - 5020:17

**intends** [1] - 5014:18

**intention** [1] - 4893:17

**interact** [1] - 4928:13

**interest** [2] - 5018:14, 5020:3

**interested** [2] - 4905:23, 4963:3

**internet** [2] - 4923:16, 4923:19

**interrupt** [1] - 4879:18

**intersection** [1] - 4914:9

**interview** [1] - 5019:1

**introduced** [2] - 4895:13, 5002:6

**introduction** [1] - 5013:8

**inverter** [1] - 4974:19

**investigations** [5] - 5002:9, 5002:18, 5002:22, 5003:4, 5003:11

**invited** [1] - 5010:19

**involve** [1] - 4983:18

**involved** [16] -

4927:20, 4957:19, 4958:4, 4960:4, 4961:18, 4961:19, 4966:5, 4969:22, 4970:8, 4975:6, 4981:22, 4981:23, 4992:22, 4994:24, 5002:20, 5007:13
**involving** [1] - 4958:8
**Isaacs** [6] - 4925:15, 4991:17, 4993:2, 5021:5, 5021:12
**Isaacs'** [1] - 5021:4
**issue** [4] - 4899:13, 4899:15, 5018:6, 5019:18
**issues** [1] - 4990:5
**it'll** [1] - 4923:1
**itself** [9] - 4964:6, 4967:6, 4971:12, 4971:18, 4989:14, 4990:5, 5011:9, 5013:12, 5013:25

## J

**jacket** [2] - 4886:15, 4896:9
**Jacksonville** [2] - 4887:21, 4888:7
**Jan** [4] - 4882:19, 4897:5, 4936:25, 5003:18
**January** [94] - 4879:7, 4879:8, 4879:9, 4879:12, 4879:21, 4880:19, 4884:5, 4884:14, 4885:2, 4885:5, 4885:8, 4885:15, 4885:19, 4891:25, 4894:21, 4895:22, 4897:24, 4899:13, 4900:3, 4901:17, 4901:20, 4902:1, 4902:8, 4903:6, 4904:17, 4907:7, 4916:23, 4917:8, 4917:13, 4918:17, 4918:20, 4918:23, 4919:1, 4920:1, 4920:4, 4921:24, 4928:11, 4928:19, 4929:6, 4929:24, 4930:15, 4930:16, 4936:1, 4936:5, 4938:7, 4939:3, 4939:21, 4940:13, 4940:20, 4942:18, 4943:4, 4944:3, 4945:8, 4948:11, 4949:7,

4949:18, 4949:21, 4949:22, 4949:23, 4950:13, 4950:21, 4954:5, 4954:10, 4954:23, 4955:13, 4962:7, 4962:14, 4964:1, 4966:8, 4966:25, 4967:18, 4970:21, 4971:18, 4974:3, 4976:6, 4977:8, 4979:5, 4980:17, 4981:16, 4985:6, 4987:8, 4988:11, 4989:3, 4989:4, 4989:9, 4989:19, 4992:7, 5000:12, 5010:15, 5010:17, 5013:25
**jeans** [6] - 4896:9, 4897:9, 4897:17, 4899:7, 4938:7, 4938:9
**Jefferson** [1] - 4977:4
**Jeffrey** [1] - 4877:4
**Jericho** [7] - 4963:15, 4963:16, 4963:17, 4964:4, 4964:6, 4964:8, 4964:10
**job** [5] - 4952:6, 4963:1, 4963:2, 4998:3, 5011:22
**Joe** [2] - 4886:3, 4945:15
**join** [1] - 4887:24
**joined** [3] - 4931:7, 4931:10, 4931:15
**joke** [1] - 4990:13
**Jones** [2] - 4903:23, 4983:5
**Judge** [1] - 4952:4
**jurisdiction** [1] - 4972:12
**JUROR** [1] - 5015:20
**jury** [31] - 4878:4, 4878:13, 4878:17, 4878:19, 4878:20, 4879:14, 4880:8, 4881:19, 4882:14, 4884:8, 4890:16, 4899:3, 4902:25, 4916:19, 4916:22, 4936:19, 4942:24, 4946:12, 4946:18, 4946:19, 4949:4, 4965:16, 4965:18, 4970:3, 4970:4, 4976:3, 4983:4, 4988:7, 5010:10, 5016:4, 5018:17
**jury's** [2] - 4991:24,

5015:2

## K

**Kane** [2] - 4898:9, 4898:10
**keep** [5] - 4919:21, 4978:24, 4984:1, 5000:3, 5011:25
**Keeper** [10] - 4892:22, 4894:23, 4896:4, 4903:15, 4908:23, 4908:24, 4917:14, 4917:16, 4930:10, 4930:11
**Keepers** [75] - 4879:17, 4881:8, 4885:1, 4885:7, 4885:24, 4887:3, 4887:22, 4888:8, 4891:12, 4891:25, 4895:19, 4898:17, 4904:2, 4904:6, 4904:15, 4905:4, 4906:25, 4907:6, 4907:16, 4908:15, 4909:16, 4910:2, 4912:1, 4912:10, 4916:3, 4917:1, 4917:9, 4918:13, 4918:16, 4920:23, 4921:14, 4921:17, 4921:21, 4921:22, 4925:25, 4927:7, 4929:9, 4929:14, 4929:17, 4931:7, 4931:15, 4932:24, 4934:4, 4934:20, 4934:23, 4935:4, 4936:4, 4938:20, 4940:17, 4940:19, 4941:7, 4944:22, 4945:6, 4953:25, 4954:3, 4955:3, 4963:24, 4964:3, 4964:7, 4985:9, 4985:10, 4986:7, 4987:7, 4987:11, 4987:13, 4988:10, 4991:25, 4992:5, 5002:21, 5005:23, 5006:4, 5006:21, 5006:24, 5007:4, 5009:1
**keeping** [1] - 4978:24
**Kelly** [24] - 4886:1, 4886:4, 4887:4, 4887:6, 4887:19, 4888:4, 4889:7, 4912:12, 4912:18, 4914:22, 4924:3,

4935:9, 4935:13, 4935:15, 4935:21, 4935:23, 4937:15, 4941:16, 4941:20, 4945:11, 4986:11, 4986:12, 4986:23, 4991:8
**Kellye** [6] - 4930:2, 4930:13, 4932:3, 4932:5, 4935:13, 4935:15
**Kentucky** [1] - 4932:22
**kept** [1] - 4944:18
**Kern** [1] - 4983:6
**khaki** [2] - 4899:7, 4938:9
**khakis** [2] - 4897:9, 4897:17
**kid** [1] - 4922:12
**kind** [22] - 4889:1, 4889:24, 4890:1, 4890:6, 4893:25, 4897:8, 4903:7, 4905:10, 4906:23, 4909:6, 4910:17, 4911:20, 4911:23, 4918:13, 4923:2, 4927:20, 4933:10, 4933:23, 4935:3, 4952:22, 4991:3, 5006:24
**Kingdom** [1] - 4958:20
**knocked** [1] - 4943:25
**knowing** [1] - 4881:4
**knowledge** [2] - 4948:20, 4992:18
**known** [3] - 4961:16, 4963:24, 4986:10
**knows** [3] - 4961:4, 4999:25, 5018:17

## L

**labor** [1] - 4971:8
**lack** [1] - 4926:14
**ladies** [3] - 4879:14, 4884:9, 4890:15
**lady** [3] - 4913:23, 4913:25, 4923:22
**lady's** [1] - 4966:4
**Lafayette** [1] - 4933:14
**laid** [1] - 4916:20
**Lake** [6] - 4879:17, 4885:23, 4886:17, 4887:7, 4887:12, 4887:21
**Lakeland** [2] -

4935:9, 4935:13,
4957:22, 4959:7
**lanyards** [1] - 4996:11
**large** [7] - 4906:7, 4958:22, 4962:6, 4969:8, 4973:6, 5007:2, 5011:9
**large-scale** [2] - 4958:22, 4962:6
**larger** [1] - 4960:9
**largest** [1] - 4958:20
**last** [12] - 4901:11, 4922:4, 4922:10, 4958:5, 4961:24, 4963:19, 4968:3, 4982:15, 4984:1, 4984:4, 5005:10, 5011:22
**lasting** [1] - 4961:24
**late** [1] - 4900:8
**launch** [1] - 4899:12
**Lauren** [1] - 4983:6
**law** [11] - 4891:14, 4916:3, 4917:2, 4926:3, 4926:9, 4933:5, 4954:3, 4958:15, 4960:7, 4960:14, 4960:16
**lawyer** [1] - 4952:4
**lawyerly** [1] - 4880:10
**lead** [5] - 4928:4, 4928:8, 4986:9, 4986:10, 5006:14
**leader** [12] - 4927:19, 4928:3, 4929:7, 4929:8, 4930:19, 4930:21, 4931:10, 4944:21, 4944:24, 4945:5, 4955:12, 4955:16
**leaders** [1] - 4929:7
**leadership** [2] - 4929:20, 4935:3
**leading** [2] - 4992:10, 5012:19
**leaning** [2] - 4962:17
**learn** [7] - 4879:20, 4915:18, 4918:15, 4922:9, 4931:10, 4958:16, 4980:9
**learned** [5] - 4879:23, 4915:14, 4915:17, 4950:6, 4959:4
**learning** [2] - 4884:3, 4884:4
**least** [1] - 4920:23
**leave** [7] - 4890:11, 4892:8, 4894:1, 4894:3, 4914:17, 5013:3, 5013:24
**leaving** [3] - 4892:4,

4950:16, 4990:1
**left** [27] - 4879:6,
4883:22, 4889:20,
4891:7, 4892:4,
4892:6, 4892:15,
4898:13, 4905:11,
4907:14, 4907:18,
4908:1, 4908:3,
4910:17, 4911:18,
4914:3, 4939:5,
4941:17, 4941:22,
4944:9, 4944:11,
4944:13, 4944:20,
4952:16, 4953:9,
4968:3, 4977:1
**left-hand** [1] - 4883:22
**leg** [1] - 4946:23
**legal** [1] - 4916:21
**legs** [2] - 4909:18,
4973:15
**length** [1] - 4878:17
**LEO** [4] - 4960:11,
4960:13, 4960:15,
4981:22
**LEOs** [2] - 4960:12,
5002:17
**less** [1] - 4916:18
**Lessard** [1] - 4989:15
**letter** [2] - 4917:23
**letters** [5] - 4917:24,
4918:1, 4918:5,
4934:19, 5010:14
**level** [4] - 4900:12,
4901:23, 4960:25,
5002:19
**liberal** [1] - 4962:17
**liberal-leaning** [1] -
4962:17
**Library** [1] - 4977:3
**license** [7] - 4890:4,
4890:6, 4890:7,
4890:8, 4890:12,
4890:16, 4890:25
**licensed** [1] - 4893:10
**licenses** [1] - 4890:21
**light** [2] - 4884:22,
4962:21
**likely** [2] - 4900:1,
5011:16
**limit** [1] - 4973:17
**limits** [1] - 4976:19
**line** [4] - 4878:17,
4952:17, 4978:15
**lines** [3] - 4912:13,
4912:19, 4967:11
**link** [1] - 4910:1
**linking** [1] - 4907:3
**list** [30] - 4960:16,
4981:8, 4982:24,
4983:2, 4983:7,

4984:17, 4986:6,
4986:17, 4991:1,
4992:8, 4992:13,
4992:14, 4993:10,
4993:16, 4993:21,
4994:1, 4997:15,
4997:16, 4997:24,
4998:7, 4999:4,
4999:7, 5009:16,
5010:20, 5010:23,
5011:25
**listed** [2] - 4990:25,
4998:20
**listen** [1] - 4895:14
**listing** [1] - 4997:21
**literally** [3] - 4854:14,
4984:19, 4995:3
**live** [2] - 4885:22,
4959:10
**located** [1] - 4959:1
**location** [7] - 4887:7,
4921:10, 4948:10,
4959:6, 4959:20,
4961:15
**lockdown** [1] - 5014:2
**logos** [2] - 4904:13,
4904:15
**LOL** [2] - 5000:9,
5001:10
**long-lasting** [1] -
4961:24
**look** [15] - 4884:20,
4897:10, 4897:11,
4899:7, 4900:6,
4957:2, 4963:19,
4970:13, 4981:24,
4986:5, 4988:22,
5003:12, 5011:24,
5012:3, 5016:2
**looked** [9] - 4903:8,
4903:9, 4903:10,
4909:20, 4952:22,
4974:5, 4992:1,
4994:2, 5010:6
**looking** [12] - 4880:23,
4882:2, 4882:16,
4961:10, 4966:9,
4967:18, 4972:20,
4979:11, 4984:24,
4997:24, 4999:20,
5005:11
**looks** [11] - 4881:21,
4881:23, 4883:14,
4883:17, 4903:7,
4903:20, 4903:21,
4999:13, 5004:19,
5005:2, 5010:3
**lost** [1] - 4962:4
**Louisville** [6] -
4921:16, 4927:12,

4927:14, 4927:19,
4932:22, 4933:8
**lovely** [1] - 4993:24
**lunch** [2] - 4878:22,
5021:10

# M

**ma'am** [48] - 4919:20,
4931:6, 4931:9,
4931:12, 4931:17,
4932:14, 4932:17,
4932:20, 4932:23,
4933:1, 4933:3,
4933:9, 4933:11,
4933:13, 4933:16,
4934:7, 4934:11,
4934:14, 4934:17,
4934:21, 4935:2,
4935:5, 4936:3,
4936:6, 4936:23,
4937:1, 4937:12,
4937:14, 4938:1,
4938:6, 4938:13,
4938:15, 4938:22,
4938:25, 4942:6,
4943:6, 4943:18,
4943:20, 4943:23,
4944:1, 4945:1,
4945:3, 4945:10,
4945:12, 4945:14,
4945:19, 4945:24
**MACHADO** [10] -
4878:12, 4925:18,
4952:8, 4990:10,
4990:15, 4990:21,
4990:22, 5018:11,
5020:11, 5020:19
**Machado** [2] -
4991:20, 5020:17
**Machado.............** [1]
- 4877:9
**MAGA** [1] - 4887:11
**magnitude** [1] -
4916:19
**main** [5] - 4884:17,
4903:12, 4909:5,
4929:9, 4963:13
**maintain** [1] - 5012:3
**major** [1] - 4957:10
**Mall** [6] - 4960:10,
4962:1, 4962:5,
4963:10, 4963:13,
4994:5
**man** [4] - 4922:7,
4935:11, 4945:15,
4945:17
**managed** [1] -
4950:12
**manned** [1] - 4910:19
**manually** [1] - 4971:7

**manufacturer** [1] -
4993:7
**map** [12] - 4948:19,
4948:21, 4949:10,
4950:18, 4951:14,
4952:1, 4967:10,
4967:15, 4976:9,
4976:11, 5010:16
**March** [6] - 4887:11,
4963:16, 4964:5,
4964:6, 4964:8,
4964:10
**marching** [1] - 4939:6
**Marjorie** [1] - 4983:5
**mark** [2] - 4904:23,
4969:18
**market** [1] - 4961:17
**markings** [1] -
4996:11
**Marsha** [1] - 4989:15
**marshal** [1] - 4960:3
**marshals** [1] -
4961:17
**Martin** [3] - 4966:15,
4966:17, 4966:18
**mask** [2] - 4886:10,
4886:15
**massive** [1] - 5011:9
**Mastriano** [1] - 4983:6
**mate** [1] - 4995:11
**matter** [2] - 4895:12,
4959:9
**matters** [1] - 5016:7
**maximum** [1] - 4974:8
**mayor's** [1] - 4959:13
**MC** [2] - 5013:7,
5013:8
**mean** [24] - 4897:18,
4911:25, 4912:22,
4913:5, 4913:9,
4921:15, 4930:15,
4930:22, 4935:7,
4935:24, 4940:2,
4941:18, 4954:12,
4954:24, 4955:2,
4959:9, 4968:17,
4986:15, 4994:15,
5005:8, 5013:19,
5015:23, 5019:12,
5019:25
**meaning** [1] - 4954:6
**means** [1] - 4973:9
**meant** [5] - 4935:13,
4951:6, 4955:3,
4969:1, 4988:22
**mechanical** [1] -
5021:23
**meet** [3] - 4922:23,
4898:7, 4909:5,
4968:19

**meeting** [3] - 4895:19,
4895:20, 4984:18
**megaphones** [1] -
4972:25
**Meggs** [67] - 4877:15,
4877:16, 4877:16,
4877:17, 4877:17,
4877:18, 4877:18,
4877:19, 4877:19,
4880:5, 4881:17,
4882:9, 4886:1,
4886:4, 4886:6,
4886:18, 4887:4,
4887:6, 4887:19,
4889:5, 4889:7,
4912:12, 4912:22,
4913:5, 4913:9,
4914:22, 4924:3,
4924:8, 4924:11,
4924:14, 4924:17,
4925:5, 4935:9,
4935:13, 4935:15,
4935:21, 4935:23,
4937:15, 4941:20,
4941:25, 4944:8,
4944:17, 4945:11,
4945:13, 4947:11,
4949:2, 4953:20,
4954:5, 4954:11,
4954:23, 4956:6,
4965:14, 4970:1,
4975:17, 4982:12,
4985:24, 4986:11,
4986:12, 4986:23,
4986:25, 4987:3,
4987:22, 5010:11,
5014:16, 5014:23,
5018:19
**Meggs's** [5] - 4888:4,
4908:25, 4941:16,
4953:22, 5020:8
**member** [11] -
4882:22, 4882:24,
4921:14, 4921:17,
4921:20, 4932:24,
4934:22, 4994:13,
5007:11, 5008:12,
5012:22
**members** [17] -
4879:17, 4907:6,
4910:1, 4912:10,
4918:16, 4938:23,
4981:16, 4983:1,
4998:19, 4999:4,
4999:5, 5000:9,
5009:16, 5010:22,
5011:3, 5011:19,
5012:17
**memorial** [1] - 4967:5
**memory** [2] - 4923:1,

4971:24
mentioned [3] -
4899:24, 4942:1,
4967:3
message [9] - 4884:7,
4884:16, 4897:3,
4899:5, 4936:21,
4936:24, 4999:24,
5000:22, 5004:2
messages [10] -
4883:2, 4899:17,
4917:14, 4937:7,
4947:7, 4977:19,
4977:21, 4988:9,
4998:7
met [11] - 4879:17,
4885:23, 4885:25,
4886:18, 4886:20,
4887:6, 4887:10,
4887:22, 4906:23,
4907:16, 5009:1
Metro [5] - 4952:8,
4952:10, 4959:14,
4960:18, 5011:12
Michael [10] -
4925:22, 4925:24,
4926:1, 4926:11,
4929:6, 4932:18,
4944:21, 4955:12,
4955:15
Michigan [2] - 4930:1,
4930:20
microphone [6] -
4956:16, 4974:11,
4974:12, 4974:14,
5013:10
microphones [2] -
4971:9, 5013:7
might [14] - 4886:2,
4891:14, 4898:11,
4902:15, 4911:19,
4921:22, 4933:18,
4934:1, 4938:3,
4938:4, 4938:9,
4942:16, 4943:10,
5020:3
mile [2] - 4884:19,
4978:15
military [1] - 4926:3
Million [1] - 4887:10
million [2] - 5000:19,
5001:11
mind [2] - 4990:11,
5000:11
minded [1] - 5007:1
minimum [3] - 4901:4,
4901:8, 4974:8
ministers [1] -
4998:23
minute [1] - 5011:22

minutes [8] - 4878:16,
4884:18, 4946:5,
5004:12, 5014:18,
5015:1, 5015:6,
5020:22
misunderstanding [1]
- 5020:16
mixer [2] - 4974:15
Monday [2] - 5016:22,
5017:1
money [1] - 5013:19
moniker [7] - 4947:16,
4947:18, 4947:21,
4947:23, 4947:25,
4948:2, 4987:2
moniker/nickname [1]
- 4931:18
monikers [2] -
4986:18, 4986:19
mood [2] - 4915:8,
4945:22
Morelock [18] -
4877:4, 4878:5,
4879:3, 4881:21,
4919:12, 4919:24,
4925:21, 4931:5,
4936:21, 4937:24,
4942:11, 4943:3,
4946:13, 4946:20,
4947:3, 4947:6,
4955:11, 4955:25
morning [17] -
4878:10, 4889:12,
4896:2, 4901:20,
4902:18, 4914:21,
4919:12, 4920:6,
4939:3, 4940:13,
4970:23, 4971:17,
4981:14, 4991:13,
5011:5, 5012:10,
5016:3
most [2] - 4911:9,
4950:19
mostly [1] - 4930:9
mother [1] - 5021:4
mouth [1] - 4962:25
move [11] - 4880:3,
4884:18, 4919:18,
4922:21, 4948:23,
4965:10, 4969:23,
4971:14, 4993:22,
4993:23, 5020:20
moved [4] - 4906:19,
4960:24, 4971:7,
4981:13
movement [1] -
4981:15
moving [5] - 4882:12,
4979:8, 4984:2,
5012:2, 5012:5

multiple [1] - 4960:11

N

name [37] - 4886:2,
4887:1, 4888:1,
4888:2, 4889:17,
4894:23, 4898:13,
4908:24, 4909:1,
4922:4, 4922:9,
4922:10, 4922:17,
4922:24, 4923:13,
4925:21, 4931:18,
4931:20, 4932:2,
4941:4, 4941:5,
4945:20, 4948:4,
4956:18, 4956:20,
4959:19, 4960:19,
4963:15, 4963:19,
4965:25, 4966:4,
4966:11, 4982:16,
4983:23, 4986:23,
4989:16, 5002:24
named [5] - 4908:23,
4908:24, 4922:7,
4935:11, 4945:15
names [14] - 4885:25,
4886:25, 4981:8,
4983:1, 4991:4,
4991:5, 4992:25,
4997:16, 4997:18,
4997:20, 4997:23,
4999:6, 5010:20
nap [1] - 4914:16
Nathan [4] - 4966:15,
4966:17, 4966:18,
4966:22
Nathan's [1] - 4975:6
Nation [6] - 4965:25,
4966:2, 4966:3,
4966:6, 4966:8,
4970:7
nation's [1] - 4994:4
national [5] - 4958:3,
4959:14, 4960:19,
4961:20, 4961:25
National [10] -
4897:10, 4897:11,
4899:6, 4958:11,
4959:8, 4960:10,
4962:5, 4963:13,
4973:25, 5003:24
native [1] - 4883:14
nature [1] - 4927:3
near [3] - 4884:12,
4885:22, 4960:22
necessarily [1] -
4930:21
necessary [6] -
4897:15, 4938:17,
4959:12, 4960:2,

4964:19, 4964:21
need [23] - 4896:15,
4897:10, 4898:5,
4899:3, 4920:20,
4968:24, 4969:1,
4969:9, 4971:3,
4972:21, 4978:17,
4978:21, 4980:11,
4984:20, 4990:10,
4991:15, 4996:12,
5000:2, 5013:4,
5015:9, 5015:10,
5016:19
needed [7] - 4895:15,
4896:21, 4907:17,
4908:16, 4909:19,
4913:22, 4944:14
needs [1] - 4964:21
negotiated [1] -
4972:2
negotiations [1] -
4970:25
NESTLER [66] -
4881:15, 4965:12,
4969:24, 4975:11,
4975:14, 4975:16,
4982:9, 4985:19,
4988:3, 4992:10,
4992:20, 4995:9,
4995:14, 4995:15,
4996:18, 4996:20,
4998:4, 4998:6,
4998:9, 4998:11,
4998:15, 4998:18,
4999:9, 4999:11,
4999:15, 4999:17,
4999:19, 5000:1,
5000:14, 5000:17,
5000:24, 5001:1,
5001:4, 5001:6,
5001:23, 5001:24,
5002:5, 5002:7,
5003:9, 5003:14,
5003:17, 5004:9,
5004:11, 5004:16,
5004:18, 5005:3,
5005:10, 5005:16,
5005:17, 5006:1,
5006:3, 5007:18,
5007:23, 5008:6,
5009:6, 5010:9,
5012:19, 5017:2,
5017:5, 5018:9,
5018:24, 5019:2,
5019:8, 5019:17,
5020:2, 5021:12
Nestler [7] - 5005:9,
5009:12, 5010:20,
5011:2, 5012:14,
5017:6, 5018:14

Nestler................ [1] -
4877:10
never [5] - 4947:14,
4985:11, 5000:11,
5009:1, 5009:4
new [1] - 4978:21
next [19] - 4889:12,
4895:2, 4895:17,
4908:18, 4909:8,
4911:21, 4913:21,
4914:21, 4968:21,
4987:2, 4999:15,
5000:25, 5005:3,
5008:5, 5016:7,
5019:14, 5020:10,
5021:10, 5021:12
nice [1] - 4878:22
nickname [4] -
4894:24, 4931:21,
4931:22, 4948:8
night [4] - 4889:6,
4899:10, 4920:5,
4920:7
none [2] - 4925:18,
4993:25
nonexistent [1] -
4899:16
nonprofessional [1] -
5006:11
noon [1] - 4898:6
normally [7] - 4974:7,
4984:14, 4984:24,
4994:14, 4994:15,
5006:13, 5013:10
north [3] - 4952:18,
4953:8, 4976:21
North [4] - 4888:8,
4888:18, 4920:11,
4932:15
northeast [3] - 4953:3,
4953:4, 5008:18
northwest [1] -
4951:25
NOTE [1] - 4878:2
notes [1] - 4925:3
nothing [3] - 4919:3,
4991:10, 5008:24
notice [2] - 5020:14,
5020:15
notification [2] -
4934:22, 4988:23
notifications [1] -
5004:6
notified [1] - 5015:23
November [3] -
4934:8, 4934:9,
4934:18
November-
December [1] -
4934:18

**NPS** [1] - 4973:25
**Number** [1] - 4968:9
**number** [19] - 4883:1,
4883:5, 4883:7,
4908:5, 4908:8,
4937:6, 4947:7,
4968:12, 4968:13,
4972:6, 4972:8,
4972:9, 4972:11,
4981:21, 4987:25,
4988:9, 4989:13,
5004:23
**numbered** [2] -
4976:23, 4976:25
**numbers** [3] -
4961:23, 4968:11,
4977:1

## O

**o'clock** [4] - 4896:1,
4920:8, 4946:9,
4970:23
**oath** [1] - 4901:24
**Oath** [86] - 4879:17,
4881:8, 4885:1,
4885:7, 4885:24,
4887:3, 4887:22,
4888:8, 4891:12,
4891:25, 4892:22,
4894:23, 4895:19,
4896:3, 4898:17,
4903:15, 4904:2,
4904:6, 4904:15,
4905:4, 4906:25,
4907:6, 4907:16,
4908:15, 4908:23,
4908:24, 4909:16,
4910:2, 4912:1,
4912:10, 4916:3,
4917:1, 4917:9,
4917:14, 4917:16,
4918:13, 4918:16,
4920:23, 4921:14,
4921:17, 4921:21,
4921:22, 4925:25,
4927:7, 4929:9,
4929:14, 4929:17,
4930:10, 4930:11,
4931:7, 4931:15,
4932:24, 4934:4,
4934:20, 4934:23,
4935:4, 4936:4,
4938:20, 4940:17,
4940:19, 4941:7,
4944:22, 4945:6,
4953:25, 4954:3,
4955:3, 4956:9,
4963:24, 4964:3,
4964:7, 4985:9,
4985:10, 4986:7,
4987:7, 4987:11,
4987:13, 4988:10,
4991:25, 4992:5,
5002:21, 5005:23,
5006:4, 5006:21,
5006:24, 5007:4,
5009:1
**object** [1] - 4882:4
**objection** [35] -
4880:4, 4881:15,
4882:7, 4902:3,
4903:2, 4912:24,
4913:6, 4913:10,
4916:5, 4916:6,
4917:10, 4926:14,
4928:22, 4936:11,
4937:16, 4942:22,
4948:25, 4954:7,
4954:13, 4954:20,
4965:12, 4969:24,
4975:11, 4975:16,
4982:9, 4985:19,
4988:1, 4992:10,
4992:20, 5003:7,
5005:6, 5007:17,
5008:3, 5010:9,
5012:19
**objections** [1] -
4987:20
**observation** [3] -
4898:22, 4900:16,
4900:18
**observe** [4] - 4917:2,
4917:13, 5002:4,
5008:24
**observer** [1] - 4988:17
**obstruct** [1] - 4955:21
**obtain** [1] - 4976:22
**obviously** [9] -
4921:7, 4960:21,
4960:24, 4964:18,
4968:23, 4973:6,
4977:3, 5011:9,
5021:2
**occasion** [1] -
4929:23
**occurring** [1] - 4917:9
**off-limits** [1] - 4976:19
**office** [1] - 4959:13
**officer** [9] - 4891:5,
4891:15, 4893:11,
4906:18, 4906:19,
4910:20, 4911:17,
4951:13, 4960:14
**officers** [3] - 4961:18,
4979:13, 5004:14
**offices** [2] - 4959:11,
4960:4
**often** [2] - 4978:18,
4980:25

**OK** [9] - 4882:19,
4897:5, 4897:20,
4899:8, 4936:25,
4937:9, 4937:15,
4991:6, 4991:7
**once** [5] - 4908:10,
4914:7, 4959:21,
4960:9, 4964:19
**one** [56] - 4886:2,
4886:21, 4890:2,
4891:4, 4891:13,
4892:22, 4893:8,
4894:22, 4895:18,
4896:15, 4896:21,
4897:19, 4898:18,
4898:21, 4902:15,
4904:3, 4905:2,
4918:12, 4920:12,
4920:15, 4920:17,
4920:23, 4928:15,
4929:7, 4930:9,
4930:10, 4943:12,
4944:13, 4954:20,
4957:18, 4958:6,
4963:9, 4963:13,
4966:14, 4967:8,
4969:3, 4973:6,
4979:13, 4980:20,
4982:5, 4982:6,
4983:25, 4984:3,
4985:17, 4992:1,
4993:21, 4994:19,
4994:22, 4995:24,
5002:8, 5002:13,
5004:4, 5005:14,
5012:5, 5012:15
**One** [6] - 4965:25,
4966:2, 4966:3,
4966:6, 4966:8,
4970:7
**ones** [4] - 4882:25,
4937:10, 4973:6,
4983:24
**online** [1] - 4933:2
**onwards** [1] - 5012:4
**OP** [4] - 4882:19,
4897:5, 4936:25,
5003:18
**open** [10] - 4917:5,
4917:23, 4918:1,
4934:19, 4959:23,
4980:13, 5009:24,
5015:4, 5018:6
**operation** [2] -
4929:21, 4932:22
**opinion** [1] - 4901:20
**opportunity** [11] -
4912:20, 4912:21,
4941:21, 4942:1,
4944:9, 4954:6,

4954:11, 4954:24,
4954:25, 4955:1,
4990:3
**option** [1] - 4994:15
**order** [4] - 4996:9,
5019:20, 5020:7,
5021:13
**ordinary** [1] - 5015:18
**organization** [12] -
4901:23, 4902:1,
4931:11, 4949:25,
4963:24, 4964:2,
4965:21, 4965:23,
4966:2, 4970:6,
4992:22, 5006:9
**organizations** [3] -
4958:20, 4962:20,
5002:15
**organized** [3] -
4897:23, 4898:1,
4901:22
**organizers** [2] -
4897:21, 4901:2
**organizing** [1] -
5013:14
**original** [2] - 4977:12,
4977:13
**originally** [7] - 4885:1,
4958:17, 4963:18,
4966:3, 4966:9,
4966:10, 4977:15
**OSHA** [1] - 4973:16
**OSHA-agreed-upon**
[1] - 4973:16
**others'** [1] - 4892:8
**otherwise** [4] -
4917:13, 4922:25,
4928:14, 4986:10
**out-of-town** [1] -
5015:9
**outreach** [1] - 4964:13
**outside** [1] - 4878:4,
4884:12, 4906:23,
4907:17, 4907:19,
4919:17, 4924:12,
4946:12, 4968:1,
5005:8, 5016:4
**overrule** [1] - 4954:19
**overruled** [3] -
4937:17, 5003:8,
5012:20
**overseas** [3] - 4926:8,
4926:9, 4926:21
**overview** [1] - 4933:5
**own** [3] - 4928:3,
4928:18, 4996:10
**owned** [1] - 4966:6

## P

**P-r-o-p-e-s** [1] -
4922:5
**p.m** [10] - 4901:5,
4901:12, 4970:23,
4983:12, 5000:5,
5000:7, 5003:20,
5004:22, 5005:19,
5021:21
**PA** [2] - 4971:9,
4974:17
**pack** [2] - 4978:24,
5013:23
**pack-up** [1] - 4978:24
**PAGE** [1] - 4877:2
**page** [12] - 4936:14,
4968:21, 4998:16,
4999:15, 4999:16,
4999:20, 5000:14,
5000:25, 5004:9,
5004:17, 5005:3,
5010:3
**paid** [7] - 4893:3,
4893:15, 4894:5,
4902:15, 4920:23,
4964:16, 4984:9
**Palian** [4] - 5018:24,
5019:2, 5019:4,
5019:6
**panel** [2] - 4878:20,
4946:19
**pants** [2] - 4899:7,
4938:10
**paper** [1] - 5019:25
**parameters** [1] -
4960:1
**Park** [3] - 4958:11,
4959:8, 4973:25
**park** [2] - 4967:5
**Parker** [4] - 4925:18,
5020:9, 5020:12,
5020:21
**parker's** [1] - 4919:9
**Parker's** [1] - 5020:9
**parking** [1] - 4921:4
**parks** [5] - 4958:3,
4959:14, 4960:19,
4961:20, 4962:1
**part** [10] - 4894:17,
4918:12, 4920:12,
4926:7, 4937:2,
4980:20, 4988:15,
4992:9, 5001:22,
5002:2
**parted** [1] - 4953:19
**Participants** [1] -
4968:9
**participants** [3] -
4972:6, 4972:8,

4972:11
**particular** [4] - 4984:3, 4986:7, 4995:1, 5019:1
**particularly** [10] - 4934:25, 4935:6, 4935:7, 4935:9, 4935:23, 4959:5, 4960:9, 4961:19, 4961:25, 4982:25
**particulars** [1] - 4882:17
**parties** [1] - 5019:21
**pass** [6] - 4903:6, 4903:7, 4903:9, 4903:10, 4903:11, 4906:20
**passed** [1] - 4911:16
**passes** [1] - 4902:24
**passing** [1] - 4903:24
**past** [6] - 4893:13, 4914:7, 4916:4, 4916:17, 4923:9, 4938:5
**paths** [1] - 4976:16
**Patriots** [1] - 5003:23
**pause** [2] - 4917:14, 4918:5
**paved** [1] - 4976:17
**pay** [3] - 4918:8, 4934:17, 4985:10
**paying** [1] - 4925:7
**Pennsylvania** [11] - 4908:19, 4909:3, 4910:6, 4914:4, 4914:5, 4950:23, 4950:25, 4951:1, 4951:2, 4951:3, 4953:12
**Pensacola** [3] - 4885:22, 4919:16, 4920:11
**people** [68] - 4888:1, 4888:14, 4888:16, 4888:17, 4894:6, 4894:10, 4896:5, 4896:6, 4897:21, 4898:21, 4903:16, 4906:7, 4906:16, 4907:25, 4908:8, 4908:13, 4910:23, 4911:9, 4912:9, 4912:14, 4939:13, 4940:3, 4940:6, 4940:25, 4943:12, 4944:11, 4945:9, 4945:23, 4952:21, 4957:11, 4958:6, 4959:12, 4963:1, 4968:19, 4978:6,

4978:7, 4981:25, 4982:24, 4984:25, 4987:11, 4991:3, 4993:23, 4995:1, 4995:2, 4995:22, 4995:25, 4996:10, 4997:15, 4997:17, 5000:11, 5000:19, 5001:14, 5001:20, 5004:24, 5005:20, 5005:24, 5006:25, 5007:2, 5007:4, 5007:9, 5008:23, 5008:24, 5011:10, 5011:14, 5011:15, 5012:5, 5012:16, 5013:4
**percent** [2] - 4942:19, 5020:1
**perfect** [1] - 5017:14
**perimeter** [3] - 4907:19, 4908:9, 4908:11
**period** [5] - 4932:12, 4934:19, 4971:3, 4971:4, 4990:4
**permission** [1] - 4964:22
**permit** [16] - 4891:14, 4959:17, 4964:24, 4965:8, 4965:23, 4967:6, 4967:16, 4968:7, 4969:14, 4969:21, 4976:22, 4977:10, 4977:13, 4980:3, 5000:3, 5001:14
**permits** [5] - 4890:22, 4891:10, 4959:5, 4959:12
**permitted** [2] - 4904:6, 4906:17
**permitting** [4] - 4957:12, 4958:13, 4959:10, 4965:25
**person** [33] - 4886:2, 4888:1, 4893:20, 4893:24, 4894:1, 4894:6, 4898:11, 4898:13, 4900:20, 4903:23, 4909:6, 4912:14, 4922:24, 4939:17, 4941:2, 4942:14, 4942:17, 4943:10, 4944:14, 4962:13, 4963:3, 4966:21, 4966:22, 4987:9, 4994:24, 4995:4, 5005:18, 5008:22, 5012:6,

5013:8, 5013:9
**person's** [2] - 4941:3, 5002:24
**personal** [6] - 4881:8, 4930:6, 4930:12, 4954:1, 4961:23, 4992:18
**personally** [3] - 4903:7, 5007:13, 5009:5
**personnel** [3] - 4964:5, 4992:14, 5006:8
**persons** [1] - 4905:3
**perspective** [1] - 5006:5
**phone** [15] - 4908:8, 4916:12, 4961:21, 4961:23, 4975:25, 4978:10, 4978:14, 4980:6, 4988:25, 4998:12, 5004:19, 5004:20, 5004:22, 5005:5, 5014:11
**photo** [1] - 4907:1
**photograph** [3] - 4903:19, 4942:12, 4943:1
**physical** [2] - 4959:6, 4979:12
**physically** [1] - 4987:11
**pick** [2] - 4914:7, 4981:6
**picked** [6] - 4878:14, 4914:9, 4914:11, 4914:22, 4914:25, 5011:16
**picking** [2] - 4981:3, 4994:18
**pickup** [1] - 4888:5
**picture** [2] - 4903:4, 4903:5
**pictured** [1] - 4907:1
**piece** [1] - 5005:10
**pieces** [1] - 4918:8
**pistol** [4] - 4890:2, 4890:3, 4920:18, 4920:19
**pistols** [2] - 4889:25, 4890:1
**place** [5] - 4930:14, 4957:13, 4960:5, 4978:17, 5011:11
**placed** [1] - 4889:20
**places** [1] - 4934:5
**plan** [14] - 4878:14, 4879:16, 4885:4, 4894:3, 4900:8, 4907:4, 4918:19,

4918:22, 4918:25, 4946:9, 4959:4, 4984:8, 4988:21, 5013:6
**planned** [8] - 4958:8, 4959:19, 4962:2, 4989:2, 4989:11, 4989:20, 4994:1, 5013:7
**planner** [12] - 4957:8, 4957:9, 4961:15, 4962:7, 4963:6, 4978:19, 4979:6, 4979:21, 4980:24, 4983:15, 5002:13, 5011:23
**planners** [5] - 4963:12, 4967:24, 4967:25, 4972:19, 4976:13
**planning** [11] - 4957:18, 4957:23, 4958:19, 4970:17, 4970:19, 4974:3, 4976:6, 4980:20, 4981:11, 4981:19, 5013:19
**plans** [2] - 4894:4, 4964:16
**plate** [9] - 4896:10, 4896:12, 4897:9, 4897:13, 4899:8, 4907:6, 4907:18, 4908:16, 4938:21
**platform** [1] - 5008:25
**playing** [1] - 4900:8
**plaza** [1] - 4910:7
**Plaza** [2] - 4920:3, 4949:25
**Plot** [1] - 4967:7
**plots** [3] - 4967:8, 4979:9, 4979:12
**plug** [2] - 4969:9, 4969:11
**pockets** [1] - 4938:10
**podium** [3] - 4972:23, 4974:12, 5013:10
**point** [23] - 4885:5, 4886:8, 4892:18, 4895:7, 4895:18, 4909:6, 4909:9, 4909:19, 4912:4, 4914:6, 4914:8, 4916:1, 4928:15, 4930:10, 4932:21, 4935:16, 4935:25, 4936:9, 4941:22, 4942:20, 4961:7, 4961:12, 4980:15
**points** [1] - 4980:11

**Police** [27] - 4910:19, 4911:16, 4912:16, 4913:16, 4951:12, 4958:9, 4959:8, 4960:20, 4960:21, 4961:2, 4961:20, 4964:17, 4964:23, 4966:23, 4967:6, 4967:10, 4967:17, 4969:16, 4970:12, 4970:16, 4970:25, 4972:4, 4972:10, 4973:22, 4976:12, 4977:15, 4979:17
**police** [13] - 4891:5, 4906:18, 4906:19, 4914:8, 4941:23, 4955:4, 4959:15, 4960:3, 4960:18, 4961:18, 5002:19, 5011:12
**policy** [1] - 4984:13
**political** [4] - 4885:11, 4885:12, 4918:13, 4962:15
**Pool** [1] - 4952:13
**portable** [1] - 4972:25
**portion** [6] - 4878:2, 4998:17, 4999:10, 5000:15, 5000:16, 5001:5
**position** [2] - 4908:7, 4935:3
**possibility** [1] - 4978:6
**possible** [6] - 4898:6, 4982:24, 4997:2, 5000:3, 5012:1, 5019:20
**possibly** [2] - 4886:16, 4916:20
**post** [1] - 4933:10
**posted** [3] - 4901:2, 4917:23, 4917:24
**posting** [1] - 4979:19
**power** [6] - 4968:21, 4968:24, 4969:1, 4969:3, 4974:17, 4974:19
**powered** [2] - 4974:13, 4974:16
**prebooked** [1] - 4961:13
**preferred** [1] - 4958:3
**premises** [1] - 4978:4
**preparations** [1] - 4959:5
**prepare** [1] - 5018:23
**prepared** [3] - 4878:3, 5016:10, 5019:9

**prerogative** [2] - 4972:13, 4972:14
**presence** [5] - 4878:4, 4878:19, 4946:12, 4946:18, 5016:4
**present** [2] - 4920:3, 5019:3
**presentation** [1] - 5020:21
**presented** [1] - 4976:12
**presenting** [1] - 5016:7
**President** [15] - 4880:18, 4896:3, 4896:6, 4902:20, 4905:6, 4905:8, 4905:16, 4905:18, 4906:3, 4907:14, 4918:2, 4949:6, 4989:8, 4989:12, 5010:15
**President's** [1] - 4905:23
**presidential** [1] - 4934:10
**presumably** [1] - 5012:12
**presume** [2] - 5015:16, 5015:18
**pretty** [10] - 4901:18, 4905:12, 4923:17, 4930:23, 4941:17, 4951:4, 4981:10, 4995:18, 4996:5, 5020:4
**previously** [3] - 4886:20, 4916:18, 4954:10
**prima** [2] - 5006:24, 5007:3
**primarily** [1] - 4900:6
**primary** [1] - 4894:5
**principles** [1] - 4959:3
**private** [5] - 4983:16, 4983:18, 4983:20, 4984:23, 4984:24
**pro** [1] - 4885:13
**pro-Trump** [1] - 4885:13
**problem** [1] - 4878:7
**problems** [2] - 4909:17, 4909:18
**procedure** [1] - 4958:14
**proceed** [1] - 5020:12
**Proceedings** [10] - 4878:4, 4878:19, 4917:5, 4946:12, 4946:18, 4980:13,

5015:4, 5016:4, 5021:21, 5021:23
**process** [3] - 4958:16, 4959:17, 4960:23
**produced** [2] - 4997:21, 5021:24
**professional** [4] - 4893:15, 5006:14, 5006:16, 5006:17
**professionally** [1] - 4921:15
**programming** [1] - 4899:10
**pronunciation** [1] - 4922:2
**property** [1] - 4888:8
**Propes** [1] - 4922:3
**proposed** [2] - 5018:10
**props** [1] - 4972:15
**prosecutor** [2] - 4923:10, 4923:12
**protect** [1] - 4912:15
**protected** [2] - 4907:9, 4932:12
**protectee** [1] - 4894:18
**protectees** [1] - 4940:9
**protecting** [11] - 4893:20, 4893:24, 4894:7, 4899:25, 4900:20, 4932:8, 4939:10, 4939:13, 4939:17, 4941:3, 4944:12
**protection** [8] - 4891:4, 4916:9, 4920:20, 4984:25, 4985:2, 4985:3, 4992:6, 5013:11
**protective** [4] - 4938:12, 4938:20, 4940:17, 4943:21
**protest** [2] - 4933:23, 4933:25
**provide** [26] - 4881:8, 4892:23, 4892:25, 4905:25, 4921:21, 4929:13, 4950:12, 4967:10, 4968:10, 4969:3, 4969:7, 4971:2, 4973:4, 4974:17, 4975:8, 4975:20, 4975:21, 4984:25, 4985:5, 4985:10, 4987:7, 4992:6, 4996:15, 4997:20, 5006:15, 5019:20

**provided** [11] - 4893:13, 4902:12, 4921:13, 4921:16, 4926:8, 4968:11, 4975:12, 4975:14, 4976:12, 4986:3, 5018:9
**providing** [18] - 4884:4, 4885:1, 4885:8, 4899:25, 4901:10, 4901:16, 4902:7, 4929:20, 4954:1, 4964:5, 4964:7, 4972:21, 4984:10, 4986:9, 4992:15, 4994:15, 4996:11, 5006:5
**provisional** [1] - 4979:15
**Ps** [1] - 4931:25
**PSD** [5] - 4884:10, 4985:15, 4990:25, 4992:2, 5013:11
**PSDs** [1] - 4994:24
**pub** [1] - 4882:11
**public** [6] - 4960:10, 4968:19, 4968:23, 4969:3, 5001:13, 5013:21
**publish** [14] - 4880:7, 4881:19, 4882:14, 4902:25, 4936:19, 4942:24, 4943:1, 4949:4, 4965:16, 4970:3, 4976:3, 4982:10, 4987:15, 5010:10
**published** [1] - 4934:19
**pull** [3] - 4961:22, 4969:11, 5002:5
**pulled** [1] - 4912:12
**purports** [1] - 4884:14
**purpose** [3] - 4909:3, 4909:5, 4929:18
**push** [2] - 4988:23, 5004:6
**putting** [1] - 5015:5

## Q

**QRF** [6] - 4891:17, 4891:19, 4891:20, 4891:25, 4892:5, 4898:8
**qualifications** [1] - 4933:6
**questions** [16] - 4880:10, 4887:15, 4919:5, 4919:8,

4919:24, 4923:10, 4925:15, 4931:1, 4946:1, 4947:7, 4955:5, 4990:8, 5009:6, 5009:13, 5019:10, 5019:11
**quick** [3] - 4891:20, 4891:21, 4998:2
**quickly** [1] - 4978:16
**quite** [1] - 4943:18
**quote** [4] - 4916:8, 4916:10, 4939:16, 4998:23

## R

**racks** [1] - 4943:25
**radio** [3] - 4899:9, 4978:5, 4978:22
**radios** [9] - 4978:1, 4978:2, 4978:13, 4978:18, 4978:20, 4978:21, 4978:22, 4978:25, 4979:1
**raise** [1] - 4956:8
**raises** [1] - 4981:24
**RAKOCZY** [35] - 4880:4, 4882:7, 4902:3, 4903:2, 4912:24, 4913:6, 4913:10, 4916:5, 4916:16, 4917:10, 4926:14, 4928:22, 4931:4, 4936:7, 4936:13, 4936:19, 4936:20, 4937:19, 4937:21, 4937:23, 4942:7, 4942:10, 4942:20, 4943:1, 4943:2, 4944:6, 4944:7, 4945:25, 4948:25, 4951:21, 4954:7, 4954:13, 4954:16, 5018:22, 5020:7
**Rakoczy** [5] - 4947:6, 4948:10, 4951:23, 4953:18, 4955:12
**Rakoczy**................ [1] - 4877:6
**rallies** [1] - 4989:6
**rally** [2] - 4898:5, 4992:19
**ran** [3] - 4974:14, 4993:25, 5004:23
**range** [1] - 4958:5
**Rangers** [1] - 4960:18
**re** [1] - 4925:7
**re-ask** [1] - 4925:7
**reached** [2] - 4964:10,

4997:25
**reaction** [2] - 4891:20, 4891:21
**read** [22] - 4883:9, 4884:7, 4897:7, 4897:19, 4898:4, 4898:18, 4899:3, 4899:5, 4899:23, 4900:5, 4900:25, 4917:13, 4918:7, 4928:21, 4934:15, 4934:25, 4937:6, 4947:7, 4947:8, 4983:4, 4988:7, 5019:21
**reading** [9] - 4900:10, 4917:16, 4918:8, 4918:12, 4936:21, 4937:10, 4977:1, 5018:7, 5018:15
**ready** [5] - 4878:23, 4956:12, 5016:14, 5016:16, 5020:13
**real** [3] - 4931:18, 4931:20, 5006:8
**reality** [1] - 4994:3
**really** [9] - 4878:18, 4904:24, 4905:24, 4915:10, 4918:6, 4918:11, 4918:12, 4923:17, 4959:9
**reason** [3] - 4932:3, 4941:14, 4981:15
**reasonable** [1] - 4971:2
**reasons** [1] - 4918:13
**receive** [3] - 4956:23, 4956:25, 4969:14
**received** [6] - 4883:2, 4903:6, 4903:7, 4903:11, 4985:16, 4986:14
**recess** [1] - 5005:21
**Recess** [1] - 4946:17
**recipro** [1] - 4890:18
**reciprocal** [1] - 4890:19
**recognize** [19] - 4882:2, 4882:16, 4882:18, 4903:4, 4903:19, 4903:21, 4904:13, 4942:11, 4942:14, 4943:4, 4943:6, 4948:16, 4965:5, 4969:20, 4974:24, 4982:4, 4982:23, 4985:14, 5010:2
**recollection** [6] - 4883:13, 4898:24,

4923:13, 4927:2, 5010:6, 5010:7
**recommendation** [1] - 4970:18
**recommendations** [1] - 4963:1
**record** [11] - 4878:11, 4896:23, 4903:18, 4916:14, 4951:21, 4956:19, 4975:20, 4976:20, 4980:7, 5014:12, 5019:21
**recorded** [1] - 5021:23
**red** [5] - 4976:15, 4976:16, 4976:18, 5010:14
**redactions** [2] - 5018:10
**Redirect** [3] - 4877:6, 4877:7, 4877:10
**REDIRECT** [3] - 4947:1, 4955:9, 5009:9
**redirect** [7] - 4946:2, 4946:7, 4946:25, 4954:17, 4954:18, 4955:7, 5009:7
**refer** [1] - 4906:24
**reference** [2] - 4997:4, 5002:18
**referred** [2] - 4903:17, 4921:25
**referring** [7] - 4903:14, 4911:25, 4963:9, 4976:10, 4979:4, 4979:5, 5001:13
**Reflecting** [1] - 4952:13
**refresh** [4] - 4883:13, 4898:24, 4922:25, 4971:24
**regard** [2] - 4926:20, 4991:3
**regarding** [4] - 4975:4, 4978:1, 5005:6, 5011:11
**regardless** [1] - 5017:24
**regards** [1] - 4926:21
**regrouped** [1] - 4911:24
**regular** [1] - 4984:4
**regularly** [3] - 4958:22, 4994:24, 5002:16
**reimbursed** [2] - 4920:24, 4921:3
**relates** [1] - 4974:1
**relating** [1] - 4969:21

**relationship** [2] - 4932:9, 4961:24
**relevant** [1] - 4959:7
**religious** [2] - 4962:23, 4998:24
**remember** [86] - 4879:16, 4881:1, 4881:23, 4882:21, 4882:25, 4883:25, 4886:2, 4887:1, 4888:9, 4889:17, 4891:15, 4892:7, 4892:16, 4894:23, 4900:19, 4902:16, 4903:8, 4903:10, 4908:6, 4909:1, 4909:23, 4909:25, 4910:5, 4910:11, 4910:16, 4910:17, 4911:20, 4911:23, 4912:20, 4912:21, 4915:6, 4915:10, 4915:16, 4917:15, 4917:22, 4917:24, 4918:1, 4918:3, 4918:8, 4920:2, 4922:18, 4923:2, 4923:5, 4923:15, 4923:19, 4923:21, 4924:7, 4924:11, 4924:16, 4924:17, 4924:19, 4926:23, 4932:1, 4932:4, 4933:19, 4933:24, 4934:9, 4934:24, 4937:3, 4937:5, 4937:10, 4937:14, 4937:18, 4938:11, 4939:23, 4941:5, 4941:8, 4944:4, 4945:17, 4945:20, 4947:12, 4947:17, 4948:6, 4949:24, 4951:20, 4952:21, 4953:11, 4953:23, 4955:13, 4955:16, 4966:11, 4993:14, 4993:15, 5004:2
**remote** [1] - 4969:10
**remove** [2] - 4894:14, 4894:18
**rendezvous** [2] - 4886:17, 4887:6
**rental** [2] - 4921:6, 4921:8
**repeat** [2] - 4901:15, 4926:17
**rephrase** [2] - 4913:7, 4929:2
**replying** [1] - 4979:14

**reported** [1] - 4878:3
**reporter** [3] - 4886:12, 4922:5, 5019:18
**REPORTER** [2] - 4916:15, 4919:18
**REPORTER'S** [1] - 4878:2
**represent** [2] - 4925:22, 4991:16
**represents** [1] - 4884:1
**request** [1] - 5009:15
**require** [1] - 4958:15
**required** [2] - 4960:2, 4968:22
**requirements** [1] - 4964:21
**reserved** [3] - 4997:2, 4997:4, 4997:5
**resolved** [1] - 5018:7
**Resource** [4] - 4959:18, 4962:11, 4962:13, 4972:24
**response** [2] - 4912:18, 4955:18
**responsibilities** [1] - 4895:21
**responsibility** [1] - 4909:7
**responsible** [1] - 4927:23
**rest** [4] - 4909:16, 4909:19, 4944:17, 5012:4
**restrictions** [2] - 4973:2, 4973:5
**result** [1] - 4964:13
**resume** [1] - 4946:9
**return** [1] - 4896:22
**returned** [1] - 4895:7
**rhetorical** [1] - 4917:8
**Rhodes** [8] - 4917:23, 4931:14, 4932:10, 4934:18, 4935:6, 4988:16, 5007:10, 5008:8
**Rhodes's** [2] - 4918:1, 4932:5
**ride** [1] - 4887:16
**riding** [1] - 4888:3
**rifle** [1] - 5018:16
**right-hand** [1] - 4977:22
**riot** [7] - 4912:16, 4933:18, 4933:22, 4934:1, 4934:2, 4941:23, 4990:6
**riots** [2] - 4934:6, 4990:7
**roadside** [1] - 4971:10

**rode** [3] - 4908:25, 4945:8, 4945:18
**roger** [1] - 4982:17
**Roger** [4] - 4885:2, 4886:21, 4935:12, 4982:16
**role** [5] - 4927:18, 4928:19, 4929:6, 4964:3, 4980:24
**romantic** [1] - 4932:9
**room** [4] - 4889:8, 4889:21, 4892:7, 4923:10
**rope** [1] - 4926:16
**ROSSI** [14] - 4991:12, 4991:19, 4991:23, 4992:11, 4992:12, 4992:21, 4993:8, 4993:9, 4995:5, 5016:22, 5017:6, 5017:8, 5021:2, 5021:15
**Rossi** [2] - 4991:16, 5016:21
**Rossi.................** [1] - 4877:9
**rotate** [1] - 4884:17
**roughly** [6] - 4888:10, 4905:6, 4905:8, 4951:14, 4960:16, 4962:2
**rows** [1] - 4904:21
**RP** [1] - 4900:7
**run** [5] - 4893:21, 4900:23, 4958:19, 4967:12, 4974:17
**running** [2] - 4930:23, 4969:1
**RV** [1] - 4898:7

### S

**safe** [4] - 4925:11, 4944:15, 4956:1, 5014:7
**safety** [1] - 4985:4
**Sandra** [4] - 4925:18, 5020:9, 5020:11, 5020:20
**Santoro** [1] - 5021:3
**sat** [1] - 4904:20
**satellite** [1] - 4969:6
**save** [1] - 4891:23
**saved** [1] - 4998:12
**saw** [12] - 4910:10, 4928:18, 4928:20, 4928:24, 4929:5, 4933:2, 4953:1, 4979:16, 4985:11, 4987:11, 5007:13,

5007:15
**scaffolding** [1] - 5003:24
**scale** [3] - 4958:22, 4962:6, 4993:24
**scanning** [1] - 4900:7
**scared** [1] - 5004:23
**scarf** [1] - 4886:16
**scene** [1] - 4911:7
**scenes** [1] - 4957:11
**schedule** [8] - 4901:2, 4998:20, 5011:22, 5015:7, 5016:23, 5017:2, 5017:7, 5019:14
**scheduled** [1] - 4897:25
**schedules** [1] - 5011:19
**scoot** [1] - 4961:22
**scope** [4] - 4954:17, 4954:18, 5005:6, 5005:9
**scratch** [1] - 4973:13
**screen** [6] - 4882:5, 4904:22, 4942:8, 4975:8, 4975:21, 4990:23
**screening** [2] - 4903:17, 4903:19
**screenshot** [1] - 5005:2
**screenshots** [1] - 4976:2
**screw** [1] - 4973:15
**screwed** [1] - 4973:15
**scroll** [6] - 4975:1, 4977:18, 4999:20, 4999:21, 5000:15, 5010:4
**seat** [3] - 4878:21, 4946:21, 5016:5
**seating** [6] - 4903:13, 4997:3, 4997:4, 4997:5, 5001:16
**SEC** [1] - 4899:10
**sec** [1] - 4990:16
**second** [3] - 4946:23, 4986:5, 4986:25
**Secret** [10] - 4884:12, 4899:11, 4900:1, 4900:3, 4906:18, 4907:12, 4939:1, 4940:14, 4940:16, 4981:23
**section** [3] - 4953:3, 4973:18, 4990:19
**Section** [1] - 4970:20
**secured** [8] - 4902:19, 4902:24, 4904:6,

4907:19, 4908:9,
4908:11, 4964:19,
4967:25
**security** [89] - 4881:9,
4884:4, 4885:1,
4885:8, 4892:23,
4892:24, 4892:25,
4893:3, 4893:5,
4893:10, 4893:13,
4893:15, 4894:5,
4894:18, 4895:14,
4895:23, 4896:6,
4898:20, 4900:13,
4901:10, 4901:16,
4902:7, 4902:15,
4903:17, 4903:24,
4905:2, 4905:25,
4906:6, 4906:15,
4908:2, 4910:18,
4913:19, 4921:13,
4921:17, 4921:21,
4926:8, 4927:21,
4929:13, 4929:18,
4929:21, 4930:6,
4930:12, 4932:13,
4933:6, 4933:10,
4935:15, 4937:25,
4938:3, 4938:16,
4938:17, 4939:12,
4939:16, 4949:24,
4950:4, 4950:12,
4954:1, 4954:2,
4964:3, 4964:5,
4964:8, 4983:16,
4983:18, 4983:20,
4984:9, 4984:12,
4984:13, 4984:16,
4984:23, 4984:24,
4985:5, 4985:10,
4987:7, 4988:15,
4992:6, 4992:9,
4992:15, 4994:12,
4994:22, 4994:25,
5006:5, 5006:8,
5006:10, 5006:16,
5006:17, 5007:1
**Security** [2] - 4959:14,
4960:18
**security-minded** [1] -
5007:1
**see** [46] - 4880:15,
4880:21, 4883:21,
4886:4, 4886:6,
4897:3, 4904:23,
4904:24, 4905:6,
4911:13, 4916:1,
4928:12, 4928:20,
4936:25, 4939:21,
4939:25, 4943:24,
4946:9, 4946:16,
4949:10, 4952:25,

4959:12, 4965:21,
4966:19, 4966:24,
4970:14, 4972:6,
4973:19, 4976:9,
4983:1, 4990:23,
4992:25, 4993:16,
4998:16, 4999:13,
4999:18, 5000:2,
5000:3, 5001:2,
5002:4, 5003:25,
5004:14, 5004:22,
5005:18, 5016:24,
5021:17
**seeing** [6] - 4911:7,
4939:23, 4940:5,
4977:25, 4988:2,
5016:2
**seek** [13] - 4880:3,
4881:14, 4925:13,
4928:16, 4936:9,
4942:21, 4948:23,
4965:10, 4975:10,
4982:2, 4985:18,
4987:17, 5010:8
**select** [1] - 4972:11
**semantics** [1] -
4958:13
**Senate** [1] - 4967:5
**senator** [1] - 4994:13
**senators** [1] - 4983:6
**send** [7] - 4899:17,
4967:17, 4978:21,
4978:22, 4978:23,
4979:2, 5020:6
**sending** [1] - 4986:6
**sent** [3] - 4933:5,
4979:1, 5000:22
**separate** [1] - 4941:21
**separated** [3] -
4908:17, 4923:25,
4943:14
**separately** [2] -
4963:23, 5008:8
**series** [1] - 4977:5
**serve** [1] - 4979:21
**served** [2] - 4978:18,
4979:6
**Service** [13] - 4884:12,
4899:11, 4900:2,
4900:3, 4906:18,
4907:12, 4939:1,
4940:14, 4940:16,
4958:11, 4959:8,
4973:25, 4981:23
**service** [10] - 4899:11,
4899:13, 4923:16,
4923:19, 4923:20,
4962:19, 4981:5,
4994:16, 5011:16
**services** [4] - 4920:24,

4921:13, 4926:8,
4926:9
**serving** [1] - 4963:5
**set** [6] - 4893:4,
4898:8, 4909:22,
4958:14, 4971:17,
5008:16
**setting** [1] - 4888:21
**settled** [1] - 4898:8
**setup** [1] - 4971:15
**seven** [1] - 4888:11
**several** [6] - 4879:17,
4881:9, 4882:24,
4890:17, 4897:25,
4903:16
**shake** [1] - 4985:1
**shall** [1] - 4967:11
**Shanelle** [2] -
4922:17, 4923:14
**share** [1] - 4965:2
**shed** [2] - 4888:24,
4889:1
**Shelby** [1] - 4993:4
**shift** [1] - 4934:8
**SHIPLEY** [10] -
4878:16, 4925:20,
4926:18, 4928:23,
4929:3, 4929:4,
4931:1, 4955:8,
4955:10, 4955:24
**Shipley** [2] - 4925:21,
4955:7
**Shipley.............** [1] -
4877:7
**Shipley..............** [1] -
4877:5
**shirt** [1] - 4899:8
**shirts** [1] - 4904:13
**short** [2] - 4884:23,
5019:13
**shorter** [1] - 4996:2
**shortly** [1] - 4946:10
**show** [13] - 4882:5,
4904:11, 4912:16,
4916:10, 4941:23,
4948:13, 4952:23,
4961:21, 4969:17,
4982:1, 4985:12,
4988:25, 5005:13
**showed** [10] - 4904:7,
4907:1, 4933:8,
4977:12, 4996:21,
4999:4, 5008:22,
5009:4, 5010:20,
5012:14
**showing** [3] -
4993:18, 4993:21,
5009:11
**shown** [1] - 4990:23
**sic** [3] - 4971:11,

4983:5, 5010:6
**side** [10] - 4905:1,
4924:4, 4924:5,
4924:8, 4924:9,
4924:12, 4940:2,
4952:25, 4977:22,
5012:24
**sidewalk** [5] -
4910:21, 4911:18,
4911:19, 4911:22
**sidewalks** [1] -
4952:22
**sight** [2] - 4978:15
**sign** [2] - 4951:3,
4969:12
**Signal** [31] - 4879:22,
4881:2, 4881:7,
4881:21, 4881:23,
4882:3, 4882:18,
4883:13, 4883:17,
4892:1, 4899:18,
4917:9, 4931:16,
4934:12, 4936:5,
4947:16, 4947:18,
4948:4, 4986:18,
4986:21, 4987:13,
4988:24, 5001:25,
5002:2, 5004:5,
5004:7, 5004:19,
5007:6, 5007:7,
5008:10, 5008:11
**signed** [1] - 4969:16
**significant** [1] -
4978:8
**signifies** [1] - 4884:1
**signify** [1] - 4976:15
**signing** [1] - 4964:15
**signs** [1] - 4972:23
**silver** [1] - 4997:9
**similar** [4] - 4926:25,
4930:13, 4930:18,
4984:17
**single** [1] - 5008:22
**sit** [1] - 4904:18
**site** [3] - 4927:20,
4931:19, 5010:24
**sitting** [6] - 4904:17,
4904:19, 4905:18,
4996:3, 5015:8
**situation** [1] - 4939:21
**six** [3] - 4888:11,
4896:5
**size** [2] - 4973:17,
4974:6
**sleep** [3] - 4888:19,
4888:23, 5018:18
**sleeping** [1] - 4889:3
**slept** [3] - 4888:24,
4889:5, 4889:7
**slide** [1] - 4990:12

**Slide** [2] - 5002:6,
5003:15
**slot** [1] - 4884:1
**slow** [2] - 4899:19,
4909:19
**slower** [1] - 4923:24
**small** [3] - 4890:2,
4995:18, 5008:16
**smaller** [1] - 4928:2
**SMS** [1] - 4899:18
**solar** [1] - 4969:6
**someone** [6] -
4884:10, 4937:7,
4942:1, 4949:24,
4975:21, 5002:21
**someplace** [1] -
4909:4
**sometime** [2] -
4920:8, 4931:7
**somewhere** [10] -
4888:9, 4894:25,
4907:18, 4912:4,
4914:7, 4951:17,
4953:2, 4953:7,
4981:6, 4989:3
**son** [1] - 4887:1
**soon** [1] - 5020:4
**SoRelle** [8] - 4930:2,
4930:13, 4932:3,
4932:5, 4932:12,
4935:13, 4935:15,
4948:2
**SoRelle's** [1] -
4935:14
**sorry** [29] - 4896:23,
4901:6, 4909:12,
4916:9, 4917:20,
4919:17, 4919:20,
4919:22, 4924:10,
4924:23, 4925:8,
4925:9, 4925:10,
4928:6, 4929:1,
4935:13, 4951:21,
4960:14, 4963:22,
4966:3, 4967:24,
4969:6, 4983:25,
4986:20, 4999:24,
5002:25, 5012:15,
5017:6, 5017:11
**sound** [4] - 4972:25,
4973:7, 4974:15
**sounded** [1] - 4897:1
**sounds** [5] - 4894:9,
4897:18, 4923:2,
4934:15, 4934:25
**source** [1] - 4972:18
**south** [1] - 4976:21
**space** [3] - 4949:8,
4961:1, 4978:12
**spaces** [1] - 4977:5

**speaker** [4] - 4885:11, 4982:18, 4993:13, 5011:21
**speakers** [14] - 4881:10, 4897:22, 4963:13, 4963:14, 4980:22, 4981:13, 4989:2, 4989:6, 4989:11, 4993:11, 5009:17, 5010:19, 5013:14, 5013:16
**speaking** [21] - 4881:10, 4896:3, 4896:7, 4902:20, 4907:15, 4947:18, 4963:5, 4964:6, 4980:16, 4981:17, 4982:25, 4987:25, 4988:9, 4997:15, 4997:17, 4997:22, 5008:25, 5011:4, 5012:9, 5012:25, 5013:9
**speaks** [2] - 4957:14, 5012:22
**specially** [1] - 4901:21
**specific** [4] - 4927:8, 4950:1, 4967:1, 4972:15
**specifically** [3] - 4892:6, 4923:15, 4925:2
**specifics** [2] - 4909:20, 4927:9
**speculate** [1] - 4913:11
**speculative** [1] - 5008:4
**speech** [11] - 4884:11, 4894:25, 4895:4, 4895:6, 4905:23, 4906:9, 4907:21, 4960:22, 4968:18, 4989:12, 4996:16
**speeches** [3] - 4894:22, 4939:3, 4961:6
**speed** [2] - 4923:22, 4980:10
**spell** [1] - 4956:18
**spent** [3] - 4935:7, 4935:10, 5013:20
**Sperry** [1] - 5021:2
**split** [2] - 4961:4, 4967:4
**spokesperson** [1] - 4965:21
**sponsoring** [1] - 4970:6
**spot** [5] - 4981:14,

4998:23, 5012:2, 5012:3
**spreadsheet** [3] - 4981:1, 4999:3
**spreadsheets** [1] - 4982:5
**squads** [1] - 4912:16
**square** [7] - 4898:5, 4898:19, 4909:9, 4910:7, 4942:15, 4943:9, 4949:25
**SS** [1] - 4994:14
**staff** [3] - 4961:20, 4978:3
**stage** [36] - 4884:17, 4898:19, 4898:22, 4904:20, 4905:1, 4905:4, 4906:20, 4907:23, 4907:25, 4949:19, 4949:22, 4950:4, 4950:6, 4950:10, 4950:15, 4972:24, 4973:11, 4973:13, 4973:14, 4974:2, 4974:9, 4974:11, 4980:10, 4980:22, 4989:22, 4995:16, 4996:1, 5001:20, 5008:16, 5009:5, 5011:7, 5012:17, 5012:24, 5013:4, 5013:12, 5013:16
**stagehands** [2] - 4971:8, 4971:14
**stages** [4] - 4884:18, 4898:1, 4940:24, 4981:15
**staging** [3] - 4971:9, 4973:17, 4981:25
**stand** [5] - 4997:7, 5008:24, 5012:16, 5012:18, 5013:4
**standard** [1] - 4965:8
**standing** [3] - 4893:6, 4893:8, 4995:22
**stands** [2] - 4891:20, 4974:12
**star** [1] - 5010:16
**start** [7] - 4884:21, 4991:2, 4999:20, 5014:14, 5015:18, 5015:23, 5017:25
**started** [9] - 4896:1, 4908:11, 4908:19, 4931:20, 4933:24, 4939:6, 5015:14, 5016:20, 5018:3
**starting** [2] - 4878:7, 4946:16, 5014:23,

5015:16, 5015:22, 5021:10
**state** [1] - 4956:18
**States** [4] - 4905:19, 4939:1, 4958:18, 4958:24
**states** [3] - 4890:17, 4890:22
**statue** [1] - 4909:10
**status** [1] - 4932:7
**stay** [3] - 4893:25, 4897:8, 4939:13
**stayed** [1] - 4995:1
**staying** [3] - 4892:17, 4892:21, 4898:25
**steal** [1] - 4878:9
**stenography** [1] - 5021:23
**step** [2] - 4946:14, 5012:24
**STEPHEN** [1] - 4956:20
**Stephen** [3] - 4877:8, 4956:7, 4956:20
**steps** [3] - 4952:25, 4953:1, 5004:14
**Steve** [1] - 4988:17
**Stewart** [9] - 4917:23, 4918:1, 4931:14, 4932:5, 4934:18, 4935:6, 4988:16, 5007:10, 5008:8
**still** [3] - 4901:1, 4952:1, 5021:4
**Stone** [7] - 4884:10, 4885:2, 4886:21, 4935:12, 4982:16, 4982:17, 5008:12
**stone** [1] - 4884:22
**stop** [4] - 4887:23, 4918:23, 4919:1, 4952:20
**stopped** [3] - 4909:9, 4909:15, 4911:23
**stopping** [1] - 4910:20
**storming** [1] - 5003:23
**stragglers** [1] - 4910:10
**straight** [1] - 4915:3
**strat** [1] - 4960:4
**strategic** [1] - 4960:4
**street** [4] - 4951:4, 4951:6, 4951:7, 5011:10
**stuff** [1] - 4897:10
**subject** [3] - 4895:12, 4926:10, 5015:15
**subpoena** [2] - 4956:23, 4957:1
**suddenly** [1] - 5012:5

**sufficient** [1] - 4942:23
**suit** [1] - 4886:15
**suits** [1] - 4984:15
**super** [1] - 4934:15
**supervisor** [1] - 4930:19
**supplied** [1] - 4991:5
**supply** [2] - 4969:8, 4974:19
**support** [1] - 4898:22
**supposed** [16] - 4885:3, 4892:22, 4895:18, 4906:6, 4906:8, 4906:10, 4907:22, 4908:2, 4912:15, 4925:3, 4939:10, 4940:21, 4941:17, 4944:11, 4945:5, 5006:5
**surroundings** [1] - 4888:20
**sustain** [1] - 4916:6
**sustained** [4] - 4912:25, 4917:11, 4954:8, 5008:4
**sweet** [1] - 4884:24
**system** [5] - 4919:22, 4969:4, 4973:7, 4974:16, 4974:18
**systems** [2] - 4968:24, 4972:25

## T

**table** [1] - 4956:24
**tacticals** [1] - 4938:10
**talks** [1] - 4979:10
**Tampa** [15] - 4894:24, 4896:4, 4903:15, 4904:3, 4905:2, 4906:25, 4914:22, 4942:16, 4942:18, 4943:10, 4943:12, 4943:19, 4943:21, 4943:24
**tap** [1] - 5014:13
**tarmac** [1] - 4976:16
**Taylor** [1] - 4983:5
**team** [11] - 4898:7, 4898:20, 4902:16, 4906:7, 4906:15, 4908:2, 4971:14, 4986:9, 4986:10, 5006:11, 5017:19
**technique** [1] - 4894:8
**technology** [1] - 4969:5
**tee** [1] - 5021:17
**ten** [3] - 4889:4,

4911:3, 4971:4
**ten-hour** [1] - 4971:4
**tend** [2] - 4962:22
**tent** [1] - 4888:23
**terms** [4] - 4958:12, 5002:14, 5020:7, 5020:10
**terribly** [1] - 4952:2
**tesifi** [1] - 4923:5
**Tesla** [1] - 4969:6
**testified** [13] - 4884:3, 4893:10, 4916:17, 4916:18, 4920:22, 4921:13, 4921:16, 4924:22, 4924:24, 4927:11, 4935:7, 4979:18, 4997:14
**testify** [3] - 5020:12, 5020:13, 5020:21
**testifying** [2] - 4923:9, 5020:3
**testimony** [12] - 4879:4, 4916:23, 4946:14, 4947:4, 4953:19, 4956:1, 4980:8, 5014:7, 5014:15, 5018:7, 5020:9
**Texas** [2] - 4891:13, 4930:11
**text** [8] - 4899:18, 4975:4, 4977:25, 4998:7, 4999:24, 5015:20, 5015:21, 5015:22
**texted** [2] - 4928:15, 4947:14
**themselves** [2] - 4978:3, 4994:14
**thinking** [1] - 5016:25
**thinks** [1] - 4985:20
**third** [1] - 5004:9
**thousand** [3] - 4883:6, 4958:6
**thousands** [1] - 4940:5
**thread** [1] - 5008:11
**threat** [7] - 4900:21, 4900:22, 4939:16, 4939:24, 5002:14, 5002:15, 5002:19
**threats** [1] - 4985:2
**three** [6] - 4906:16, 4957:19, 4962:5, 4995:25, 5001:21, 5019:11
**throughout** [1] - 5013:21
**throw** [2] - 4998:19, 5009:16

**Thursday** [1] - 5015:8
**ticking** [1] - 4964:21
**timeline** [1] - 4981:2
**timing** [4] - 4959:20, 5017:17, 5018:1, 5020:3
**today** [8] - 4886:4, 4886:6, 4886:22, 4913:20, 4931:5, 4956:21, 4956:23, 4983:25
**together** [7] - 4927:10, 4930:24, 4968:19, 4973:16, 4980:25, 4981:1
**Tom** [15] - 4894:24, 4896:4, 4903:15, 4904:3, 4905:2, 4906:25, 4914:22, 4942:16, 4942:18, 4943:10, 4943:12, 4943:19, 4943:21, 4943:24
**tomorrow** [14] - 4878:8, 4878:10, 5014:14, 5015:7, 5015:11, 5015:18, 5016:11, 5016:18, 5016:25, 5018:8, 5018:21, 5020:8, 5021:7, 5021:8
**tonight** [2] - 4897:20, 5015:21
**took** [5] - 4902:9, 4902:10, 4902:17, 4902:24, 4914:16
**top** [7] - 4883:22, 4892:23, 4952:13, 4992:1, 4998:10, 4998:17, 5001:4
**touch** [2] - 4904:22, 4949:12
**toward** [3] - 4887:16, 4908:14, 4950:20
**towards** [8] - 4887:13, 4908:12, 4908:20, 4910:6, 4911:10, 4939:6, 4941:22, 4956:16
**tower** [1] - 4978:8
**towers** [1] - 4978:14
**town** [2] - 4888:9, 5015:9
**traffic** [1] - 4914:8
**training** [4] - 4893:19, 4900:13
**transaction** [1] - 4985:11
**transactions** [1] - 4957:12

**transcript** [6] - 4878:3, 4916:11, 5018:16, 5019:19, 5019:24, 5021:24
**transcription** [1] - 5021:24
**transparency** [1] - 5018:14
**transportation** [1] - 4994:16
**travel** [3] - 4879:7, 4879:11, 4889:12
**traveled** [1] - 4885:18
**traveling** [1] - 4995:4
**travels** [2] - 4956:1, 5014:7
**tremendous** [2] - 4940:1, 4940:3
**trial** [1] - 4878:2
**trip** [1] - 4925:11
**trouble** [1] - 4913:23
**truck** [7] - 4887:22, 4888:4, 4888:5, 4889:7, 4889:9, 4908:25, 4971:5
**trucks** [2] - 4971:5, 5014:3
**true** [1] - 5010:5
**Trump** [10] - 4880:11, 4880:18, 4885:13, 4905:6, 4905:8, 4918:2, 4949:6, 4989:8, 4990:1, 5010:15
**Trump's** [1] - 4989:12
**trumps** [1] - 4884:11
**trusted** [2] - 4898:17, 4941:7
**try** [5] - 4878:9, 4909:15, 4994:12, 5011:25, 5017:15
**trying** [3] - 4922:21, 4923:19, 5017:16
**Tuesday** [3] - 4884:22, 4899:10, 4900:8
**turn** [2] - 4896:23, 4961:12
**turned** [2] - 4911:18, 4914:6
**tweet** [3] - 4880:15, 4880:19, 4880:21
**Twitter** [1] - 4880:13
**two** [5] - 4889:25, 4894:22, 4896:6, 4920:12, 4920:20, 4930:7, 4931:25, 4934:19, 4957:19, 4962:5, 4974:16, 4978:23, 4978:25, 4992:25, 4995:25,

5001:21, 5007:6, 5007:8, 5007:13, 5007:15, 5019:3, 5021:8
**two-day** [1] - 4978:23
**type** [2] - 4888:21, 4890:3
**types** [1] - 4884:23
**typical** [1] - 4959:17
**typically** [1] - 4983:18

## U

**U.S** [2] - 4960:19, 4967:1
**Uber** [1] - 4981:5
**UK** [1] - 4958:22
**ultimately** [3] - 4969:14, 4979:21, 4989:19
**unacceptable** [1] - 4911:14
**unavailable** [1] - 5012:12
**Under** [6] - 4966:1, 4966:2, 4966:3, 4966:6, 4966:8, 4970:7
**under** [9] - 4901:24, 4904:24, 4904:25, 4949:8, 4962:18, 4965:25, 4968:9, 4970:20, 4972:15
**underneath** [2] - 4949:16, 4967:1
**understood** [2] - 4913:16, 4921:12
**unfold** [1] - 4911:8
**unfolding** [2] - 4901:1, 4939:22
**unfortunately** [1] - 4878:8
**UNIDENTIFIED** [1] - 5015:20
**unique** [1] - 4960:6
**United** [5] - 4905:19, 4939:1, 4958:18, 4958:20, 4958:24
**units** [1] - 5013:20
**unless** [3] - 4994:15, 5015:16, 5020:14
**unlikely** [2] - 5021:7, 5021:8
**unnecessary** [2] - 4915:22, 4915:23
**unpaid** [1] - 5006:11
**unusual** [2] - 5013:1, 5013:2
**up** [77] - 4885:23, 4885:25, 4887:22,

4892:23, 4898:8, 4901:19, 4904:7, 4906:23, 4907:3, 4907:16, 4908:19, 4908:20, 4908:25, 4909:3, 4909:5, 4909:16, 4910:1, 4910:11, 4910:21, 4911:18, 4911:22, 4912:11, 4912:16, 4914:7, 4914:9, 4914:11, 4914:22, 4914:25, 4924:3, 4924:5, 4928:2, 4932:16, 4933:8, 4936:7, 4941:14, 4941:23, 4942:7, 4943:15, 4945:9, 4946:20, 4957:2, 4959:12, 4961:4, 4961:22, 4962:9, 4963:2, 4963:19, 4967:4, 4970:14, 4971:17, 4978:24, 4980:10, 4981:3, 4981:6, 4981:11, 4985:1, 4988:24, 4991:19, 4993:10, 4994:18, 5002:5, 5003:12, 5008:16, 5008:22, 5009:4, 5011:16, 5012:3, 5012:14, 5013:2, 5013:9, 5013:23, 5015:11, 5016:7, 5021:17
**upset** [1] - 4907:23
**USAfx** [1] - 4975:13
**usage** [1] - 4978:8
**usual** [2] - 4981:10, 4981:15

## V

**vacant** [1] - 5002:25
**vaguely** [1] - 4882:21
**valid** [3] - 4890:12, 4890:13, 4890:16
**various** [4] - 4927:5, 4965:18, 4967:8, 4983:20
**veered** [1] - 4910:17
**veers** [1] - 4916:6
**vehicle** [9] - 4887:16, 4887:24, 4888:3, 4898:8, 4910:18, 4914:7, 4951:11, 4951:14, 4951:18
**vehicles** [4] - 4994:17, 4994:18, 5011:16
**vendor** [1] - 4958:3

**venue** [2] - 4896:6, 4903:12
**verbatim** [1] - 4918:3
**verify** [1] - 4998:1
**Vernon** [1] - 4983:5
**vest** [2] - 4938:12, 4943:21
**vests** [1] - 4938:20
**vetted** [1] - 4933:4
**via** [2] - 4879:22, 5008:10
**vicinity** [1] - 4893:8
**video** [2] - 5005:1, 5005:2
**videos** [1] - 5019:8
**view** [2] - 4926:24, 4954:2
**views** [1] - 4962:15
**violence** [3] - 4915:15, 4915:17, 4915:18
**VIP** [6] - 4898:20, 4903:13, 4903:24, 4906:23, 4907:17, 5001:18
**VIPs** [1] - 4884:19
**Virginia** [5] - 4889:16, 4890:11, 4890:13, 4890:16, 4892:4
**voluntarily** [1] - 4956:21
**volunteer** [1] - 5006:10
**vote** [1] - 4918:23

## W

**wait** [6] - 4895:1, 4909:15, 5012:18, 5012:24, 5017:10, 5021:19
**waited** [2] - 4902:23, 4910:5
**walk** [10] - 4895:24, 4906:6, 4906:8, 4923:22, 4951:1, 4951:8, 4959:16, 4961:10, 4965:18, 4970:4
**walked** [9] - 4910:10, 4910:14, 4910:21, 4914:3, 4914:8, 4923:24, 4943:12, 4950:23, 5011:15
**walking** [13] - 4893:7, 4908:11, 4908:19, 4909:3, 4909:18, 4911:9, 4913:23, 4921:24, 4939:8, 4939:9, 4944:18, 4951:2, 4951:4

**wall** [1] - 4969:11
**wants** [2] - 5010:15, 5019:5
**warlock** [2] - 4899:12, 4899:21
**warmer** [1] - 4889:9
**Washington** [38] - 4879:7, 4879:11, 4879:21, 4881:2, 4881:7, 4885:15, 4885:19, 4887:13, 4887:16, 4889:15, 4889:16, 4890:24, 4891:3, 4891:8, 4891:10, 4891:12, 4891:16, 4909:13, 4915:3, 4919:25, 4920:10, 4928:11, 4930:14, 4936:1, 4948:19, 4948:21, 4949:18, 4950:2, 4950:7, 4950:16, 4955:18, 4955:21, 4957:24, 4958:2, 4959:22, 4962:3, 4963:6, 4983:21
**water** [1] - 4978:17
**waved** [1] - 4886:10
**ways** [2] - 4941:21, 4953:19
**weapons** [9] - 4889:20, 4889:21, 4889:22, 4889:24, 4890:7, 4890:9, 4914:23, 4914:25, 4920:12
**wear** [6] - 4896:8, 4896:12, 4896:18, 4907:6, 4938:12, 4938:14
**wearing** [8] - 4886:10, 4886:14, 4907:13, 4909:21, 4909:24, 4943:19, 4943:21, 4996:10
**website** [5] - 4934:20, 4998:20, 4999:6, 5009:20, 5010:5
**Wednesday** [6] - 4899:8, 4900:1, 4900:7, 4900:9, 4901:3, 4970:21
**weekend** [1] - 4986:8
**weight** [1] - 4973:17
**welcome** [4] - 4878:22, 4919:14, 4946:21, 4956:11
**well-known** [1] - 4961:16
**West** [1] - 4967:4

**west** [1] - 4951:24
**whichever** [1] - 4924:12
**Whip** [1] - 4947:21
**WHIPIT** [1] - 4931:24
**Whippit** [6] - 4931:23, 4947:19, 4947:25, 4948:2, 4948:5, 4948:8
**Whisperer** [7] - 5003:1, 5003:3, 5003:10, 5003:20, 5004:2, 5004:12, 5005:18
**white** [1] - 4886:16
**White** [4] - 4949:9, 4949:10, 4949:16, 4950:19
**whole** [5] - 4906:16, 4915:22, 4918:7, 4972:25, 5013:22
**wide** [1] - 4911:20
**wife** [1] - 4945:13
**WildProtest** [1] - 5010:24
**WildProtest.com** [3] - 4999:6, 5009:16, 5009:20
**Willard** [2] - 4898:20, 4899:1
**William** [6] - 4878:3, 4925:21, 4991:17, 4993:2, 5021:3
**windows** [1] - 5009:24
**wire** [2] - 4884:11, 4884:12
**witness** [33] - 4879:24, 4880:7, 4881:13, 4881:24, 4886:9, 4913:10, 4916:17, 4925:14, 4936:8, 4942:8, 4948:14, 4949:13, 4949:15, 4951:22, 4951:24, 4952:12, 4952:17, 4952:23, 4953:2, 4965:3, 4969:17, 4974:22, 4982:1, 4982:21, 4985:12, 4987:15, 5009:22, 5014:16, 5014:17, 5015:5, 5015:13, 5020:18, 5021:3
**WITNESS** [4] - 4925:12, 4926:17, 4956:2, 4956:10
**Witness** [2] - 4956:3, 5014:9
**Witnesses** [1] -

4877:3
**witnesses** [3] - 4956:5, 5020:24, 5020:25
**woman** [3] - 4921:25, 4922:15, 4923:13
**Woodward** [21] - 4878:24, 4916:16, 4924:14, 4925:5, 4936:22, 4937:6, 4946:2, 4956:4, 4956:12, 4975:12, 4980:5, 4990:9, 4996:21, 4999:4, 5002:6, 5009:7, 5014:13, 5016:6, 5016:19, 5018:9, 5018:12
**woodward** [2] - 4916:13, 4946:24
**WOODWARD** [129] - 4878:25, 4879:2, 4879:24, 4880:7, 4880:9, 4881:5, 4881:6, 4881:11, 4881:19, 4881:20, 4881:24, 4882:1, 4882:4, 4882:8, 4882:11, 4882:14, 4882:15, 4896:22, 4897:1, 4897:2, 4902:4, 4902:5, 4902:25, 4903:3, 4913:1, 4913:8, 4913:13, 4916:8, 4916:10, 4916:22, 4917:3, 4917:6, 4917:7, 4917:12, 4919:3, 4937:16, 4942:22, 4946:3, 4946:5, 4946:25, 4947:2, 4948:13, 4948:15, 4948:23, 4949:4, 4949:5, 4951:23, 4952:4, 4952:12, 4952:14, 4953:16, 4953:17, 4954:9, 4954:14, 4954:22, 4955:5, 4956:6, 4956:13, 4956:15, 4965:2, 4965:4, 4965:10, 4965:16, 4965:20, 4969:15, 4969:17, 4969:19, 4969:23, 4970:3, 4970:5, 4974:21, 4974:23, 4975:10, 4975:13, 4975:15, 4975:19, 4976:3, 4976:5,

4980:12, 4980:14, 4982:1, 4982:3, 4982:8, 4982:14, 4982:20, 4982:22, 4983:13, 4983:14, 4985:12, 4985:13, 4985:18, 4985:20, 4985:22, 4986:1, 4987:5, 4987:6, 4987:15, 4987:18, 4987:20, 4987:24, 4988:5, 4988:7, 4988:8, 4989:17, 4989:18, 4990:8, 4990:12, 5005:5, 5005:7, 5005:13, 5007:17, 5008:3, 5009:8, 5009:10, 5009:22, 5010:1, 5010:8, 5010:10, 5010:13, 5010:25, 5011:1, 5012:21, 5014:5, 5014:15, 5014:22, 5015:1, 5018:13, 5019:6, 5019:11
**Woodward's** [1] - 5019:10
**Woodward.....** [1] - 4877:4
**Woodward............** [2] - 4877:6, 4877:10
**Woodward..............** [1] - 4877:8
**word** [9] - 4886:17, 4890:18, 4907:24, 4912:21, 4941:20, 4941:25, 4962:25, 5019:24
**words** [7] - 4912:20, 4924:19, 4933:19, 4949:16, 4953:22, 4994:16, 5006:11
**Words** [1] - 4941:25
**wore** [3] - 4896:9, 4907:9, 4938:7
**works** [2] - 4890:16, 4962:25
**world** [1] - 5017:14
**worldwide** [1] - 4959:2
**worried** [2] - 4915:11, 4945:23
**worry** [1] - 4954:21
**would've** [1] - 4971:10
**write** [1] - 4986:9
**writes** [1] - 5004:23
**writing** [1] - 4925:3
**wrote** [7] - 4918:4, 5000:5, 5000:7,

5001:2, 5001:7, 5001:10, 5005:19

## Y

**yards** [3] - 4905:10, 4905:13, 4911:23
**years** [5] - 4958:5, 4959:4, 4961:24, 4962:4, 4984:4
**yell** [1] - 4912:4
**yelled** [1] - 4912:6
**yelling** [1] - 4912:9
**yesterday** [4] - 5016:14, 5016:16, 5019:18, 5019:21
**you-all** [5] - 4924:18, 4933:25, 4936:11, 5016:3, 5018:7
**young** [2] - 4922:12, 4945:17
**yourself** [4] - 4893:23, 4934:6, 4948:4, 4975:22

## Z

**Zaremba** [1] - 4878:3
**zero** [1] - 5000:11